In re: INITIAL PUBLIC OFFERING SECURITIES LITIGATION

No. 21 MC 92(SAS).

United States District Court, S.D. New York.

Feb. 19, 2003.

Melvyn I. Weiss, Robert Wallner, Ariana J. Tadler, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, Stanley Bernstein, Robert Berg, Bernstein Liebhard & Lifshitz, LLP, New York, NY, for Plaintiffs.

Gandolfo V. DiBlasi, Penny Shane, Sullivan & Cromwell, New York, NY, for Defendants (Underwriters).

Jack C. Auspitz, Matthew M. D'Amore, Morrison & Foerster LLP, New York, NY, for Defendants (Issuers).

Nina F. Locker, Wilson Sonsini Goodrich & Rosati PC, Palo Alto, CA, for Certain Issuer Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

This Document Relates To: All Cases

### TABLE OF CONTENTS †

#### INTRODUCTORY MATERIAL

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 293

II. SYNOPSIS OF HOLDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 295

III. SECURITIES LAW, HOT ISSUES MARKETS AND TIE–IN
AGREEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 298

† A complete Table of Authorities is found directly after the Opinion and before the Appendices.

A. General Background on the Securities Act and Exchange Act............298
B. Hot Issues Markets, Market Manipulation and Tie-in Agreements .......299
 1. Hot Issues Market of 1959–1962......................................300
 2. Hot Issues Market of 1967–1971......................................302
 3. Hot Issues Market of 1979–1983......................................305
 4. Hot Issues Market of 1998–2000......................................306

IV. THE COMPLAINTS ...........................................................308
 A. Individual Complaints.....................................................308
 1. Factual Allegations and Allegation of Market Manipulation .........308
 2. The Registration Statement's Misleading Statements and
 Omissions ................................................................310
 3. Claims ...................................................................314
 B. Part I of Master Allegations ............................................314
 1. Tie-in Allegations and Undisclosed Compensation....................314
 2. Statistical Analysis ....................................................318
 3. Matrix Illustrating Various Relationships Among Underwriters.....319
 4. Analyst Allegations.....................................................319
 5. Motivations of the Underwriters, Issuers and Individual
 Defendants ...............................................................320
 C. Part II and Part III of the Master Allegations ........................320

GOVERNING LEGAL PRINCIPLES

V. PLEADING UNDER THE FEDERAL RULES OF CIVIL PROCEDURE.....321
 A. Rule 8(a) ..................................................................322
 B. Rule 9(b) ..................................................................324
 1. Why Rule 9(b) Requires Particularity ...............................325
 2. How Particularity Deters Claims of Fraud ..........................326
 3. Rule 9(b) Must Be Read in Harmony with Rule 8 ...................326

VI. PLEADING SECURITIES FRAUD.............................................328
 A. Pleading Securities Fraud Before 1995 ................................329
 B. Pleading Securities Fraud After the PSLRA...........................329
 1. Paragraph (b)(1) .......................................................329
 2. Paragraph (b)(2) .......................................................330

VII. PRELIMINARY ISSUES .....................................................331
 A. Standard of Review ......................................................331
 1. The Court Must Take the Pleadings as True and Draw All
 Inferences In Plaintiffs' Favor .......................................331
 2. Both Defendants and the Court Must Accept the Complaints As
 Pled......................................................................332
 3. Clarity of Pleadings Is Not a Factor in Dismissal ...................333
 B. The Pleading Standards for Some of the Claims Are Governed by
 the PSLRA; Others are Governed by Both the PSLRA and the
 Federal Rules ............................................................333
 1. The Differences Between the Scope of the PSLRA's Pleading
 Requirements and Rule 9(b).........................................333
 2. The Federal Rules Still Apply to Certain Types of Securities
 Fraud Claims ...........................................................334
 3. Summary ................................................................335

APPLICATION OF LEGAL PRINCIPLES

VIII. SECTION 11 CLAIMS.......................................................336
 A. The Section 11 Claims Have Been Properly Pled.....................336
 1. The PSLRA's Pleading Standards Do Not Apply to Claims
 Brought Under the Securities Act..................................337

2. Rule 8(a) Applies to Section 11 .................................... 338
3. Plaintiffs Need Not Plead Reliance in Order to State Certain of
 Their Section 11 Claims ........................................ 342
4. Plaintiffs Need Not Plead that the Issuers and Individual
 Defendants Had Knowledge in Order to State Section 11
 Claims Against Those Defendants ................................ 342
B. Most Plaintiffs Have Stated Section 11 Claims Upon Which Relief
 May Be Granted ................................................. 344
 1. Plaintiffs Have Standing ..................................... 344
 2. Plaintiffs Have Not Pled Allegations of Knowledge Inconsistent
 With Their Claims ........................................... 344
 3. Those Plaintiffs Who Sold Securities Above the Offering Price
 Have No Damages and Therefore No Claim Upon Which
 Relief Can Be Granted ....................................... 347

IX. SECTION 15 CLAIMS ................................................ 351

X. RULE 10B–5 CLAIMS FOR MATERIAL MISSTATEMENTS AND
 OMISSIONS AGAINST THE UNDERWRITERS, ISSUERS AND
 INDIVIDUAL DEFENDANTS ........................................ 353
 A. The Rule 10b–5 Claims for Material Misstatements Have Been
 Properly Pled ............................................... 353
 1. The Material Misstatement Claims Satisfy Paragraph (b)(1) of
 the PSLRA—Particularity ................................. 353
 a. Paragraph (b)(1)'s First Two Requirements Have Been
 Satisfied ............................................ 353
 b. Paragraph (b)(1)'s Last Requirement Has Been Satisfied ....... 354
 2. The Material Misstatement Claims Satisfy Paragraph (b)(2) of
 the PSLRA—Scienter ...................................... 359
 a. Allocating Underwriters ............................. 360
 b. Non–Allocating Underwriters ......................... 361
 c. Individual Defendants ............................... 362
 i. The Motive Allegations Are Sufficient as to Sixty–Four
 Defendants ....................................... 366
 ii. The Motive Allegations Are Insufficient as to 161
 Defendants ....................................... 366
 d. Issuers ............................................. 368
 i. The Motive Allegations Are Sufficient as to 185 Issuers ..... 370
 ii. The Motive Allegations Are Insufficient as to 116
 Issuers .......................................... 370
 e. Summary ............................................. 371
 3. The Material Misstatement Claims Adequately Plead the
 Remaining Elements of a Rule 10b–5 Claim: Transaction
 Causation, Loss Causation, Reliance and Damages ............... 372
 a. Transaction Causation ............................... 375
 b. Loss Causation and Damages ......................... 377
 B. Plaintiffs Have Stated Rule 10b–5 Claims For Material Misstate-
 ments and Omissions Upon Which Relief May Be Granted ........... 378
 1. The Misstatements and Omissions Are Material ................ 379
 2. All Defendants Had a Duty to Disclose ...................... 380

XI. RULE 10B–5 CLAIMS FOR MARKET MANIPULATION AGAINST
 THE ALLOCATING UNDERWRITERS ................................ 384
 A. The Market Manipulation Claims Satisfy Paragraph (b)(2) of the
 PSLRA—Scienter ............................................. 384
 B. The Market Manipulation Claims Adequately State Claims Upon
 Which Relief May Be Granted ................................ 385
 1. Plaintiffs Adequately Plead "Deceptive or Manipulative
 Conduct" ............................................... 387

2. *College Bound II* Is Not the Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 390

XII. SECTION 20 CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 392

## CONCLUDING MATERIAL

XIII. LEAVE TO REPLEAD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 397

XIV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 399

## TABLE OF AUTHORITIES

## APPENDICES

A1. LIST OF CONSOLIDATED CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 416
A2. SECTION 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 421
A3. SECTION 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 422
A4. RULE 10b–5 CLAIMS AGAINST INDIVIDUAL DEFENDANTS . . . . . . . . 422
A5. RULE 10b–5 CLAIMS AGAINST ISSUERS . . . . . . . . . . . . . . . . . . . . . . . 426
A6. SECTION 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 432

### INTRODUCTORY MATERIAL

These cases allege a vast scheme to defraud the investing public. The scheme—characterized by Tie-in Agreements, Undisclosed Compensation, and analyst conflicts, and concealed by misrepresentations and omissions—was aimed at fraudulently driving up the price of stock in hundreds of companies in the immediate aftermarket of their initial public offerings ("IPOs"). Plaintiffs allege that investment banks routinely required substantial investors to participate in the scheme in order to receive allotments of these valuable IPOs. The companies going public and their officers profited handsomely by taking advantage of the inflated value of the stock to raise capital, enter into mergers and acquisitions, or sell their individual holdings at enormous gains. The investment banks profited by receiving kickbacks from the investors who received the IPO allocations. To hide the scheme from the investing public, the investment banks, companies, and officers violated the securities laws by making misleading statements in offering documents and by manipulating the market. Thousands of ordinary investors, who are. Plaintiffs in these cases, allege that the value of their holdings plummeted as a result of this unlawful conduct.

## I. INTRODUCTION

From January 1998 to December 2000, over 460 high technology and Internet-related companies raised capital by selling ownership of their company to the public.[1] Prior to going public, each company hired a group of investment banks to underwrite their IPO. Some, but not all, of the Underwriters allocated the IPO stock for distribution to initial purchasers ("Allocating Underwriters"). On the day of the IPO, the Allocating Underwriters sold the stock directly to those customers, usually institutional investors. The price of the stock was predetermined and set forth in a registration statement filed with the Securities and Exchange Commission ("SEC"). In general, the Underwriters received 7% of the gross proceeds (or some other fixed

---

1. *See* Jay Ritter & Tim Loughran, *Why Has IPO Underpricing Changed Over Time?*, Working Paper (Jan. 16, 2003), *available at* http://bear.cba.ufl.edu/ritter/work_pa- pers/whynew.pdf. For a list of high technology and Internet IPOs from 1990 to 2002, see http://bear.cba.ufl.edu/ritter/List of Internet IPOs.xls.

amount) as compensation for their services, and the Issuer received the remaining capital. *See MDCM Holdings, Inc. v. Credit Suisse First Boston Corp.*, 216 F.Supp.2d 251, 253 (S.D.N.Y.2002). After the offering, those who purchased on the IPO could profit by selling their stock in the aftermarket, *i.e.*, on a stock exchange such as the Nasdaq. Indeed, from 1998 to 2000, customers who bought IPO stock often made large profits as the price of the stock dramatically surged in the aftermarket.[2]

Plaintiffs who bought stock in the aftermarket for 309 of these high-technology and Internet-related stocks allege that the Allocating Underwriters required their customers to enter into agreements to buy additional shares of the Issuer in the aftermarket as a condition of receiving the right to purchase the IPO stock. In some instances, these customers were also required to make those purchases at predetermined escalating prices. As a result of these "Tie-in Agreements," the Allocating Underwriters created an artificial demand for the company's stock and caused the price of the stock to rise. In addition, the Underwriters used this scheme to enrich themselves by requiring customers to pay them a portion of the profits they made by selling the IPO shares in the aftermarket.

Spurred by newspaper and government investigations into the IPO allocation practices of various investment banks,[3] Plaintiffs filed over 1,000 Complaints in this district from January 11 to December 6, 2001, each alleging that the Underwriters perpetrated this scheme in connection with 309 IPOs. *See Makaron v. VA Linux Sys., Inc.*, No. 01 Civ. 242 (first action filed January 11, 2001); *Genduso v. Internap Network Servs. Corp.*, No. 01 Civ. 11247 (last action filed December 6, 2001).[4] Plaintiffs are suing three groups of defendants in each IPO case: the Underwriters of the IPO, the company that issued the stock ("Issuer" or "Issuer Defendant"), and the company's officers ("Individual Officers" or "Individual Defendants"). In total, Plaintiffs are suing fifty-five Underwriters, 309 Issuers, and thousands of Individual Defendants.[5]

In an effort to coordinate the lawsuits and avoid taxing the limited judicial resources of this district, the Assignment Committee of the Southern District of New York directed that all of the actions be transferred to this Court for "coordination and decision of pretrial motions, discovery and related matters other than trial." Order, *In re Initial Public Offering Sec. Litig.*, 21 MC 92 (Aug. 9, 2001). This Court subsequently consolidated the lawsuits by Issuer (*e.g.*, *In re Cacheflow Securities Litigation*), thereby resulting in 309 consolidated cases that are being coordi-

---

**2.** *See* Plaintiffs' Master Allegations ("MA") ¶¶ 57–59 (stating that the average first day gain was just over 60% for all IPOs during the class period and almost 140% for all IPOs involved in this litigation); *see also infra* Part III.B.4 (describing the hot issues market from 1998–2000).

**3.** *See, e.g.*, Susan Pulliam & Randall Smith, *Trying to Avoid the Flippers*, Wall St. J., Dec. 6, 2000, at A1.

**4.** One Plaintiff filed her action on December 6, 2002, *see Muller v. Diversa Corp.*, No. 02

Civ. 9699, taking advantage of the newly-expanded statute of limitations for securities fraud actions contained in the Sarbanes–Oxley Act of 2002. *See* Pub.L. No. 107–204 § 804(a), 116 Stat. 745, 801 (2002) (amending 28 U.S.C. § 1658).

**5.** Plaintiffs also brought complaints relating to the IPOs of Novatel Wireless, Inc., Symyx Technologies, Inc., and Versatel Telecom International N.V. but have voluntarily dismissed those cases.

nated in the above-captioned litigation.[6]

The Underwriters, Issuers, and Individual Defendants now move to dismiss these actions in their entirety.[7] In broad terms, the Defendants put forward two grounds for dismissal. *First,* they argue that each of the 309 Complaints fails to comply with the pleading requirements of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Second,* they contend that even if the allegations are properly pled and assumed to be true, the Complaints must be dismissed for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). For the reasons that follow, these motions are granted in part and denied in part.

## II. SYNOPSIS OF HOLDINGS

It is axiomatic that when deciding a motion to dismiss, a court must accept as true the factual allegations of a complaint. Indeed, the court must draw every reasonable inference from those factual allegations in favor of the party bringing suit. It is against this backdrop that the many rulings contained in this Opinion must be understood.

The general requirements for pleading a complaint are found in the Federal Rules of Civil Procedure unless a specific statute sets forth a different pleading standard. Rule 8 requires, only a "short and plain statement of the claim showing that the pleader is entitled to relief." When plead-

ing fraud, under Rule 9, however, "the circumstances constituting fraud . . . [must] be stated with particularity."

In addition, in the field of securities law, the PSLRA imposes a heightened pleading standard with respect to some causes of action by adding two more requirements. *First,* when pleading that a defendant has made a material misstatement or omission on which the investing public relies, the complaint must specify each statement alleged to have been misleading, the reason the statement is misleading, and, if the misstatement is alleged on information and belief, the facts on which that belief is formed. *Second,* when a securities fraud claim requires that a defendant act with fraudulent intent, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

Taking the facts of the Complaints as true, the causes of action as pled, and drawing every inference in Plaintiffs' favor, Plaintiffs have alleged one coherent scheme to defraud, the entire purpose of which was to artificially drive up the price of the securities. This scheme offends the very purpose of the securities laws, namely "to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing."[8] Where insiders con-

---

**6.** A list of each consolidated action is contained in Appendix 1 to this Opinion.

**7.** Defendants filed two sets of motions: one by Underwriter Defendants and one by Issuer and Individual Defendants.

References to Underwriters' motion and brief are given as "X Und. Mem. at Y," the first number being the volume of the brief, the second being the page number (Underwriters submitted their moving brief in six volumes).

References to Plaintiffs' opposition to these briefs are given as "X Pl. Mem. at Y," and Underwriters' reply are given as "X Und. Reply at Y." References to Issuers' brief are given as "Iss. Mem. at X," Plaintiffs' opposition are given as "Pl. Mem. (Iss.) at X." and Issuers' reply are given as "Iss. Reply at X."

**8.** *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (citing H.R.Rep. No. 73–85, at 1–5 (1933)).

spire to frustrate the efficient function of securities markets by exploiting their position of privilege, they have perpetrated a double fraud: they have manipulated the market, and they have covered up that manipulation with lies and omissions. When investors have been injured by these frauds, those insiders may be liable under the securities laws.

Plaintiffs bring six claims against various Defendants. All Defendants are alleged to have made false statements in the registration statement and prospectus related to a particular IPO, in violation of Section 11 of the Securities Act of 1933 (First Claim). The Individual Defendants are alleged to have controlled the Issuers who made those false statement in violation of Section 15 of the 1933 Act (Second Claim). All Defendants are alleged to have made false statements in the registration statement and prospectus with the intent to deceive the investing public, in violation of Section 10(b) of the Exchange Act of 1934 (Third and Fourth Claims). The Allocating Underwriters are also alleged to have engaged in a scheme to manipulate the securities markets in violation of Section 10(b) of the 1934 Act (Fifth Claim). Lastly, the Individual Defendants are alleged to have controlled the Issuers who violated Section 10(b) of the 1934 Act, in violation of Section 20 of that Act (Sixth Claim).

Because these cases are of great importance to the public, and because this Opinion is lengthy and highly technical, a synopsis of its holdings is warranted. The following constitutes, in summary form, the rulings of the Court.

### Section 11 Claims

Section 11 was designed to hold those who prepare registration statements in connection with IPOs—such as the Underwriters, Issuers, and Individual Defendants here—to a stringent standard of liability for *any* material misrepresentations contained in those statements, although certain Defendants may raise their *due* diligence as an affirmative defense at trial. Pleading under Section 11 is governed solely by Rule 8 because fraud is not an element of a Section 11 claim. Plaintiffs have sufficiently pled, under the standard of Rule 8, that all those who signed the registration statement or prospectus violated Section 11 because those documents failed to disclose the fraudulent scheme—specifically, the Tie-in Agreements and the Undisclosed Compensation. Moreover, on the secondary offerings, the registration documents also failed to disclose that the analyst reports were prepared by analysts employed by the Underwriters, who consistently issued recommendations tainted by undisclosed conflicts of interest. However, those Plaintiffs who sold their shares above the offering price have no damages as a matter of law, and their claims must be dismissed.

### Section 15 Claims

Section 15 was designed to hold a defendant jointly liable if it controlled a person or entity who violated Section 11. Pleading a Section 15 claim is also governed by Rule 8, and thus only requires an allegation that the defendant controlled a person or entity that violated Section 11. Here, the Individual Defendants are alleged to have controlled the Issuers who violated Section 11. While the Individual Defendants may raise lack of knowledge as an affirmative defense at trial, Plaintiffs need not plead that the Section 15 Defendants acted with the intent to defraud. Thus, the Section 15 claims are dismissed only in those cases where the Section 11 claims have been dismissed for lack of damages.

### Section 10(b) Claims for Material Misstatements and Omissions

Section 10(b) —the general "securities fraud" provision in the 1933 and 1934

Acts—was designed to punish intentionally manipulative or deceptive practices employed as part of a scheme to defraud. One prohibited practice is intentionally making materially false or misleading statements concerning publicly traded securities. In such a case, a plaintiff must comply with either the PSLRA or Rule 9, depending on the particular element, because Section 10(b) claims are claims of fraud. Thus, Plaintiffs must plead the misleading statements themselves, the basis to believe those statements are misleading, and the Defendants' intent to defraud investors under the PSLRA. Plaintiffs must also plead that those misstatements and omissions were material, and that those Defendants had a duty to disclose the information. Finally, Plaintiffs must plead, under Rule 9, that they purchased the stock after relying on those material misstatements and were damaged as a result.

Plaintiffs have successfully pled that all of the Underwriters (both Allocating and Non–Allocating) made material misstatements and omissions, which they had a duty to disclose, with the intent to defraud the investing public. Plaintiffs have also alleged, with the required particularity, that they purchased stock based on their falsely inflated market price, and that the misrepresentations caused a significant disparity between the price of the securities and their real value, resulting in significant financial damages.

Nonetheless, Plaintiffs have failed to plead that *some* of the Issuers and Individual Defendants acted with the required intent to defraud. Specifically, when an Issuer exploited the inflated value of the company to engage in a merger or acquisition, or to raise even more money through further stock offerings, the intent requirement has been satisfied. Likewise, when an Individual Defendant sold large amounts of her shares at a significant profit relatively close in time to the IPO, the requisite intent has been demonstrated. In all other instances, the pleading of intent to defraud is inadequate and therefore the claims against those Issuers and Individual Defendants must be dismissed.

**Section 10(b) Claim for Market Manipulation**

In addition to punishing material misstatements and omissions, Section 10(b) was designed to prohibit *any* intentional conduct that deceives or defrauds investors by controlling or artificially affecting the price of securities. Such claims are typically described as "market manipulation" claims. Plaintiffs' pleading obligations for the market manipulation claims are identical to those for the material misstatements claims except, because there are no alleged misstatements, the PSLRA only governs the pleading of intent to defraud. Thus, Plaintiffs must plead with particularity the manipulative scheme itself, the intent to defraud the investing public, reliance on the integrity of the market (*i.e.*, that they believed it was *not* manipulated) and resulting damages.

Plaintiffs have succeeded in pleading a market manipulation claim against the Allocating Underwriter Defendants. They have alleged that these Defendants acted with the requisite intent because they required their customers to engage in Tie-in Agreements and to pay Undisclosed Compensation in order to receive an initial allocation of stock. Subsequent purchases, at escalating prices, falsely inflated the price of the shares. This very conduct evinces a strong inference that Defendants intended to defraud the investing public. Plaintiffs also have alleged that these Defendants engaged in deceptive or manipulative conduct because Defendants' conduct was "designed to deceive or defraud investors by controlling or artificially af-

fecting the price of securities." [9] Finally, Plaintiffs have alleged the remaining elements of these claims with the required specificity.

### Section 20 Claims

Section 20 was designed to hold a defendant jointly liable if it controlled a person or entity who violated Section 10(b). The pleading of a Section 20 claim is governed solely by Rule 8, because such claims do not necessarily require proof of scienter, nor is fraud an essential element of such claims. Thus a plaintiff must allege only that a defendant controlled a person or entity who violated Section 10(b). At trial, a plaintiff must also show that the defendant was a "culpable participant" in the underlying fraud—*i.e.,* took some action (or inaction) that furthered the underlying fraud. A defendant may then offer proof that the culpable participation was done in good faith. Because Plaintiffs have adequately alleged control, the Section 20 claims survive against those Individual Defendants who controlled Issuers liable under Section 10(b), and are dismissed only against those Individual Defendants who controlled an Issuer as to whom the Section 10(b) claims have been dismissed.

In sum, Plaintiffs have pled a coherent scheme by Underwriters, Issuers, and their officers to defraud the investing public. As such, these lawsuits may proceed.

## III. SECURITIES LAW, HOT ISSUES MARKETS, AND TIE–IN AGREEMENTS

### A. General Background of the Securities Act and Exchange Act

In the aftermath of the bull market of the 1920s, the 1929 stock market crash, and the subsequent Great Depression, Congress held extensive hearings to investigate the practices underlying securities

trading. *See generally Legislative History of the Securities Act of 1933 and Securities Exchange Act of 1934* (J.S. Ellenberger & Ellen P. Mahar eds.1973). During these investigations, Congress repeatedly discovered instances of market manipulation and deception, which it concluded had contributed to the market's collapse. For example, Professor Steve Thel has written:

> Before [President] Roosevelt was even inaugurated, [Chief Counsel of the Senate Banking and Currency Committee Ferdinand] Pecora revealed fabulous excesses in investment, commercial banking, and the financing of public utilities. Among other things, he showed that in the years before the crash, some respected bankers had controlled the market price of securities in which they held an interest by effecting huge purchases or sales as the situation required. Instances of such manipulative trading were uncovered repeatedly throughout the course of the hearings.

Steve Thel, *The Original Conception of Section 10(b) of the Securities Exchange Act,* 42 Stan. L.Rev. 385, 412 (1990) (footnotes omitted). Likewise, a 1934 Act Senate Committee report explained, albeit in more muted tones, how the market was manipulated:

> Several devices are employed for the purpose of artificially raising or depressing security prices.... Among such practices are fictitious "wash" sales; "matched" orders, or orders for the purchase and sale of the same security emanating from a common source for the purpose of recording operations on the tape and thereby creating a false appearance of activity; and other transactions specifically designed to manipulate the price of a security.

**9.** *Ernst & Ernst,* 425 U.S. at 199, 96 S.Ct. 1375.

S.Rep. No. 73–792, at 7–8 (1934). ("1934 Senate Report").

In order to protect the integrity of the market and combat such practices, Congress enacted the Securities Act of 1933 ("Securities Act") [10] and the Securities Exchange Act of 1934 ("Exchange Act").[11] In general, the Securities Act regulates the initial offering of securities, *see Gustafson v. Alloyd Co.*, 513 U.S. 561, 571–72, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), while the Exchange Act regulates post-distribution purchases and trading, *see Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 171, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).[12]

The Securities Act "was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Ernst & Ernst*, 425 U.S. at 195, 96 S.Ct. 1375 (citing H.R.Rep. No. 73–85, at 1–5). The Exchange Act "was intended principally to protect investors against manipulation of stock prices through regulation of transactions upon securities exchanges and in over-the-counter markets, and to impose regular reporting requirements on companies whose stock is listed on national securities exchanges." *Id.* (citing 1934 Senate Report at 1–5). "A fundamental purpose, common to these statutes, was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." [13] *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963) (footnote omitted). *See also SEC v. Zandford*, 535 U.S. 813, 122 S.Ct. 1899, 1903, 153 L.Ed.2d 1 (2002) (same). Every IPO at issue here is governed by the regulatory framework created by these Acts.

---

10. Securities Act of 1933, May 27, 1933, ch. 38, Title I, § 1, 48 Stat. 74 (codified as amended at 15 U.S.C. §§ 77a–77aa).

11. Securities Exchange Act of 1934, June 6, 1934, ch. 404, Title I, § 1, 48 Stat. 881 (codified as amended at 15 U.S.C. §§ 78a–78mm).

12. In subsequent years, Congress also enacted the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79 et seq. (2000), the Trust Indenture Act of 1939, 15 U.S.C. § 77aaa et seq. (2000), the Investment Company Act of 1940, 15 U.S.C. § 80a–1 et seq. (2000), and the Investment Advisers Act of 1940, 15 U.S.C. § 80b–1 et seq. (2000), all of which govern the securities industry.

13. To effectuate these purposes, there are twelve private causes of action available under the two Acts. The Securities Act's three explicit provisions include: Section 11, 15 U.S.C. § 77k (liability for material misrepresentations and omissions in registration statements); Section 12, 15 U.S.C. § 77*l* (liability for misrepresentations and omissions in public prospectuses and for sale of unregistered securities); and Section 15, 15 U.S.C. § 77o (liability for controlling persons).

The Exchange Act's five explicit provisions include: Section 9, 15 U.S.C. § 78i (liability for certain manipulations of securities traded on stock exchanges); Section 16, 15 U.S.C. § 78p(b) (liability for short-swing profits); Section 18, 15 U.S.C. § 78r (liability for misleading statements in certain periodic reports filed with the SEC); Section 20, 15 U.S.C. § 78t (liability for controlling persons); and Section 20A, 15 U.S.C. § 78t–1 (1994) (liability for insider-trading if plaintiff was a contemporaneous trader).

In addition, there are four implied causes of action under the Exchange Act: Section 10b, 15 U.S.C. § 78j, and Rule 10b–5, 17 C.F.R. § 240.10b–5 (general fraud liability provisions); Section 14(a), 15 U.S.C. § 78n(a), and Rule 14a–9, 17 C.F.R. § 240.14a–9 (prohibiting fraud in connection with proxy solicitations); Section 14(e), 15 U.S.C. § 78n(e) and Rule 14e–3, 17 C.F.R. § 240.14e–3 (prohibiting fraud in connection with tender offers); and Section 13(e)(1), 15 U.S.C. § 78m(e)(1) (prohibiting fraud in connection with issuer's repurchase of its own shares).

## B. Hot Issues Markets, Market Manipulation, and Tie-in Agreements

When a company goes public, the initial offering price (the price paid by the first customer) is established by the company and underwriters. Once issued, the stock price is determined by the market. For at least five decades, studies have shown that IPOs generally trade on the open market at a price significantly higher than the offering price, a phenomenon known as underpricing. For example, a stock might have an initial offering price of $18 and rise to a closing market price of $20 on its first day. Such stock is underpriced by $2 (or approximately 11%).[14] "For a long time, the standard underpricing seemed to be between five and twenty percent." Robert Prentice, *Whither Securities Regulation? Some Behavioral Observations Regarding Proposals For Its Future*, 51 Duke L.J. 1397, 1446 n.230 (2002) (citation omitted).

From the perspective of the initial purchasers, the underpricing of IPO stock is wonderful because they can make a substantial profit on their investment by selling their stock in the aftermarket. The increased sales activity—and the higher stock price—are also attractive to the issuer, who benefits from the false impression that the company is so highly valued. The issuer then exploits that impression by using its stock as currency to make acquisitions, or by raising more capital through a higher-priced secondary offering. The underpricing itself is not all good for the issuer—in one sense there was "money left on the table" because the issuer lost out on the difference between the offering price and the first day's closing market price. *MDCM Holdings*, 216 F.Supp.2d at 254. But the increased after-market trading that may attend underpriced issues is likely to make the whole process a winning proposition for the issuer.

When the price of an IPO stock rises quickly in the market, it is often referred to as a "hot issue." In turn, so-called "hot issues markets" are typically characterized by severe underpricing. *See, e.g.,* Jay R. Ritter, *The 'Hot Issue' Market of 1980*, 57 J. Bus. 215 (1984). Over the past four decades, there have been four such markets. The first three occurred from 1959–1962, 1967–1971, and 1979–1983,[15] while the most recent hot issues market lasted from 1998–2000—the time period at the heart of this litigation. Not surprisingly, conduct of the sort alleged in these cases came to the attention of regulators in each of these hot issues markets.

### 1. Hot Issues Market of 1959–1962

"From 1959 until the market decline of early 1962, the distribution of securities by

---

14. For a listing of the number of IPOs and the average first day return (by month) since 1960, see Roger G. Ibbotson, et al., *The Market's Problems with the Pricing of Initial Public Offerings*, 6 J. Applied Corp. Fin. 66–74 (1994). Updated data (January 1960—December 2001) is available from Jay Ritter, *IPO Data, at* http://bear.cba.ufl.edu/ritter/ipodata.htm.

15. *See Report of the Securities and Exchange Commission Concerning the Hot Issues Markets,* at 4–28 (Aug.1984) ("SEC Hot Issues Report") (describing these three periods as hot issues markets, "a cyclical phenomenon, typically occurring in the late stages of a bull market"); *Public Investigation in the Matter of Hot Issues Securities Markets,* Ad. File No. 4–148 (1972) ("SEC File No. 4–148"); *Report of Special Study of Securities Markets of the Securities and Exchange Commission,* H.R. Doc. No. 88–95, pt. 1, at 151 (1st Sess.1963) ("SEC Special Study" or "Special Study"); *see also* U.S. Securities and Exchange Commission Staff Legal Bulletin No. 10, August 25, 2000 *available at* http://www.sec.gov/interps/legal/slbmr10.htm ("SEC Legal Bulletin").

companies that had not made a previous public offering reached the highest level in history." [16] SEC Special Study at 487; *see also id.* at 514. "The public eagerly sought stocks of companies in certain 'glamour' industries, especially the electronics industry, in the expectation that they would quickly rise to a substantial premium—an expectation that was often fulfilled." *Id.* at 487. "It was not uncommon for underwriters to receive, prior to the effective date, public 'indications of interest' for five times the number of shares available." *Id.* at 515. "Within a few days or even hours after the initial distribution, these so-called 'hot issues' would be traded at premiums of as much as 300 percent above the original offering price." *Id.* at 487. "In many cases, the price of a 'hot' issue later fell to a fraction of its original offering price." *Id.*

In the midst of this "climate of general optimism and speculative interest," *id.,* the SEC "addressed reports that certain dealers participating in distributions of new issues had been making allotments to their customers only if such customers agreed to make some comparable purchase in the open market after the issue was initially sold." SEC Legal Bulletin (describing Exchange Act, Release No. 6536). In response to these reports, the SEC issued the following interpretive release:

> The attention of the Securities and Exchange Commission has been directed to recently published articles in business magazines and the public press which indicate that certain dealers participat-

ing in distributions of new issues have been making allotments to their customers only if such customers agree to make some comparable purchase in the open market after the issue is initially sold. The Commission wishes to call the attention of dealers to the fact that generally speaking any such arrangement involves a violation of the anti-manipulative provisions of the Securities Exchange Act, particularly Rule 10b–6 thereunder, and may involve violation of other provisions of the federal securities laws. Should evidence of such practice by individual firms be developed, the Commission will take appropriate action.

Securities Act, Release No. 4358/Exchange Act, Release No. 6536 (Apr. 24, 1961), *available at* 1961 WL 61584.[17]

In 1963, the SEC transmitted to Congress the "Report of Special Study of Securities Markets of the Securities and Exchange Commission." *See supra* note 15. It "was the most extensive examination of the securities markets since the 1930s" and included "a thorough analysis of new issues" in response to the bull market of the previous three years. SEC Hot Issues Report at 5. "The intensive and extensive examination made by the special study reveals a picture ... of a general climate of speculation which may rank with excesses of previous eras." SEC Special Study at 553. "More than any single activity or incident, it is this climate of speculative fervor which provides a key to the new-issue phenomenon." *Id.*

---

16. The rise of the new issues market actually began six years earlier and "[t]he number of companies making their first public offerings climbed steadily during the period from 1953 to 1961, reaching an historic high in the years 1959 to 1961 when the bull market attained its peak." SEC Special Study at 553.

17. The SEC describes the nature of its interpretive releases as follows: "The Commission

occasionally provides guidance on topics of general interest to the business and investment communities by issuing 'interpretive' releases, in which we publish our views and interpret the federal securities laws and SEC regulations." U.S. Securities and Exchange Commission, SEC Interpretive Releases, *at* http://www.sec.gov/rules/interp.shtml.

"The *Special Study* brought into sharp focus, for the first time, the role of the underwriter in the new issues markets." SEC Hot Issues Report at 6. "The underwriter played an important role in the new-issue phenomenon not only by originating and distributing stock in companies going public but also, in many cases, by encouraging the speculative climate." SEC Special Study at 553. "Many of the problems targeted by the *Special Study* related to underwriting practices, distribution and aftermarket trading." SEC Hot Issues Report at 6. For example, some firms "under pressure from customers and salesmen hungry for new issues, lowered their standards of quality and size of issuers whose securities they would underwrite."[18] SEC Special Study at 553–54.

"In the pricing of new issues, underwriters could not help but be influenced by the knowledge that the prices of many issues would subsequently rise in the immediate after-market to prices hardly justified by traditional standards of value." *Id.* at 554. The Special Study identified a number of problems and abuses that resulted from this knowledge. For example, some underwriters "set low offering prices in the expectation of withholding substantial portions of the issue in accounts of insiders to be sold out to the public." *Id.* Likewise, "[s]ome underwriters found opportunities

with the strong public demand for new issues to obtain very high amounts of compensation from small speculative companies." *Id.*

"The *Special Study* also found that certain techniques employed by broker-dealers exacerbated the 'hotness' of an issue, often creating immediate and substantial premiums over the initial offering price." SEC Hot Issues Report at 8. Among other manipulative techniques,[19] the study found that "solicitation of aftermarket purchases was common and might be actively engaged in by one or more of the major distributors." SEC Special Study at 556. "To add to the aftermarket excitement, some managing underwriters arranged for solicitation of customers at premium prices through nonparticipating firms." *Id.* "Demand for new issues was further stimulated in some cases by market letters, advisory recommendations, articles in the financial press and other planned publicity, usually optimistic in tone."[20] *Id.*

## 2. Hot Issues Market of 1967–1971

"In 1967–1971, the new issues markets experienced a resurgence," SEC Hot Issues Report at 11, this time with issues in fast food business and "space age" technol-

---

**18.** The SEC limited the scope of its criticism by noting that "[m]ost of the older firms exercised careful investment banking judgement in determining which companies were suitable for public ownership...." SEC Special Study at 553.

**19.** For example, the underwriters often engaged in the practices known as "withholding" and "free-riding." *See* SEC Special Study at 555. "Withholding occurs when a broker-dealer shelves substantial blocks of a new issue in order to restrict supply of the security, thus facilitating a price increase. Free-riding occurs when the shares are placed in the accounts of affiliates or insiders of a broker-dealer, who then trade at a profit

once the price rises due to the artificially restricted supply." SEC Hot Issues Report at 9.

**20.** The Special Study also commented: "The disclosure provisions of the Securities Act assume a particular importance to the purchaser of a new issue in the aftermarket, especially in periods of intense demand.... [P]ersons who bought in the after-market often were less sophisticated [than the initial customers] and more susceptible to the allure of publicity and rumor about 'hot issues.' " SEC Special Study at 556. *See also* SEC Hot Issues Report at 9.

ogy. As former SEC Chairman Arthur Levitt has recalled:

> It was in the midst of the so-called "go-go years." I remember walking the halls sensing a feeling among us of unlimited potential and boundless opportunity. Our markets were experiencing an enormous volume surge, growing institutionalization and quite rampant speculation. It was big news I recall that Kentucky Fried Chicken was selling at close to 100 times earnings.

Arthur Levitt, Remarks before the 2000 Annual Meeting of the Securities Industry Association (Nov. 9, 2000).

"In response [to this market], the Commission and the NASD [National Association of Securities Dealers] created a joint task force in mid–1972 to combat the problems caused by hot issues." SEC Hot Issues Report at 11. "Teams of Commission and NASD personnel conducted intensive examinations and investigations of certain broker-dealers." *Id.* The SEC also "began public, fact-finding hearings on the hot issues experience." *Id.* (citing SEC File No. 4–148). These investigations uncovered a "considerable number" of violations of the securities laws that resulted in various enforcement actions by the SEC and NASD. *Id.*

Indeed, the trading abuses of the hot issues market also received scrutiny from the New York State Attorney General who requested that his office study the problems associated with the hot issues market of the late 1960s. *See* David Clurman, *Controlling a Hot Issue Market*, 56 Cornell L.Rev. 74 (1970) (discussing study made at the request of Attorney General Louis J. Lefkowitz). The Attorney General's study concluded that "a pattern emerged whereby substantial sums of money went into new and highly speculative ventures." *Id.* at 82.

> The atmosphere became one of pure gambling, and in the process it was not too difficult to rig the game. The big winners were underwriters, insiders of the issuing companies, and those with contacts in these groups. The losers were those investors who purchased at inflated prices and the economy itself.

*Id.*

"The basic device used to further overheat the market was stimulating demand while simultaneously reducing supply." *Id.* at 76. "Brokers increased demand," for example, "by frequently emphasizing to their customers the difficulty of obtaining shares." *Id.* "Salesmen regularly predicted that the after-market prices would be higher than the original or current prices." *Id.*

"Cruder techniques [to stimulate demand] included brokers informing customers that if they did not make additional purchases in the after-market they would be cut off from further new issues." *Id.* "In addition, a steady flow of 'tips' was fed into the market, and purchasers often stated that this type of information had stimulated their interest in a particular security." *Id.* at 76–77. The study also "uncovered instances where intra-office brokerage memoranda were inconsistent with offering literature." *Id.* at 77. In sum, "[c]ompany insiders and investment bankers took full advantage of the opportunities presented to them by the generally heated situation—a situation that was partially of their own creation." *Id.* at 78.

In response, the SEC "proposed a number of amendments to its rules to curb the excesses of hot issues." SEC Hot Issues Report at 12.[21] In particular, the SEC

---

**21.** For this proposition, the Hot Issues Report cites Securities Act Release Nos. 5274, 5276, 5277, 5279 (July 26, 1972) and Exchange Act Release No. 9673 (July 26, 1972).

proposed adopting Rule 10b–20 after having received "indications that broker-dealers involved in distributing shares may be imposing requirements involving consideration in addition to the announced price of the shares."[22] Certain Short Selling of Securities and Securities Offerings, Exchange Act Release No. 10636, 39 Fed. Reg. 7806 (February 11, 1974). As the SEC explained:

> Proposed Rule 10b–20 *makes explicit* the duty placed on broker-dealers (and others) to refrain from explicitly or implicitly demanding from their customers any payment or consideration in addition to the announced offering price of any securities. The Commission has received indications that in some offerings for which public demand is inadequate the purchase of such offerings['] shares may be tied to certain inducements, such as the opportunity to purchase sought after "hot" issue shares, for which demand exceeds supply. In response to these inducements, a number of persons may have been encouraged to participate in the distribution of shares for which sufficient public demand does not exist by purchasing them solely with a view to their immediate resale and merely to accommodate those marketing the offerings. The demand for offering shares crea[t]ed by the activities of these participants in the distribution process may obfuscate realistic assessments by underwriters who do not induce such participation and by investors and potential investors of the valid demand for such offerings and may artificially affect the offering price for such shares. Further, rewarding these participants with "hot" issue shares may artificially stimulate high public demand for such shares in that the prior commitment made to such participants, which unjustifiably deprives many members of the public of the opportunity to purchase such "hot" issue shares at their original offering price, relegates such persons denied shares in the offerings to making purchases in the after market.

*Id.* (emphasis added).

Rule 10b–20 was eventually withdrawn in 1988. *See* Exchange Act Release No. 26182 (Oct. 14, 1988), *available at* 1988 WL 999999. The SEC explained:

> In view of the substantial period of time that has elapsed since Rule 10b–20 was proposed and the fact that 'tie-in' ar-

---

**22.** As originally drafted, the proposed rule stated:

> Rule 10b–20 Prohibition Against Additional Consideration In Securities Offerings
> (a) It shall be unlawful for any person, including, but not limited to, an underwriter, prospective underwriter, issuer, broker, dealer or other person who has agreed to participate or is participating, directly or indirectly, in an offering of securities . . . in connection with the offer or sale of any security registered on a national securities exchange or any security not so registered, directly or indirectly,
> (1) to require a purchaser or proposed purchaser of such security to purchase any other security being or proposed to be offered or sold by any such person, or
> (2) to require a purchaser or proposed purchaser to make payment of any consid-
>
> eration for such security other than that indicated in the registration statement and prospectus or notification on Form 1–A and offering [a] circular covering the offer and sale of such security, or
> (3) to require a purchaser or proposed purchaser, in order to purchase such security, to perform any act, engage in any conduct, effect any other transaction or refrain from assurance to perform, engage in, effect or refrain from any of the foregoing, other than any usual or customary requirements for payment for such security within the time required under this Act or the opening of an account with such broker or dealer.

*Id. See also* Certain Manipulative Practices in Public Offerings, Exchange Act Release No. 11328, 40 Fed.Reg. 16090, 16091–92 (Apr. 2, 1975).

rangements may be reached under existing antifraud and antimanipulation provisions of the federal securities laws, the Commission has determined to withdraw proposed Rule 10b–20.

*Id.* (citing SEC Hot Issues Report at Section IV.A.3). *See also* SEC Hot Issues Report at Section V (entitled "Current Regulatory Authority").

### 3. Hot Issues Market of 1979–1983

From 1979 to 1983, another hot issues market arose. This time the companies going public were from Denver, Salt Lake City and the New York area. *See* SEC Hot Issues Report at 15–23. "Fad and high-technology business lines were well-represented, including robotic manufacturing, medical products, computers, video materials and entertainment."[23] *Id.* at 22–23. Once again, the SEC and NASD launched a number of investigations into broker-dealers and their underwriting practices in response to reports of abuses in the allocation process. *See id.* at 15–23.

The SEC provided a comprehensive review of this market when it issued its 1984 Hot Issues Report describing "the abuses identified by the Commission's regulatory and enforcement efforts" and "set[ting] forth the Commission's relevant statutory and rulemaking authority, concluding that this authority is broad enough to cover abuses that have been identified during hot issues markets." *Id.* at 3–4. The Report found that "selling abuses" were the most common form of misconduct. *Id.*

at 28. "Generally, the abuses found in a hot issues market involve either artificial restrictions on supply or attempts to stimulate demand that facilitate a rapid rise in the price of a security." *Id.* at 29. The Commission uncovered a wide range of fraudulent activities including schemes founded upon market manipulation and domination, free-riding and withholding of stocks to shorten supply. *See id.* at 29–30.

"A few cases involve 'tie-in' arrangements by which underwriters of hot issues require customers, as a condition of participation in a hot issue offering, either (1) to agree to purchase additional shares of the same issue at a later time and at an increased price, or (2) to participate in another hot issue offering." *Id.* at 37. "This practice stimulates demand for a hot issue in the aftermarket, thereby facilitating the process by which stock prices rise to a premium." *Id.* at 37–38. Indeed, the report highlights an example of one underwriter who was alleged to have caused the price of an IPO stock priced at $1 to rise to over $4 within a few hours of its offering. *See id.* at 38–39 (discussing case 13 attached to the report). The broker-dealer achieved this by (1) requiring customers to place aftermarket purchase orders for the IPO stock at substantial premiums above the offering price and (2) instructing salespersons to advise customers that the company had good financial prospects when it did not.[24] *See id.*

When discussing whether schemes such as tie-in arrangements violate the law, the

---

**23.** A snapshot of the 1980s IPO industry is provided by the SEC Hot Issues Report. From January 1, 1980 to August 31, 1983, there were 735 IPOs. *See id.* at 23. "In these offerings, approximately 30 percent, or 233 issues, were quoted at a price 25 percent higher than the initial offering price within five trading days after the offering." *Id.* (describing the types of companies that experienced hot issues).

**24.** "A variant of the tie-in is where broker-dealer firms having no nominal connection with the initial distribution may be used to market an issue in the aftermarket at premium prices." SEC Hot Issues Report at 39. "In this way, the original underwriter seeks to avoid the pitfalls of Rule 10b–6 and to mask its control of the market for such securities." *Id.*

report is unambiguous: "Every abusive sales and trading practice discussed in this Report *clearly* violates the federal securities laws as implemented by the Commission pursuant to its rulemaking authority." *Id.* at 61–62 (emphasis added). "The anti-fraud provisions of the federal securities laws, a cornerstone of Congress' system of promoting free and open markets for capital formation, are indispensable weapons in combating hot issues abuses. Taken together, these prohibitions offer broad protection to investors." *Id.* at 62.

### 4. Hot Issues Market of 1998–2000

Few people may remember the glamour industries of the 1960s, the 1970s "go-go years," or the fact that Denver and Salt Lake City were at the epicenter of the 1980s IPO market. But the Internet and high-tech boom of the 1990s, "irrational exuberance," and Silicon Valley are not far removed from current events. Indeed, in recent years the rise and fall of these companies has been the subject of numerous articles, many books,[25] several documentaries (real and fictional),[26] and at least one off-Broadway play.[27] Two observa-

tions concerning this market bear special mention.

The first is that the underpricing of the IPOs of the late 1990s was severe when measured against any other time period. While IPOs have been historically underpriced by five to twenty percent, IPOs in the 1990s frequently surged to 100%–200% of the offering price on the first day of trading. *See* Jay Ritter, *Big Runups of 1975–2000* (August 2001) (listing IPO stock that doubled in price on the first day of trading since 1975) *available at* http://bear.cba.ufl.edu/ritter/runup750.pdf. "In 1999," for example, "117 IPOs doubled on their first day. This compares with 39 during the previous 24 years combined." *Id.* In fact, the ten largest first-day increases in IPO stock since 1975 all took place from November 1998 to December 1999.

Indeed, the IPO market of 1998–2000 was more extraordinary than the previous three hot issues markets. The other hot issues markets that had unusual first day increases were often accompanied by a below average number of companies going public. For example, in February of 1980,

---

**25.** *See, e.g.,* Lori Gottlieb & Jesse Jacobs, *Inside the Cult of Kibu: And Other Tales of the Millennial Gold Rush* (2002); John Cassidy, *Dot.con: The Greatest Story Ever Sold* (2002); Stephan Paternot, *A Very Public Offering: A Rebel's Story of Business Excess, Success and Reckoning* (2001); Michael Lewis, *The New New Thing: A Silicon Valley Story* (2001); David Kuo, *dot.bomb: My Days and Nights at an Internet Goliath;* Casey Kait & Stephen Weiss, *Digital Hustlers: Living Large and Falling Hard in Silicon Alley* (2001).

**26.** For documentaries, see *What Happened* (The Means of Production, Inc.2002) (documentary describing itself as a "tragic-comedic look at the collapse of the Internet economy"); *E–Dreams* (Wonsuk Chin & Sam Pai 2002) (documentary chronicling the rise and fall of Kozmo.com, an online convenience store); *Start-up.com* (Artisan Entertainment 2001) (documentary chronicling the rise and

fall of GovWorks.com, a company that allowed users to pay taxes and government related bills online). For fictional documentaries, see *Dotcom: Hot Tubs, Pork Chops and Valium* (Brett Singer & Simeon Schnapper 2002) (fictional documentary of the rise and fall of Zectek.com, a company that is "the solution for e-tomorrow"); *Behind the Start-up: IceVan.com* (Sharon Zezima & Kal Deutsch 2002) (six-minute fictional documentary about IceVan.com, a company offering one-hour ice delivery, gourmet ice and accessories) *available at* http://www.icevan.com/.

**27.** *See* Bruce Weber, *Burning Bridges and Bridging Disasters: Lampooning@disorganization.com,* N.Y. Times, May 14, 2002 at E5 (theater review of Mike Daisey's off-Broadway play *21 Dog Years: Doing Time@Amazon.com,* "a lampoon of the contemporary corporate culture spawned by the dot.com boom and exemplified by Amazon.com").

the average first day increase for IPOs was 119%; in February of 2000, the average first day increase was 116%. These two averages are the first and second highest increases of the last three decades. But what makes the latter far more impressive is that only eight companies went public in February 1980, a number far below the historical average of twenty-nine companies that go public per month.[28] In stark contrast, *fifty-five* companies issued stock in February 2000. Likewise, taking into account the number of months that witnessed extraordinary first day increases, the IPO market of the 1990s substantially surpassed each of the previous hot issues markets. The table below sets forth the top fifteen months in terms of average first day increases since 1960, a majority of which occurred in the most recent hot issues market:

| First Day Increase | Month/Year | Number of IPOs |
| --- | --- | --- |
| 119.1 | Feb. 1980 | 8 |
| 116.2 | Feb. 2000 | 55 |
| 114.6 | Dec. 1999 | 40 |
| 103.8 | Dec. 1967 | 11 |
| 99.5 | Jan. 1999 | 12 |
| 97.9 | Nov. 1999 | 54 |
| 96 | May 1968 | 28 |
| 90.7 | Apr. 1977 | 5 |
| 87.5 | Mar. 1999 | 21 |
| 86.5 | Jan. 2000 | 15 |
| 85 | Mar. 2000 | 53 |
| 82.2 | Sep. 1998 | 3 |
| 80 | May 1978 | 2 |
| 77.1 | Oct. 1999 | 56 |
| 76.8 | Sep. 1999 | 40 |

The second point is that at the end of 2000, the SEC and various newspapers began to report on abuses in the IPO allocations. In August 2000, the SEC's Division of Market Regulation issued a legal bulletin stating that it had "become aware of complaints that, while participating in a distribution of securities, underwriters and broker-dealers have solicited their customers to make additional purchases of the offered security after trading in the security begins." SEC Legal Bulletin. The Bulletin sought to remind "underwriters, broker-dealers, and any other person who is participating in a distribution of securities ... that they are *prohibited* from soliciting or requiring their customers to make aftermarket purchases until the distribution is completed." *Id.* (emphasis added).

Newspapers also reported on their own investigations into the IPO allocation process. For example, on December 6, 2000, the *Wall Street Journal* published a front-page article discussing how investment banks were requiring their customers to buy shares of stock in the aftermarket as a condition of receiving IPO stock allocations. *See Trying to Avoid the Flippers.* The article begins:

> Hedge-fund trader Robert Meglio was riding high Aug. 15 when shares of Dyax Corp., a biotech company, made their trading debut at $15 and jumped to $20. His fund, Oracle Partners, had been allowed to buy 50,000 shares of the initial public offering. It scored a quick paper profit of $250,000.
>
> But its fat slice of the deal was no accident. To snare such a generous IPO

**28.** Data collected by Jay Ritter indicates that 14,756 companies have gone public during the 504 months between January 1960 and December 2001, *see supra* note 14, for an average of 29.3 IPOs per month.

allocation, Mr. Meglio says, he had told salesmen at Dyax's lead underwriter, J.P. Morgan & Co., that his fund would be willing to buy 100,000 more shares after they started trading. "I got a nice allocation, and if I hadn't indicated I would be an after-market buyer, I would have gotten a lot less," Mr. Meglio says. So goes the new IPO playbook on Wall Street. Underwriters want robust after-market buying so that an IPO will be a success for the newly public company and will make money for ground-floor investors. And big institutional investors are happy to express their plans for such buying in hopes of getting more shares at the IPO price.

*Id.*

The next day, the *Wall Street Journal* published another article reporting that federal authorities had begun investigating how securities firms were allocating IPO stock. *See* Susan Pulliam & Randall Smith, *U.S. Probes Inflated Commissions for Hot IPOs*, Wall St. J., Dec. 7, 2000, at C1. The article explained:

> The Securities and Exchange Commission along with the U.S. attorney's office in Manhattan are conducting the inquiry, which is at an early stage, the people say. A federal grand jury has also been called by the U.S. attorney's office to consider evidence. Both the U.S. attorney's office and the SEC have issued subpoenas to IPO participants, requesting trading records and other documents, these people add.
>
> The authorities are scrutinizing ways in which Wall Street dealers may have sought and obtained larger-than-typical trading commissions in return for giving

coveted allocations of IPOs to certain investors. Some of the arrangements could have included specific formulas tied to the investors' profits on the offerings, the people familiar with the probe say.

*Id.*

The first complaint in this litigation was filed one month later. *See Makaron v. VA Linux Sys., Inc.*, 01 Civ. 242 (filed Jan. 11, 2001).

## IV. THE COMPLAINTS

Plaintiffs have filed an Amended Complaint in 308 of the 309 consolidated cases. The Complaints detail the allegations about each Issuer's offering and set forth the various claims against the Underwriters, the Issuer and its officers. In addition, Plaintiffs have filed a document entitled "Master Allegations" that contains the allegations that are shared by all of the Complaints. The individual Complaints incorporate the Master Allegations by reference.

### A. Individual Complaints

As a randomly-chosen example of the individual Complaints, I shall describe in some detail the 34–page Consolidated Amended Complaint in *In re Cacheflow, Inc. Sec. Litig.*, 01 Civ. 5143 (filed April 24, 2002) ("Cacheflow Compl.").

### 1. Factual Allegations and Allegations of Market Manipulation

In 1999, Cacheflow, Inc., was a Sunnyvale, California-based company that produced appliances designed to speed up content delivery over the Internet.[29] *See* Cacheflow Compl. ¶ 17. At the time the

---

**29.** In the most basic terms, these appliances stored the most requested Internet data (*e.g.*, articles or pictures) from a customer's website—a process known as "caching." Once a customer's data is cached, the appliance is able to deliver the data to users of that website without contacting the original server. As a result, a customer's web-users have quicker access to the data.

company decided to go public, Brian NeSmith was the company's President and Chief Executive Officer, Michael Malcolm was Chairman of the Board of Directors, and Michael Johnson was Chief Financial Officer, Vice President and Secretary. *See id.* ¶¶ 18–20. Each of these individuals signed a registration statement and prospectus that was submitted to the SEC (collectively referred to as the "registration statement"). *See id.*

On November 18, 1999, Cacheflow's registration statement was approved by the SEC. *See id.* ¶ 5. The next day, an underwriting syndicate distributed 5,000,000 shares of Cacheflow at a price of $24.00 per share. *See id.* ¶ 30. The underwriting syndicate consisted of the following investment banks:

| POSITION | UNDERWRITER |
| --- | --- |
| LEAD MANAGER | Morgan Stanley |
| CO–MANAGER | CSFB |
| | Dain Rauscher |
| SYNDICATE MEMBERS | Robertson Stephens (as successor-in-interest to Banc Boston) |
| | BancBoston |
| | Salomon |
| | J.P. Morgan (as successor-in-interest to H & Q) |
| | H & Q |

*Id.* ¶ 14. All of the Underwriters were allocated Cacheflow's initial stock except for J.P. Morgan (H & Q).[30] *See id.* ¶¶ 14–15.

"On the day of the IPO, the price of Cacheflow stock shot up dramatically, trading as high as $139.25 per share, or more than 480% above the IPO price on substantial volume." *Id.* ¶ 31. Trading on the Nasdaq under the ticker symbol "CFLO", the price of Cacheflow's stock continued to rise in the weeks following the IPO. *See id.* ¶ 32. Indeed, the stock "hit a high of $182 1/6 per share on December 9, 1999, just prior to the end of the quiet period."[31] *Id.* At some point after the offering, "Plaintiffs Val Kay, Greg Frick, Eric Egelman and Kenneth L. Schmid ... purchased or otherwise acquired shares of Cacheflow common stock traceable to the IPO." *Id.* ¶ 12.

Plaintiffs allege that this remarkable price increase in Cacheflow's stock "was not the result of normal market forces." *Id.* ¶ 31. Rather, "the Allocating Underwriter Defendants created artificial demand for Cacheflow stock by conditioning share allocations in the IPO upon the requirement that customers agree to purchase shares of Cacheflow in the aftermarket and, in some instances, to make those purchases at pre-arranged, escalating prices ("Tie-in Agreements")." *Id.* ¶ 3. "As part and parcel of this scheme ... certain of the underwriters ... also improperly utilized their analysts, who, unbeknownst to investors, were compromised by conflicts of interest, [to] artificially inflate or maintain the price of Cacheflow stock by issuing favorable recommendations in analyst reports." *Id.* ¶ 7.

---

**30.** The contract between Cacheflow and the Underwriters was a so-called "firm commitment" agreement under which the Underwriters purchased the IPO securities directly from the Issuer and then resold the securities to investors. Cacheflow Compl. ¶ 30. Thus, even if the investment banks had failed to sell the stock, Cacheflow would have received the agreed upon sum. In addition, the contract granted the underwriting syndicate an option to purchase 750,000 additional shares at the initial offering price ($24.00) minus the underwriting discounts and commissions. *Id.*

**31.** For a time line of Cacheflow from its beginning on March 13, 1996, until February 2000 when its stock was trading at $112.875, see Suzanne McGee, *Venture Capitalists 'R' Us: CacheFlow: The Life Cycle of a Venture-Capital Deal*, Wall St. J., Feb. 22, 2000 at C1, *available at* 2000 WL–WSJ 3018799.

Under this scheme, Cacheflow's Underwriters profited by "requir[ing] their customers to repay a material portion of profits obtained from selling IPO share allocations in the aftermarket through one or more of the following types of transactions:"

(a) paying inflated brokerage commissions;

(b) entering into transactions in otherwise unrelated securities for the primary purpose of generating commissions; and/or

(c) purchasing equity offerings underwritten by these IPO Underwriter Defendants, including, but not limited to, secondary (or add-on) offerings that would not be purchased but for the unlawful scheme alleged herein.

*Id.* ¶ 4. Plaintiffs collectively refer to these payments as "Undisclosed Compensation." *Id.*

Plaintiffs also contend that NeSmith, Malcolm and Johnson "knew of or recklessly disregarded the conduct complained of herein through their participation in the 'Road Show' process by which underwriters generate interest in public offerings." [32] *Id.* ¶ 8. Moreover, these officers benefitted from the Tie-in Agreements "as a result of their personal holdings of the Issuer's stock." *Id.*

## 2. The Registration Statement's Misleading Statements and Omissions

According to the Complaint, Cacheflow's registration statement "failed to disclose, among other things ... that the Allocating Underwriter Defendants had required Tie-in Agreements in allocating shares in the IPO and would receive Undisclosed Compensation in connection with the IPO." *Id.* ¶ 6. Plaintiffs further allege that the Defendants made eight specific materially false or misleading statements.

*First,* Plaintiffs highlight the following paragraph in the registration statement:

In order to facilitate the offering of the common stock, the underwriters may engage in transactions that stabilize, maintain or otherwise affect the price of the common stock. Specifically, the underwriters may agree to sell or allot more shares than the 5,000,000 shares of common stock Cacheflow has agreed to sell them. This over-allotment would create a short position in the common stock for their own account. To cover over-allotments or to stabilize the price of the common stock, the underwriters may bid for, and purchase, shares of common stock in the open market. Finally, the underwriting syndicate may reclaim selling concessions allowed to an underwriter or a dealer for distributing the common stock in the offering if the syndicate repurchases previously distributed shares of common stock in transactions to cover syndicate short positions, in stabilization transactions or otherwise. Any of these activities may stabilize or maintain the market price of the common stock above independent market levels. The underwriters are not required to engage in these activi-

---

**32.** A road show involves "representatives of the lead underwriter and the issuer travel[ing] to various cities and meet[ing] with potential investors who may have an interest in purchasing shares in the IPO." MA ¶ 22. *See also Sandstad v. CB Richard Ellis, Inc.,* 309 F.3d 893, 895 n. 1 (5th Cir.2002) (" 'A road show is designed to drum up interest in the issue among potential investors.' ") (quoting David L. Scott, *Wall Street Words* 326 (Rev. ed.1997)); *Gabriel Capital, L.P. v. NatWest Fin. Inc.,* 177 F.Supp.2d 169, 171 n. 2 (S.D.N.Y.2001) (defining a road show as a sales presentation by underwriters and issuers recommending the purchase of securities to investors).

ties and may end any of these activities at any time.

*Id.* ¶ 37. "[These statements] were materially false and misleading because the Allocating Underwriter Defendants required customers to commit to Tie-in Agreements and created the false appearance of demand for the stock at prices in excess of the IPO price in violation of Regulation M," a regulation promulgated by the SEC under the Exchange. Act. *Id.* ¶ 38. Rule 101(a) of Regulation M states:

> *Unlawful Activity.* In connection with a distribution of securities, it shall be unlawful for a distribution participant or an affiliated purchaser of such person, directly or indirectly, to bid for, purchase, or attempt to induce any person to bid for or purchase, a covered security during the applicable restricted period.

*Id.* ¶ 35 (quoting 17 C.F.R. § 242.101). Moreover, the SEC Legal Bulletin explains:

> *Tie-in agreements are a particularly egregious form of solicited transactions prohibited by Regulation M.* As far back as 1961, the Commission addressed reports that certain dealers participating in distributions of new issues had been making allotments to their customers only if such customers agreed to make some comparable purchase in the open market after the issue was initially sold. The Commission said that such agreements may violate the antimanipulative provisions of the Exchange Act, particularly Rule 10b–6 (which was replaced by Rules 101 and 102 of Regulation M)

under the Exchange Act, and may violate other provisions of the federal laws.

> *Solicitations and tie-in agreements for aftermarket purchases are manipulative because they undermine the integrity of the market as an independent pricing mechanism for the offered security.* Solicitations for aftermarket purchases give purchasers in the offering the impression that there is a scarcity of the offered securities. This can stimulate demand and support the pricing of the offering. Moreover, traders in the aftermarket will not know that the aftermarket demand, which may appear to validate the offering price, has been stimulated by the distribution participants. Underwriters have an incentive to artificially influence aftermarket activity because they have underwritten the risk of the offering, and a poor aftermarket performance could result in reputational and subsequent financial loss.[33]

*Id.* ¶ 36 (emphasis in original) (quoting the SEC Legal Bulletin). "At no time did the Registration Statement/Prospectus disclose that the Allocating Underwriter Defendants would require their customers to engage in transactions causing the market price of Cacheflow common stock to rise, in transactions that cannot be characterized as stabilizing transactions, over-allotment transactions, syndicate covering transactions or penalty bids." *Id.* ¶ 38.

*Second,* Plaintiffs contend that the registration statement was false and misleading because Regulation S–K requires disclosure of payments from customers who re-

---

**33.** "Staff Legal Bulletins summarize the [Securities Exchange] Commission staff's views regarding various aspects of the federal securities laws and SEC regulations. They represent interpretations and policies followed by the Divisions of Corporation Finance, Market Regulation, or Investment Management on any given matter. Because they represent the views of the staff, staff legal bulletins are not legally binding." U.S. Securities and Exchange Commission, Staff Legal Bulletins, *available at* http://www.sec.gov/interps/legal.shtml.

ceived IPO shares.[34] *See* Cacheflow Compl. ¶ 42. Item 508(e) of Regulation S–K provides:

> *Underwriter's Compensation.* Provide a table that sets out the nature of the compensation and the amount of discounts and commissions to be paid to the underwriter for each security and in total. The table must show the separate amounts to be paid by the company and the selling shareholders. *In addition, include in the table all other items considered by the National Association of Securities Dealers to be underwriting compensation for purposes of that Association's Rules of Fair Practice.*

*Id.* ¶ 39 (emphasis in original) (quoting 17 C.F.R. § 229.508(e)). The NASD "specifically addresses what constitutes underwriting compensation in NASD Conduct Rule 2710(c)(2)(B) (formerly Article III, Section 44 of the Association's Rules of Fair Practice)[.]" *Id.* ¶ 40. It states:

> For purposes of determining the amount of underwriting compensation, all items of value received or to be received from any source by the underwriter and related persons which are deemed to be in connection with or related to the distribution of the public offering as determined pursuant to subparagraphs (3) and (4) below shall be included.

*Id.* (emphasis omitted). NASD Conduct Rule 2710(c)(2)(C) requires:

> If the underwriting compensation includes items of compensation in addition to the commission or discount disclosed on the cover page of the prospectus or

similar document, a footnote to the offering proceeds table on the cover of the prospectus or similar document shall include a cross-reference to the section on underwriting or distribution arrangements.

*Id.* ¶ 41. "Contrary to applicable law, the Registration Statement/Prospectus did not set forth, by footnote or otherwise, the Undisclosed Compensation." *Id.* ¶ 42.

*Third,* the registration statement "misleadingly stated that the underwriting syndicate would receive as compensation an underwriting discount of $1.68 per share, or a total of $8,400,000, based on the spread between the per share proceeds to Cacheflow ($22.32) and the Offering price to the public ($24.00 per share)." *Id.* ¶ 43. "This disclosure was materially false and misleading as it misrepresented underwriting compensation by failing to include Undisclosed Compensation." *Id.*

*Fourth,* the registration statement was materially false and misleading when it stated:

> The underwriters initially propose to offer part of the shares of common stock directly to the public at the initial public offering price set forth on the cover page of this prospectus [$24.00] and part to various dealers at a price that represents a concession....

*Id.* ¶ 44. This statement was "materially false and misleading in that in order to receive share allocations from the Allocating Underwriter Defendants in the IPO, customers were required to pay an amount

---

**34.** "Regulation S–K coordinates the one-time disclosure requirements of the 1933 Act relating to public offerings with the continuous disclosure requirements of reporting companies under the 1934 Act...." Winthrop B. Conrad, Jr. and Bruce K. Dallas, *The Registration Process—Overview and Selected Considerations,* in *How to Prepare an Initial Public Offering 2001* 157, 167 (Practising Law Institute Corporate Law and Practice Course Handbook Series No. B0–01BW, 2001). *See also* Proposed Revision of Regulation S–K and Guides for the Preparation and Filing of Registration Statements and Reports, 46 Fed. Reg. 78, 79 (proposed Jan. 2, 1981); Adoption of Integrated Disclosure System, 47 Fed.Reg. 11,380, 11,389 (Mar. 16, 1982).

in excess of the IPO price set forth on the cover page in the form of Undisclosed Compensation and/or Tie-in Agreements." *Id.* ¶ 45.

*Fifth,* the investment banks that allocated Cacheflow's stock violated NASD Conduct Rule 2330(f), which states that "no member or person associated with a member shall share directly or indirectly in the profits or losses in any account of a customer carried by the member or any other member." *Id.* ¶ 46. "The Allocating Underwriter Defendants' scheme was dependent upon customers obtaining substantial profits by selling share allocations from the IPO and paying a material portion of such profits to the Allocating Underwriter Defendants. In this regard, the Allocating Underwriter Defendants shared in their customers' profits in violation of NASD Conduct Rule 2330(f)." *Id.* ¶ 47. "The failure to disclose the Allocating Underwriter Defendants' unlawful profit-sharing arrangement as described herein, rendered the Registration Statement/Prospectus materially false and misleading." *Id.* ¶ 48.

*Sixth,* the registration statement was "false and misleading due to its failure to disclose the material fact that the Allocating Underwriter Defendants were charging customers commissions that were unfair, unreasonable, and excessive as consideration for receiving allocations of shares in the IPO." *Id.* Plaintiffs base this allegation on NASD Conduct Rule 2440, which states in relevant part:

[A member] shall not charge his customer more than a fair commission or service charge, taking into consideration all relevant circumstances, including market conditions with respect to such security at the time of the transaction, the expense of executing the order and the value of any service he may have rendered by reason of his experience in

and knowledge of such security and market therefor.

*Id.* ¶ 49. Moreover, according to Guideline IM–2440 of the NASD:

It shall be deemed a violation of ... Rule 2440 for a member to enter into any transaction with a customer in any security at any price not reasonably related to the current market price of the security or to charge a commission which is not reasonable.... A mark-up of 5% or even less may be considered unfair or unreasonable under the 5% policy.

*Id.* ¶ 50.

*Seventh,* the registration statement "failed to accurately disclose which of the underwriters identified therein actually participated in the distribution of the IPO." *Id.* ¶ 52. For example, "J.P. Morgan (H & Q) did not receive any of the 100,000 shares listed next to its name." *Id.* ¶ 54. Thus, the registration statement "was materially false and misleading in that it did not inform the investing public that the shares in the IPO would be distributed only by a few of the underwriters" who were identified in the registration statement. *Id.* ¶ 53.

*Eighth,* and finally, on "December 15, 1999, just after the expiration of the 'quiet period' with respect to the Cacheflow IPO, Defendants CSFB and Dain Rauscher each initiated analyst coverage of Cacheflow. Dain Rauscher issued a 'Strong Buy' recommendation with a 12–month price target of $175 per share .... [and] Cacheflow stock closed at $141.50 per share that day." *Id.* ¶ 56. "The price target set forth in the Dain Rauscher report was materially false and misleading as it was based upon a manipulated price." *Id.* ¶ 57.

### 3. Claims

Based on these allegations, Plaintiffs have brought six claims against the Defendants pursuant to the Securities Act and the Exchange Act. *First,* that each member of the underwriting syndicate, Cacheflow, NeSmith, Malcolm and Johnson violated Section 11 of the Securities Act by including untrue statements and omitting statements of material fact in Cacheflow's registration statement. *See* Cacheflow Compl. ¶¶ 60–68; *see also* 15 U.S.C. § 77k. *Second,* that NeSmith, Malcom and Johnson are liable under Section 15 of the Securities Act, which holds a controlling person liable for a company's Section 11 violation. *See* Cacheflow Compl. ¶¶ 69–75; *see also* 15 U.S.C. § 77o. *Third,* that the Allocating Underwriter Defendants (*i.e.,* all of the underwriters except J.P. Morgan (H & Q)) violated Section 10(b) of the Exchange Act and Rule 10b–5 by manipulating the market with Tie-in Agreements and by requiring customers to pay Undisclosed Compensation. *See* Cacheflow Compl. ¶¶ 84–92; *see also* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. *Fourth,* that all Underwriter Defendants violated Section 10(b) and Rule 10b–5 by making material misrepresentations and omissions for the purpose of securing and concealing the Tie-in Agreements, Undisclosed Compensation, the conflicts of interest between the Underwriter Defendants and the analysts who reported on Cacheflow's stock or some combination thereof. *See* Cacheflow Compl. ¶¶ 93–103; *see also* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. *Fifth,* that Cacheflow, NeSmith, Malcom, and Johnson violated Section 10(b) and Rule 10b–5 by carrying out a scheme to artificially inflate the price of the company's stock by making material misrepresentations and omissions to conceal the Under-

writers' behavior. *See* Cacheflow Compl. ¶¶ 111–20; *see also* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. *Sixth,* that NeSmith, Malcom and Johnson are liable under Section 20(a), which holds a controlling person liable for a company's Section 10(b) and Rule 10b–5 violations. *See* Cacheflow Compl. ¶¶ 121–24; *see also* 15 U.S.C. § 78t(a).

The following chart summarizes these claims:

| Claim | Underwriters | Issuers | Individuals |
|---|---|---|---|
| 1. | Section 11 | Section 11 | Section 11 |
| 2. | | | Section 15 |
| 3. | Rule 10b–5 for manipulative practices (only against Allocating Underwriters) | | |
| 4. | Rule 10b–5 for false statements and omissions | | |
| 5. | | Rule 10b–5 for false statements and omissions | Rule 10b–5 for false statements and omissions |
| 6. | | | Section 20(a) |

### B. Part I of Master Allegations

There are essentially three parts to the Master Allegations. Part I outlines factual allegations against the Defendants. Part II provides relevant details about twenty-two of the fifty-five Underwriter Defendants. Part III contains a brief description of each Underwriter Defendant and the number of shares received for each IPO. Part I will be the discussed in the greatest detail because it contains the most relevant factual allegations.

### 1. Tie-in Allegations and Undisclosed Compensation

Part I of the Master Allegations is 114–pages long and its most important paragraphs are 14–17 and 34.[35] Paragraphs 14–17 set forth the Plaintiffs' alle-

---

**35.** The Master Allegations also generally describe the scope and time frame of the current litigation, *see* MA ¶¶ 1–4, as well as the mechanics of an IPO, *see id.* ¶¶ 6, 18–26.

gations about the alleged Tie-in Agreements and Undisclosed Compensation:

14. The Underwriter Defendants set about to ensure that there would be large gains in aftermarket trading on shares following initial public offerings by improperly creating artificial aftermarket demand. They accomplished this by conditioning share allocations in initial public offerings upon the requirement that customers agree to purchase, in the aftermarket, additional shares of stocks in which they received allocations, and, in some instances, to make those additional purchases at pre-arranged, escalating prices ("Tie-in Agreements").

15. These Tie-in Agreements did not always require that the investors receiving allocations in initial public offerings actually purchase shares in the aftermarket, although often they did. The Tie-in Agreements were designed to ensure ready demand for shares in the event the Underwriter Defendants so desired.

16. By extracting agreements to purchase shares in the aftermarket, the Underwriter Defendants created artificial demand for aftermarket shares, thereby causing the price of the security to artificially escalate as soon as the shares were publicly issued.

17. Not content with record underwriting fees obtained in connection with new offerings, the Underwriter Defendants sought, as part of their manipulative scheme, to further enrich themselves by improperly sharing in the profits earned by their customers in connection with the purchase and sale of IPO securities. The Underwriter Defen-

dants kept track of their customers' actual or imputed profits from the allocation of shares in the IPOs and then demanded that the customers share a material portion of the profits obtained from the sale of those allocated IPO shares through one or more of the following types of transactions: (a) paying inflated brokerage commissions; (b) entering into transactions in otherwise unrelated securities for the primary purpose of generating commissions; and/or (c) purchasing equity offerings underwritten by the Underwriter Defendants, including, but not limited to, secondary (or add-on) offerings that would not be purchased but for the Underwriter Defendants' unlawful scheme (Transactions "(a)" through "(c)" above will be, at varying times, collectively referred to hereinafter as "Undisclosed Compensation").

MA ¶¶ 14–17.

"For example," according to paragraph 34, "customers who received allocations of IPO shares in the following listed IPOs fulfilled their commitments to purchase shares in the aftermarket pursuant to Tie-in Agreements, netting the Underwriter Defendants and other underwriters of the referenced offerings substantial additional trading revenue and commissions and substantially and artificially increasing the demand for the issuer's shares[.]" *Id.* ¶ 34. The statement made in the Master Allegations with respect to Cacheflow's IPO is representative of the allegations repeatedly made in paragraph 34:

One customer, in order to obtain shares of the Cacheflow IPO from Morgan Stanley, was required or induced to and did purchase from Morgan Stanley in the aftermarket, at prices substantially

above the IPO price, thousands of additional Cacheflow shares.

*Id.* ¶ 34, at 16.

While paragraph 34 makes similar allegation with respect to almost every IPO—from Aclara Biosciences to Z–Tel Technologies—and fills over 71 pages of the Master Allegations, *see id.* ¶ 34 at 8–80, these allegations are not duplicative. The allegations in paragraph 34 differ in three significant ways. *First,* each allegation varies with respect to the Underwriter from whom that particular unnamed customer bought the IPO stock. For example, the allegations involving Autoweb and Backweb Technologies state:

> One customer, in order to obtain shares of the Autoweb IPO *from CSFB,* was required or induced to and did purchase *from CSFB* in the aftermarket, at prices substantially above the IPO price, about twice the number of Autoweb shares allocated to that customer in the IPO.
>
> \* \* \* \* \* \*
>
> One customer, in order to obtain shares of the Backweb Technologies IPO *from Goldman Sachs,* was required or induced to and did purchase *from Goldman Sachs* in the aftermarket, at prices substantially above the IPO price, more

than three times the number of Backweb Technologies shares allocated to that customer in the IPO.

*Id.* ¶ 34 at 13–14 (emphasis added).

*Second,* the allegations differ as to the amount of stock that the customer was required or induced to buy in the aftermarket. For instance, while one customer was required or induced to purchase "thousands of additional Intersil shares," *id.* ¶ 34 at 37, another customer was required or induced to purchase "more than three times the number of Liberate shares allocated to that customer in the IPO," *id.* ¶ 34 at 40.[36]

*Third,* in forty-seven of the 309 cases, Plaintiffs allege at least two examples of customers who were required or induced to buy stock in the aftermarket from a particular Underwriter.[37] For example, the allegations with respect to PSI Technologies state:

> a) One customer, in order to obtain shares of the PSI Technologies IPO from J.P. Morgan (H & Q), was required or induced to and did purchase from J.P. Morgan (H & Q) in the aftermarket, at prices substantially above the IPO price, as many PSI Technologies shares as

---

**36.** Overall, there are five different quantities of stock that customers bought in the aftermarket: customers bought "thousands of additional shares," the same amount as they were sold in IPO stock, or more than twice, three times or four times the number of IPO shares that they were sold.

**37.** Those IPOs include: Agilent Techs., Audible, Braun, Brocade, BSquare, Choice One, Clarent, Covad, Cybersource, Digital Island, Doubleclick, eToys, Focal Comm., Global Crossing, High Speed Access, Immersion, Informax, (ITXI) Integrated Telecom, Manufacturers Servs., Martha Stewart Living Omnimedia, Metasolv [sic] Software, MP3.com, Net2Phone, Network Engines, Netzero, Northpoint Comm. Group, Onvia.com, PacWest Telecomm, Packeteer, Paradyne Net-

works, Perot Sys., Prodigy Comm., PSI Techs., Radio One, Ravisent Techs., Rhythyms [sic] Netconnections, Sonicwall, Spanish Broadcasting, Starmedia Network, Telecommunications Sys., Terra Networks, VIA Net. works [sic], Viador, Webvan, World Wrestling Federation Entertainment, ZDZ, Z–Tel Tech.

In eleven of these forty-seven IPOs, Plaintiffs have alleged more than two examples of a customer who bought stock because of a Tie-in Agreement. Those IPOs include (number of customers in parenthetical): Agilent Tech. (4), eToys (3), Global Crossing (5), Manufacturers Servs. (3), Netzero (3), Northpoint Comm. Group (3), Perot Systems (5), PSI Techs. (3), Spanish Broadcasting (3), Terra Networks (4), ZDZ (5).

that [sic] allocated to that customer in the IPO.

b) One customer, in order to obtain shares of the PSI Technolog[ies] IPO from Soundview Technolog[ies] (E*Trade), was required or induced to and did purchase from Soundview Technolog[ies] (E*Trade) in the aftermarket, at prices substantially above the IPO price, four times the number of PSI Technology shares allocated to that customer in the IPO.

c) One customer, in order to obtain shares of the PSI Technolog[ies] IPO from Goldman Sachs, was required or induced to and did purchase from Goldman Sachs in the aftermarket, at prices substantially above the IPO price, thousands of additional PSI Technology shares.

*Id.* ¶ 34 at 59.

Paragraphs 35–56 further supplement these allegations in three ways. *First,* these paragraphs provide more details about the types of Undisclosed Compensation that customers paid to the investment banks. Paragraphs 41–43 state:

41. One form of Undisclosed Compensation involved the payment of inflated brokerage commissions. In that regard, investors were instructed or made to understand that allocations of IPO shares would be awarded to customers that paid per share commission rates well in excess of the ordinary and customary commission rates for these accounts, as well as the rules and regulations governing the securities industry.

42. The Underwriter Defendants also sought and received Undisclosed Compensation from customers in the form of commissions paid on trades of highly liquid securities made solely for the purpose of generating commissions. Sometimes these trades were executed in stocks for which the Underwriter Defendants were market makers and which they wanted to actively support. These trades were akin to "churned" sales or "wash" transactions, generated for the main purpose of creating financial benefits for the Underwriter Defendants.

43. The Underwriter Defendants also sought and received Undisclosed Compensation in the form of compensation earned by forcing customers to buy shares of offerings, including undesired add-on offerings, with the understanding that customers would receive IPO allocations only if they purchased such shares.

*Id.* ¶¶ 41–43.

*Second,* the paragraphs provide further detail as to how the investment banks enforced their scheme with their customers:

45. With regard to retail accounts, firms (including, for example, Morgan Stanley and Paine Webber) typically utilized a grid (or index) system whereby allocations were made to individual brokers, to then be awarded to clients, based on point totals. The higher the points, the more likely it was for a broker to be awarded an allocation of shares in an initial public offering.

46. Brokers earned points on the grid by allocating shares to clients who were required or induced to buy, and in fact bought, shares of the issuer in the aftermarket, typically at multiples of the initial shares allocated and at prices above the offering price. Brokers also earned points by selling customers

shares in add-on offerings. These offerings typically were not favored investments by customers as they offered scant investment returns. However, underwriters earned large fees on add-on offerings and received sizeable commissions on sales of such shares.

47. The Underwriter Defendants' misconduct in connection with [the] initial public offerings was so pervasive and uniform from underwriting firm to underwriting firm, that retail sales personnel relocating to new firms were able to transfer their "grid" scores to new firms.

*Id.* ¶¶ 45–47.

*Third,* paragraphs 35–56 refer to various newspaper articles that have reported on the government's investigation into the IPO allocation practices of investment banks during the same time period. For example, the Master Allegations quote a May 11, 2001, New York Times article reporting on the federal grand jury testimony of hedge fund trader Walter Scott Bruan that states:

Mr. Bruan has contended that investment banks manipulated the trading of I.P.O.'s by lining up commitments from investors to buy more shares at specific prices above the offering prices. That practice, known as laddering, would help to ensure that the price of a new stock would rise on its first day of trading, fueling demand from other investors who wanted a piece of a hot stock, Mr. Bruan has said.

*Id.* ¶ 36 (quoting Patrick McGeehan, *Hedge Fund Managers Said to Talk to Grand Jury,* N.Y. Times, May 11, 2001, at C1). Likewise, the Master Allegations have similar quotations from other investigative reports on IPO allocation practices. *See id.* ¶ 37 (quoting from 5/25/01 USA Today article); *id.* ¶ 40 (quoting from 12/7/00 Wall Street Journal article); *id.* ¶¶ 49–52 (quoting from Red Herring articles that were published in a seven-part series beginning on 5/2/01); *id.* ¶ 53 (quoting from 6/29/01 Wall Street Journal article); *id.* ¶ 55 (quoting from 6/24/00 Wall Street Journal article).

## 2. Statistical Analysis

Paragraphs 57–65 fall under a heading entitled "Statistical Analysis Of The Coordinated Litigation Confirms the Misconduct Alleged Herein." *Id.* at 87. These paragraphs compare various data from the IPOs at issue in this coordinated litigation with other data from other IPOs during the same time period or from previous years. Specifically, Plaintiffs allege:

(1) the IPO Litigation Offerings "had the highest average first day market gain [almost 140%] of any initial public offering market of any period measured [*i.e.,* 1980–1999]," *id.* ¶ 58,

(2) "although average first day gains were also higher for all IPOs during the Class Period [ ] (just over 60%), the first day aftermarket gains of the IPO Litigation Offerings (almost 140%) were far more dramatic," *id.* ¶ 59,

(3) "[w]hereas in the Prior Period IPO Market [from Jan. 1980—June 1998], approximately one out of every ten initial public offerings fell below 10% of the offering price within three years," this happened to "more than 50% of the initial public offerings comprising the IPO Litigation Offerings," *id.* ¶ 60,

(4) "whereas on average the number of shares traded in the first five days after the IPO was equal to 85% of the shares offered in the Prior Period IPO Market [Oct.1982–June 1998], the number of shares traded on average in the first five days after

the IPO Litigation Offerings was equal to over 350% of the shares issued," *id.* ¶ 61,

(5) "part of the Underwriter Defendants' motivation for engaging in the misconduct [ ] was to conduct secondary offerings at a much higher price ... [and] the percentage of IPOs that were followed by a subsequent equity offering within 6 months increased dramatically for the IPO Litigation Offerings [when compared with IPOs from 1980–June 1998]," *id.* ¶ 62,

(6) "[i]n the Prior Period IPO Market [January 1980–June 1998], secondary offerings followed initial public offerings on average less than 3.5% of the time ... [while] the IPO Litigation Offerings were followed by secondary offerings within six months almost five times as often (16%)," and "[a]ll Offerings were followed by secondary offerings within six months of the IPO only slightly more than 8% of the time," *id.* ¶ 63,

(7) "[t]he IPO Litigation Offerings showed substantial price increases on average around the end of the quiet period, whereas initial public offerings in the Prior Period IPO Market [Jan.1989–June 1998] showed very little price increase on average," *id.* ¶ 64,

(8) "[t]he IPO Litigation Offerings also contrasted markedly with All Offerings during the 1998–2000 IPO Market," *id.* ¶ 65.

Each of these allegations is followed by a four-colored graph illustrating the allegation.

### 3. Matrix Illustrating Various Relationships Among Underwriters

Paragraphs 66–85 fall under a heading entitled "Matrix." This six-page illustration shows "the relationships between the lead underwriters ('book runners') of the IPO Litigation Offerings and the underwriters who participated in such offerings." *Id.* ¶ 66. For example, a representative allegation states:

In the 41 IPO Litigation Offerings in which Robertson Stephens was the book-runner (or co-book-runner), the following underwriters participated in the number of IPO Litigation Offerings set forth next to their names: Bear Stearns (7); H & Q (14); SG Cowen (7); Piper Jaffray (12); Prudential (8); SureTrade (7); Weisel (7); First Albany (8); Dain Rauscher (16); CE Unterberg (8); E*Trade (16); and Needham & Co. (10).

*Id.* ¶ 70. The matrix illustrates the relationship that each of the twenty-one investment banks that served as book-runners or co-book-runners in the IPO Litigation Offerings had with the other investment banks. *See id.* ¶ 66.

### 4. Analyst Allegations

Paragraphs 86–108 contain the Plaintiffs' allegations that the Underwriter Defendants used their analysts "to artificially inflate and maintain the aftermarket price of [the IPO] securities." *Id.* ¶ 86. "[T]he Underwriter Defendants utilized their analysts to recommend such stocks at their first opportunity, typically at the end of the so-called 'quiet period,' 25 days following the offering." *Id.* "Between 1998 and 2000, 97% of analyst initiations at the expiration of the quiet period were by managing underwriters of the initial public offering. Virtually all such coverage was positive." *Id.* ¶ 108. "In many instances the favorable recommendations were accompanied by unrealistic price targets, frequently reiterated throughout the relevant class periods." *Id.* ¶ 86. Not only did "analysts employed by the Underwriter Defendants [know] that a negative recom-

mendation would likely lead to fewer investment banking opportunities," *id.* ¶ 89, but they have been "confronted with enormous pressure to issue favorable recommendations regarding shares underwritten by the various Underwriter Defendants," *id.* ¶ 107.

The Master Allegations allege three types of perceived conflicts. "[M]any, if not most, of the Underwriter Defendants tied their analysts' compensation to the performance of the investment banking section of the Underwriter Defendants so that the winning of new investment bank business would directly inure to the pecuniary benefit of the analyst." *Id.* ¶ 88. "Many analysts also suffered from conflicts of interest due to their ownership of stock in companies they were recommending." *Id.* ¶ 90. Finally, "analysts frequently had equity interests in entities including venture capital funds and partnerships which had investment interests in these issuers." *Id.* ¶ 104.

### 5. Motivations of the Underwriters, Issuers and Individual Defendants

The last four paragraphs of Part I, *see id.* ¶¶ 109–12, allege the motivations that the various Defendants had in carrying out these Tie-in Arrangements. In addition to receiving various forms of Undisclosed Compensation, *see id.* ¶¶ 41–43, "the Underwriter Defendants were [also] able to parlay the spectacular increase in market capitalization attendant to each offering into additional and highly lucrative investment banking opportunities for themselves," *id.* ¶ 109. "Examples of these additional opportunities include the underwriting of add-on offerings such as

secondary and tertiary equity offerings (for which the Underwriter Defendants typically were paid a fixed percentage of the offering price), the underwriting and sales of debt and convertible offerings and advisory services including financial consulting and advising on mergers and acquisitions." *Id.* Likewise, during the late 1990s, "the Underwriter Defendants marketed themselves by emphasizing the prospect of substantial market gains, including the first day gains, of IPO Offerings to entice potential clients to retain those underwriters." *Id.* ¶ 110.

The last paragraph contains the only reference to the alleged motivation of the Issuers and the Individual Defendants to participate in this scheme. *See id.* ¶ 112. "The Issuers, as new publicly held corporations, benefitted financially from the misconduct as the run up of their respective stock prices afforded them with substantial opportunities to utilize their stock as currency in connection with corporate acquisitions, and to raise even more money through add-on offerings." *Id.* As far as the Individual Defendants are concerned, "[they] were motivated to and did benefit financially as a result of the sharp appreciation in value of the respective Issuer's stock price." *Id.*

### C. Part II and Part III of the Master Allegations

Although the second and third part of the Master Allegations fill hundreds of pages, they are easily summarized. Part II has twenty-two sections, each of which is tabbed to one particular Underwriter Defendant.[38] All of the sections contain

---

**38.** The following investment banks are included in Part II (tab number in parenthetical): Credit Suisse First Boston (1), Goldman Sachs (2), Morgan Stanley (3), Robertson Stephens (4), Merrill Lynch (5), Lehman Brothers (6), Donaldson Lufkin & Jenrette Securi-

ties, Inc. (7), Bear Stearns (8), Salomon Smith Barney (9), Deutsche Banc Securities Inc. (10), J.P. Morgan Chase & Co. (11), U.S. Bancorp Piper Jaffray, Inc. (12) RBC Dain Rauscher, Inc. (13), Prudential Securities Incorporated (14), CIBC WorldMarkets Corp.

(1) background information on that Underwriter, (2) quotations from various newspaper articles reporting on perceived abuses in the IPO allocations by that investment bank, and (3) a list of the IPOs and their offering price that the Underwriter led or co-led, First Day High Price, and the percentage increase that the First Day High represents when compared to the IPO price. In addition, the twenty-one page section on CSFB restates facts revealed from the government's investigation into the IPO allocation practices of that bank as well as its subsequent settlement with the SEC.

Part III is marked with two tabs. After Tab A, Plaintiffs have listed each of the fifty-five investment banks and provided several paragraphs of information about the bank's corporate structure. After Tab B, Plaintiffs have listed the IPOs the Underwriter participated in, the IPO price and the number of shares that investment bank was allocated in that IPO. In addition, Plaintiffs have included estimates as to the amount of additional compensation that customers were required to pay in order to receive the IPO stock. For example, one summary reads:

*Banc of America*

| IPO | IPO Price | Shares Allocated |
|---|---|---|
| Apropos | $22.00 | 2,000 |
| Digital Insight | $15.00 | 2,000 |
| Digitas | $24.00 | 4,000 |
| DrKoop.com | $ 9.00 | 20,000 |
| High Speed Access | $13.00 | 8,000 |
| Modem Media | $16.00 | 1,000 |
| NetRatings | $17.00 | 2,000 |
| Oni Systems | $25.00 | 2,000 |
| Repeater Technologies | $ 9.00 | 1,000 |
| Saba Software | $15.00 | 1,000 |
| Ticketmaster Online–City Search, Inc. | $14.00 | 9,000 |
| Utstarcom | $18.00 | 2,000 |

In order to receive the above listed and other IPO allocations of securities from Banc of America, the recipients of such allocations were required or induced to pay in excess of $3.7 million in commissions to Banc of America during 1999 and 2000. These commissions were generated from trades that would not have occurred but for the allocations, and which were created predominately for the purpose of compensating Banc of America for the allocations received. All of these commissions are referred to herein as "Undisclosed Compensation".

*Id.* Sect. III, Tab B, at 1. A similar chart and allegation follows the listing of each Underwriter.

## *GOVERNING LEGAL PRINCIPLES*

### V. PLEADING UNDER THE FEDERAL RULES OF CIVIL PROCEDURE

The individual Complaints average more than thirty pages each, comprising a total of nearly 11,355 pages. Defendants have challenged these Complaints as insufficient. The parties have submitted over 500 pages of legal briefing along with thousands of additional pages of attachments, appendixes and letters to support their arguments. Given the seriousness of these allegations, the extent of the briefing, and the fact that there are more than one thousand parties, a thorough discussion of the pleading requirements of the

(15), Banc of America (16), Paine Webber (17), Dillon Read (18), SoundView/Wit Capital/E*Offering (19), Friedman Billings (20), SG Cowen (21), and Thomas Weisel Partners LLC (22).

Federal Rules of Civil Procedure and the PSLRA is in order.

## A. Rule 8(a)

Under the Federal Rules it is remarkably easy for a plaintiff to plead a claim: Unless the claim falls into one of the two exceptions set forth in Rule 9, a plaintiff must simply provide "(1) a short and·plain statement of the grounds upon which the court's jurisdiction depends . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." Fed.R.Civ.P. 8(a). Almost five decades ago, in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), the Supreme Court first considered the argument that a plaintiff must also "set forth specific facts to support [the complaint's] general allegations." *Id.* at 47, 78 S.Ct. 99. The Supreme Court responded unanimously:

> The decisive answer to this is that the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. . . . Such simplified "notice pleading" is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues.

*Id.* at 47–48, 78 S.Ct. 99. "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Id.* at 48, 78 S.Ct. 99.

In *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), the Supreme Court rebuked the lower courts for imposing a more demanding rule of pleading on certain types of cases that are sometimes disfavored by the courts (*e.g.*, section 1983 claims against municipalities, prisoner litigation, and civil rights cases). The Court (again unanimous) reaffirmed its previous decision by stating: "In *Conley v. Gibson*, we said in effect that the Rule meant what it said." *Leatherman*, 507 U.S. at 168, 113 S.Ct. 1160 (citation omitted). Moreover, as if to warn the lower courts not to stray from the Rules, the Court held that heightened pleading "is a result which must be obtained by the process of amending the Federal Rules, and not by judicial interpretation. In the absence of such an amendment, federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." *Id.* at 168–69, 113 S.Ct. 1160.[39]

Nonetheless, last term in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), the Supreme Court found occasion to again remind the lower courts not to raise the bar for pleading. This time reversing a case that originated from this district, the Court (still unanimous) reiterated that "Rule 8(a)'s simplified pleading standard applies to *all* civil actions, with limited exceptions." *Id.* at 513, 122 S.Ct. 992 (emphasis added). "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed

---

39. *See also* 28 U.S.C. § 2072(a) (2000) ("The Supreme Court shall have the power to prescribe general rules of practice and procedure . . . for cases in the United States district courts (including proceedings before magistrate judges thereof) and courts of appeals.").

facts and issues and to dispose of unmeritorious claims." *Id.* at 512, 122 S.Ct. 992. "Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint *only* if it is clear that no relief could be granted under *any* set of facts that could be proved consistent with the allegations.'" *Id.* at 514, 122 S.Ct. 992 (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)) (emphasis added). "Rule 8(a) establishes a pleading standard without regard to whether a claim will succeed on the merits." *Swierkiewicz,* 534 U.S. at 515, 122 S.Ct. 992.

While the meaning of "a short and plain statement of the claim" is clear on its face, Fed.R.Civ.P. 8(a)(2), the drafters removed any conceivable ambiguity by including more than a dozen sample complaints in the Appendix. *See* Fed.R.Civ.P.App. Forms 3–18. According to Rule 84, "[t]he forms contained in the Appendix of Forms are sufficient under the rules and are intended to indicate the simplicity and brevity of statement which the rules contemplate." [40] Fed.R.Civ.P. 84. It is worth emphasizing that not one of these exemplar complaints is more than half a page in length.

"For example, Form 9 sets forth a complaint for negligence in which plaintiff simply states in relevant part: 'On June 1, 1936, in a public highway called Boylston Street in Boston, Massachusetts, defendant negligently drove a motor vehicle against plaintiff who was then crossing said highway.'" *Swierkiewicz,* 534 U.S. at 513 n. 4, 122 S.Ct. 992 (quoting Fed.R.Civ. P.App. Form 9). As the Supreme Court recognized in *Swierkiewicz,* one clearly written *sentence* can satisfy Rule 8(a)(2). *See id.; see also Walker v. Thompson,* 288 F.3d 1005, 1011 n. 2 (7th Cir.2002). If the complaint also includes statements "of the grounds upon which the court's jurisdiction depends" and "the relief the pleader seeks," the plaintiff has satisfied Rule 8.[41] Fed.R.Civ.P. 8(a)(1), (3).

■ Rule 8(a) does not require plaintiffs to plead the legal theory, facts or elements underlying their claim. There is *nothing* in Form 9, for example, to support plaintiff's accusation of negligence. "It does not say, for example, whether the hypothetical defendant was speeding, driving without lights, or driving on the wrong side of the road." *Atchinson v. District of Columbia,* 73 F.3d 418, 423 (D.C.Cir.1996). Nor does it outline the four elements of negligence and explain how each is satisfied. "Form 9 thus treats the *mere allegation* of negligence as sufficient." *Id.* (emphasis added). Form 9's allegations are wholly conclusory: by simply describing the claim in a short and plain fashion, Form 9 satisfies the Federal Rules. *See* Fed.R.Civ.P. 84.

■ "A complaint that complies with the federal rules of civil procedure cannot be dismissed on the ground that it is conclusory or fails to allege facts." *Higgs v.*

---

**40.** *See also Conley,* 355 U.S. at 47, 78 S.Ct. 99 ("The illustrative forms appended to the Rules plainly demonstrate [what is required]."); *Swierkiewicz,* 534 U.S. at 513 n. 4, 122 S.Ct. 992 (same).

**41.** In fact, not all of Rule 8 must be satisfied in order to plead a claim. "Although Rule 8(a)(3) of the civil rules requires that a complaint contain 'a demand for judgment for the relief the pleader seeks,' the demand is not itself a part of the plaintiff's claim, and so

failure to specify relief to which the plaintiff was entitled would not warrant dismissal under Rule 12(b)(6) (dismissal for failure to state a claim)." *Bontkowski v. Smith,* 305 F.3d 757, 762 (7th Cir.2002) (citations omitted). "Any doubt on this score is dispelled by Rule 54(c), which provides that a prevailing party may obtain any relief to which he's entitled even if he 'has not demanded such relief in [his] pleadings.'" *Id.* (quoting Fed.R.Civ.P. 54(c)) (collecting cases).

*Carver,* 286 F.3d 437, 439 (7th Cir.2002). "The courts keep reminding plaintiffs that they don't have to file long complaints, don't have to plead facts, don't have to plead legal theories." *Id.* (quotation marks and citation omitted). To comply with Rule 8, plaintiffs need not provide anything more than sufficient notice to permit defendant to file an answer.[42] In this regard, Form 9 is the definition of short and plain: "It can be read in seconds and answered in minutes." *McHenry v. Renne,* 84 F.3d 1172, 1177 (9th Cir.1996).

Indeed, plaintiffs who want to provide something more than a short complaint should be cautious because "[a] party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding." *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,* 757 F.2d 523, 528 (2d Cir.1985).[43] Plaintiffs may even plead themselves out of court at the outset of their lawsuit by pleading information that defeats their legal claim, thereby "thwarting what might, for all we know, have been a fruitful program of pretrial discovery for the plaintiff." *Conn v. GATX Terminals Corp.,* 18 F.3d 417, 419 (7th Cir.1994) (citing examples). *See also Stone Motor Co. v. General Motors Corp.,* 293 F.3d 456, 464 (8th Cir. 2002) ("[A] dismissal under Rule 12(b)(6) should be granted only in the unusual case in which a plaintiff includes allegations that show, on the face of the complaint, that there is some insuperable bar to relief.") (quoting *Schmedding v. Tnemec Co.,* 187 F.3d 862, 865 (8th Cir.1999)).

Given these incentives, it is no surprise that courts "continue to be puzzled why lawyers insist on writing prolix complaints that can only get them into trouble." *Hammes v. AAMCO Transmissions, Inc.,* 33 F.3d 774, 778 (7th Cir.1994). Plaintiffs would do well to remember that in law, as in life: "He who guards his mouth and his tongue keeps himself from calamity." *Proverbs* 21:23 (New International Version).

## B. Rule 9(b)

"Rule 9(b) does impose a particularity requirement in two specific instances." *Leatherman,* 507 U.S. at 168, 113 S.Ct. 1160. It states in full: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated

---

**42.** *See Flickinger v. Harold C. Brown & Co.,* 947 F.2d 595, 600 (2d Cir.1991) ("[F]ederal pleading is by statement of claim, not by legal theory."); *Newman v. Silver,* 713 F.2d 14, 15 n. 1 (2d Cir.1983) (same). The Second Circuit once explained: "The test of a complaint's sufficiency is whether it is detailed and informative enough to enable defendant to respond.... The central concern is that the complaint afford defendant sufficient notice of the [behavior] complained of to enable him to defend himself." *Kelly v. Schmidberger,* 806 F.2d 44, 46 (2d Cir.1986) (quotation marks and citations omitted). This point has recently been emphasized by other circuit courts as well. *See Higgs,* 286 F.3d at 439; *Langadinos v. American Airlines, Inc.,* 199 F.3d 68, 72–73 (1st Cir.2000).

**43.** *See also Soo Line R.R. Co. v. St. Louis Southwestern Ry. Co.,* 125 F.3d 481, 483 (7th Cir.1997) (same); *National Ass'n of Life Underwriters, Inc. v. Commissioner of Internal Revenue,* 30 F.3d 1526, 1530 (D.C.Cir.1994) (same); *Schott Motorcycle Supply, Inc. v. American Honda Motor Co.,* 976 F.2d 58, 61 (1st Cir.1992) (same); *Missouri Hous. Dev. Comm'n v. Brice,* 919 F.2d 1306, 1315 (8th Cir.1990) (same); *Davis v. A.G. Edwards & Sons, Inc.,* 823 F.2d 105, 108 (5th Cir.1987) (same); *Ferguson v. Neighborhood Hous. Servs.,* 780 F.2d 549, 550–51 (6th Cir.1986) (same).

Of course, pleadings are not binding if properly withdrawn or amended, although "the factfinder may very well find that such a contradictory statement reduces the credibility of the witness." *Tho Dinh Tran v. Alphonse Hotel Corp.,* 281 F.3d 23, 32 (2d Cir. 2002).

with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R.Civ.P. 9(b). Of these two exceptions, fraud is far more important—courts and commentators rarely discuss the failure to plead a claim of mistake with particularity (much less dismiss a case for that reason). *See Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 682 (7th Cir.1992).

## 1. Why Rule 9(b) Requires Particularity

There are two main reasons why fraud claims must be pled with particularity: notice and deterrence.[44] With respect to the former, general accusations of fraud are thought to be too amorphous to provide defendants with sufficient notice to permit a response. *See Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir.2000) (" 'The primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based.' ") (quoting *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir.1990)). "Fraud ... embrace[s] such a wide variety of potential conduct that a defendant needs a substantial amount of particularized information about plaintiff's claim in order to enable him to understand it and effectively prepare his response."[45] 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* ("Fed.Prac.") § 1296 ("Pleading the Circumstances of Fraud or Mistake—History and Purpose").

Requiring particularity may also deter plaintiffs from filing frivolous fraud claims. Courts and commentators have offered several explanations for why fraud claims require more deterrence than other claims. One of the most common is that lawsuits based on fraud are more likely to harm a defendant's reputation than a typical lawsuit. "Accusations of fraud," even if proven to be untrue, "can do serious damage to the goodwill of a business firm or a professional person." *Bankers Trust Co.*, 959 F.2d at 683. In addition, fraud claims should be deterred because "assertions of fraud ... often are involved in attempts to reopen completed transactions or set aside previously issued judicial orders." 5 Fed. Prac. § 1296. Because finality has value, courts will not lightly reexamine completed transactions because one party has claimed fraud. *See Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir.1999) (citing *Stearns v. Page*, 48 U.S. (7 How.) 819, 828–30, 12 L.Ed. 928 (1849)); *see also Chamberlain Mach. Works v. United States*, 270 U.S. 347, 348–49, 46 S.Ct. 225, 70 L.Ed. 619 (1926).

Another explanation is that fraud claims deserve more deterrence than other law-

---

44. The Second Circuit repeatedly has stated that "[t]he purpose of Rule 9(b) is threefold—it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from 'improvident charges of wrongdoing,' and to protect a defendant against the institution of a strike suit." *O'Brien v. National Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir.1991). *See also Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995); *DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir. 1987). Because two of these three goals concern deterrence, there are really two distinct goals.

45. The fraudulent manipulation of the securities markets, for example, may take many forms. Washing, matching, jumping, capping, pegging, churning, pooling, ramping, marking, and warehousing are some of the more well-known forms of market manipulation that the law prohibits. There are undoubtedly many more variations—the scope and content of a manipulative practice are only limited "by new schemes which the fertility of man's invention would contrive." *Capital Gains Research Bureau*, 375 U.S. at 193 n. 41, 84 S.Ct. 275 (quoting letter from Lord Hardwicke to Lord Kames (June 30, 1759)) (quotation marks removed).

suits because plaintiffs frequently file fraud claims for the wrong reasons. *See generally* 5 Fed. Prac. § 1297. For example, some fraud claims are nothing more than "strike suits"—that is, attempts by plaintiffs to extract settlements from defendants who would rather pay the plaintiff than face the cost of discovery and trial.

Plaintiffs may also sue defendants in order to conduct "fishing expeditions" where a party files a complaint containing general allegations of fraud in hopes that subsequent discovery will uncover enough evidence to substantiate allegations.[46] Finally, "fraud is frequently charged irresponsibly by people who have suffered a loss and want to find someone to blame for it." *Ackerman,* 172 F.3d at 469 (citing *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978) (Friendly, J.) (coining the phrase "fraud by hindsight")).

### 2. How Particularity Deters Claims of Fraud

Rule 9(b) deters plaintiffs from filing fraud claims in two ways. *First,* by requiring plaintiffs to state their claim with particularity, the Rule creates a disincentive to the filing of claims for an improper reason. For example, the claim's particularity narrows the potential scope of discovery. Likewise, because pleadings are binding judicial admissions, *see supra* note 43, plaintiffs cannot easily change their claims based on what they discover during litigation. Thus, requiring plaintiffs to state their claims with particularity has a certain salutary effect.

*Second,* particularity increases the cost of filing the complaint by forcing a plaintiff to conduct a more substantial investigation of the grounds for her claim before bringing suit. *See Ackerman,* 172 F.3d at 469. Because "factual contentions [must] have evidentiary support," Fed.R.Civ.P. 11(b)(3), claims that are stated with particularity will necessarily require the plaintiffs to make inquiries that are more extensive than usual. *See also* Fed.R.Civ.P. 11(b) (stating that attorneys must certify that they have made their pleadings to "the best of [their] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances").

### 3. Rule 9(b) Must Be Read in Harmony with Rule 8(a)

It is worth emphasizing that Rule 9(b) and Rule 8(a) are children of the same parents: their pleading requirements only differ in degree, not in kind. "[T]his bite of Rule 9(b) was part of the pleading revolution of 1938" in which the drafters rejected arduous fact pleading in favor of providing simple notice. *Williams v. WMX Techs., Inc.,* 112 F.3d 175, 178 (5th Cir. 1997). "[I]n applying rule 9(b) we must not lose sight of the fact that it must be reconciled with rule 8 which requires a short and concise statement of claims." *Felton v. Walston & Co.,* 508 F.2d 577, 581 (2d Cir.1974). Thus, in various ways, courts in this circuit and others have repeatedly emphasized that Rule 9(b) must be read in harmony with the principles established by Rule 8(a). *See, e.g., Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d

---

**46.** *So-called "fishing expeditions" may not be all bad, however. For one thing, the threat of being sued, even if the plaintiff is still digging for facts, may serve to deter fraud. Moreover, the balance of harms may tip in favor of a fishing expedition rather than an undiscovered fraud. This may be so, even though the victim of a fishing expedition who has not*

*committed any harm is forced to serve as the unwilling fish. In any event, a pure fishing expedition is forbidden by Rule 11, which is the law of the land. See Fed.R.Civ.P. 11; see also American Home Assurance Co. v. Republic Ins. Co., 984 F.2d 76, 78–79 (2d Cir.1993); Lyeth v. Chrysler Corp., 929 F.2d 891, 899 (2d Cir.1991).*

Cir.1990) ("Rule 9(b) ... must be read together with rule 8(a) which requires only a 'short and plain statement' of the claims for relief."); *DiVittorio,* 822 F.2d at 1247 (same); *Credit & Fin. Corp. v. Warner & Swasey Co.,* 638 F.2d 563, 566 (2d Cir. 1981) (same).[47]

■ While a complaint may properly plead a cause of action under Rule 8(a) by stating "defendant negligently drove a motor vehicle against plaintiff," Fed.R.Civ. P.App. Form 9, plaintiff's mere incantation of "fraud" will not satisfy Rule 9(b)'s requirement of particularity. *See, e.g., Segal v. Gordon,* 467 F.2d 602, 606 (2d Cir.1972). The additional requirements of Rule 9(b) were well described by Judge Frank Easterbrook when he wrote that "[particularity] means the who, what, when, where, and how: the *first paragraph* of any newspaper story." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) (emphasis added).

While Judge Easterbrook seems to suggest that good lawyers (or at least good reporters) should be able to write a claim

of fraud in one paragraph, the Appendix to the Rules shows that it can be done in one sentence. Form 13 alleges fraud and satisfies Rule 9(b) by stating:

> Defendant C.D. on or about [date given] conveyed all his property, real and personal [or specify and describe] to defendant E.F. for the purpose of defrauding plaintiff and hindering and delaying the collection of the indebtedness evidenced by the note above referred to.

Fed.R.Civ.P.App. Form 13. In less than fifty words, this model complaint answers the five questions posed by Judge Easterbrook:

- who: Defendant C. D.
- what: committed fraudulent conveyance (a type of fraud)
- when: on or about (date given)
- how: by conveying all his property, real and personal to E. F.
- why: for the purpose of hindering and delaying the collection of the indebtedness owed to plaintiff

"Official Form 13 demonstrates that even fraud may be pleaded without long or highly detailed particularity."[48] *Guidry v.*

---

**47.** *See also Schaller Tel. Co. v. Golden Sky Sys., Inc.,* 298 F.3d 736, 746 (8th Cir.2002) ("[T]he Federal Rules of Civil Procedure require a plaintiff to plead the circumstances constituting fraud ... with particularity. We interpret this rule of pleading in harmony with the principles of notice pleading.") (quotation marks and citations omitted); *Ziemba v. Cascade Int'l Inc.,* 256 F.3d 1194, 1202 (11th Cir.2001) ("The application of Rule 9(b), however, must not abrogate the concept of notice pleading.") (quotation marks and citation omitted); *Cayman Exploration Corp. v. United Gas Pipe Line Co.,* 873 F.2d 1357, 1362 (10th Cir.1989) ("We recognize that the policy of simplicity in pleadings which underlies the Federal Rules of Civil Procedure requires a court to read Rule 9(b)'s requirements in harmony with Rule 8's call for a 'short and plain statement of the claim' ") (citation omitted); *Michaels Bldg. Co. v. Ameritrust Co.,* 848 F.2d 674, 679 (6th Cir.1988) ("In ruling upon a motion to dismiss under Rule 9(b) ... a court must factor in the policy

of simplicity in pleading which the drafters of the Federal Rules codified in Rule 8.... [T]he two rules must be read in harmony."); *Friedlander v. Nims,* 755 F.2d 810, 813 n. 3 (11th Cir.1985) ("Rule 9(b) must not be read to abrogate rule 8, however, and a court considering a motion to dismiss for failure to plead fraud with particularity should always be careful to harmonize the directives of rule 9(b) with the broader policy of notice pleading."); *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984) ("[F]ocusing exclusively on [Rule 9(b)'s] 'particularity' language 'is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.' ") (citations omitted).

**48.** One court, in this district, has rejected the view that following Form 13 is enough to satisfy Rule 9(b). *See Federal Deposit Ins. Corp. v. La Antillana, S.A.,* No. 88 Civ. 2670, 1990 WL 58914, at *8 (S.D.N.Y. May 4, 1990) ("The Court finds that the mere adherence to

*U.S. Tobacco Co.,* 188 F.3d 619, 632 (5th Cir.1999).

## VI. PLEADING SECURITIES FRAUD

### A. Pleading Securities Fraud Before 1995

Courts have long held that complaints pleading securities fraud claims must comply with Rule 9(b) by stating the circumstances constituting fraud with particularity. *See Segal,* 467 F.2d at 607 (gathering citations). Unlike a pleading that satisfies Rule 8, a securities fraud claim is not properly pled if it merely repeats a statute or regulation verbatim. "A [securities] complaint cannot escape the charge that it is entirely conclusory in nature merely by quoting such words from the statutes as 'artifices, schemes, and devices to defraud' and 'scheme and conspiracy.' " *Id.* at 608. "To pass muster under [R]ule 9(b), the complaint must allege the time, place, speaker, and sometimes even the content of the alleged misrepresentation." *Ouaknine,* 897 F.2d at 79. *See also Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993).

To prevail, plaintiffs must ultimately prove by a preponderance of the evidence that the defendant committed the alleged fraud (*e.g.,* the misleading statement or omission) with scienter. When plaintiffs are at the pleading stage, however, scienter—"intent, knowledge, and other condi-tion of mind"—"may be averred generally." Fed.R.Civ.P. 9(b).

Although Rule 9(b) states that scienter may be pleaded generally, for more than a generation the Second Circuit has required that plaintiffs also plead a factual basis that gives rise to a "strong inference" of fraudulent intent. The origins of this pleading requirement are found in *Ross v. A.H. Robins Co., Inc.,* 607 F.2d 545 (2d Cir.1979), where the court stated:

> [A]t this stage of the litigation, we cannot realistically expect plaintiffs to be able to plead defendants' actual knowledge. On the other hand, *plaintiffs can be required to supply a factual basis for their conclusory allegations regarding that knowledge.* It is *reasonable to require* that the plaintiffs specifically plead those events which they assert give rise to a *strong inference* that the defendants had knowledge of the facts contained in paragraph 18 of the complaint or recklessly disregarded their existence. And, of course, plaintiffs must fix the time when these particular events occurred.

*Id.* at 558 (emphasis added). Over the next sixteen years, the Second Circuit repeatedly reaffirmed its holding that plaintiffs must provide a factual basis for their claims that defendants acted with fraudulent intent.[49]

a form pleading does not in itself constitute a proper allegation. The fact that plaintiff alleges a fraudulent conveyance does not immunize the cause of action from the particularity requirements of Rule 9(b)."). Yet *La Antillana's* holding contradicts the plain language of Rule 84 and has been rejected by other courts. *See, e.g., General Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1079 (7th Cir.1997) ("Form 13 provides an example of a complaint on a joint claim to recover debt and to void a fraudulent conveyance."); *cf.* 5 Fed. Prac. § 1298 (discussing Form 13). Moreover, a few years after *La Antillana,* the Supreme Court reminded the

lower courts that "[heightened pleading] is a result which must be obtained by the process of amending the Federal Rules, and not by judicial interpretation." *Leatherman,* 507 U.S. at 168–69, 113 S.Ct. 1160.

**49.** The Second Circuit's requirement of a factual basis for the general averment of scienter was not widely accepted, however, and other circuits explicitly rejected the notion that it was mandated by Rule 9(b). *See, e.g., In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1546 (9th Cir.1994) (en banc); *Phelps v. Wichita Eagle–Beacon,* 886 F.2d 1262, 1270 n. 5 (10th Cir.1989); *McGinty v. Beranger Volkswagen,*

In 1987, the Second Circuit developed the doctrine further in *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46 (2d Cir.1987), by holding that there are two ways for a plaintiff to plead facts supporting a "strong inference" that the defendant acted with scienter. *First*, the plaintiff could "allege facts showing a motive for committing fraud and a clear opportunity for doing so." *Id.* at 50. *Second*, "[w]here motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Id.* (citations omitted).

### B. Pleading Securities Fraud After the PSLRA

Recognizing that courts applied different standards to claims of securities fraud, Congress promulgated a nation-wide standard for pleading securities complaints in 1995 by enacting the PSLRA. The PSLRA imposes at least two pleading requirements on securities actions, referred to as paragraph (b)(1) and paragraph (b)(2). Paragraph (b)(1) applies to securities claims "in which the plaintiff alleges that the defendant" either "made an untrue statement of a material fact" or "omitted to state a material fact." 15 U.S.C. § 78u–4(b)(1). Paragraph (b)(2) applies to claims "in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind." 15 U.S.C. § 78u–4(b)(2).

### 1. Paragraph (b)(1)

Any claim that falls under paragraph (b)(1)'s purview must "[1] specify each statement alleged to have been misleading, [2] the reason or reasons why the state-

ment is misleading, and [3], if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Plaintiffs' burden with respect to the first two requirements of paragraph (b)(1) is self-evident. In order to plead a claim, a plaintiff cannot generically aver that the defendant made a material misstatement or omission, nor may she merely copy the language of the statute. Rather, plaintiff must specifically plead the statements or omissions that give rise to her cause of action and then explain why they were false or misleading. These pleadings then serve as binding judicial admissions that control the plaintiff's case throughout the course of the proceedings.

The requirements of paragraph (b)(1)'s third element are not as obvious. To begin, the third requirement does not apply to all allegations but rather only "if an allegation regarding the statement or omission is made on information and belief." 15 U.S.C. § 78u–4(b)(1). As the Second Circuit has explained: "Allegations of fraud cannot ordinarily be based 'upon information and belief,' except as to 'matters peculiarly within the opposing party's knowledge.'" *Luce v. Edelstein*, 802 F.2d 49, 54 n. 1 (2d Cir.1986) (quoting *Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 379 (2d Cir.1974), *overruled on other grounds by Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1100 n. 9, 1100–06, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991)). *See also Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990) ("[A]llegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge."); *Stern v.*

---

*Inc.*, 633 F.2d 226, 228 (1st Cir.1980); *Cramer v. General Tel. & Elecs. Corp.*, 582 F.2d 259, 272–73 (3d Cir.1978).

*Leucadia Nat'l Corp.*, 844 F.2d 997, 1003 (2d Cir.1988) (same).

In turn, "whenever plaintiffs allege, on information and belief, that defendants made material misstatements or omissions, the complaint must 'state with particularity *all* facts on which that belief is formed.' " *Novak*, 216 F.3d at 312 (quoting 15 U.S.C. § 78u–4(b)(1)) (emphasis added). In *Novak*, however, the Second Circuit found that "notwithstanding the use of the word 'all,' paragraph (b)(1) does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based." *Id.* at 313. The Second Circuit's "reading of the provision focuses on whether the facts alleged are sufficient to support a *reasonable belief* as to the misleading nature of the statement or omission." *Id.* at 314 n. 1 (emphasis added). Under *Novak*, "plaintiffs need only plead with particularity *sufficient* facts to support those beliefs." [50] *Id.* at 313–14 (emphasis in original).

To summarize, two threshold questions must be answered to determine whether paragraph (b)(1)'s third element applies: *First*, which allegations regarding the statement or omission are made on information and belief? [51] *Second*, are those the types of allegations that may be alleged on information and belief?

If plaintiff *has* put forward allegations on information and belief, then whether paragraph (b)(1)'s third element is met raises three additional questions: *First*, what facts have the plaintiffs put forward to support that belief? *Second*, have the plaintiffs stated those facts with particularity? *Third*, are those "*sufficient* facts to support those beliefs[?]" *Novak*, 216 F.3d at 313–14.

### 2. Paragraph (b)(2)

Paragraph (b)(2) requires the plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). In *Novak*, the Second Circuit held that this requirement may be satisfied in one of two ways: the plaintiffs may plead "motive and opportunity to commit fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness." *See Novak*, 216 F.3d at 310–11.

This is, of course, nothing more than a restatement of the Second Circuit's case law prior to 1995. The *Novak* court reached this holding after reviewing the text and legislative history, and ultimately concluded that when Congress passed the PSLRA, it settled the disagreement between the circuits in favor of the Second Circuit's pleading standard. *See id.* [52] In promulgating the PSLRA, Congress rec-

---

**50.** The Second Circuit based this holding on the ground that "[r]eading 'all' literally would produce illogical results that Congress cannot have intended." *Novak*, 216 F.3d at 314 n. 1.

**51.** "Information and belief" commonly refers to assertions "based on secondhand information that the declarant believes to be true." *Black's Law Dictionary* 783 (7th ed.1999). One court has explained:

The prototypical "information and belief" statement is something on the order of: "on information and belief, 'party x' gave confidential information to 'party y.' " In such instances, it is relatively easy to apply the aforementioned mandates: the plaintiff

must simply plead the factual basis that leads to the belief that such a transaction took place.

*In re Allaire Corp. Sec. Litig.*, 224 F.Supp.2d 319, 326 (D.Mass.2002).

**52.** *See also id.* at 311 (stating that "the PSLRA adopted [the Second Circuit's] 'strong inference' standard"); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir.1999) ("We believe Congress's use of the Second Circuit's language compels the conclusion that the Reform Act establishes a pleading standard approximately equal in stringency to that of the Second Circuit."). *See generally* S.Rep. No. 104–98, at 7 (1995) (stating that

ognized that the Second Circuit's "pre-PSLRA standard was the most stringent in the nation." *Id.* at 310.

Given that the PSLRA adopts the Second Circuit's pre–1995 pleading standards, our prior case law may be helpful in providing guidance as to how the "strong inference" standard may be met. Therefore, in applying this standard, district courts should look to the cases and factors discussed [in the case law] to determine whether plaintiffs have pleaded facts giving rise to the requisite "strong inference." These cases suggest, in brief, that the inference may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud, (2) engaged in deliberately illegal behavior, (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

*Id.* at 311 (citations omitted).

## VII. PRELIMINARY ISSUES

Before turning to Defendants' arguments as to why each of Plaintiffs' claims should be dismissed, it is necessary to address some preliminary pleading issues. In addition, I will address the Defendants' argument that the pleadings should be dismissed because they are vague and incomprehensible. *See, e.g.,* 1 Und. Mem. at 18–31.

### A. Standard of Review

### 1. The Court Must Take the Pleadings as True and Draw All Inferences in Plaintiffs' Favor

A motion to dismiss under Rule 12 should be granted only if " 'it appears be-

yond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Weixel v. Board of Educ. of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley,* 355 U.S. at 45–46, 78 S.Ct. 99 (alterations omitted)). At the motion to dismiss stage, the issue " 'is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test.' " *Phelps v. Kapnolas,* 308 F.3d 180, 184–85 (2d Cir.2002) (quoting *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir. 1998)).

The task of the court in ruling on a Rule 12(b)(6) motion is " 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' " *Pierce v. Marano,* No. 01 Civ. 3410, 2002 WL 1858772, at *3 (S.D.N.Y. Aug.13, 2002) (quoting *Saunders v. Coughlin,* No. 92 Civ. 4289, 1994 WL 88108, at *2 (S.D.N.Y. Mar. 15, 1994)). When deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002). Courts may not consider matters outside the pleadings but may consider documents attached to the pleadings, documents referenced in the pleadings, or documents that are integral to the pleadings. *See id.* at 152–53; *see also* Fed.R.Civ.P. 10(c).

In addition to Rule 12, the PSLRA provides an alternate basis for dismissal: "the

the PSLRA "clarifies the pleading requirements for bringing securities fraud claims by adopting a standard modeled on that currently applied by the United States Court of Ap-

peals for the Second Circuit, the leading circuit court in this area."); 141 Cong. Rec. 37801 (1995) (statement of Rep. Lofgren); *id.* at 37801 (statement of Rep. Moran).

court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs [ (b) ](1) and [ (b) ](2) are not met." 15 U.S.C. § 78u–4(b)(3)(A). "Although the pleading requirements under the PSLRA are strict, they do not change the standard of review for a motion to dismiss. Even under the PSLRA, the district court, on a motion to dismiss, must draw all reasonable inferences from the particular allegations in the plaintiff's favor, while at the same time requiring the plaintiff to show a strong inference of scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir.2002) (citations omitted) (citing *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir.2001) (en banc)).

## 2. Both the Defendants and the Court Must Accept the Complaints as Pled

Throughout their briefs, the Defendants refashion and redraft much of the Complaints, then argue for the dismissal of claims that are not in those Complaints. For example, the Underwriters' third and fifth briefs are respectively entitled "Memorandum in Support of the Underwriter Defendants' Motion to Dismiss *Undisclosed Compensation* Claims," 3 Und. Mem. (emphasis added), and "Memorandum in Support of the Underwriter Defendants' Motion to Dismiss All *Analyst* Claims," 5 Und. Mem. (emphasis added).[53]

These briefs then argue that these "claims" should be dismissed.

A plain reading of the Complaint shows that there are no such claims. For example, the Cacheflow Complaint *explicitly* alleges six claims and even highlights the claims with headings that are bolded, underlined and capitalized. The third cause of action in the Cacheflow Complaint has the following heading: *"THIRD CLAIM (FOR VIOLATIONS OF SECTION 10(b) AND RULE 10b–5 THEREUNDER AGAINST THE ALLOCATING UNDERWRITER DEFENDANTS BASED UPON DECEPTIVE AND MANIPULATIVE PRACTICES IN CONNECTION WITH THE IPO)".* Cacheflow Compl. at 23. In similar fashion, each claim brought by the Plaintiffs in Cacheflow relates to alleged statutory violations committed by the Defendants; each claim contains a heading that removes any ambiguity. *See supra* Part IV.A.3.

■ While it is perfectly proper to use shorthand phrases to describe these claims, the Defendants have rewritten the Complaints in a way that they believe favors dismissal. It must be remembered, however, that Plaintiffs are the master of their complaint and "neither this Court nor the defendant have the right to redraft the complaint to include new claims."[54] *MDCM Holdings*, 216 F.Supp.2d at 258.

---

**53.** *See* 3 Und. Mem. at 22 ("For the foregoing reasons, the Underwriter Defendants respectfully urge the Court to dismiss all Undisclosed Compensation claims.").

**54.** Of course, the Plaintiffs' claims are based on factual allegations of Tie–In Agreements, Undisclosed Compensation and conflicted analysts. But only the causes of actions may be properly called "claims" on a motion to dismiss. Indeed, courts cannot dismiss factual allegations because they must always be accepted as true. In contrast, courts may dismiss causes of action. *See, e.g.,* Fed.R.Civ.P. 12(b)(6) (allowing defendants to make a motion for "failure to state a *claim* upon which relief can be granted" (emphasis added)). In fact, the Underwriter Defendants recognize this simple distinction at other points in their briefs. For example, Brief 4 is entitled "Memorandum in Support of the Underwriter Defendants' Motion to Dismiss Market Manipulation and Other Claims *Based on* Tie–In Allegations." 4 Und. Mem. (emphasis added); *see also* 6 Und. Mem. (entitled "Memorandum in Support of the Underwriter Defendants' Motion to Dismiss All *Section 11* Claims" (emphasis added)).

Defendants must take the Complaints as they are written.

### 3. Clarity of Pleadings Is Not a Factor in Dismissal

■ The Defendants also argue at great length that the Complaints should be dismissed because they are "incomprehensible," "too vague" and "meaningless." 1 Und. Mem. at 18–31. This argument has no merit. The Complaints are written in plain English and are well drafted by competent counsel. No one should have any trouble understanding what has been alleged. *See supra* Part IV (summarizing the Complaints). Moreover, this failure, if it exists, is not a ground for Rule 12(b)(6) dismissal. If the Defendants were truly perplexed by the Complaints, they should have filed a motion under Rule 12(e), which states:

> If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading. The motion shall point out the defects complained of and the details desired. If the motion is granted and the order of the court is not obeyed within 10 days after notice of the order or within such other time as the court may fix, the court may strike the pleading to which the motion was directed or make such order as it deems just.

Fed.R.Civ.P. 12(e).[55] "Perhaps tellingly," the Defendants "made no such motion here," *Langadinos,* 199 F.3d at 73 n. 6 (discussing Rule 12(e)), nor would such motion have been granted. *See also*

### B. The Pleading Standards for Some of the Claims Are Governed by the PSLRA; Others Are Governed by Both the PSLRA and the Federal Rules

Defendants argue in part that the Complaints are not properly pled under Rule 9(b) and the PSLRA. While the parties apparently assumed that both the Rule and the PSLRA applied to these pleadings, recent appellate decisions cast some doubt on this assumption. *See In re Navarre Corp. Sec. Litig.,* 299 F.3d 735, 742 (8th Cir.2002) ("Contrary to the district court's analysis, the investors technically do not need to meet the requirements of *both* Federal Rule of Civil Procedure 9(b) and the PSLRA, as the PSLRA supercedes reliance on 9(b) in securities fraud cases and embodies the standards of 9(b).") (emphasis in original) (citing *Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1034 n. 12 (9th Cir.2002)); *City of Philadelphia v. Fleming Cos.,* 264 F.3d 1245, 1255 n. 13 (10th Cir.2001); *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 193–94 (1st Cir.1999); *see also Advanta,* 180 F.3d at 531.

### 1. The Differences Between the Scope of the PSLRA's Pleading Requirements and Rule 9(b)

While the parties have treated the requirements of the Rule and the PSLRA as interchangeable, a plain reading of the two provisions shows they are in fact quite different. The most significant difference lies in the claims they cover. Rule 9(b)

*Swierkiewicz,* 534 U.S. at 514, 122 S.Ct. 992 (same).

---

**55.** The Second Circuit once responded to such an argument by stating: "[The fraud complaint's] general purport is plain enough, and if the [defendant] had really any doubt about its meaning—which plainly it had not—it had, and still has, relief under Rule 12(e); the day has passed when substantial interests stand or fall for such insubstantial reasons." *Levenson v. B. & M. Furniture Co.,* 120 F.2d 1009, 1009–10 (2d Cir.1941) (per curiam) (L. Hand, Chase and Clark).

applies to *"all averments of fraud,"* Fed. R.Civ.P. 9(b) (emphasis added) including, of course, all claims of securities fraud.[56]

In stark contrast, paragraph (b)(1) of the PSLRA only applies to a subset of claims brought under the Exchange Act. In particular, it applies to "any private action arising under this chapter [of the Exchange Act] in which the plaintiff alleges that the defendant"

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading.

15 U.S.C. § 78u–4(b)(1).

■ Consider, for example, Rule 10b–5, which makes it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, *or*

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5(a)–(c) (emphasis added). While claims brought under Rule 10b–5(b) must always satisfy paragraph (b)(1)'s statutory requirement, claims

brought under Rule 10b–5(a) or 10b–5(c) need not if they do not rely upon misstatements or omissions (*e.g.*, if they allege market manipulation).

■ Paragraph (b)(2) applies to "any private action arising under this chapter [of the Exchange Act] in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind." 15 U.S.C. § 78u–4(b)(2). In contrast to paragraph (b)(1), *all* claims brought under Rule 10b–5 must satisfy paragraph (b)(2) because all such claims require proof that defendant acted with an intentional or reckless state of mind. *See, e.g., Novak,* 216 F.3d at 308.

### 2. The Federal Rules Still Apply to Certain Types of Securities Fraud Claims

■ Given that Rule 9(b) and the PSLRA differ in scope, a pivotal question is whether the Plaintiffs "need to meet the requirements of *both* Federal Rule of Civil Procedure 9(b) and the PSLRA." *Navarre,* 299 F.3d at 742 (emphasis in original). With respect to those requirements specifically imposed by paragraphs (b)(1) and (b)(2) of the PSLRA—pleading facts suggesting scienter and specifying the material misstatements and omissions—plaintiffs only need to satisfy the PSLRA. If Congress intended that paragraph (b) set a pleading standard that is *higher* or the *equivalent* of Rule 9(b) for these elements of securities fraud, then the requirements of the Rule are subsumed by the PSLRA. On the other hand, if Congress intended to set a pleading standard that is *lower* than Rule 9(b), that standard must govern be-

---

**56.** There are four types of securities fraud under the Exchange Act: (1) Section 10b, 15 U.S.C. § 78j, and Rule 10b–5, 17 C.F.R. § 240.10b–5 (general fraud liability provisions); (2) Section 14(a), 15 U.S.C. § 78n(a), and Rule 14a–9, 17 C.F.R. § 240.14a–9 (prohibiting fraud in connection with proxy solicitations); (3) Section 14(e), 15 U.S.C. § 78n(e) and Rule 14e–3, 17 C.F.R. § 240.14e–3 (prohibiting fraud in connection with tender offers); and (4) Section 13(e)(1), 15 U.S.C. § 78m(e)(1) (prohibiting fraud in connection with issuer's repurchase of its own shares).

cause a statute supercedes a Rule when the two are in conflict. *See Jackson v. Stinnett,* 102 F.3d 132, 134 (5th Cir.1996). *See also Advanta,* 180 F.3d at 531 n. 5 ("the Reform Act supersedes Rule 9(b)").

 However, this leaves the question of whether Congress intended that the PSLRA supercede Rule 9(b) with regard to the remaining elements of a securities fraud claim. Consider, for example, Rule 10b–5(a) claims in which a plaintiff alleges that the defendant has "employ[ed][a] device, scheme, or artifice to defraud." 17 C.F.R. § 240.10b–5(a). The answer is not difficult. Congress intended that the PSLRA supercede the Federal Rules only as to those elements which the PSLRA explicitly mentions (*i.e.,* scienter and material misstatements and omissions). *See* S.Rep. No. 104–98, at 15. In all other respects, the Rules govern these pleadings.

### 3. Summary

Given that both the PSLRA and Rule 9(b) apply to claims of securities fraud— although never at the same time to the same element—it is necessary for litigants to be precise when challenging or defend-

ing a claim.[57] In this litigation, plaintiffs have pled two securities fraud claims: one for market manipulation and another for material misstatements and omission in the registration statement. Each of these claims trigger the PSLRA and Rule 9(b), but in different ways.

In this regard, the following standards will apply:

1. Market manipulation under Rule 10b–5(a) or Rule 10b–5(c): Plaintiffs must satisfy Rule 9(b) by stating "the circumstances constituting fraud ... with particularity." Fed.R.Civ.P. 9(b). Because plaintiffs must ultimately prove scienter to prevail, paragraph (b)(2) of the PSLRA also applies to this claim. Thus, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

2. Material omissions and misstatements under Rule 10b–5(b): Plaintiffs must satisfy both paragraph (b)(1) and (b)(2) of the PSLRA. It is unnecessary, however, for courts to analyze the "circumstances constituting fraud" under Rule 9(b).[58]

---

**57.** There is also a need for the courts to be precise. The source of confusion arises from the overly broad language sometimes employed by the courts. When courts have stated that the PSLRA trumps the Federal Rules, they have been referring to the elements of misstatements and omission or scienter. *See, e.g., Lipton,* 284 F.3d at 1034 n. 12 ("The PSLRA changed the pleading requirements in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and scienter."); *Fleming Cos.,* 264 F.3d at 1255 n. 13 ("The scienter pleading requirements of the PSLRA supercede the provisions of Rule 9(b) in securities fraud cases.") (citation omitted).

**58.** The fact that Rule 9(b) no longer applies to claims of misrepresentation and omission only serves to heighten the pleading burden

previously imposed on plaintiffs. Prior to the PSLRA, the Second Circuit had held: "To pass muster under [R]ule 9(b), the complaint must allege the time, place, speaker, and *sometimes* even the content of the alleged misrepresentation." *Ouaknine,* 897 F.2d at 79 (emphasis added). *See also Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994) (same); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1057 (2d Cir.1993) (same). Thus, prior to the PSLRA, there may have been occasions when a plaintiff did not have to plead the misstatement or omission (*e.g.,* if they reasonably believed that an omission was made but could not reasonably know it without discovery). In contrast, under paragraph (b)(1) of the PSLRA, plaintiffs must *always* specify the alleged misstatement or omission.

In both cases, Rule 9(b) governs the pleading of the remaining elements of the claims: loss causation, transaction causation, reliance and damages.

### APPLICATION OF LEGAL PRINCIPLES

With these governing legal principles firmly in mind, I will now, finally, address Defendants' motions. In order to prevail, Defendants must demonstrate that Plaintiffs have failed to meet their pleading burdens or have failed to state their claims as a matter of law.

### VIII. SECTION 11 CLAIMS

#### A. The Section 11 Claims Have Been Properly Pled

Plaintiffs' first claims allege violations of Section 11 by the Underwriters, Issuers and Individual Officers.[59] *See* Part IV.A (summarizing Cacheflow Compl. ¶¶ 60–68). Section 11(a) states in pertinent part:

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is *proved* that at the time of such acquisition he knew of such untruth or omission) may ... sue—

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration

statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;

. . . . .

(5) every underwriter with respect to such security.

15 U.S.C. § 77k(a) (emphasis added).

As the Supreme Court has explained:

Section 11 of the 1933 Act allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement. The section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering.

*Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (footnotes omitted). Under Section 11, a plaintiff need not prove that the defendants acted with scienter; "he need only show a material misstatement or omission to establish his *prima facie* case." *Id.* at 382, 103 S.Ct. 683 (emphasis added). "Although limited in scope, § 11 places a relatively minimal burden on a plaintiff." *Id.*

Defendants identify three pleading deficiencies in Plaintiffs' Section 11 claims. *First,* the Underwriters argue that Rule 9(b)'s heightened pleading standards apply to the Section 11 claims because they

---

**59.** While Plaintiffs have brought Section 11 claims in only 281 cases, *see* Appendix 1, attached to 3 Pl. Mem., Plaintiffs' counsel confirmed during oral argument that there is no principled reason for this distinction between the complaints. *See* 11/1/02 Tr. at 19–

20 (Statement of Melvyn I. Weiss). Rather, in the midst of filing all 309 Complaints, certain claims were (from Plaintiffs' perspective) inadvertently omitted. *See id.* Plaintiffs have not sought leave to add new Section 11 claims.

"sound in fraud" and that Plaintiffs have not satisfied this burden. 1 Und. Mem. at 15. *Second,* the Underwriters assert that those Plaintiffs who bought their shares after the initial twelve months' earning statements were issued should be dismissed for failure to allege reliance. *See* 6 Und. Mem. at 2–3. *Third,* the Issuers and Individual Defendants argue that the Plaintiffs fail to allege that these Defendants knew about the information that was omitted from the registration statement. *See* Iss. Mem. at 50–55. For the reasons discussed below, these arguments have no merit.

### 1. The PSLRA's Pleading Standards Do Not Apply to Claims Brought Under the Securities Act

 Whether the heightened pleading requirements of the PSLRA apply to Section 11 turns on the interpretation of the phrase "any private action arising *under this chapter.*" 15 U.S.C. § 78u–4(b)(1), (2) (emphasis added). When taken out of context, "under this chapter" is ambiguous because 15 U.S.C. § 78u–4(b) is found under Chapter 2B of Title 15 of the United States Code and entitled "Securities Exchanges." That is, all Exchange Act claims fall under Chapter 2B of Title 15. In contrast, Chapter 2A of Title 15 is entitled "Securities and Trust Indentures" and contains all of the Securities Act claims.

The question, then, is whether the phrase "under this chapter" refers to Chapter 2B (and thus paragraph (b) only applies to Exchange Act claims) or whether it refers to Chapter 2 (and thus paragraph (b) also applies to Securities Act claims). However, if the statute's full text and structure are considered, *see United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am. Inc.,* 508 U.S. 439, 454–55, 113 S.Ct. 2173, 124 L.Ed.2d 402

(1993), then there is no ambiguity: Congress only intended paragraph (b) of 15 U.S.C. § 78u–4 to apply to Exchange Act claims.

*First,* paragraph (b) is entitled: "Requirements for securities fraud actions." 15 U.S.C. § 78u–4(b). Securities fraud claims can be brought only under the Exchange Act (and regulations promulgated thereunder). *See supra* notes 13 and 56. The title of paragraph (b) is therefore a strong indicator that Congress only intended it to apply to Exchange Act claims. *See INS v. National Ctr. for Immigrants' Rights, Inc.,* 502 U.S. 183, 189, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991) ("[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text."); *United States v. Fisher,* 6 U.S. (2 Cranch) 358, 386, 2 L.Ed. 304 (1805) (Marshall, C.J.) ("Where the mind labours to discover the design of the legislature, it seizes every thing from which aid can be derived; and in such case the title claims a degree of notice, and will have its due share of consideration.").

*Second,* and more important, in enacting the PSLRA Congress repeatedly treated the Securities Act and the Exchange Act as separate chapters. *See* 15 U.S.C. §§ 77z–1(a)(2)–(3), 78u–4(a)(2)–(3) (identical provisions concerning plaintiff certifications, appointment of lead plaintiffs, selection of lead counsel, restrictions on plaintiffs); *id.* §§ 77z–1(c), 78u–4(c) (identical provisions concerning sanctions for abusive litigation); *id.* §§ 77z–1(d), 78u–4(d) (identical provision concerning defendant's right to written jury interrogatories). If this Court were to interpret "under this chapter" as used throughout 15 U.S.C. § 78u–4 to include the Securities Act, each of these identical provisions in the Securities Act would be entirely superfluous.[60] *United States v. Nordic*

---

60. These provisions would be superfluous because paragraph (a)(1) of the Exchange Act

*Vill., Inc.*, 503 U.S. 30, 36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) ("a statute must, if possible, be construed in such fashion that every word has some operative effect."). *See also Washington Market Co. v. Hoffman*, 101 U.S. 112, 115–16, 11 Otto 112, 25 L.Ed. 782 (1879).

In sum, because the phrase "under this chapter" as used throughout 15 U.S.C. § 78u–4 only refers to the Exchange Act, the PSLRA pleading requirements have no application to claims that arise under Section 11 or other provisions of the Securities Act (*e.g.*, Section 15).

## 2. Rule 8(a) Applies to Section 11

Rather than contend that Plaintiffs' Section 11 claims must satisfy the PSLRA, Defendants seek to impose a heightened

pleading standard through the Federal Rules. "Because the Section 11 claims asserted here 'sound in fraud,'" Defendants contend, "they must be pled in accordance with the heightened pleading standards imposed by Federal Rule of Civil Procedure Rule 9(b)." 1 Und. Mem. at 15 (citing *Ellison v. American Image Motor Co.*, 36 F.Supp.2d 628, 639 (S.D.N.Y. 1999); *Schoenhaut v. American Sensors, Inc.*, 986 F.Supp. 785, 795 n. 13 (S.D.N.Y. 1997); *In re Chaus Sec. Litig.*, No. 88 Civ. 8641, 1990 WL 188921, at *10 (S.D.N.Y. Nov.20, 1990)).

While some courts have accepted Defendants' argument, most have not because nothing in Section 11 requires a plaintiff to prove the defendant committed fraud.[61] Rule 9(b) requires a plaintiff to

states: "The provisions of this subsection shall apply in each private action arising *under this chapter* that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." *Id.* § 78u–4(a)(1) (emphasis added). Thus, any provision contained in "this subsection," such as paragraphs (b)(1) and (2), must apply to "each private action arising under this chapter." 15 U.S.C. § 78u–4(a)(1).

Of course, this conclusion rests on the assumption that the phrase "under this chapter" should be interpreted consistently throughout 15 U.S.C. § 78u–4. It would be foolish indeed to interpret the same words differently when used in the same statute, and enacted by the same Congress, given that courts strive to give the same interpretation to identical words in *different* statutes. *See, e.g., Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 117–18, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (applying same interpretation to identical words in similar statutes); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (same).

**61.** *See, e.g., In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 315 (8th Cir.1997) (declining to apply Rule 9(b) to Section 11 claims because "a pleading standard which requires a party to plead particular facts to support a cause of action that does not include fraud or

mistake as an element comports neither with Supreme Court precedent nor with the liberal system of 'notice pleading' embodied in the Federal Rules of Civil Procedure"); *In re In-Store Adver. Sec. Litig.*, 878 F.Supp. 645, 650 (S.D.N.Y.1995) ("This court finds that '[b]ecause proof of fraud is not necessary to prevail on a Section 11 claim ... Rule 9(b) does not apply to a Section 11 claim.'") (alteration in original) (citations omitted); *Nelson v. Paramount Communications, Inc.*, 872 F.Supp. 1242, 1246 (S.D.N.Y.1994) ("While Defendants contend that the requirements of Rule 9(b) of the Federal Rules of Civil Procedure apply to Section 11 claims, the law in the Southern District appears to be to the contrary."); *In re College Bound Consol. Litig.*, No. 93 Civ. 2348, 1994 WL 172408, at *3 (S.D.N.Y. May 4, 1994) (*"College Bound I"*) ("[Defendant] appears to be under the misapprehension that the pleading of plaintiffs' Section 11 claim is governed by the strict requirements of Federal Rule of Civil Procedure Rule 9(b), rather than the minimal requirements of Rule 8(a)."); *In re AnnTaylor Stores Sec. Litig.*, 807 F.Supp. 990, 1003 (S.D.N.Y. 1992) ("Because proof of fraud is not necessary to prevail on a Section 11 claim, courts have long held that Rule 9(b) does not apply to a Section 11 claim.") (citations omitted); *Ross v. Warner*, 480 F.Supp. 268, 273 (S.D.N.Y.1979) ("At the outset, it should be

plead "the circumstances *constituting fraud* ... with particularity." Fed. R.Civ.P. 9(b) (emphasis added). Because there is no need to prove fraud in a Section 11 claim, there is no need to satisfy Rule 9(b). Because a plaintiff cannot be required to *plead* something it need not *prove,* I join the majority of courts in this district that have concluded that Rule 9(b) does not apply to Section 11 claims.

Defendants argue that several circuit courts have recognized the sound in fraud doctrine.[62] But this argument is somewhat exaggerated. *See* 11/1/02 Tr. at 205 (statement of Mark Holland that "the Ninth, the Fifth, the Third, and the Seventh" Circuits have adopted the sound in fraud doctrine, while "the Eighth Circuit goes the other way").

While the Seventh Circuit discussed the application of Rule 9(b) to Section 16(a) and Section 20 claims in *Sears v. Likens,* 912 F.2d 889, 893 (7th Cir.1990), the district courts in that Circuit have refused to

apply *Sears* to Section 11 claims on the ground that the circuit's reference to Rule 9(b) was pure dictum.[63] The clear holding in *Sears* is that the securities at issue in the case were "exempt from the provisions of the Securities Act." *Sears,* 912 F.2d at 892. Having disposed of the Securities Act claims on this basis, there was plainly no need to hold that Rule 9(b) governs the Section 11 claims or that the plaintiffs failed to meet that requirement.

Meanwhile, in recent years the Fifth and Third Circuits have taken steps to substantially undercut the application of the sound in fraud doctrine. In the Fifth Circuit, plaintiffs who explicitly disavow any allegation of fraud in connection with their Section 11 claim only need to satisfy Rule 8(a).[64] Likewise, the Third Circuit has signaled its intention to follow the Fifth Circuit by allowing plaintiffs to explicitly disavow fraud in pleading Section 11 claims.[65]

---

noted that a successful action under section 11 does not require proof of fraud, and therefore, the Rule 9(b) particularity requirement does not apply.") (citations omitted); *Billet v. Storage Tech. Corp.,* 72 F.R.D. 583, 585 (S.D.N.Y.1976) (noting that fraud need not be alleged under sections 11 and 12 and Rule 9(b) is inapplicable to them); *Schoenfeld v. Giant Stores Corp.,* 62 F.R.D. 348, 351 (S.D.N.Y.1974) ("[s]ection 11 is not restricted by the rule of particularity").

62. The Second Circuit has not yet decided this issue. *See* 11/1/02 Tr. at 205 (statement of Mark Holland).

63. *See, e.g., Danis v. USN Communications, Inc.,* 73 F.Supp.2d 923, 932 (N.D.Ill.1999) ("It remains unsettled in this circuit whether Rule 9(b)'s requirement of particularity when pleading fraud applies to §§ 11 and 12 claims."); *In re First Merchs. Acceptance Corp. Sec. Litig.,* No. 97–C2715, 1998 WL 781118, at * 11 (N.D.Ill. Nov.4, 1998) ("The court agrees with Plaintiffs, however, that the court in *Sears* was not asked to, nor did it, determine whether Rule 9(b) properly applied

to § 11 claims, which do not require scienter for liability.").

64. The Fifth Circuit's alleged holding that the sound in fraud doctrine requires that Section 11 claims be pled with particularity rests on the following footnote: "When 1933 Securities Act claims are grounded in fraud rather than negligence as they clearly are here, Rule 9(b) applies." *Melder v. Morris,* 27 F.3d 1097, 1100 n. 6 (5th Cir.1994). This doctrine has now been somewhat modified by the Circuit's holding in *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.,* 238 F.3d 363, 369 (5th Cir. 2001) (Higginbotham, J.) (holding that because a complaint "expressly do[es] not assert that defendants are liable for fraudulent or intentional conduct and disavow[s] and disclaim[s] any allegation of fraud" under Section 11, "[t]hose claims do not 'sound in fraud' and cannot be dismissed for failure to satisfy Rule 9(b)") (alteration in original).

65. In *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 287 (3d Cir.1992), the court stated: "The district court held that the § 11 and § 12(2) allegations in Count II 'sounded in fraud' and

At the time that the parties briefed the instant motions, only the Ninth Circuit had taken an unequivocal stance on the sound in fraud doctrine by stating that Rule 9(b) should apply even if a plaintiff *explicitly* disavows fraud in connection with its Section 11 claim. *See In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1405 n. 2 (9th Cir. 1996). The Ninth Circuit has now signaled its desire to move away from rigid application of the sound in fraud doctrine. In *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097 (9th Cir.2003), the court explained that

> in a case where fraud is *not* an essential element of the claim, and where allegations of both fraudulent and non-fraudulent conduct are made in the complaint ... particular averments of fraud [that] are insufficiently pled under Rule 9(b) ... should be disregard[ed] ... or strip[ped][ ] from the claim. The court should then examine the allegations that remain to determine whether they state a claim.

*Id.* at 1104–05 (emphasis added). Thus, Rule 9(b) no longer applies to *all* allegations in a Section 11 claim; it applies only to the actual "averments of fraud." *Id.* at 1105.

The Ninth Circuit is the only circuit court that has provided any rationale for its decision to accept the sound in fraud doctrine: " 'Rule 9(b) serves to ... protect professionals from the harm that comes from being subject to fraud charges.' Fraud allegations may damage a defendant's reputation regardless of the cause of action in which they appear, and they are therefore properly subject to Rule 9(b) in every case." *Vess*, 317 F.3d at 1105 (quoting *Stac Elec.*, 89 F.3d at 1405) (ellipsis in original) (citations omitted). But even if these policy considerations apply with the same force to a claim that does *not* require proof of scienter, the Supreme Court has made it clear that such considerations are never a valid reason to stray from the language of the applicable statute or Rule. "Whatever merits these and other policy arguments may have, it is not the province of [the courts] to rewrite the statute [or Rules] to accommodate them." *Artuz v. Bennett*, 531 U.S. 4, 10, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000). *See also Badaracco v. Commissioner*, 464 U.S. 386, 398, 104 S.Ct. 756, 78 L.Ed.2d 549 (1984) ("Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement.").

Indeed, in the last decade the Supreme Court has *twice* admonished the lower courts for augmenting federal pleading requirements: "A requirement of greater specificity for particular claims is a result that '*must* be obtained by the process of amending the Federal Rules, and *not* by judicial interpretation.' " *Swierkiewicz*, 534 U.S. at 515, 122 S.Ct. 992 (quoting *Leatherman*, 507 U.S. at 168, 113 S.Ct. 1160) (emphasis added). In fact, in *Swierkiewicz*, the Defendant tried to persuade the Court on policy grounds by asserting that "allowing lawsuits based on concluso-

---

that Rule 9(b) applies. We agree." More recently, however, the Third Circuit declared that it was error for the district court to impose a heightened pleading burden on a Securities Act claim "[a]bsent a determination that plaintiffs' claims sounded in fraud, or some analysis explaining why Rule 9(b) should apply when a section 12(2) claim does not sound in fraud." *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 717 n. 20 (3d Cir.1996). The court then noted that its previous decision in *UJB Financial Corporation* had also stated: *"By its plain wording,* Rule 9(b) would not appear to apply to claims that a defendant negligently violated §§ 11 and 12(2); we need not and do not decide this issue." *Id.* (emphasis added). The *Westinghouse* court further cited with approval two district court cases in which the district court refused to apply Rule 9(b) to the claim because Plaintiffs had not pled fraud in connection with their Securities Act claim. *See id.* (citing *In re Chambers Dev. Sec. Litig.*, 848 F.Supp. 602, 624 (W.D.Pa.1994)).

ry allegations of discrimination to go forward will burden the courts and encourage disgruntled employees to bring unsubstantiated suits." *Id.* at 514, 122 S.Ct. 992. The Court responded: "Whatever the practical merits of this argument, the Federal Rules do not contain a heightened pleading standard for employment discrimination suits." *Id.* at 514–15, 122 S.Ct. 992.[66]

Plaintiffs rely on those cases that have allowed litigants to explicitly disclaim any allegations of fraud in connection with their Section 11 claims, as Plaintiffs have, in order to avoid Rule 9(b)'s heightened pleading standard. *See* 3 Pl. Mem. at 2 n.4; *see also Lone Star Ladies,* 238 F.3d at 369; *Westinghouse,* 90 F.3d at 717. But it is obvious from the Complaints that Plaintiffs' disclaimer is superficial.[67] *See, e.g.,* Cacheflow Compl. ¶ 60 ("Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein, except to the extent that any such allegation may be deemed to sound in fraud."). Ultimately, if Plaintiffs are to prevail on

their Section 11 claims, they will necessarily have to prove factual allegations that also give rise to their claims of securities fraud under Rule 10b–5.[68] Thus, if Plaintiffs recover damages under Section 11, they will have proved that the Allocating Underwriters manipulated the market with Tie-in Agreements, a violation of Rule 10b–5(a), as well as intentionally made misstatements and omissions in the registration statements, a violation of Rule 10b–5(b). In this sense, the Section 11 claims are "grounded" in their fraud claims in a way that cannot be simply disavowed by the Plaintiffs.

This does not mean, however, that a heightened *pleading standard* applies to Plaintiffs' Section 11 claims. Whether Rule 8(a) or 9(b) is triggered turns on the type of claim alleged (*i.e.,* the cause of action) rather than the factual allegations on which that claim is based.[69] That courts must look at the type of *claim* being alleged to determine which Rule applies is obvious from the plain language of Rule 8, which states that a "pleading which sets

**66.** *See also* Brian Murray and Donald J. Wallace, *You Shouldn't Have To Plead More Than You Have To Prove,* 53 Baylor L.Rev. 783, 800 (2001) ("The sound in fraud rationale for applying the stringent Rule 9(b) fraud pleading requirements to a strict liability and negligence claim in which the defendants have the burden of proving a lack of negligence is a judicially-created rule with no basis in legislative intent."); Krista L. Turnquist, Note, *Pleading Under Section 11 of the Securities Act of 1933,* 98 Mich. L.Rev. 2395, 2397 (2000) (same).

**67.** Nonetheless, to hold that plaintiffs who disavow fraud in connection with their Section 11 claim have properly pled their claim, while the absence of such a disclaimer warrants dismissal, turns pleading into an impermissible *"game of skill* in which *one misstep* by counsel may be decisive to the outcome." *Conley,* 355 U.S. at 48, 78 S.Ct. 99 (emphasis added).

**68.** Plaintiffs have brought securities fraud claims pursuant to Rule 10b–5 against the

Allocating Underwriters for a scheme of market manipulation involving Tie-in Agreements, Undisclosed Compensation and misleading analyst reports. The Section 11 claims (which are brought against *all* of the Underwriters, Issuers and Individual Defendants) allege that the registration statement contained eight material misstatements and omissions. Each of these misstatements and omissions relates to various parts of the scheme that the Allocating Underwriters allegedly perpetrated (*e.g.,* the Issuers failed to disclose that the Allocating Underwriters were receiving additional compensation). Thus, in order for Plaintiffs to prevail on their Section 11 claims, Plaintiffs must first establish that the Allocating Underwriters engaged in the alleged scheme. If they fail to prove this scheme happened, then their Section 11 claims will necessarily fail.

**69.** *See supra* note 42 (discussing the distinction).

forth a *claim* for relief, whether an origi-
nal *claim,* counter*claim,* cross-*claim,* or
third-party *claim,* shall contain . . . a short
and plain statement of *the claim* showing
that the pleader is entitled to relief." Fed.
R.Civ.P. 8 (emphasis added).[70] Likewise,
Rule 9(b) only applies to claims that fall
under the category of fraud or mistake.
Because a Section 11 claim is not a fraud
claim, Rule 8(a) applies. That the same
factual allegations also give rise to a Rule
10b–5 claim is irrelevant to this analysis.

That being so, just as the half-page mod-
el complaints in the Appendix to the Fed-
eral Rules of Civil Procedure satisfy the
pleading requirements of the Federal
Rules, *see* Fed.R.Civ.P. 84, Plaintiffs' alle-
gations here are sufficient to state a Sec-
tion 11 claim against each of the Defen-
dants. *See, e.g.,* Cacheflow Compl. ¶¶ 1, 5,
6, 9, 61.

### 3. Plaintiffs Need Not Plead Reliance in Order to State Certain of Their Section 11 Claims

Section 11(a) requires that if a plaintiff
acquires the security

> after the issuer has made generally
> available to its security holders an earn-
> ing statement covering a period of at
> least twelve months beginning after the
> effective date of the registration state-
> ment, then the right of recovery under
> this subsection shall be conditioned *on
> proof* that such person acquired the se-
> curity relying upon such untrue state-
> ment in the registration statement or
> relying upon the registration statement
> and not knowing of such omission, but
> such reliance may be established without
> proof of the reading of the registration
> statement by such person.

15 U.S.C. § 77k(a) (emphasis added). De-
fendants argue that in approximately a
dozen of these coordinated cases, "plain-
tiffs . . . purchased their shares after the
issuers made available an earning state-
ment covering a period of at least twelve
months beginning after the effective date
of the registration statement." 6 Und.
Mem. at 3. "None of those plaintiffs allege
that they relied upon the registration
statement they claim was misleading." *Id.*
"As a result," Underwriters argue, "those
claims should be dismissed." *Id.*

 This argument has no merit
because Rule 8 does not require plaintiffs
to plead the elements of a claim. *See
supra* Part V.A. Just as plaintiffs do not
need to allege causation in order to plead a
negligence claim (even though a plaintiff
must ultimately prove causation to pre-
vail), *see* Fed.R.Civ.P.App. Form 9, plain-
tiffs do not need to allege reliance on a
registration statement to plead a Section
11 claim. *See, e.g., In re MobileMedia
Sec. Litig.,* 28 F.Supp.2d 901, 923 (D.N.J.
1998) ("A plaintiff need not plead fraud,
reliance, motive, intent, knowledge or
scienter under Section 11."). Indeed, giv-
en that the Underwriter Defendants do
not claim they lack notice of the Section 11
claim, or that there are no set of facts
under which plaintiffs could prevail, their
argument must be rejected.

### 4. Plaintiffs Need Not Plead that the Issuers and Individual Defendants Had Knowledge in Order to State Section 11 Claims Against Those Defendants

The Issuers and Individual Defendants
argue that "Section 11 liability does not

---

**70.** That the application of Rule 8(a) or Rule
9(b) turns on the claim and not the factual
allegations underlying the claim is also obvi-
ous given that factual allegations are not nec-
essary to satisfy Rule 8(a). *See Phelps,* 308
F.3d at 186–87 (relying on *Swierkiewicz* and

holding that "the court may not go beyond
[Rule] 8(a)(2) to require the plaintiff to sup-
plement his pleadings with additional facts
that support his allegation[s]"). *See also
Swierkiewicz,* 534 U.S. at 513 n. 4, 122 S.Ct.
992.

attach in instances in which the allegedly omitted information is not known to [them]." Iss. Mem. at 51. As a result, they argue that the Section 11 claims should be dismissed because Plaintiffs have failed to allege that these Defendants knew about the omitted material. The Plaintiffs disagree, arguing that "[c]ourts have held, time and time again, that issuers are liable under Section 11 irrespective of their knowledge (or lack thereof)." Pl. Mem. (Iss.) at 11.

Section 11 "was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean,* 459 U.S. at 381–82, 103 S.Ct. 683 (footnotes omitted). The Supreme Court has held that, "[l]iability against the *issuer* of a security is virtually absolute" while "[o]ther defendants bear the burden of demonstrating due diligence." *Id.* at 382, 103 S.Ct. 683 (emphasis added). *See also AnnTaylor Stores,* 807 F.Supp. at 998 ("An issuer has absolute liability for any misrepresentations or omissions; the underwriters and signatories have an *affirmative* due diligence *defense.*") (emphasis added).

 Because intent to defraud is not an element in a Section 11 claim, "only a material misstatement or omission need be shown to establish a *prima facie* case, and scienter need not be alleged." *Degulis v. LXR Biotechnology, Inc.,* 928 F.Supp. 1301, 1310 (S.D.N.Y.1996). *See also In re Twinlab Corp. Sec. Litig.,* 103 F.Supp.2d 193, 201 (E.D.N.Y.2000) ("Section 11 'places a relatively minimal burden on a plaintiff,' requiring simply that the plaintiff allege that he purchased the secu-

rity and that the registration statement contains false or misleading statements concerning a material fact.") (quoting *Herman & MacLean,* 459 U.S. at 381–82, 103 S.Ct. 683). Because there is no scienter requirement in Section 11, Plaintiffs need not plead that the Defendants had knowledge of the alleged omission. *See In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.,* 202 F.Supp.2d 8, 12 (S.D.N.Y.2001); *see also Degulis v. LXR Biotechnology, Inc.,* No. 95 Civ. 4204, 1997 WL 20832, at *3 (S.D.N.Y. Jan.21, 1997) ("[T]o make out a *prima facie* case at the pleadings stage, Plaintiffs need only allege a material misstatement or omission. Neither knowledge nor reason to know is an element in a plaintiff's *prima facie* case.").

Defendants cite *In re Adams Golf, Inc. Sec. Litig.,* 176 F.Supp.2d 216 (D.Del. 2001), and *In re Ultimate Corp. Sec. Litig.,* No. 86 Civ. 5944, 1989 WL 86961 (S.D.N.Y. June 30, 1989) (mem.), in support of their argument that Plaintiffs must plead that the Issuers and Individual Defendants had knowledge of the alleged omissions at the time of the IPO. *See* Iss. Mem. at 50–53. Defendants' reliance on these cases is misplaced. *Ultimate* decided a motion for summary judgment and thus provides little guidance at the pleading stage. *Adams Golf* is easily distinguished. The court granted a motion to dismiss in that case because it concluded that neither of the alleged omissions was actionable as a matter of law: one omission was simply not material, *see Adams Golf,* 176 F.Supp.2d at 234, and the other was a forward looking statement (*i.e.,* something which could not have been known at the time of the omission), *id.* (citing *Zucker v. Quasha,* 891 F.Supp. 1010, 1014 (D.N.J.1995)).[71]

---

**71.** The *Adams Golf* court did hold that "in order to state a claim for a material omission, the plaintiffs' allegations must identify that this alleged undisclosed material risk was known and material at the time of the IPO." *Id.* at 233–34. That holding is not binding on this Court and is against the great weight of authority in this Circuit.

Here, all of the alleged misrepresentations are actionable. *See infra* Part X.B.

While some Defendants may raise an affirmative defense that the alleged omission concerned information of which it was unaware, and which it could not have discovered by the exercise of reasonable care, *see Herman & MacLean,* 459 U.S. at 382, 103 S.Ct. 683; *AnnTaylor Stores,* 807 F.Supp. at 998, Plaintiffs need not plead the converse—namely, that Defendants had the requisite knowledge. Accordingly, Plaintiffs have sufficiently pled their Section 11 claims.

### B. Most Plaintiffs Have Stated Section 11 Claims Upon Which Relief May Be Granted

#### 1. Plaintiffs Have Standing

Section 11 creates a right of action for "any person" acquiring a security offered pursuant to a misleading registration statement. 15 U.S.C. § 77k(a). Nonetheless, Underwriters argue that only individuals who purchase in the initial offering (as opposed to the aftermarket) may assert a claim. *See* 6 Und. Mem. at 8; 6 Und. Reply at 4–8.[72]

█ The Court of Appeals has now definitively held otherwise: "aftermarket purchasers who can trace their shares to an allegedly misleading registration statement have standing to sue under § 11 of the 1933 Act." *Demaria v. Andersen,* 318 F.3d 170, 178–79 (2d Cir.2003). *Accord Lee v. Ernst & Young, LLP,* 294 F.3d 969, 976–78 (8th Cir.2002); *Joseph v. Wiles,* 223 F.3d 1155, 1158 (10th Cir.2000); *Hertzberg v. Dignity Partners, Inc.,* 191 F.3d 1076, 1079–82 (9th Cir.1999). *See also Milman,*

192 F.R.D. at 107 ("a secondary market purchaser who can trace her securities to a registered offering may bring suit under [section] 11"). Because Plaintiffs allege that their shares are traceable to the allegedly misleading registration statements, *see, e.g.,* Cacheflow Compl. ¶¶ 12, 61, they unquestionably have standing.

#### 2. Plaintiffs Have Not Pled Allegations of Knowledge Inconsistent with Their Claims

"Although reliance ordinarily need not be pled to state a Section 11 claim, under Section 11(a) a plaintiff has no claim if 'it is *proved* that at the time of such acquisition he knew of such untruth or omission.'" 2 Und. Mem. at 9 (quoting *McMahan & Co. v. Wherehouse Entm't, Inc.,* 65 F.3d 1044, 1047 (2d Cir.1995)) (emphasis added). *See also* 15 U.S.C. § 77k(a) (providing that when a registration statement has a material misstatement or omission "any person acquiring such security (*unless it is proved that at the time of such acquisition he knew of such untruth or omission* ) may ... sue [the following groups]" (emphasis added)). "Here," the Underwriters argue, "the pleadings allege on their face 'common knowledge' of the alleged misrepresentation." 2 Und. Mem. at 9. "Because a court may properly dismiss a claim on the pleadings when an affirmative defense appears on its face, the Section 11 claims should be dismissed." *Id.* (quotation marks and citation omitted).

█ While the Underwriters are correct that Plaintiffs may plead themselves out of court by pleading information that defeats their legal claim because a com-

---

**72.** The Underwriters had argued that the Second Circuit had not "specifically ruled on the issue," 6 Und. Mem. at 5. Because the Second Circuit has now made an explicit ruling, this argument is no longer tenable, if it ever was: "*Barnes* squarely and correctly held that, un-

der the plain language of the statute, secondary market purchasers with traceable shares have standing to assert § 11 claims." *Milman v. Box Hill Sys. Corporation,* 192 F.R.D. 105, 108 n. 11 (S.D.N.Y.2000) (citing *Barnes v. Osofsky,* 373 F.2d 269, 271–73 (2d Cir.1967)).

plaint is a binding judicial admission, *see supra* note 43 and accompanying text, they are incorrect in their assertion that Plaintiffs have done so here. A fair reading of the Master Allegations shows that Plaintiffs have merely pled the alleged scheme was "common knowledge" among the customers who received the initial distribution of stock from the Underwriters (*e.g.*, those who were required to enter into Tie-in Agreements). In contrast, the Plaintiffs in these cases are investors who bought the IPO stock in the aftermarket, not customers who were allocated the initial stock.[73] *See, e.g.*, Cacheflow Compl. ¶ 12 (listing Plaintiffs Val Kay, Greg Frick, Eric Egelman, and Kenneth L. Schmid who purchased or otherwise acquired shares of Cacheflow common stock). Indeed, "[t]he vast majority of [the] plaintiffs in fact are retail purchasers in the aftermarket," although some institutional investors who bought stock in the aftermarket have also brought suit. *See* 11/1/02 Tr. at 32.

The pertinent allegations to which the Underwriters refer in making their "common knowledge" argument are paragraphs thirty through thirty-three of the Master Allegation. *See* 2 Und. Mem. at 2 (quoting parts of MA ¶¶ 30–33). Those paragraphs state in full:

30. Institutional and retail investors, *who have received allocations in initial public offerings from various firms,* have noted that it was common knowledge that the clients who were forced to pay Undisclosed Compensation to the underwriters, in the form of commissions or otherwise, and who agreed to purchase in the aftermarket received allocations in the IPO.

31. This industry-wide understanding was sometimes expressed by the Underwriter Defendants and other times implied, but nevertheless invariably communicated between those with the power *to make allocations of shares in initial public offerings* (the underwriters). . . .

32. For example, "Michael Sola, portfolio manager for T. Rowe Price's Developing Technology Fund, explained to *USA Today* [May 25, 2001] how the game was played. He said that 'people know that the higher they say they are willing to buy the stock (in the after market), *the bigger the allocation [of IPO shares] they are going to get.'*" [Testimony of David W. Tice, David W. Tice & Associates, Inc., before the House Committee on Financial Services, Capital Markets, Insurance and Government Sponsored Enterprises Subcommittee, June 14, 2001].

33. Even institutional investors generally considered to be medium or large in terms of amount of assets under management, were told by Underwriter Defendants, in words or substance, *that in order to receive IPO allocations,* they had to commit to buying additional shares in the aftermarket.

MA ¶¶ 30–33 (emphasis added). When read in context, there is no ambiguity as to *who* had "common knowledge" of the alleged scheme: the Underwriters and their customers. *See id.* This allegation is entirely consistent with the Plaintiffs' allegations that in 309 IPOs, Underwriters repeatedly required their customers who received IPO stock (*e.g.*, T. Rowe Price's Developing Technology Fund, medium, and large institutional investors) to enter

---

**73.** *See* Transcript of November 18, 2002 telephone conference, at p. 9, in which Melvyn I. Weiss, Plaintiffs' counsel represented that none of the Plaintiffs bought on the IPO.

into Tie-in Agreements and pay Undisclosed Compensation. At the same time, there is no concession that investors *in the aftermarket*—*i.e.*, the Plaintiffs in these cases—knew about this scheme.

In arguing that the Plaintiffs have pled themselves out of court, the Underwriters point to the allegation that institutional *and retail investors* knew about the scheme, and thus all retail investors must have known about the scheme. *See* 11/1/02 Tr. at 31 (David W. Ichel stating: "It says also retail investors."). However, this interpretation reads the words "retail investor" out of context. The sentence to which the Underwriters refer states: "Institutional and retail investors, *who have received allocations in initial public offerings from various firms* ...." MA ¶ 30 (emphasis added). While it is true that Plaintiffs have pled that at least some retail investors knew about the scheme, this group is plainly limited to those investors who received stock from the Underwriters in the IPO.[74]

The Underwriters' argument would only have merit if the Complaints had alleged that the scheme was common knowledge among all investors. But not only is there no such allegation, such an allegation would not be reasonable given that investors who buy stock in the initial allocation generally have more knowledge of the IPO process than investors who purchase stock in the aftermarket. Indeed, the SEC has long defended the importance of securities law on the ground that investors in the

aftermarket have a much lower level of sophistication and knowledge about the IPO process than initial purchasers. *See, e.g.*, SEC Special Study at 556 (arguing that disclosure provisions of the Securities Act are particularly important because "persons who bought in the after-market often [are] less sophisticated [than customers who received original allotments] and more susceptible to the allure of publicity and rumor about 'hot issues.' "); SEC Hot Issues Report at 9 (same).

Nor does the allegation that the scheme was "common knowledge" among those required to participate in the scheme mean that *every* client knew about it.[75] The fact that some of the Plaintiffs are institutional investors does not *necessarily* mean that "at the time of such acquisition [of the securities that they] knew of [the alleged] untruth or omission [in the registration statement]." 15 U.S.C. § 77k(a). Perhaps they were one of the few institutional investors who did not know. Of course, Defendants may conduct discovery to determine the Plaintiffs' actual knowledge and seek to prove that they were fully aware of the alleged scheme. Likewise, they may use the allegation that it was "common knowledge" to try to "reduce[ ] the credibility of the witness" who claims she was ignorant. *Tho Dinh Tran*, 281 F.3d at 32. But these are ultimately issues for the trier of fact to resolve. Thus, Plaintiffs have not pled themselves out of

---

74. At oral argument, Melvyn I. Weiss, Plaintiffs' Liaison Counsel, stated that the pleadings were intended to allege that the ones who knew were the ones "[w]ho benefited from the continuing enterprise that we are alleging was illegal [*i.e.*, customers who entered into Tie-in Agreements]." 11/01/02 Tr. at 31.

75. Common does not mean ubiquitous or omnipresent. Common means: "Occurring fre-

quently or habitually; usual. Most widely known...." *The American Heritage Dictionary of the English Language* at 373 (4th ed.2000). Even if the scheme was "common knowledge" among the Underwriters' customers, then some customers still may not have known about the scheme—even if that situation only occurred infrequently or in unusual circumstances.

court with respect to their Section 11 claims.

### 3. Those Plaintiffs Who Sold Securities Above the Offering Prices Have No Damages and Therefore No Claim Upon Which Relief Can Be Granted

■ Defendants are correct, however, in arguing that all Section 11 claims brought by Plaintiffs who sold securities at prices *above* the offering price must be dismissed because these Plaintiffs have no damages. Section 11(e), entitled "Measure of Damages," provides in pertinent part that damages under Section 11 are:

[T]he difference between the amount paid for the security (*not exceeding the price at which the security was offered to the public*) and . . . the price at which

such security shall have been disposed of in the market before suit. . . .

15 U.S.C. § 77k(e) (emphasis added).

■ If a plaintiff has no conceivable damages under Section 11, she cannot state a claim upon which relief can be granted and her Section 11 claims must be dismissed. *See* Fed.R.Civ.P. 12(b)(6). *See also In re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1203–05 (9th Cir. 2002) (affirming dismissal under Rule 12(b)(6) because plaintiff's own pleadings revealed that he made a profit on the sale of his securities). *Cf. Adair v. Kaye Kotts Assocs.*, No. 97 Civ. 3375, 1998 WL 142353, at *8 (S.D.N.Y. Mar. 27, 1998) ("For plaintiffs' Section 11 claim to be dismissed under Section 11(e) at this stage in the proceedings, defendants must conclusively establish that plaintiffs' damages are *de minimus.*") (citation omitted).[76]

---

**76.** Because a plaintiff has no duty to plead damages in order to state a valid Section 11 claim, *see Herman & MacLean*, 459 U.S. at 382, 103 S.Ct. 683, it is not a foregone conclusion that the absence of damages should defeat such a claim at the motion to dismiss stage. Rule 12 provides that,

If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12.

Here, I have reviewed the certificates "filed with the complaint," as required by the PSLRA, that set forth the damages claimed by lead Plaintiffs. *See* 15 U.S.C. § 78u–4(a)(2) (requiring each plaintiff to submit a certificate including, among other things, "the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint"). It is well-settled that in deciding a motion to dismiss, a court may consider "documents that are . . . attached to the complaint. . . ." *Gryl v. Shire Pharm. Group Plc*, 298 F.3d 136, 140 (2d Cir.2002). *See also* Fed.R.Civ.P. 10(c). As the Court of Appeals explained,

[G]enerally, the harm to the plaintiff when a court considers material extraneous to a complaint is the lack of notice that the material may be considered. Accordingly, "[w]here plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated."

*Chambers*, 282 F.3d at 153 (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991)). Thus, a document which is "integral" to the complaint may be considered on a motion to dismiss. In a securities fraud class action, the lead plaintiff certification must be considered integral to the complaint because it is required by the PSLRA.

Even if Rule 56 treatment were appropriate, the parties have submitted "all material . . . pertinent" to such a motion, and I have resolved all disputed issues of fact in favor of the non-moving party. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 143, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). While I have relied upon letters submitted by the parties, I have applied *only* the facts agreed upon by them.

Defendants argue that Section 11(e) specifies that the measure of damages is the lesser of a security's purchase price and its offering price, minus its sale price, *i.e.*, an investor who bought above the offering price must nonetheless use the offering price as the starting point for damages calculations. If that same investor then sold the security at a price above the offering price—even if the sale was for a loss—that difference would be a negative number. Thus, if a security was issued at $100, bought at $200, and sold at $150, the damages would be (-$50): $100 (the lesser of the offering price and the purchase price) minus $150 (the sale price). Negative damages are, of course, no damages at all.

Plaintiffs urge a different interpretation of Section 11(e): the parenthetical phrase "not exceeding the price at which the security was offered to the public" applies not to the "amount paid for the security," but rather to the "difference." According to Plaintiffs, the damages are $50: the $200 purchase price minus the $150 sale price.

The proper interpretation of Section 11(e) appears to be a question of first impression in this Circuit, and perhaps the entire country.[77] The courts that have previously "resolved" this question seem to have done so inadvertently, and uniformly without discussion.

As the Supreme Court has recently noted, "in all statutory construction cases, we begin with the language of the statute." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002). "The first step 'is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case,'" *Id.* (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)), and if it does, "there is no reason to resort to legislative history." *United States v. Gonzales*, 520 U.S. 1, 6, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997) (citing *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)).

The language of Section 11(e) is plain and unambiguous. The parenthetical requirement "not exceeding the price at which the security was offered to the public" is placed after the first term in the

See 12/13/02 Letter from Mark Holland, counsel for Underwriters, to the Court (setting forth twenty-one cases where no Plaintiff has Section 11 damages); 12/16/02 Letter from Melvyn I. Weiss to the Court (agreeing with Defendants' factual allegations in seventeen of those cases, and disagreeing in four others); 12/17/02 Letter from Mark Holland to the Court. *See also* 11/18/02 Tr. at 11–12 (Statement of Robert A. Wallner).

77. One commentator has noted that "less than a dozen Section 11(e) damage cases have reached judicial resolution," Michael J. Kaufman, *Securities Litigation: Damages* § 6:30 (2002), but none of those cases have addressed the issue presented here. Indeed, while both Underwriter Defendants and Plaintiffs purport to cite authority resolving this question in their favor, neither has. The two cases cited by the Underwriter Defendants—*In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1262 (N.D.Cal.2000), and *PPM Am., Inc. v. Marriott Corp.*, 853 F.Supp. 860, 875–78 (D.Md.1994)—stand for the very different proposition that a party who sells for a *profit* (*i.e.*, who sells at a price higher than the purchase price) has no damages under Section 11, a self-evident proposition. *Kramer v. Scientific Control Corp.*, 365 F.Supp. 780, 790 (E.D.Pa.1973), cited by Plaintiffs, admittedly supports Plaintiffs' reading. That case, however, failed to analyze the instant question—indeed, there is no indication that the question was even brought to the court's attention. Moreover, neither of the two cases that *Kramer* cites on this question support Plaintiffs' reading, further indicating that that court was not made aware of the issue. *See Chasins v. Smith, Barney and Co.*, 438 F.2d 1167, 1173 (2d Cir.1970); *Sarlie v. E.L. Bruce Co.*, 265 F.Supp. 371, 376 (S.D.N.Y.1967).

equation, thereby requiring that it modify the first term, *i.e.,* "the amount paid." Had Congress intended for the parenthetical limitation to apply to the difference, it could have said so.[78] For example, Congress could have pegged the measure of damages at "the difference (not exceeding the price at which the security was offered to the public) between the amount paid for the security" and its sale price.

Moreover, Plaintiffs' reading of Section 11(e) would make Section 11(g) entirely redundant. Section 11(g) provides that, "In no case shall the amount recoverable under this section exceed the price at which the security was offered to the public." 15 U.S.C. § 77k(g). The term "amount recoverable" found in Section 11(g) is nothing more than a cap on damages. Section 11(e), which governs the calculation of damages, uses the term "difference" to define the amount recoverable, thus the terms are synonymous. Under the reading espoused by Plaintiffs, therefore, Sections 11(e) and 11(g) are redundant; requiring that the "difference" does not exceed the offering price in Section 11(e) would be exactly the same as capping the "amount recoverable" at the offering price in Section 11(g). But canons of construction demand that the parenthetical limitation in Section 11(e) imposes an additional restriction. *See Nordic Vill.,* 503 U.S. at 36, 112 S.Ct. 1011; *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955); *Montclair v. Ramsdell,* 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883); *Washington Market*

*Co.,* 101 U.S. at 115, 11 Otto 112; *Muniz v. United States,* 236 F.3d 122, 127 (2d Cir. 2001). The only plausible interpretation is to read the parenthetical limitation onto the "amount paid," which limits the class of possible plaintiffs under Section 11.

Because the statute is written in clear and unambiguous language, "judicial inquiry is complete." *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 290 (2d Cir.2002) (quoting *Connecticut Nat'l Bank,* 503 U.S. at 254, 112 S.Ct. 1146). *See also Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) ("where the statutory language provides a clear answer, [our analysis] ends there"). However, because no court has previously passed on this issue, it is worth briefly noting that the legislative history of Section 11 also supports this conclusion.

At the time the Securities Act was passed in 1933, Section 11(e) read:

> The suit authorized under subsection (a) may be either (1) to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or (2) for damages if the person suing no longer owns the security.

48 Stat. 74, 83 (1933). Under the initial embodiment of Section 11, therefore, the measure of damages was the "purchase price, or ... damages not exceeding such price...." H.R.Rep. No. 73–85, at 9. *See also* S.Rep. No. 73–47, at 5 (1933). This original formulation was based on the remedy of rescission. *See Federal Securities*

---

**78.** I am well aware that "[t]he importance of statutory language depends not on its punctuation, but on its meaning." *Chickasaw Nation v. United States,* 534 U.S. 84, 98, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001) (O'Conner, J., dissenting) (citation omitted). *See also United States Nat. Bank of Ore.,* 508 U.S. at 454, 113 S.Ct. 2173 ("plain-meaning analysis based only on punctuation is necessarily in-

complete and runs the risk of distorting a statute's true meaning"); *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 250, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (citing cases). Nonetheless, for the reasons discussed below, the lessons drawn from construing the punctuation merely support the plain meaning of the statute.

*Act: Hearings before the House Interstate and Foreign Commerce Committee,* 73d Cong. 145–46 (1933) (testimony of Ollie M. Butler, Foreign Service Division, Department of Commerce); *id.* at 222 (statement of Hon. Huston Thompson); *Securities Act: Hearings before the Senate Banking and Currency Committee,* 73d Cong. 87–88, 149–54, 230 (1933). Section 11 as a whole was intended to complement the common law remedies available to securities purchasers, while at the same time eliminating some of the roadblocks to recovery (*e.g.,* the requirements of privity, and the elements of reliance, causation, and scienter). Section 11(e), therefore, was meant to provide the same remedies available under common law, *i.e.,* rescission or damages.

Nonetheless, Section 11(e) came under immediate criticism. In an influential piece worth quoting at length, then-Professor William O. Douglas wrote of the original Section 11(e):

> When the Act provides for damages, it [ ] introduces distinct innovations.... It is provided that "In no case shall the amount recoverable under this section exceed the price at which the security was offered to the public." If the purchaser still owns the security he may on tendering it back to any of the parties under Section 11 recover what he paid for it, provided he paid less than the public offer price. In case he paid more than the public offer price he would be entitled to receive only an amount equal to that price. If he bought at $125, the public offering price being $100, and the price dropped to $50 he might elect to rescind and recover $100. But if he sold at $50 he might recover damages of $75. Now it has been asserted that in such a case the damages recoverable would be $50—the difference between the public offering price and the price at which plaintiff sold. In other words it is

claimed that the subsection quoted means what would have been meant if it had provided "In no case shall the amount recoverable as damages under this section exceed the amount by which the price at which the security was offered to the public is in excess of the price at which plaintiff sold the security." Section 11(g), however, does not use such a measure. If courts thus restrict the measure of damages, they may or may not be conforming to the intent of Congress. But they certainly would be reading into the Act words that are not there.

William O. Douglas & George E. Bates, *The Federal Securities Act of 1933,* 43 Yale L.J. 171, 174–75 (1933) (footnotes omitted). *See generally* Harry Shulman, *Civil Liability and the Securities Act,* 43 Yale L.J. 227 (1933).

As a result of this criticism, Section 11(e) was amended by Section 206(d) of the Exchange Act, which implemented the current Section 11(e) by inserting just the language (slightly edited) that Douglas suggested.

As one scholar observed at the time,

> Damages are still *prima facie* the difference between the amount realized on the value of the security and the amount at which the security was offered to the public. One clarification here adopts the Commissioner's view that if a security is offered at $100, purchased by the plaintiff at $200 and sold by him at $50, his damages are $50 [offering price minus sale price] and not $100 [the recissionary measure of damages] as might have been contended under the original Act.

John Hanna, *The Securities Exchange Act of 1934,* 23 Cal. L.Rev. 1, 8 (1934). *See also* 78 Cong. Rec. 8716 (1934) (Statement

of FTC Commissioner James M. Landis).[79] Assuming the amendments were responsive to the "Commissioner's view," then Congress' intent was plainly to set the measure of damages as the lesser of the purchase price and offering price, minus the sale price of a security.

■■■ Therefore, based on the plain language of Section 11 and its legislative history, a plaintiff who sells a security above its offering price has no cognizable damages under Section 11 of the Securities Act, notwithstanding the fact that such plaintiff may have actually suffered a loss.[80] Accordingly, the Section 11 claims of such Plaintiffs must be dismissed.[81]

## IX. SECTION 15 CLAIMS

Section 15 states:

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under [Section 11] ... shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o. Plaintiffs' Section 15 claims accuse Individual Defendants of controlling Issuer Defendants and thereby sharing liability for those Issuers' violations of Section 11. Defendants argue that

**79.** It should be noted, too, that Commissioner Landis was one of the initial framers of the Securities Act. *See generally* James M. Landis, *The Legislative History of the Securities Act of 1933*, 28 Geo. Wash. L.Rev. 29 (1959).

**80.** Defendants also argue that anyone who *held* securities that traded above their offering price on the date of the lawsuit should be precluded from suing under Section 11. While such Plaintiffs may indeed be unable to prove damages, that is not an appropriate question at this stage. Section 11(e) sets the measure of damages for a plaintiff still holding her securities at the "value" of those securities at the time of suit. *See* 15 U.S.C. § 77k(e)(3). "Value," however, is not necessarily equal to "price," and the determination of value is a fact-intensive inquiry. *See McMahan*, 65 F.3d at 1048–49. It would be inappropriate to resolve this question at the motion to dismiss stage. *See Swierkiewicz*, 534 U.S. at 514, 122 S.Ct. 992.

Similarly, I will not address Issuer Defendants' argument that Plaintiffs' Section 11 claims should be dismissed because they have allegedly failed to show that the offering prices of the relevant securities were "inflated [] by a misrepresentation or omission in the registration statement." Iss. Mem. at 58. Although Section 11(e) does provide that dam-

ages should be reduced to the extent that loss is attributable to something other than a misstatement in the registration statement, that provision is an affirmative defense, with the burden of proof explicitly on the defendant. *See Adair*, 1998 WL 142353 at *7; *Beecher v. Able*, 435 F.Supp. 397, 406 (S.D.N.Y.1975). Furthermore, whether losses were attributable to other sources is necessarily a fact question; plaintiffs are certainly not required to plead that the offering price was artificially inflated in order to successfully state a Section 11 claim. *See Herman & MacLean*, 459 U.S. at 382, 103 S.Ct. 683 (plaintiff "need only show a material misstatement or omission to establish his *prima facie* case"). Even if this were a pleading requirement, in this Circuit "any decline in value is presumed to be caused by the misrepresentation in the registration statement." *McMahan*, 65 F.3d at 1048. Drawing every inference in Plaintiffs' favor, as I must, any allegation of loss therefore suggests that the offering price was artificially inflated. *See, e.g.,* Cacheflow Compl. ¶ 25 ("Plaintiffs ... have sustained damages because of Defendants' unlawful activities alleged herein.").

**81.** The ten cases where the Section 11 claims are dismissed are listed in Appendix 2 to this Opinion.

Plaintiffs have not adequately pled these claims. *See* Iss. Mem. at 60–65.

 In order to establish a prima facie Section 15 claim, a plaintiff need only establish (1) control, and (2) an underlying violation of Section 11 (or Section 12(a)(2)).[82] *See In re Independent Energy Holdings PLC Sec. Litig.*, 154 F.Supp.2d 741, 770 (S.D.N.Y.2001). Rule 9(b) does not apply to the pleading of a Section 15 claim because fraud is not an element of that claim.[83] And the PSLRA does not apply, as Section 15 does not require proof of scienter,[84] and because Section 15 arises under the Securities Act. Therefore, Section 15 claims need only be pleaded under Rule 8; a defendant is only entitled to notice that she allegedly controlled an entity that violated Section 11.

 Control is " 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.' " *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir.1996) (quoting 17 C.F.R. § 240.12b–2). A plaintiff is required to *prove* actual control, not merely control person status. *See Cromer Fin. Ltd. v. Berger*, 137 F.Supp.2d 452, 484 (S.D.N.Y. 2001). Naked allegations of control, however, will typically suffice to put a defendant on notice of the claims against her.[85]

 Here, Plaintiffs allege "[e]ach of the Individual Defendants was a control person of the Issuer with respect to the IPO [and] ... [a]s a result, the Individual Defendants are liable under Section 15 of the Securities Act for the Issuer's primary violation of Section 11 of the Securities Act." Cacheflow Compl. ¶¶ 72, 74. These paragraphs, in combination with the allegations supporting the Section 11 claims, provide notice to the Individual Defendants of the claims brought against them. Thus, the Section 15 claims are adequately pled.[86]

82. Although some courts have imposed a third element of "culpable participation," the majority of courts have not. *See Dorchester Investors v. Peak Trends Trust*, No. 99 Civ. 4696, 2003 WL 223466, at *3 (S.D.N.Y. Feb.3, 2003) (collecting cases). The concept of "culpable participation" is discussed *infra* at Part XII.

83. Indeed, Rule 9(b) does not even apply to the underlying Section 11 violation. *See supra* Part VIII.A.2.

84. Although plaintiffs are not required to prove scienter, a defendant may raise, as an affirmative defense, that the underlying violation occurred without her knowledge. *See Demarco v. Edens*, 390 F.2d 836, 841–42 (2d Cir.1968) (holding that Section 15 provides that "a defendant may *exculpate himself* from liability by fulfilling *his burden* of proving that he did not know, and in the exercise of reasonable care could not have known ... of the existence of the facts by reason of which the liability of the controlled person is alleged to exist.") (emphasis added). *See also McDaniel v. Compania Minera Mar de Cortes, Sociedad Anonimo, Inc.*, 528 F.Supp. 152, 165 (D.Ariz. 1981) ("Good faith constitutes an affirmative defense to Section 15 liability.").

85. In *Independent Energy*, I held that "[t]o survive a motion to dismiss, a plaintiff need only plead facts supporting a reasonable inference of control." 154 F.Supp.2d at 770. *See also Gabriel Capital, L.P. v. NatWest Fin. Inc.*, 122 F.Supp.2d 407, 426–27 (S.D.N.Y. 2000). The logic of *Swierkiewicz*, however, may have disturbed this holding. I am no longer convinced that even facts supporting a reasonable inference of control must be pleaded. Nonetheless, by virtue of their positions (*e.g.*, CEO, CFO) and Plaintiffs' specific allegations, these Individual Defendants very likely exercised actual control over the Issuers. *See, e.g.*, Cacheflow Compl. ¶¶ 72–74.

86. Obviously, the Section 15 claims are dismissed in those cases where the Section 11 claims (against both Issuers and Individual Defendants) have been dismissed. The Individual Defendants against whom the Section 15 claims are dismissed are listed at Appendix 3 to this Opinion.

## X. RULE 10B–5 CLAIMS FOR MATERIAL MISSTATEMENTS AND OMISSIONS AGAINST THE UNDERWRITERS, ISSUERS AND INDIVIDUAL DEFENDANTS

Plaintiffs have brought two distinct claims under Rule 10b–5, a regulation that makes it unlawful

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

Plaintiffs' first set of claims allege that *all* Defendants made material misstatements and omissions in the registration statements, either with an intentional or reckless state of mind, in violation of Rule 10b–5(b). *See, e.g.,* Cacheflow Compl. ¶¶ 95, 99, 100, 101. Because material omissions and misstatements are an essential part of these claims, *see* 17 C.F.R. § 240.10b–5(b), they must satisfy the requirements of paragraph (b)(1). Similarly, because Plaintiffs must ultimately prove that the Defendants acted with scienter, these claims must also satisfy paragraph (b)(2). Rule 9(b) governs the remaining elements of these claims.

### A. The Rule 10b–5 Claims for Material Misstatements Have Been Properly Pled

#### 1. The Material Misstatement Claims Satisfy Paragraph (b)(1) of the PSLRA—Particularity

Paragraph (b)(1) requires that for any claim asserting material misstatements or omissions, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

#### a. Paragraph (b)(1)'s First Two Requirements Have Been Satisfied

Plaintiffs have explicitly pled that seven specific material misstatements and omissions contained in the registration statement are false or misleading.[87] *See supra* Part IV.A.2. Moreover, for each misstatement or omission, Plaintiffs have stated the reasons why they believe these statements and omissions are misleading.

---

87. The eighth alleged misstatement in most complaints relates to statements in the analyst reports issued after the expiration of the twenty-five day "quiet period." A few points must be noted. In the Cacheflow case, the analyst report was prepared by Dain Rauscher, one of the Allocating Underwriters. Thus, there is a Rule 10b–5 material misstatement claim against Dain Rauscher based on alleged misstatements or omissions in the analyst report. Assuming, *arguendo,* that the analyst allegation was a stand-alone claim, and that the analyst claim was time-barred as Defendants assert, that would not result in the dismissal of any of the claims in the Cacheflow case. Discovery may reveal that the Defendants agreed prior to the IPO that a misleading analyst report would be issued after the IPO and that this agreement was a part of the overall scheme to manipulate the market. Whether a claim would be time-barred would have no impact on using this allegation as evidence in support of a claim of market manipulation *or* failure to disclose the fact of the agreement to issue positive analyst reports.

*See id.* These eight statements and omissions and the alleged reasons they were false and misleading are briefly summarized as follows:

*First,* the registration statement failed to disclose that Allocating Underwriters had entered into Tie-in Agreement with their customers, in violation of Regulation M, 17 C.F.R § 242.101.

*Second,* the registration statement did not include the Undisclosed Compensation as required by Regulation S–K, 17 C.F.R. § 229.508(e).

*Third,* the registration statement misleadingly stated that the underwriting syndicate would receive as compensation an underwriting discount of $1.68 per share, or a total of $8,400,000, based on the spread between the per share proceeds (*e.g.,* $22.32) and the Offering price to the public (*e.g.,* $24.00 per share) but failed to include the Undisclosed Compensation.

*Fourth,* the registration statement misleadingly stated that the Allocating Underwriters would offer the IPO shares to the public at a price set forth on the cover page because customers had to pay an amount in excess of that listed price through Tie-in Agreements and Undisclosed Compensation.

*Fifth,* the registration statement failed to disclose that the Allocating Underwriters were violating NASD Conduct Rule 2330(f), which prohibits underwriters from sharing in the profits or losses in any account of a customer.

*Sixth,* the registration statement failed to disclose that the Allocating Underwriters were charging customers commissions that were unfair, unreasonable, and excessive in order to receive allocations of IPO shares, a violation of NASD Conduct Rule 2440.

*Seventh,* the registration statement did not accurately state which of the underwriters would actually participate in the distribution of the IPO (*e.g.,* J.P. Morgan did not receive any of the 100,000 shares listed next to its name in the Cacheflow IPO).

*Eighth,* analyst reports issued just after the expiration of the "quiet period" with a "Strong Buy" recommendation and a 12–month price target (*e.g.,* $175 per share in Cacheflow) was materially false and misleading as it was based upon a manipulated price.

Plaintiffs have satisfied the first two requirements of paragraph (b)(1). They have not generally averred that the registration statements were misleading. Nor are the proffered reasons speculative or vague. Rather, Plaintiffs have pointed to specific provisions of the statement and then provided reasonable explanations as to why they believe specific statements or omissions were false or misleading.

Although these requirements are easy to satisfy, it is worth remembering that Plaintiffs are bound by these pleadings throughout the course of the proceedings. Because Plaintiffs have specified the misstatements and omissions that they claim were misleading, the Court is able to evaluate whether they are material as a matter of law. *See infra* Part X.B.1.

In short, while nothing more is needed to satisfy these two requirements of paragraph (b)(1) on a motion to dismiss, the PSLRA has clearly served its purpose by putting the Defendants on notice of the specific misstatements and omissions that are at issue.

**b. Paragraph (b)(1)'s Last Requirement Has Been Satisfied**

On November 25, 2002, I directed Plaintiffs to identify which of their allegations were based on information and belief, and to identify for those allegations, the

"facts on which that belief [was] formed." Order, *In re Initial Public Offering Sec. Litig.*, 21 MC 92 (S.D.N.Y. Nov. 25, 2002) ("11/25/02 Order").[88] *See also Lirette*, 999 F.Supp. at 165 (requiring similar submission in order to establish basis for information and belief).

 In response to the 11/25/02 Order, Plaintiffs submitted a chart—almost one thousand pages in length—identifying which paragraphs of the 309 Complaints and the Master Allegations were based on information and belief, and the basis for those beliefs. Plaintiffs identified eleven categories of sources: (1) confidential sources; (2) registration statements and/or prospectuses; (3) SEC filings; (4) press releases; (5) media resources, including newspapers, magazines, Internet sources, and books; (6) analyst reports; (7) letters to Plaintiffs' counsel from Underwriter Defendants' counsel; (8) academic literature; (9) congressional testimony; (10) the Order Pursuant to New York General Business Law § 354 in *In re An Inquiry by Eliot Spitzer, Attorney General of the State of New York*, No. 02401522 (Sup.Ct. N.Y.Co. Apr. 8, 2002); and (11) the Consent Decree in *SEC v. Credit Suisse First Boston Corp.*, No. 1:02 CV 00090, 2002 WL 479836 (D.D.C. Jan. 29, 2002).[89]

---

**88.** As originally pled, Plaintiffs' only reference to information and belief was contained in an introductory statement preceding the first paragraph of each Complaint. *See, e.g.*, Cacheflow Compl. at p. 1. "This is no longer an acceptable approach to pleading." *Lirette v. Shiva Corp.*, 999 F.Supp. 164, 165 (D.Mass. 1998). Indeed, "[c]ourts unanimously agree ... that a prefatory statement preceding paragraph 1 of a complaint clearly does not satisfy the PSLRA's information and belief pleading requirements." Glen DeValerio & Kathleen M. Donovan–Maher, *Information and Belief Pleading Under the Private Securities Litigation Reform Act of 1995*, SF86 ALI–ABA 365, 376 (Course of Study May 10, 2001) (citing, as examples, *Feeney v. Mego Mortgage Corp.*, 45 F.Supp.2d 1356, 1357 (N.D.Ga.1999); *In re Aetna, Inc. Sec. Litig.*, 34 F.Supp.2d 935, 942 (E.D.Pa.1999); *In re Health Mgmt. Sys., Inc. Sec. Litig.*, No. 97 Civ. 1865, 1998 WL 283286, at *3 (S.D.N.Y. June 1, 1998); *Brady v. Anderson*, No. 97 Civ. 2154, 1998 U.S. Dist. LEXIS 20774, at *11, 20, 25–26, 32–33 (C.D.Cal. May 27, 1998); *In re Silicon Graphics, Inc. Sec. Litig.*, 970 F.Supp. 746, 763 (N.D.Cal.1997)).

Such an introductory statement fails to satisfy paragraph (b)(1) for two reasons. *First*, it does not "specify, *as to each particular allegation* ... whether that allegation is made upon information and belief or is supported by some document or statement on personal knowledge by a potential witness." *Lirette*, 999 F.Supp. at 164 (emphasis added). As a result, the court is unable to determine the threshold issue of whether a particular allegation has been properly based on information and belief. *Second*, Plaintiffs have failed to indicate which facts support those allegations made on information and belief. Yet clearly indicating the facts that support allegations based on information and belief is critical under paragraph (b)(1). Not only must it be determined whether those facts are pled "with particularity," 15 U.S.C. § 78u–4(b)(1), but it must also be decided whether those facts sufficiently support Plaintiffs' information and belief. *See Novak*, 216 F.3d at 313–14; *see also supra* Part VI.B.1 (discussing paragraph (b)(1)'s requirements). For an example of a case where the Complaint specified the allegations based on information and belief, as well as the underlying facts, see *Allaire*, 224 F.Supp.2d at 326 n. 4.

**89.** Sources described by these general categories can plainly form a basis for Plaintiffs' beliefs. *See, e.g.*, *Novak*, 216 F.3d at 313–14 (permitting information and belief pleading based on confidential sources, media reports, private communications, and "other facts"); *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 319 (3d Cir.1997) (permitting information and belief pleadings based on "filings with the SEC, annual reports, press releases, recorded interviews, media reports on the company, and reports of securities analysts and investor advisory services").

The latter two sources—both dated 2002—may plausibly support the formation of Plaintiffs' information and belief, even though these actions were originally filed in 2001, because the Complaints were amended in April 2002. *See, e.g.*, Cacheflow Compl. (amended Apr. 19, 2002).

 This submission was "deemed to be part of the complaints," *see* 11/25/02 Order, and therefore supplemented the pleadings,[90] which already averred that:

> Plaintiffs, by their undersigned attorneys, individually and on behalf of the Class described below, *upon information and belief, based upon, inter alia, the investigation of counsel,* which includes a review of public announcements made by Defendants, interviews with individuals with knowledge of the acts and practices described herein, Securities and Exchange Commission ("SEC") filings made by Defendants, press releases, and media reports, except as to Paragraph 12 applicable to the named Plaintiffs which is alleged upon personal knowledge, bring this Consolidated Amended Complaint (the "Complaint") against the Defendants named herein, and allege as follows:

Cacheflow Compl. at 1 (emphasis added).[91]

 For each of the Complaints, Plaintiffs identified approximately fifty para-

---

90. A court has the authority to permit leave to amend pleadings "whenever justice so requires." Fed.R.Civ.P. 15(a). In these cases, the ends of justice were better served by permitting Plaintiffs to file a supplement to their pleadings, as opposed to dismissing their claims and then granting leave to replead. *See, e.g., Hotel Constructors, Inc. v. Seagrave Corp.,* 574 F.Supp. 384, 391 (S.D.N.Y.1983) (directing plaintiff to submit supplement to complaint, as opposed to granting motion to dismiss, in order to meet pleading standard).

91. A number of district courts have erroneously drawn a distinction between allegations made on "information and belief," as opposed to on "investigation of counsel," in order to avoid applying paragraph (b)(1)'s third requirement. *See, e.g., Zeid v. Kimberley,* 973 F.Supp. 910, 915 (N.D.Cal.1997) ("even though some of the facts appear to be peculiarly within Defendants' knowledge, Plaintiffs ... have, through investigation, acquired sufficient facts to state a claim for fraud *without relying on allegations made on information and belief.*") (emphasis added), *rev'd on other grounds,* 201 F.3d 446, 1999 WL 993649 (9th Cir.1999) (table). Similarly, in *In re PetSmart, Inc. Sec. Litig.,* 61 F.Supp.2d 982, 988 n. 2 (D.Ariz.1999), plaintiffs used almost precisely the same language as Plaintiffs here, asserting that their allegations were based "upon information and belief as to all other matters, based upon, *inter alia,* the investigation made by and through counsel...." In *PetSmart,* the court held that "insisting that the complaint is not based on information and belief but rather on the investigation of counsel *is the same as pleading personal knowledge.*" *Id.* at 989 (emphasis added). As a result, that court held that plaintiffs need not satisfy paragraph (b)(1)'s third requirement.

These holdings are disingenuous. "Rule 11(b) of the Federal Rules of Civil Procedure requires that allegations in a complaint be based upon *either* personal knowledge *or* information and belief." *In re Nice Sys., Ltd. Sec. Litig.,* 135 F.Supp.2d 551, 569 n. 11 (D.N.J.2001) (emphasis added) (citing *Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.,* 186 F.3d 157, 166 (2d Cir.1999)). The phrase "on investigation of counsel" merely satisfies Rule 11 by showing that counsel has a sufficient basis to make an allegation in good faith. *See In re Green Tree Fin. Corp. Stock Litig.,* 61 F.Supp.2d 860, 872 (D.Minn.1999) ("because an attorney is required, under Rule 11 of the Federal Rules of Civil Procedure, to investigate claims before filing a complaint, plaintiffs should not be allowed to avoid the heightened pleading standard by claiming 'investigation of counsel.'"), *rev'd on other grounds,* 270 F.3d 645 (8th Cir.2001). If counsel's investigation involves speaking to her client, the allegation can be made on personal knowledge; otherwise, it must be on information and belief. But no amount of investigation can transform information and belief—hearsay, essentially—into personal knowledge. Thus, for purposes of paragraph (b)(1), the phrase "on investigation of counsel" is meaningless. *See, e.g., In re Party City Sec. Litig.,* 147 F.Supp.2d 282, 303 (D.N.J.2001) (holding that allegations based on investigation of counsel are allegations on information and belief); *In re Equimed, Inc. Sec. Litig.,* No. 98–CV–5374, 2000 WL 562909, at *4 (E.D.Pa. May 9, 2000) ("To distinguish between 'information and be-

graphs based on information and belief. It is important to note, however, that paragraph (b)(1) does not apply to each of the paragraphs identified by Plaintiffs. Rather, paragraph (b)(1) applies only to allegations regarding statements (here in the registration statements/prospectuses) alleged to be misleading. Many of the paragraphs identified by Plaintiffs plead matters of fact, *see, e.g.,* Cacheflow Compl. ¶ 31 ("On the day of the IPO, the price of Cacheflow stock shot up dramatically, trading as high as $139.25 per share, or more than 480% above the IPO price on substantial volume.").[92] Other paragraphs plead conclusory allegations of motive but plead *no* facts—on information and belief or otherwise. *See, e.g.,* Cacheflow Compl. ¶ 110(b) ("The Issuer [and Individual] Defendants were motivated by the fact that the artificially inflated price of the Issuer's shares in the aftermarket would enable Individual Defendants to sell personal holdings in the Issuer's securities at artificially inflated prices in the aftermarket or otherwise."). These statements and allegations are not at issue here.

What remains are a handful of paragraphs in the Complaints that allege, on information and belief, that Defendants made various material misstatements. *See, e.g., id.* ¶¶ 38, 43, 45, 48, 51–54. In addition, several allegations describing the unlawful scheme are critical to Plaintiffs' material misstatement allegations because, *inter alia,* Plaintiffs plead that Defendants made material misstatements simply by failing to disclose various aspects of the scheme. *See, e.g., id.* ¶¶ 34, 47, 55–57.[93] In sum, Plaintiffs' allegations of material misstatements are that Defendants failed to disclose their illegal conduct in their registration statements and prospectuses. *See, e.g., id.* ¶ 48 ("The failure to disclose the Allocating Underwriter Defendants' unlawful profit-sharing arrangement as described herein, rendered the Registration Statement/Prospectus materially false and misleading."). Plaintiffs further allege that Defendants' motive in failing to disclose the scheme was to conceal and perpetuate the scheme. *See, e.g., id.* ¶ 99 ("The material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of, *inter alia:* (a) securing and concealing the Tie-in Agreements; (b) securing and concealing the Undisclosed Compensation; and/or (c) concealing that certain of the Underwriter Defendants and their analysts who reported on the Issuer's stock had material conflicts of interest."). Thus, if Plaintiffs have identified a sufficient basis to support the formation of their belief

lief' and 'investigation of counsel' is meaningless; it would permit evasion of the clear intent of a statutory mandate. Plaintiffs must state with particularity those facts upon which their allegations are formed, even if made upon 'investigation of counsel.' ").

92. Such facts are entitled to judicial notice pursuant to Federal Rule of Evidence 201(b)(2) which provides that a judicially noticed fact is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Cf.* Fed.R.Evid. 803(17) (stating that "market quotations … generally used and relied upon by the public" are not hearsay even if the declarant is available, presumably because of

the inherent trustworthiness of such information).

93. The allegations contained in these thirteen paragraphs were derived from the following categories of sources: confidential sources, the registration statements/prospectuses, media reports, the consent decree in *SEC v. Credit Suisse First Boston Corp.,* letters from Underwriter Defendants' counsel, academic literature, and analyst reports. Thus, SEC filings, press releases, congressional testimony, and the Order in *In re An Inquiry by Elliot Spitzer,* although listed in Plaintiffs' submission in response to the 11/25/02 Order, did not actually provide the basis for any of Plaintiffs' beliefs for purposes of paragraph (b)(1).

that Defendants engaged in the manipulative conduct—and that Defendants failed to disclose that conduct—they have satisfied paragraph (b)(1)'s third requirement. *See Novak,* 216 F.3d at 313–14.

The requirements of the PSLRA must be read consistently with its purpose. *See Barrett v. Van Pelt,* 268 U.S. 85, 90–91, 45 S.Ct. 437, 69 L.Ed. 857 (1925). Congress enacted the information and belief pleading requirement because "[n]aming a party in a civil suit for fraud is a serious matter. Unwarranted fraud claims can lead to serious injury to reputation for which our legal system effectively offers no redress." H.R. Conf. Rep. 104–369, at 41. The purpose of the information and belief requirement—indeed, the purpose of all of the PSLRA's heightened pleading requirements—was to weed out meritless lawsuits at the pleading stage.[94]

On this point the rule of the Second Circuit is clear: "paragraph (b)(1) does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiffs need only plead with particularity *sufficient* facts to support those beliefs." *Novak,* 216 F.3d at 313–14 (emphasis in original). What facts and what level of particularity are sufficient to support a plaintiff's beliefs will vary from case to case. Under paragraph (b)(1), sufficiency and particularity are intricately related; the greater the basis for a belief, *i.e.,* the more obviously sufficient plaintiffs' sources are, the less particularity is required in identifying them. Where an allegation stems from only one or two sources, however, it is important that they be identified with absolute particularity. The critical threshold is that the allegations must be made in a way that satisfies the court that plaintiff's charge of fraud is not "unwarranted."

For example, where a fraud allegation is founded on the uncorroborated allegations of one anonymous whistle-blower, it is necessary to uniquely identify that source, either by naming her or by describing her with such particularity as to satisfy the court that her information is credible. *See id.* at 314 (where allegations are based solely on information from confidential sources, "there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."). Where, as here, there are many confidential sources who all say the same thing—that they were required to enter into Tie-in Agreements—and those sources are corroborated by a vast number[95] of media reports[96] (including admissions by insid-

---

**94.** A second purpose underlying paragraph (b)(1) " 'is to afford defendant[s] fair notice of the plaintiff's claim and the factual ground upon which it is based.' " *Novak,* 216 F.3d at 314 (quoting *Ross,* 904 F.2d at 823). There is no doubt here that Defendants were on notice of the allegations against them—leveled by the popular media, Congress, the SEC, and the New York Attorney General's Office—that in turn formed the basis for Plaintiffs' beliefs.

**95.** Indeed, a search for newspaper articles mentioning "fraud" in the same sentence as "IPO" during the Cacheflow class period (November 19, 1999 to December 6, 2000)—a period just over a year—yielded too many results for LEXIS to return.

**96.** *See, e.g., D.H. Blair Ex–Broker Pleads Guilty to Charges of Stock Fraud in IPOs,* Wall. St. J., June 6, 2001, at B10; Greg Ip, et al., *Internet Bubble Broke Records, Rules and Bank Accounts,* Wall St. J., July 14, 2000, at A1; Howard Kurtz, *Risky Business,* Wash. Post, Aug. 27, 2000, at W08; *Hedge Fund Managers Said to Talk to Grand Jury;* Susan Pulliam & Randall Smith, *Linux Deal is Focus of IPO–Commission Probe,* Wall St. J., Dec. 12, 2000, at C1; Susan Pulliam, et al. *SEC Intensifies Inquiry into Commissions for Hot*

ers), as well as intensive investigations by both state and federal agencies, the cumulative effect of the evidence is important. In such a case, the sheer volume of the corroboration obviates the need for absolute particularity.

Here, generic references to news articles, academic literature, and press releases are sufficiently particular to support the formation of Plaintiffs' beliefs because the substance of those beliefs—that the Defendants were perpetrating a massive fraud on the securities market in connection with most every IPO—was the stuff of daily headlines.[97] The alleged fraud had so permeated the news media that there can be no doubt that Plaintiffs have a sufficient basis for their information and belief, and that is all that the statute requires. The same can be said for any of the categories of sources proffered by Plaintiffs. Because there is no real doubt in these cases that Plaintiffs have ample grounds on which to base their *allegations,* there is no danger that the allegations here are "unwarranted"—even if they ultimately turn out to be untrue.

To ask Plaintiffs to show more than they have would be pointless, and to ask the Court to cross-reference every paragraph of every complaint against particular me-

dia reports, articles, letters, and other sources would be a waste of this Court's limited resources. Accordingly, Plaintiffs have satisfied the third requirement of paragraph (b)(1).

## 2. The Material Misstatement Claims Satisfy Paragraph (b)(2) of the PSLRA—Scienter

Paragraph (b)(2) provides, "In any private action ... in which the plaintiff may recover money damages only on *proof* that the defendant acted with a particular state of mind, the complaint shall ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (emphasis added). In most of the Complaints, Plaintiffs have brought Rule 10b–5(b) claims for material misstatements and omissions against all Defendants: Allocating Underwriters, Non–Allocating Underwriters, Individual Officers, and Issuers. Plaintiffs allege that each of these Defendants made the seven misstatements and omissions when signing the registration statement. Plaintiffs have satisfied the requirements of paragraph (b)(2) with respect to these alleged misstatements and omissions for each Defendant.[98]

---

*IPOs—Goldman, Bear Stearns and Morgan Stanley Get Requests for Data,* Wall St. J., Dec. 13, 2000, at C1; Susan Pulliam & Randall Smith, *Trade Offs: Seeking IPO Shares, Investors Offer to Buy More in After–Market,* Wall St. J., Dec. 6, 2000, at A1; *Trying to Avoid the Flippers;* Neil Roland, *Credit Suisse Pays US$100M Over IPOs: Avoids Fraud Charges,* Nat'l Post, Jan. 23, 2002, at FP16; Randall Smith & Susan Pulliam, *U.S. Probes Inflated Commissions for Hot IPOs,* Wall St. J., Dec. 7, 2000, at C1. *See also supra* note 25 (citing books).

**97.** *Cf. Health Mgmt.,* 1998 WL 283286, at *3 (requiring plaintiffs to identify particular articles, SEC filings, etc., albeit in a case involving isolated incidents of fraud at a single company).

**98.** Plaintiffs also allege that some of the Underwriters made material misstatements in the analyst reports issued after the quiet period. *See, e.g.,* Cacheflow Compl. ¶ 57 ("The price target set forth in the Dain Rauscher report was materially false and misleading as it was based upon a manipulated price."). Paragraph (b)(2) is also satisfied with respect to this allegation as Dain Rauscher is accused of having engaged in the overall scheme with its customers.

However, to the extent that this portion of the claim is brought against any Defendant other than the Underwriter who issued the analyst report it must fail because such Defendants did not *"make* any untrue statement of a material fact" or "omit to state a material

### a. Allocating Underwriters

■ Plaintiffs have alleged that the Allocating Underwriters engaged in a scheme that could have only happened intentionally, and which they knew must be disclosed to the investing public: "the Allocating Underwriter Defendants created artificial demand for Cacheflow stock by conditioning share allocations in the IPO upon the requirement that customers agree to purchase shares of Cacheflow in the aftermarket and, in some instances, to make those purchases at pre-arranged, escalating prices ('Tie-in Agreements')." Cacheflow Compl. ¶ 3. Under this scheme, the Allocating Underwriters profited by "requir[ing] their customers to repay a material portion of profits obtained from selling IPO share allocations in the aftermarket through one or more of the following types of transactions:

(a) paying inflated brokerage commissions;

(b) entering into transactions in otherwise unrelated securities for the primary purpose of generating commissions; and/or

(c) purchasing equity offerings underwritten by the Allocating Underwriter Defendants, including, but not limited to, secondary (or add-on) offerings that would not be purchased but for the unlawful scheme alleged herein".

*Id.* ¶ 4.[99] Finally, as part of this overall scheme, not every Underwriter who was listed on the registration statement distributed the company's shares, *see id.* ¶¶ 53–54, because by concentrating the Underwriters who would allocate shares, it was "easier for a select group of underwriters in various offerings to engage in the manipulative practices." MA ¶ 54.

These allegations of the Allocating Underwriters' *conduct* give rise to a strong inference that they made each of the seven material misstatements and omissions with the required *state of mind.* The alleged conduct was so obviously manipulative (and material, *see infra* Part X.B.1) that it could not have been done inadvertently. That Allocating Underwriters then signed registration statements that plainly failed to disclose the scheme—in the face of an obvious duty to disclose, *see infra* Part X.B.2—gives rise to a strong inference that the misstatements were made intentionally for the purpose of defrauding the investing public.

Indeed, even if parts of the alleged scheme consisted of permissible stabilization practices (which is highly unlikely, *see infra* Part XI.B.1), the failure to disclose that conduct still would have evinced an intent to defraud. It is well-established that the SEC allows Underwriters to engage in certain acts of "stabilization." *See* 15 U.S.C. § 78(i)(a)(6) (granting the SEC the authority to promulgate rules that allow "pegging, fixing or stabilizing the price of [a] security"); 17 C.F.R. § 242.104 (establishing guidelines for acts of stabilization); *see also Friedman v. Salomon/Smith Barney, Inc.,* No. 98 Civ. 5990, 2000 WL 1804719, at *3 (S.D.N.Y. Dec.8, 2000) ("*Friedman I*") (describing the history and law of stabilization), *aff'd,* 313 F.3d 796 (2d Cir.2002) ("*Friedman II*").

For instance, if the public offering price for a security is $10.00 per share, and

---

fact" contained in the report. 17 C.F.R. § 240.10b–5 (emphasis added).

99. "As part and parcel of this scheme ... certain of the underwriters ... also improperly utilized their analysts, who, unbeknownst to investors, were compromised by conflicts of interest, [to] artificially inflate or maintain the price of Cacheflow stock by issuing favorable recommendations in analyst reports." Cacheflow Compl. ¶ 7.

the market price before the completion of the distribution falls to $9.00 per share, the manager may enter a stabilizing bid of $10.00 per share to prevent persons interested in the security from purchasing securities in the open market at a price below the public offering price.

Samuel N. Allen, *A Lawyer's Guide to the Operation of Underwriting Syndicates,* 26 New Eng. L.Rev. 319, 349 (1991). While such acts manipulate the market by artificially inflating the price,[100] they are nonetheless lawful and do not violate either Rule 10b–5(a) or (c).

■ However, if an underwriter fails to disclose its stabilization practices, it is liable for making material misstatements and omissions in violation of Rule 10b–5(b), *see* 17 C.F.R. § 240.10b–5(b), because any act of manipulation—even a legal one—is material and must be disclosed. *See Miller v. Steinbach,* 268 F.Supp. 255, 274 (S.D.N.Y.1967); *see also infra* Part X.B.2.

The rule—of logic as much as of law—is that whenever a defendant engages in clearly manipulative practices, and then conceals those practices by making misstatements, the concealment is presumptively done with the intent to defraud.

### b. Non–Allocating Underwriters

Because Plaintiffs cannot accuse the Non–Allocating Underwriters of requiring their customers to enter into any Tie-in Agreements and pay Undisclosed Compensation, the allegations that were sufficient to show a strong inference of scienter with respect to the *Allocating* Underwriters do not suffice with respect to the *Non–Allo-*

*cating* Underwriters. For example, in the Cacheflow complaint, Plaintiffs allege that J.P. Morgan (H & Q) did not allocate any stock, *see* Cacheflow Compl. ¶¶ 14–16. J.P. Morgan, as a Non–Allocating Underwriter, argues that it neither knew of nor recklessly disregarded the conduct of the Allocating Underwriters who were engaged in the allegedly illegal scheme, and as a result, did not knowingly or recklessly make the first six misstatements and omissions, which related to the Tie-in Agreements and Undisclosed Compensation.[101]

■ Nonetheless, for at least two reasons, Plaintiffs have made other allegations that are sufficient to give rise to a strong inference that the Non–Allocating Underwriters signed the registration statement with the requisite state of mind. *First,* it is significant that these Underwriters were listed on the registration statements as underwriters of the IPO, but then allegedly received no allocation. This circumstance is so unusual that it supports a strong inference that the Non–Allocating Underwriters either knew about, or acted with reckless disregard towards, the entire scheme of the Allocating Underwriters when signing the registration statement. *Second,* these Complaints cannot and need not be read in isolation. There are 309 Complaints against the fifty-five Underwriters in which Plaintiffs describe in painstaking detail the relationships between the various investment banks. *See* MA ¶¶ 66–85. Even if an Underwriter took no role in one allocation, it took an active role in others—and in those IPOs it is accused of committing illegal acts. For example, during the class period J.P. Morgan was either a Lead or Co–Lead Under-

---

100. *See generally* 9 Louis Loss & Joel Seligman, *Securities Regulation* 3988–4071 (3d ed.1992) (describing stabilization as a lawful act of market manipulation).

101. Of course, paragraph (b)(2) has been satisfied with respect to the seventh misstatement of failing to accurately state which of the Underwriters would actually participate in the distribution of the IPO.

writer in twelve other IPOs in which it is alleged to have required Tie–In Agreements of its customers and taken Undisclosed Compensation.[102] The allegations that J.P. Morgan engaged in the same scheme in these IPOs raise a strong inference that in the Cacheflow IPO J.P. Morgan knew that the misstatements and omissions in the registration statements were misleading; or, at least, acted with reckless disregard towards their truth.

Similarly, in the Master Allegations, Plaintiffs allege that at least one customer was required or induced by J.P. Morgan to buy stock in the aftermarket at prices substantially above the IPO price in six IPOs.[103] These allegations also raise a strong inference that in the Cacheflow IPO J.P. Morgan knew that the misstatements and omissions in the registration statements were false or misleading because the Allocating Underwriters would and did require Tie-in Agreements and Undis-

closed Compensation.[104] Paragraph (b)(2) has thus been satisfied.

### c. Individual Defendants

On November 13, 2002, I directed Plaintiffs to submit charts summarizing their allegations of scienter as to the Individual Defendants and Issuers in each of the 309 complaints. *See* Order, *In re Initial Public Offering Sec. Litig.*, No. 21 MC 92 (S.D.N.Y. Nov. 13, 2002) ("11/13/02 Order"). As to the Individual Defendants, Plaintiffs were directed to identify (1) their title, (2) whether they signed the relevant registration statement, (3) the source of their knowledge of the alleged misrepresentations or omissions, (4) the number of shares of the relevant Issuer that they owned, (5) the number of shares sold, (6) the dates(s) of sale, and (7) the proceeds from the sale. In response, Plaintiffs submitted a chart on November 26, 2002.[105] As an example, Plaintiffs submitted the following chart in connection with the Ask Jeeves Inc.[106] offering:

---

**102.** *See* MA Tab 11 (alleging that J.P. Morgan was Lead/CoLead Underwriter in the IPOs of Apropos Technologies, Earthweb (Dice), F5 Networks, High Speed Access, Hoovers, Immersion, Net2Phone, PSI Technologies Holdings, Rowecom, Telecommunications Systems, Valley Media, and Vicinity).

**103.** Apropos Technologies, F5 Networks, Hoovers, Net2Phone, PSI Technologies Holdings, and Telecommunications Systems. *See* MA ¶ 34, at 11, 28, 33, 46, 58–59, 68–69.

**104.** This does not mean, of course, that the Court makes any finding as to whether these

allegations alone would suffice to *prove*, at trial, that a Non–Allocating Underwriter acted with the requisite state of mind.

**105.** Plaintiffs' charts do not add anything to the pleadings; they are merely a tool to assist the Court in locating and comparing the allegations of scienter in each of the 309 complaints.

**106.** Plaintiffs' charts do not contain an entry with respect to the Individual Defendants in Cacheflow because those Defendants were voluntarily dismissed by Plaintiffs. *See also infra* note 113.

| Individual Defendant | Title | Signed? | Source of Knowledge | Shares Owned | Shares Sold | Date(s) Sold. | Proceeds |
|---|---|---|---|---|---|---|---|
| Robert W. Wrubel | President, CEO and Board Member | Yes | -Road Show -Close interaction with Underwriter Defendants prior to IPO ¶¶ 137, 138, 139, 140 Individual Defendant stock sales | 189,424 | Approximately 100,000 shares (Including 10,000 in Secondary Offering) | 8/16/2000– 2/23/2001 | Approximately $1,320,000 (Including $720,000 in Secondary Offering) |
| | ¶ 22 | ¶ 22 | ¶ 142(b) | ¶ 142(a) | ¶ 142(b) | ¶ 142(b) | ¶ 142(b) |

 Plaintiffs' allegations against the Individual Defendants who signed the registration statement [107] are not nearly as strong as those against the Underwriters. This is not surprising given that the Complaints most fully describe the conduct and motivations of the Underwriters. *Compare* MA ¶¶ 1–111 (describing, over 113 pages, the conduct and motivations of the Underwriters), *with* MA ¶ 112 (describing the conduct and motivations of Individual Defendants). For example, while Plaintiffs have pled hundreds of examples of Underwriters who were involved in Tie-in Agreements, *see id.* ¶ 34, they have not

alleged a single instance of an Individual Defendant who actually knew about the alleged scheme. In short, Plaintiffs have not alleged facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness by the Individual Defendants with respect to the registration statements.[108] *See Novak*, 216 F.3d at 307–08.

 Nonetheless, Plaintiffs' Rule 10b–5(b) claims against the Individual Defendants may still satisfy paragraph (b)(2) of the PSLRA by alleging that the Individual Defendants had the "motive and opportunity" to make the alleged misstatements

**107.** Only a person who signed the registration statement can be deemed to have "ma[d]e any untrue statement of a material fact or to [have] omit[ted] to state a material fact" contained inside the statement. 17 C.F.R. § 240.10b–5. *Cf. In re Deutsche Telekom AG Sec. Litig.*, No. 00 Civ. 9475, 2002 WL 244597, at *5 (S.D.N.Y. Feb.20, 2002) ("[W]hile the nature of a prospectus itself is to solicit the purchase of securities, it is those who sign the registration statement that accompanies the prospectus who are deemed solicitors.") (citing *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058, 2001 WL 1111508, at *7 (S.D.N.Y. Sept.20, 2001); *APAC Teleservice, Inc., Sec. Litig.*, No. 97 Civ. 9145, 1999 WL 1052004, at *11 (S.D.N.Y. Nov.19, 1999)). Eighteen of the Individual Defendants did not sign any registration statements. The Rule 10b–5 claims against those Defendants, listed at Part B of Appendix 4 to this Opinion, are hereby dismissed.

**108.** The Complaints allege, and Plaintiffs argue, that because the Individual Defendants

attended the road shows and interacted with the Underwriters prior to the IPOs, there is strong circumstantial evidence of conscious misbehavior or reckless disregard of the truth. The problem with this argument is that it defeats the gatekeeping function of paragraph (b)(2); were Plaintiffs' argument true, "the executives of virtually every corporation in the United States could be subject to fraud allegations." *Ferber v. Travelers Corp.*, 785 F.Supp. 1101, 1107 (D.Conn.1991) (cited with approval in *Shields*, 25 F.3d at 1130). Many officers attend road shows and most work closely with the underwriter prior to the IPO. If these facts alone could provide *strong* circumstantial evidence of conscious misbehavior, then most officers, and *all* issuers, would be appropriate defendants whenever there is a basis to allege that the registration statements contained a material misrepresentation or omission. If this were the case, the difference between a Section 11 claim and a Rule 10b–5(b) claim would be substantially eroded.

and omissions. *See supra* Part VI.B.2. In the Cacheflow Complaint, for instance, Plaintiffs allege:

(a) The Individual Defendants beneficially owned substantial amounts of the Issuer's common stock. For example, as of the IPO, Defendant NeSmith owned 2,000,000 shares, and Defendant Malcolm owned 5,163,785 shares. These holdings, which were purchased or otherwise acquired at prices below the IPO price, substantially increased in value as a result of the misconduct alleged herein.

(b) The Issuer Defendants were motivated by the fact that the artificially inflated price of the Issuer's shares in the aftermarket would enable Individual Defendants to sell personal holdings in the Issuer's securities at artificially inflated prices in the aftermarket or otherwise. In this regard, after Cacheflow's IPO, Defendants NeSmith, Malcolm and Johnson filed SEC Form 144's indicating the sale or intention to sell thousands of shares at a substantial premium over the IPO price as follows: [listing stock sales of NeSmith, Malcolm and Johnson]

Cacheflow Compl. ¶ 110(a)-(b). The Complaint estimates that NeSmith made the following amounts of money by selling Cacheflow stock during the class period: $1,308,840 (30,000 shares on December 1, 2000), $3,021,000 (65,000 shares between November 27–30, 2000), $8,480,000 (90,000 shares between August 21–22, 2000), and $4,799,000 (90,000 shares on June 16, 2000). *See id.* ¶ 110(b). Malcom and Johnson made similar amounts of money by selling their stock. *See id.*

The Individual Defendants, for purposes of this motion, do not challenge that they had the opportunity to know about the entire scheme and thereby make the alleged misstatements and omissions. Indeed, the Individual Defendants who signed the registration statements were intimately involved in the IPO process with the Underwriters (*e.g.*, marketing the company and attending road shows).[109] *See, e.g.*, Cacheflow Compl. ¶¶ 8, 108. *See also Shields*, 25 F.3d at 1130 (holding that opportunity requires pleading that the defendants had "the means and likely prospect of achieving concrete benefits by the means alleged."). Because there was an opportunity for the Individual Defendants to discover the alleged scheme and commit the material misstatements and omissions, the only significant question is whether the Individual Defendants also had the motive.

The Second Circuit has explained that motive is properly alleged by stating "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 170 (2d Cir.2000) (quoting *Shields*, 25 F.3d at 1130). Here, the ability to inflate the value of Cacheflow stock and make large personal financial gains constitutes the type of "concrete benefits" that could motivate any of the Individual Defendants to

---

109. The same allegations that were insufficient to find that Plaintiffs have pled strong circumstantial evidence of conscious misbehavior or recklessness, *see supra* note 108, are sufficient to meet the "opportunity" prong of the motive and opportunity test. The difference is that the opportunity prong is only half the test. While the road show allegations were not sufficient to provide *strong* circum- stantial evidence of knowledge, they undoubtedly provide *some* circumstantial evidence of knowledge which, in theses cases, is the functional equivalent of opportunity. But without a sufficient allegation of motive, the pleading will still fail to plead a "strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

purposefully make the alleged material misstatements and omissions or, at the very least, act with reckless disregard of their truth.

As the *Novak* court held, the motive prong is "generally met when corporate insiders [are] alleged to have misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit." 216 F.3d at 308.[110] The Individual Defendants in these cases are "corporate insiders" who allegedly signed a registration statement in order to keep "the stock price artificially high while they sold their own shares at a profit." *Id.* Where corporate insiders engaged in " 'unusual insider trading activity,' " *Stevelman,* 174 F.3d at 85 (quoting *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1117 (9th Cir. 1989))[111] *i.e.,* sold hundreds of thousands of

---

110. "*Novak* cites approvingly *Stevelman v. Alias Research, Inc.,* 174 F.3d 79, 85 (2d Cir. 1999), where several insiders, including one making optimistic statements, sold large positions in the defendant company, and *Goldman v. Belden,* 754 F.2d 1059 (2d Cir.1985), where some defendants 'profited from defendants' bullish statement by selling large blocks of their common stock holdings …' (*Goldman* at 1070)." *Ruskin v. TIG Holdings, Inc.,* No. 98 Civ. 1068, 2000 WL 1154278, at *5 n. 2 (S.D.N.Y. Aug. 14, 2000). Thus, under *Goldman* and *Stevelman* a plaintiff may plead motive by alleging that a corporate insider sold significant amounts of personal stock after the allegedly fraudulent misstatement or omission was made.

In *Goldman,* the "Complaint alleged that during the period that the class members were buying Sykes common stock, [Vice President and Director John Sykes sold] 40,000 … shares of Sykes common stock at those artificially high prices…." 754 F.2d at 1063. The 40,000 shares only constituted 26% of his Sykes common stock. *See id.* at 1065. Moreover, as the lower court found, the defendant was retiring and thus would logically liquidate some of his stock for that reason. *See id.* (citing *Goldman v. Belden,* 580 F.Supp. 1373, 1381 (W.D.N.Y.1984)). Nonetheless, the Second Circuit reversed the district court's dismissal, "conclud[ing] that the Complaint was sufficient to state a claim against John Sykes and that the district court's conclusions [with respect to the retirement] impermissibly reached beyond the scope of the Complaint, and, indeed, invaded the province of the trier of fact." *Id.* at 1071.

Likewise, in *Stevelman,* the Complaint alleged that "two Alias vice-presidents sold thousands of their shares of Alias common stock at a price of $25 and above," a price that was substantially higher than the offering

given that "the company's stock had gained $12.50 in value since its launch." 174 F.3d at 81–82. In addition, "[Chairman, CEO, President, and Co-founder of Alias Research, Inc., Stephen] Bingham sold 175,000 shares, or about 40% of his Alias stock holdings, earning about $3.5 million.'" *Id.* at 82. The Second Circuit held "these sales could clearly be characterized as unusual insider trading activity during the class period which may permit an inference of bad faith and scienter." *Id.* at 85 (quotation marks and citation omitted).

111. It is true, as the Individual Defendants contend, that attenuated and generalized motives do not satisfy paragraph (b)(2) because they are not sufficiently "unusual." For example, the desire simply to "maintain the appearance of corporate profitability, or of the success of an investment, will *naturally* involve benefit to a corporation," and those benefits are insufficiently concrete to qualify as a motive. *Chill v. General Elec. Co.,* 101 F.3d 263, 268 (2d Cir.1996) (emphasis added). Likewise, the Second Circuit has held, "that the existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter." *Acito,* 47 F.3d at 54.

But there is a significant difference between the allegations in *Chill* and *Acito* and those alleged in *Novak* and here. Unlike *Chill* and *Acito,* the allegations in these cases do not apply with equal force to every corporate officer.

When a plaintiff alleges that a corporate insider who owned stock in the company made an "unusual" trade by selling her stock at an inflated price arising from her fraudulent misstatements or omissions, a strong inference arises that she either knew the truth

dollars worth of inflated stock, the motive prong is plainly satisfied.[112] *See* Cacheflow Compl. ¶ 110(b).

### i. The Motive Allegations Are Sufficient as to Sixty–Four Defendants

Plaintiffs' chart lists a total of 243 Individual Defendants.[113] Ninety-two of these Defendants—all of them officers or board members alleged to have signed the registration statements—sold shares in their companies following the IPO. For sixty-four of these (ninety-two) Defendants, the allegations are sufficient, at the pleading stage, to create an inference of scienter.

The allegations are sufficient for different reasons. For example, for fifty-one of these (sixty-four) Defendants, Plaintiffs have identified the number of shares owned, the number of shares sold, the date of the sale, and the proceeds from the sale. So long as these trades were "unusual" (discussed *infra* Part X.A.2.c.ii) and took place reasonably soon after the IPO, the motive prong is plainly satisfied for pleading purposes.

On the other hand, for thirteen of these (sixty-four) Defendants, Plaintiffs have merely pled the amount of the proceeds without identifying the number of shares owned or sold. Nonetheless, because of the magnitude of the proceeds—ranging

from $220,000 to $40,000,000—it is fair to infer that the sales were "unusual," and therefore satisfy the motive prong at this stage. But if discovery should reveal, for example, that a sale of $220,000 in proceeds is an insignificant percentage of a Defendant's holdings in the Issuer, such a Defendant is overwhelmingly likely to be dismissed at the summary judgment stage.[114]

### ii. The Motive Allegations Are Insufficient as to 161 Defendants

Plaintiffs' Rule 10b–5 claims must be dismissed against 161 Individual Defendants either because (i) Plaintiffs have made no allegations of motive (133 Defendants); (ii) Plaintiffs' allegations of motive are not sufficiently particular (twelve Defendants); or (iii) Plaintiffs' allegations of motive are insufficient as a matter of law (sixteen Defendants).

 Plaintiffs have made *no* motive allegations with respect to 133 Individual Defendants. Fifty of these (133) Defendants owned no shares in the company and, of course, sold no shares. For those fifty Defendants, there was no allegation sufficient to show that the Defendant satisfied the motive prong of the "motive and opportunity" test. Accordingly, the Rule 10b–5 claims against these fifty Defendants must be dismissed. The other

---

or acted with reckless disregard of it. In other words, unusual trades on the heels of misstatements or omissions that inflate the price of a security strongly imply that the unusual trades were made with knowledge of the artificial inflation and thus the misstatements and omissions. Such an inference is not overly general; it applies only to certain insiders who reap a direct benefit through the stock, rather than indirectly through, for example, higher compensation resulting from higher corporate earnings.

112. Indeed, Plaintiffs' allegations that these corporate insiders had the motive to take advantage of the IPO market does not simply

follow as a matter of logic—it follows as a matter of history. In every hot issues market that has been studied since 1959, there have been instances of unscrupulous insiders who violated the securities laws and committed fraud on investors. *See supra* Part III.B.

113. The Complaints name many more Individual Defendants than the 243 listed in the chart, but Plaintiffs have voluntarily dismissed the remainder, including those named in the Cacheflow Complaint.

114. The sixty-four Defendants whose motions to dismiss are denied are listed in Part A of Appendix 4 to this Opinion.

eighty-three of these (133) Defendants are alleged to have owned shares in the company—often substantial shares—but there is no allegation that they sold any of those shares during the relevant period. As a result, the Complaints against these eighty-three Individual Defendants again fail the motive prong. Mere ownership in the absence of profit-taking does not establish a motive that would support a "strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Thus, the Rule 10b-5 claims are dismissed with respect to these 133 Defendants.[115]

 Plaintiffs' Rule 10b-5 claims must be dismissed against an additional twelve Defendants because paragraph (b)(2) requires the plaintiff to "state with *particularity* facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (emphasis added). For these twelve Defendants, the Complaints plead generally that they sold (or intended to sell) some of their stock, but the allegations lack any particulars, *i.e.*, there is no information as to how many shares were sold, the percentage of that Defendant's holdings that were sold, the dates of the sales, or the proceeds from those sales. These allegations are

not sufficiently particular to make a meaningful determination as to motive. Because of this, Plaintiffs have failed to allege that these Defendants acted with the required state of mind. Accordingly, the Rule 10b-5 claims for material misstatements against these twelve Defendants must also be dismissed.[116]

 Finally, Plaintiffs' Rule 10b-5 claims must be dismissed, as a matter of law, against sixteen Individual Defendants. Although Plaintiffs have identified sales with sufficient particularity as to these sixteen Defendants, the trades themselves are insufficient to permit an inference of motive because they do not evince *unusual* insider trading activity.[117] The Court of Appeals has stressed that "none of [its] cases establishe[s] a *per se* rule that the sale by one officer of corporate stock for a relatively small sum can never amount to unusual trading. Rather, each case [must be] decided on its own facts." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75 (2d Cir.2001). In the cases at bar, Individual Defendants are alleged to have sold between 0.65 percent[118] and approximately 751 percent[119] of their holdings. In these cases, insider sales that represent less than ten percent of that insiders' total holdings are insufficiently "unusual" to permit an inference of scienter. *See, e.g.*,

---

115. These 133 Defendants are listed in Part C of Appendix 4 to this Opinion.

116. These twelve Defendants are listed in Part D of Appendix 4 to this Opinion. With respect to these twelve Defendants, Plaintiffs may be able to add sufficient particulars to establish motive by repleading. *See infra* Part XIII.

117. With respect to the percentage of an insider's total holdings that must be traded, see Brian E. Pastuszenski et al., *Post-PSLRA Judicial Treatment of Insider Trading Allegations as a Basis for Pleading Scienter in Securities Fraud Cases*, SG091 ALI-ABA 831, 857-58 (Course of Study May 2-3, 2002) (listing cases).

118. *See* Amended Class Action Complaint for Violations of the Federal Securities Laws, *In re GlobeSpan, Inc. IPO Sec. Litig.*, No. 01 Civ. 10741, ¶¶ 130(a) and (b) (filed Apr. 19, 2002) (sales of Keith Geeslin).

119. *See* Corrected Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws, *In re Covad Communications Group Inc. IPO Sec. Litig.*, No. 01 Civ. 5834, ¶¶ 200(a) and (b) (filed June 18, 2002) (sales of Robert Knowling). Plaintiffs give no explanation for how Mr. Knowling was able to sell more than 100% of the stock that he owned, nor do Defendants question this assertion.

*In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y.1999) (sales ranging from eleven percent to 100 percent sufficiently unusual); *In re Guilford Mills, Inc., Sec. Litig.*, No. 98 Civ. 7739, 1999 WL 33248953, at *4 (S.D.N.Y. July 21, 1999) (sale of slightly less than ten percent of holdings sufficiently unusual). The Rule 10b–5 claims against those sixteen Defendants who sold less than ten percent of their holdings are therefore dismissed.[120]

### d. Issuers

The 11/13/02 Order also directed Plaintiffs to submit charts detailing their scienter allegations against the Issuer Defendants. Plaintiffs were directed to identify for each Issuer (1) the source of the Defendant's knowledge of the alleged misrepresentations and omissions, and (2) any stock-based acquisitions made by the Issuer after the IPO or any other acts by the Issuer that relied upon the allegedly artificially inflated value of the company. *See* 11/13/02 Order. In response, Plaintiffs again submitted charts on November 26, 2002.[121] The following chart with respect to the Cacheflow offering is an example of Plaintiffs' submissions:

| Issuer | Source of Knowledge for 10(b)–5 Claims | Acquisitions/other acts which relied on inflated value of the company |
|---|---|---|
| Cacheflow, Inc. | -Road Show<br>-Close interaction with Underwriter Defendants prior to IPO<br><br>¶¶ 105, 106, 107, 108<br><br><br>Individual Defendant stock sales<br>¶ 110(b) | Acquisitions:<br><br>06/05/00 SpringBank Networks in a stock deal valued at $180 million;<br><br>12/08/00 Entera in a stock deal valued at $440 million<br><br>¶ 110(c) |

For the same reasons discussed above with respect to the Individual Defendants, Plaintiffs have failed to plead strong circumstantial evidence that the Issuers engaged in conscious misbehavior or acted recklessly, sufficient to support a strong inference that they knowingly or recklessly made the specified misstatements and omissions in the registration statements.[122] Nonetheless, Plaintiffs' Rule 10b–5(b) claims against the Issuers may still satisfy paragraph (b)(2) of the PSLRA by alleging that the Issuer had the "motive and opportunity" to make the alleged misstatements and omissions.

There is again no dispute as to opportunity. The Issuers, acting through their corporate officers, were intimately involved in the IPO process with the Underwriters (*e.g.*, setting the initial price of the IPO stock). *See, e.g.*, Cacheflow Compl. ¶ 107 ("Once the Issuer Defendants had determined to retain the Underwriter Defendants with respect to the Issuer's IPO, the Issuer Defendants worked closely with the Underwriter Defendants in preparing the Registration Statement/Prospectus, as well as generating interest in the IPO by speaking with various, but selected, groups of investors."); *see*

---

**120.** These sixteen Defendants are listed in Part E of Appendix 4 to this Opinion.

**121.** Plaintiffs' submission contains no new allegations. Rather, it merely catalogs the scienter allegations in each of the 309 Complaints.

**122.** *See supra* note 108.

*also Shields*, 25 F.3d at 1130 (holding that pleading opportunity requires that the defendants had "the means and likely prospect of achieving concrete benefits by the means alleged.").[123] Because there was an opportunity for the Issuers to discover the alleged scheme and commit the material misstatements and omissions in the registration statement, the only significant question is whether they also had the motive.

To satisfy the motive prong, Plaintiffs again point towards "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Ganino*, 228 F.3d at 170 (quoting *Shields*, 25 F.3d at 1130). Specifically, the Plaintiffs allege:

> The Issuers, as new publicly held corporations, benefitted financially from the misconduct [of the Underwriters] as the run up of their respective stock prices afforded them with substantial opportunities to utilize their stock as currency in connection with corporate acquisitions, and to raise even more money through add-on offerings.

MA ¶ 112. Likewise, the Complaint in Cacheflow alleges:

> The Issuer Defendants were further motivated by the fact that the Issuer's artificially inflated stock price could be utilized as currency in negotiating and/or consummating stock-based acquisitions after the IPO. In this regard, the Issuer Defendants [sic] made at least two acquisitions. On June 5, 2000, Cacheflow acquired SpringBank Networks, Inc. in a stock deal valued at a total of $180 million. In addition, on December 18, 2000, Cacheflow acquired Entera, Inc. in a stock deal valued at a total of $440 million.

Cacheflow Compl. ¶ 110(c).

These benefits are sufficiently concrete and personal so as to provide a motive for Cacheflow to purposefully or recklessly make the specified material misstatements and omissions in the registration statement that artificially inflated the value of the company. *See, e.g., In re Complete Mgmt. Inc. Sec. Litig.*, 153 F.Supp.2d 314, 328 (S.D.N.Y.2001) (allegation that defendants "sought to maintain the artificially high stock price so that the [company] might use that stock as currency for acquisitions ... is a sufficiently concrete motive to support a strong inference of scienter.").

▆▆▆ While the Issuers undoubtedly benefitted from the artificially inflated value of their companies, an argument also could be made that money that was rightfully theirs ended up in the pockets of the Underwriters and the select investors who received the initial allocations.[124] Whether the benefits obtained through the alleged

---

123. *See supra* note 109.

124. Cacheflow's IPO serves as an example. On November 19, 1999, the underwriting syndicate distributed 5,000,000 shares of Cacheflow at a price of $24.00. *See* Cacheflow Compl. ¶ 30. Hence, the company raised proceeds of 120 million dollars minus the compensation provided to the Underwriters for their services. However, on the first day of trading, Cacheflow's closing price was $126.375. *See* Jay Ritter, *Money Left on the Table in IPOs*, Working Paper at 2 (Jan. 14, 2003), *available at* http://bear.cba.ufl.edu/ritter/work_papers/monew.pdf. If "the amount of money left on the table is defined as the difference between the closing price on the first day and the offer price, multiplied by the number of shares sold," then Cacheflow left $511,875,000 on the table ($631,875,000 minus $120,000,000). *Id.* at 1.

If investors truly valued Cacheflow at $631,875,000 on the day of the offering, then Cacheflow could have made much more money by issuing the same amount of stock at a higher price or issuing more shares at the original price. Cacheflow may have lost a good deal of money because of the Underwriters' underpricing and, if so, may have had no motive to go along with the Underwriters' alleged scheme.

fraud outweighed the possible loss resulting from the initial underpricing is a question of fact that must be left for another day. The role of the Court on a motion to dismiss is not to weigh evidence but merely to determine whether a claim has been pled. The only question remaining here is whether, drawing all reasonable inferences in favor of the Plaintiffs, they have pled allegations that provide a motive for the Issuers to participate in the alleged misrepresentations and omissions.

### i. The Motive Allegations Are Sufficient as to 185 Issuers

Plaintiffs have pled facts sufficient to create an inference of motive, and thus scienter, with respect to 185 Issuers by alleging either (i) stock-based acquisitions (156 Issuers), or (ii) add-on offerings (twenty-nine Issuers).

The Plaintiffs have alleged with particularity—by specifying the information requested in the 11/13/02 Order—that 156 Issuers (including Cacheflow) used the alleged inflated value of their shares to make one or more stock-based acquisitions. This category also includes one Issuer that entered into a stock-based merger with another company (El Sitio, Inc.),

and one case where a stock-based acquisition was announced but not necessarily consummated (Evolve Software, Inc.). These allegations are sufficient to show motive.

The motive allegations are also sufficient in twenty-nine cases which, though lacking particularized allegations about any acquisition (either by failing to allege an acquisition at all, or by only alleging one generally), contain allegations of add-on offerings. *See Twinlab*, 103 F.Supp.2d at 206 (holding that allegations that issuer "inflate[d] the stock price to maximize revenue from the secondary offering" was a "sufficient allegation of motive"); *Duncan v. Pencer*, No. 94 Civ. 0321, 1996 WL 19043, at *14 (S.D.N.Y. Jan. 18, 1996) (holding that issuer's public offering to raise capital stated a "motive theory [ ] sufficient to withstand a motion to dismiss."). Plaintiffs have alleged that these Issuers used the inflated value of their shares to support a secondary or tertiary offering to raise additional funds.[125]

### ii. The Motive Allegations Are Insufficient as to 116 Issuers [126]

Plaintiffs' Rule 10b–5 claims are dismissed against 116 Defendants either be-

---

However, Plaintiffs correctly note that this analysis "make[s] the assumption that just because these stocks soared into the hinterlands in price that they had [that] true value [*e.g.*, Cacheflow was worth $631,875,000]." 11/1/02 Tr. at 111 (Statement of Melvyn I. Weiss, Plaintiffs' Liaison Counsel). It is equally likely that customers only valued the company at this price *because of* the manipulative scheme. In that case, Cacheflow's value as reflected in the stock market would have been fictitious—not based on the company's real worth but rather on a speculative fervor primed by the Tie-in Agreement. Under such circumstances, Cacheflow would have benefitted by allowing the Allocating Underwriters to require Tie-in Agreements and hence had a concrete motive to make material misstatements and omissions in the registration statement.

In any event, on a motion to dismiss, alternative theories offered by Defendants cannot defeat the pleading. *See Caiola v. Citibank, N.A.*, 295 F.3d 312, 323 (2d Cir.2002) (holding that where an allegation is subject to two interpretations, "Rule 12(b)(6) obligates us at this point to draw all reasonable inferences in [plaintiff's] favor ... [w]e thus need not and do not decide whether Rule 10b–5 standing would be satisfied under the second theory" because the first theory "incontrovertibly ... give[s] rise to standing").

**125.** These 185 Issuers are listed in Part B of Appendix 5 to this Opinion.

**126.** In addition to dismissing the Rule 10b–5 claims against 116 Issuers, eight Issuers were never named as Defendants in these cases.

cause (i) Plaintiffs have made no allegations of motive, *i.e.,* no acquisitions or add-on offerings (ninety-three Issuers); (ii) Plaintiffs' allegations of motive are not sufficiently particular (twenty-one Issuers); or (iii) Plaintiffs' allegations of motive are insufficient as a matter of law (two Issuers).

Plaintiffs have made no allegation of motive whatsoever with respect to ninety-three of the Issuers. In the Issuer chart, one column was titled "Acquisition/other acts which relied on inflated value of the company." This column was left entirely blank in these ninety-three cases.[127] Because there is no pleading of motivation sufficient to satisfy paragraph (b)(2)'s requirement that the defendant acted with the requisite state of mind, the Rule 10b–5 material misstatement claims against these Issuers must be dismissed.[128]

 Next, Plaintiffs have failed to meet the particularity requirement of paragraph (b)(2) with respect to an additional twenty-one Issuers. In these cases, Plaintiffs have pled that each Issuer made at least one acquisition—or in one case (Tickets.com), sought to make an acquisition—but the pleadings fail to provide any information regarding the number of shares transacted or monetary values of the acquisitions. These allegations fail the particularity requirement of paragraph (b)(2) and therefore must be dismissed.[129]

Finally, with respect to two Issuers, Plaintiffs allege a single acquisition each—

one with a monetary value, one without—that occurred in March 2002, far removed in time from the IPO. These two acquisitions are insufficient as a matter of law because they occurred after the close of the Class Period, when it is admitted that the allegedly fraudulent scheme was publicized. I am therefore unable to draw the inference that these Issuers capitalized on an artificially inflated stock price.[130] *See High View Fund, L.P. v. Hall,* 27 F.Supp.2d 420, 427–28 (S.D.N.Y.1998) (where defendants did not take advantage of alleged scheme to defraud until one year later, "[t]hese allegations of misconduct are simply too far removed from plaintiffs' solicitation of investments through the Offering Memorandum to create the requisite inference of scienter. A contrary result would eviscerate the protections afforded by Rule 9(b).").

**e. Summary**

Plaintiffs have satisfied paragraph (b)(2) with respect to certain members of each class of Defendant by showing "strong circumstantial evidence" or "motive and opportunity." In each case, the following facts give rise to a strong inference of scienter:

For Allocating Underwriters, the fact that they required their customers to enter into Tie-in Agreements and received Undisclosed Compensation.

For Non–Allocating Underwriters, the fact that they received no allocation and

---

These eight Issuers are listed in Part A of Appendix 5 to this Opinion.

**127.** Plaintiffs' chart inadvertently stated that one Issuer (Virage, Inc.) was not named as a Defendant. However, upon inspection of the complaint, the Issuer *was* named but no allegations of motive were pled.

**128.** These ninety-three Issuers are listed in Part C to Appendix 5 to this Opinion.

**129.** These twenty-one Issuers are listed in Part D of Appendix 5 to this Opinion. The problems with these claims may be cured by repleading, *see infra* Part XIII.

**130.** These two Issuers are listed in Part E of Appendix 5 to this Opinion.

failed to disclose it, while acting as Allocating Underwriters in other IPOs and requiring Tie-in Agreements in those IPOs.

For Issuers, the fact that they made acquisitions, mergers, or add-on offerings based on the inflated value of their stock.

For Individual Defendants, the fact that they sold a large amount of stock within a short period of time after the IPO.

### 3. The Material Misstatement Claims Adequately Plead the Remaining Elements of a Rule 10b–5 Claim: Transaction Causation, Loss Causation, Reliance and Damages

The remaining elements of a Rule 10b–5 claim are not required to be pleaded under the PSLRA. Nonetheless, in the Second Circuit, plaintiffs have long been required to apply Rule 9(b) to the pleading of *all* elements of a Rule 10b–5 claim. *See Schlick*, 507 F.2d at 379–80. Most recently, the Second Circuit reiterated that to plead a Rule 10b–5 claim based on material misstatements or omissions, "[a] plaintiff must *allege*" the following elements:

" 'that [1] in connection with the purchase or sale of securities, the defendant, [2] acting with scienter, [3] made a false material misrepresentation or omitted to disclose material information

and that [4] plaintiff's reliance on defendant's conduct [5] caused [plaintiff] injury.' " *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 264 (2d Cir.1993) (alteration in original) (quoting *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir.1985)). *Caiola*, 295 F.3d at 321 (emphasis and numbering added).[131] Furthermore, "causation under federal securities laws is two-pronged: a plaintiff must *allege* both transaction causation, *i.e.*, that *but for* the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, *i.e.*, that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir.2001) (emphasis added) (citing *Manufacturers Hanover Trust Co. v. Drysdale Secs. Corp.*, 801 F.2d 13, 20 (2d Cir.1986)).

In 1995, Congress codified the loss causation requirement in the PSLRA:

In any private action arising under this chapter, the plaintiff shall have the burden of *proving* that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

15 U.S.C. § 78u–4(b)(4) (emphasis added). Congress did not, however, require loss causation to be pled.[132] But approximately a year ago, the Court of Appeals reiterat-

---

**131.** Where a Rule 10b–5 claim is premised on market manipulation, a plaintiff must allege "a scheme by the defendants to defraud," rather than "misrepresentations or omissions of material fact." *Nanopierce Techs. Inc. v. Southridge Capital Mgmt. LLC.*, No. 02 Civ. 0767, 2002 WL 31819207, at *6 (S.D.N.Y. Oct.10, 2002) (quoting *Schnell v. Conseco, Inc.*, 43 F.Supp.2d 438, 448 (S.D.N.Y.1999) (B.Parker, J.)).

**132.** The legislative history of the PSLRA, while not controlling, lends support to this

view. Congress consistently treated the "loss causation" section separately from the new pleading requirements set forth in paragraphs (b)(1) and (b)(2). *See* H.R. Conf. Rep. No. 104–369, at 41 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 740 (discussing "loss causation" and "heightened pleading standard" separately); S.Rep. No. 104–98, at 7, *reprinted in* 1995 U.S.C.C.A.N. 679, 686 (stating that loss causation is one of several provisions of the PSLRA "intended to reduce the cost of raising capital," and discussing it separately from pleading requirements). Moreover,

ed, in *Suez Equity*, that a securities fraud plaintiff must *plead* loss causation, along with the other elements of Rule 10b–5. The court noted that the concepts of loss causation and transaction causation were "somewhat elusive," but reminded the lower courts that causation in the securities law context is "two-pronged." *Suez Equity*, 250 F.3d at 95–96.[133] The court adopted the following rule:

> Congress specified paragraphs (b)(1) and (b)(2) as pleading requirements, but cast loss causation in terms of plaintiff's "burden of proo[f]." *Compare* 15 U.S.C. § 78u–4(b)(1)–(2) *with* § 78u–4(b)(4). *But see* H.R. Conf. Rep. No. 104–369, at 41.
>
> The structure of the PSLRA provides further support for the proposition that Congress did not intend to require the pleading of loss causation. The paragraph dealing with loss causation—paragraph (b)(4)—is separated from the two paragraphs imposing pleading requirements by paragraph (b)(3) which provides for an automatic stay of discovery during the pendency of any motion to dismiss. Moreover, the PSLRA explicitly instructs courts to "dismiss the complaint if the requirements of paragraphs [b](1) and [b](2) are not met." 15 U.S.C. § 78u–4(b)(3)(A). Conspicuously absent is the requirement that a complaint be dismissed for failure to plead loss causation; rather, loss causation is discussed in terms of plaintiff's burden of proof, the obvious inference being that failure to prove loss causation will defeat a claim, but failure to plead it will not. Indeed, in other circuits, courts have explicitly found that loss causation is not a pleading requirement. *See Lynx Ventures LP v. Canadian Imperial Bank of Commerce*, No. CV 99–07160, 2000 WL 33223384, at *1 (C.D.Cal. Apr.18, 2000) ("allegations of loss causation need not be pled with particularity.... Rule 9(b) is satisfied if the allegations set forth what is false or misleading and why it is false"); *Page v. Derrickson*, No. 96–842–CIV–T–17C, 1997 WL 148558, at *6 (M.D.Fla. Mar.25, 1997) ("Plaintiff alleges that '[b]y reason thereof, [it has] been damaged.' Due to the general pleading requirements established by Fed. R.Civ.P. Rule 8, this Court finds that these allegations are sufficient to satisfy the element of causation in a § 10(b) action.") (alterations in original).

[P]laintiffs may allege transaction and loss causation by averring both that they would not have entered the transaction but for the misrepresentations *and* that the defendants' misrepresentations induced a disparity between the transaction price and the true "investment quality" of the securities at the time of transaction.[134]

**133.** *Swierkiewicz*, however, may have a significant impact on this line of authority (which started with *Schlick*). Read broadly, *Swierkiewicz* stands for the proposition that a complaint need only meet the pleading requirements of the Civil Rules generally; a plaintiff need not plead the elements of an action. Rule 9(b), which governs the pleading of fraud, requires only that a plaintiff plead the "circumstances constituting fraud" with particularity. There is no requirement in the Rule that a plaintiff plead all of the elements of fraud, and courts have consistently held that the pleading requirements of Rule 9(b) must be read in harmony with those of Rule 8. *See* discussion *supra* note 47 and accompanying text. As previously noted, for example, Form 13 purports to adequately plead fraudulent conveyance but does not plead the elements of that cause of action.

While the rule in this Circuit may be too strict, it is nonetheless controlling. Although *Swierkiewicz* can be read broadly, the Court was careful to limit its holding to cases arising under Rule 8(a). 534 U.S. at 513, 122 S.Ct. 992 ("Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions. Rule 9(b), for example, provides for greater particularity in all averments of fraud or mistake."). And the Second Circuit has chosen, even post-*Swierkiewicz*, to insist that plaintiffs alleging securities fraud plead the elements of such claims. *See Caiola*, 295 F.3d at 321.

**134.** It appears that Congress envisioned almost precisely this standard of loss causation when it enacted the PSLRA. In their respective conference reports, both the House and the Senate used the same language:

> For example, [to show loss causation] the plaintiff would have to prove that the price at which the plaintiff bought the stock was

250 F.3d at 97–98 (emphasis in original).[135] Such allegations suffice to allege not only loss and transaction causation, but also the elements of reliance, *see Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir.2001) ("transaction causation is generally understood as reliance"), and damages (because loss causation presupposes damages).

In short, the rule of *Suez Equity* sets out the pleading requirements for all elements of a Rule 10b–5 claim that are governed by Rule 9(b) rather than by the PSLRA. Under *Suez Equity*, the hallmark of an adequately pled Rule 10b–5 claim is not necessarily a particularized allegation of direct causation, but rather the allegation of a coherent scheme to defraud that accounts generally for both the plaintiff's initial investment and, without any definitive supervening cause,[136] the loss on that investment.[137] *See generally In re Blech Sec. Litig.*, 961 F.Supp. 569, 586 (S.D.N.Y.1997) (*"Blech II"*); *Aquino v. Trupin*, 833 F.Supp. 336, 342 (S.D.N.Y. 1993) ("it is not necessary to plead causation in any great detail"); *In re Accelr8 Tech. Corp. Sec. Litig.*, 147 F.Supp.2d 1049, 1057 (D.Colo.2001) ("it is not Plaintiffs' burden to prove loss causation in their pleadings"). Where a complaint, read liberally, alleges such a scheme and other-

---

artificially inflated as the result of the misstatement or omission.

H.R. Conf. Rep. No. 104–369, at 41; S.Rep. No. 104–98, at 15.

**135.** This rule, however, was born primarily from the court's prior precedent. "Were we unconstrained by our own precedents, we might propose a different standard. We note that the approach of the Seventh Circuit—inquiring whether the loss at issue was caused by the materialization of a risk that was not disclosed because of the defendant's fraud—appears to be both principled and predictable." *Suez Equity*, 250 F.3d at 98 n. 1 (citing *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 685–86 (7th Cir.1990) and *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir.1997)).

**136.** It is typically inappropriate, however, to look to supervening causes when examining whether a complaint has adequately pled loss causation. Unless a plaintiff pleads decisive supervening causes for its loss and thus pleads itself out of court, *see supra* note 45 and accompanying text, the requirement that a court draw all factual inferences in favor of a plaintiff at the motion to dismiss stage will usually preclude any finding of a supervening cause. For example, Defendants here urge that the Court take judicial notice of "the significant market-wide and industry-wide downturn in early 2000," 2 Und. Mem. at 12, which they suggest may account for Plaintiffs' losses. While "plaintiffs' losses *may* not be attributed to the instances of misconduct they have broadly alleged," *id.* at 13 (emphasis added), I am unable to conclude that they *cannot* be attributed to the alleged fraud. *See Rothman v. Gregor*, 220 F.3d 81, 95 (2d Cir. 2000); *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 215–17 (2d Cir.2000). *See also Rankow v. First Chicago Corp.*, 870 F.2d 356, 357 (7th Cir.1989) ("[A]ny intervening change in market conditions not directly caused by the defendant could break the chain of causation and exempt the defendant from liability, a result that would eviscerate Rule 10b–5.").

**137.** Defendants argue that Plaintiffs have not pled loss causation with sufficient particularity because they did not allege "when the inflation [of the transaction price] began and ended" and "whether the amount of alleged inflation varied over time," 2 Und. Mem. at 11. This argument lacks any merit. So long as Plaintiffs allege a coherent scheme to defraud that accounts directly for their losses, loss causation has been adequately pled. *See infra* Part X.A.3.

Defendants also argue that the start and end date of the alleged manipulation may affect which plaintiffs have valid claims. *See* 2 Und. Mem. at 14–17. While this may be true, it has never been required that all plaintiffs have valid claims under every cause of action alleged or every factual scenario under those causes of action. Which plaintiffs may recover on which claims is properly addressed at the class certification stage. *See In re Initial Public Offering Sec. Litig.*, No. 21 MC 92, 2002 WL 31780181, at *4 (S.D.N.Y. Dec.12, 2002).

wise comports with Rule 9(b) and the PSLRA, it is adequately pled.

These cases allege "an industry-wide scam ... whereby people were put into IPOs, the stock was hyped, the insiders got out, and the little people who bought [the stock] on their broker's recommendations were left holding the bag. That's the guts of what these cases are coming down to." 9/26/01 Tr. at 17 (Statement of Jeffrey Barist, counsel to Deutsche Banc Alex. Brown). *See also supra* Part IV. The question, then, is whether the pleading of such a scheme adequately alleges

> both that [Plaintiffs] would not have entered the transaction but for the misrepresentations *and* that the defendants' misrepresentations induced a disparity between the transaction price and the true "investment quality" of the securities at the time of transaction.

*Suez Equity,* 250 F.3d at 97–98 (emphasis in original).

### a. Transaction Causation

The first prong of the *Suez Equity* test—transaction causation, or reliance [138] —is satisfied if a plaintiff alleges that defendants have "disseminat[ed] false information into the market on which a reasonable investor would rely." *In re Ames Dept. Stores Inc. Stock Litig.,* 991 F.2d 953, 967 (2d Cir.1993). *See also Hade v. Capozzi,* No. 91 Civ. 5897, 1996 WL 426394, at *1 (S.D.N.Y. July 30, 1996) (citing *Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1494 (2d Cir.1992) and *Schlick,* 507 F.2d at 380–81).

Plaintiffs here rely solely on the so-called "fraud on the market" theory of reliance.

The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Basic Inc. v. Levinson,* 485 U.S. 224, 241–42, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (alterations in original) (quoting *Peil v. Speiser,* 806 F.2d 1154, 1160–61 (3d Cir. 1986)). Where such an "efficient market" exists, all public information is assumed to be rapidly assimilated and therefore is assumed to affect prices. Almost by definition, any misstatement or omission that affects the price of a security—especially one that incorrectly represents its value—is important to the reasonable investor. *See infra* Part X.B.1. Under the fraud on the market theory, an individual investor need not be aware of and rely explicitly on those alleged misstatements; it is sufficient that she bases her transactions on the market trends or securities prices that are altered by the fraud. In these cases, Plaintiffs specifically rely on the fraud on the market "presumption." *See* Cacheflow Compl. ¶ 76.

Defendants contend that the fraud on the market doctrine is inapplicable. *See* 2 Und. Mem. at 6–8. Defendants' primary contention is that the fraud on the market theory cannot apply to IPOs because, "at the outset and for a significant period following an IPO, the market for those securities lacks the ingredients that make a

---

**138.** "Reliance [is] also referred to as 'transaction causation....'" *Press v. Chemical Inv.* *Servs. Corp.,* 166 F.3d 529, 539 (2d Cir.1999).

market efficient." 2 Und. Mem. at 6.[139] Defendants cite cases holding or suggesting that the fraud on the market doctrine is inapplicable in IPO cases as a matter of law.[140]

■ The instant cases are different than this line of cases in at least two important respects. *First*, the cases at bar concern purchases in the aftermarket. Although much of the allegedly fraudulent conduct happened at the time of the IPO, that fraud is alleged to have altered the price of the securities in the aftermarket, not on the IPO. Prices in the aftermarket are set by the market, thus the fraud on the market theory may apply. *Second*, to the extent that the immediate aftermarket of an IPO might be inefficient, the line of cases beginning with *Freeman* in 1990 all pre-date the most recent hot issues market.[141] Certain technological advances—especially the rise of the Internet—ensure that information permeates the market faster than ever before.[142] The increased

**139.** Defendants also contend that Plaintiffs have "aver[red] facts which are facially inconsistent with the fraud on the market theory of reliance." 2 Und. Mem. at 1–2 (quoting *Scone Invs. L.P. v. Am. Third Mkt. Corp.*, No. 97 Civ. 3802, 1998 WL 205338, at *6 (S.D.N.Y. Apr.28, 1998)). In particular, Defendants point to certain paragraphs of the Master Allegations that purportedly allege that the fraudulent schemes were "common knowledge," MA ¶ 30, and that there was an "industry-wide understanding" about their existence, *id.* ¶ 31. But, as noted earlier, these paragraphs merely allege that the fraud was common knowledge among those investors who purchased on the IPOs, *i.e.,* the very institutional and retail investors who were subject to the Tie-in Agreements and who paid the Undisclosed Compensation. *See supra* Part VIII.B.2. Plaintiffs have repeatedly alleged that the fraud was unknown to the investors who purchased in the aftermarket, *i.e.,* to Plaintiffs. *See, e.g.,* Cacheflow Compl. ¶ 103 ("Plaintiffs and other members of the Class purchased or otherwise acquired the Issuer's common stock during the Class Period *without knowledge of the fraud alleged herein.* . . .") (emphasis added).

**140.** *See, e.g., Eckstein v. Balcor Film Investors,* 8 F.3d 1121, 1130 (7th Cir.1993); *Freeman v. Laventhol & Horwath,* 915 F.2d 193, 198 (6th Cir.1990) (rejecting fraud on the market presumption because a primary market for newly issued municipal bonds is not efficient); *Berwecky v. Bear, Stearns & Co.,* 197 F.R.D. 65, 68 n. 5 (S.D.N.Y.2000) (holding that fraud on the market theory does not apply to IPOs "because in an IPO there is no well-developed market in the offered securities"); *Danis v. USN Communications, Inc.,* 189 F.R.D. 391, 397 (N.D.Ill.1999); *Gruber v. Price Water-house,* 776 F.Supp. 1044, 1052 (E.D.Pa.1991) (refusing to apply fraud on the market presumption because "[i]n an initial public offering it cannot be assumed price reflects value because there is simply no open and developed market" and because "interested parties have set the price"); *see also Reingold v. Deloitte Haskins & Sells,* 599 F.Supp. 1241, 1263 (S.D.N.Y.1984) (declining to apply fraud on the market theory because a court "will presume reliance only when it is logical to do so").

**141.** One case, *Berwecky,* was decided more recently. However that court decided the issue without analysis—in a footnote—relying on the older precedent noted above. 197 F.R.D. at 68 n. 5.

**142.** *See, e.g., Whither Securities Regulation?,* at 1448 ("Thanks to SEC disclosure requirements, EDGAR, and the Internet, even the most unsophisticated and dunderheaded investors have access to much the same information available to the most sophisticated of professional and institutional investors."); *id.* at 1448 n. 241 (citing articles detailing the "information overload" experienced by investors in the information age); John C. Coffee, *Brave New World? The Impact(s) of the Internet on Modern Securities Regulation,* 52 Bus. Law. 1195, 1198 (1997) ("[o]ne implication of the Internet's advent is that the boundaries of the efficient market may extend outward to include less actively traded securities on regional exchanges or the lower tiers of NASDAQ that are not today closely followed by securities analysts."); *see also* http://www.internetcap.com (web site dedicated to news, discussion and advice on technology-related IPOs).

ability of the market to quickly assimilate information from a wider array of sources tips the balance more heavily in favor of applying the efficient market hypothesis in these cases.[143]

 ▮ Moreover, whether the fraud on the market theory applies is not a pure question of law. Rather, that determination turns on whether the relevant market has the traits of an "efficient market" as described in *Basic*. Thus, the question of whether securities were traded in an efficient market should not be decided on a motion to dismiss. *See RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 185 F.Supp.2d 389, 404 (S.D.N.Y.2002) (deciding applicability of fraud on the market doctrine at summary judgment); *Ellison*, 36 F.Supp.2d at 643–44 ("At this [motion to dismiss] stage in the litigation, before discovery has even commenced, I am not prepared to hold as a matter of law that

the allegations [that the fraud on the market doctrine applies] fail."); *In re Laser Arms Corp. Sec. Litig.*, 794 F.Supp. 475, 490 (S.D.N.Y.1989) ("Whether in fact Laser Arms traded in an efficient market is a question of fact. Therefore, resolution of that issue must await presentation of further proof at trial.").[144]

 Accordingly, because Plaintiffs have sufficiently pled the applicability of the fraud on the market presumption, they have adequately pled the element of transaction causation.

### b. Loss Causation and Damages

 ▮ Plaintiffs have also adequately pled loss causation and damages under the second prong of the *Suez Equity* test—that the alleged misrepresentations artificially inflated the market price of the relevant securities.[145] Defendants' argu-

---

**143.** In addition, a competing line of circuit court cases has applied the fraud on the market presumption to newly issued securities in undeveloped markets on the so-called "fraud created the market" theory. *See, e.g., Ross v. Bank South, N.A.*, 885 F.2d 723, 730 (11th Cir.1989) (en banc); *Lipton v. Documation, Inc.*, 734 F.2d 740, 746 (11th Cir.1984); *T.J. Raney & Sons v. Fort Cobb, Okla. Irrigation Fuel Auth.*, 717 F.2d 1330, 1333 (10th Cir. 1983); *Shores v. Sklar*, 647 F.2d 462, 469–71 (5th Cir.1981) (en banc); *see generally* Robert G. Newkirk, Comment, *Sufficient Efficiency: Fraud on the Market in the Initial Public Offering Context*, 58 U. Chi. L.Rev. 1393, 1394 (1991) (arguing that "plaintiffs' reliance on the market price is indeed reasonable in many IPO situations, and that courts should consider the characteristics of the individual IPO market in applying the fraud on the market theory"); Joseph De Simone, Note, *Should Fraud on the Market Theory Extend to the Context of Newly Issued Securities?*, 61 Fordham L.Rev. S151, S171–72 (1993); Note, *The Fraud–on–the–Market Theory*, 95 Harv. L.Rev. 1143, 1156–58 (1982). It is unclear whether the fraud created the market theory is good law in this circuit. *See Washington Nat'l Ins. Co. of New York v. Morgan Stanley*

*& Co.*, No. 90 Civ. 3342, 1999 WL 461796, at *9 (S.D.N.Y. July 2, 1999).

**144.** *See also Simpson v. Specialty Retail Concepts*, 823 F.Supp. 353, 355 (M.D.N.C.1993) (denying summary judgment on fraud on the market theory because of existence of material factual dispute); *Good v. Zenith Elecs. Corp.*, 751 F.Supp. 1320, 1323 (N.D.Ill.1990) (same); *Cammer v. Bloom*, 711 F.Supp. 1264, 1287 (D.N.J.1989) (same).

**145.** The second prong of the *Suez Equity* test essentially applies the fraud on the market theory to loss causation. Although the Second Circuit has never explicitly stated it that way, other circuits have: "In a fraud-on-the-market case, plaintiffs establish loss causation if they have shown that the price on the date of purchase was inflated because of the misrepresentation." *Knapp v. Ernst & Whinney*, 90 F.3d 1431, 1438 (9th Cir.1996) (citation omitted). *Accord In re Control Data Corp. Sec. Litig.*, 933 F.2d 616, 619–20 (8th Cir. 1991). *See also Fellman v. Electro Optical Sys. Corp.*, No. 98 Civ. 6403, 2000 WL 489713, at *12 (S.D.N.Y. Apr.25, 2000) (applying *Knapp* ).

 Because the difference between the transaction price and real value of the stock is the

ments notwithstanding, Plaintiffs have pled, with significant particularity, an extensive and coherent scheme of loss causation. Indeed, the entire aim of the alleged misrepresentations was to "secur[e] and conceal[ ]" the Tie-in Agreements, Undisclosed Compensation, and analyst conflicts, Cacheflow Compl. ¶ 99, which in turn had the effect of "artificially inflat[ing] and maintain[ing] the market price of and demand for the Issuer's common stock." *Id.* ¶ 96. As Defendants concede, Plaintiffs "charge an 'industry wide' scheme to inflate prices in the aftermarket for all 'IPO Litigation Offerings' over a period of years. . . ." 2 Und. Mem. at 1 (quoting MA ¶ 3).

Plaintiffs have alleged, *inter alia*, a scheme to create "artificial demand," Cacheflow Compl. ¶ 3, by requiring investors seeking an allocation of a particular IPO to enter into Tie-in Agreements and purchase stock in the aftermarket, the mechanics of which are set forth in great detail. *See, e.g.*, MA ¶¶ 36–54. The alleged result was to create "the false appearance of demand for the stock at prices in excess of the IPO price." Cacheflow Compl. ¶ 38. In addition, certain Underwriter Defendants are alleged to have used their analysts to issue fraudulent "Buy," "Strong Buy," or "Outperform" recommendations, *id.* ¶ 56, the result of which was to "manipulate the aftermarket stock price," *id.* ¶ 55. In all, the alleged scheme "had the effect of inflating the price of the Issuer's common stock above the price that would have otherwise prevailed in a fair and open market." *Id.* ¶ 59.

Defendants' repeated insistence that Plaintiffs' scheme of loss causation is somehow "incoherent," misses the mark. *See* 2 Und. Mem. at 9–17. Relying on a

particular reading of the Complaints, Defendants argue that relief may not be available to every Plaintiff under every allegation (*e.g.*, Plaintiffs that purchased before the conflicted analyst reports were released cannot plead loss causation in relation to the analyst conflicts). While this may be one legitimate reading of the allegations, it is neither the best reading because it does not take the Complaints as pled, *see supra* Part VII.A.2, nor the one that must be applied on a motion to dismiss. Taking the facts of the Complaints as true, the causes of action as pled, and drawing every inference in their favor, Plaintiffs have alleged one coherent scheme to defraud—characterized by Tie-in Agreements and analyst conflicts, motivated by Undisclosed Compensation, and secured and concealed by lies and omissions—the *entire purpose* of which was to artificially drive up the price of the relevant securities. This is precisely the sort of scheme contemplated in *Suez Equity* as satisfying the loss causation requirement. Accordingly, Plaintiffs have adequately pled damages and loss causation.

## B. Plaintiffs Have Stated Rule 10b–5 Claims for Material Misstatements and Omissions Upon Which Relief May Be Granted

Defendants next argue that the alleged misstatements or omissions fail to state a claim upon which relief may be granted because Defendants had no duty to disclose the facts about which they allegedly lied. This argument raises two related questions: (1) whether the alleged misrepresentations were material, and, if so, (2) whether Defendants had a duty to disclose that which they allegedly did not.

---

measure of damages, *see, e.g., In re Credit Suisse First Boston Corp. Sec. Litig.*, No. 97 Civ. 4760, 1998 WL 734365, at *12 (S.D.N.Y.

Oct. 20, 1998), a complaint that adequately pleads loss causation necessarily also adequately pleads damages.

## 1. The Misstatements and Omissions Are Material

For a misstatement or omission to be material,

> there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (footnote omitted). The Supreme Court has "expressly adopt[ed]" this standard of materiality for claims arising under Section 10(b) and Rule 10b–5. *Basic*, 485 U.S. at 232, 108 S.Ct. 978. As the Court explained, "[t]he question of materiality, it is universally agreed, is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." *TSC Indus.*, 426 U.S. at 445, 96 S.Ct. 2126. "[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic*, 485 U.S. at 240, 108 S.Ct. 978.[146]

 The question of materiality is rarely amenable to disposition as a matter of law. Rather, it is considered a "mixed question of law and fact." *TSC Indus.*, 426 U.S. at 450, 96 S.Ct. 2126. Materiality may be resolved as a matter of law "[o]nly if the established omissions are 'so obviously important to an investor, that reasonable minds cannot differ,'" *id.* (quoting *Johns Hopkins Univ. v. Hutton*, 422 F.2d

1124, 1129 (4th Cir.1970)), or, "if the information is trivial ... or is 'so basic that any investor could be expected to know it,'" *Ganino*, 228 F.3d at 161–62 (quoting *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 702 (2d Cir.1998)). Thus,

> when presented with a Rule 12(b)(6) motion, "a complaint may not properly be dismissed ... on the grounds that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."

*Ganino*, 228 F.3d at 162 (quoting *Goldman*, 754 F.2d at 1067). *See also Halperin v. EBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir.2002). Moreover, when evaluating misstatements in a registration statement or prospectus,

> we read it as a whole. Our inquiry does not focus on whether particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities. As we have explained, a prospectus will violate federal securities laws if it does not disclose material objective factual matters, or buries those matters beneath other information, or treats them cavalierly.

*Demaria*, 318 F.3d at 180 (quotation marks and citations omitted).

 Under this stringent test, Plaintiffs plainly plead materiality. The eight

---

**146.** Materiality in the Rule 10b–5 context mirrors materiality in any tort action: "The matter [misrepresented] is material if ... a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question...." Restatement (Second) of Torts § 538(2)(a) (1977). *See also* W. Page Keeton et al., *Prosser and Keeton on Torts* § 108 (5th ed.1984). Thus, the Second Circuit has held,

even before *TSC Indus.* and *Basic,* that the materiality and reliance requirements work in tandem to ensure both that the individual plaintiff actually acted upon the fact misrepresented and that a reasonable man would also have acted upon such a fact. *See SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir.1968) (en banc); *List v. Fashion Park, Inc.,* 340 F.2d 457, 462 (2d Cir.1965).

alleged omissions and misstatements, set forth at Part X.A.1.a, need not be analyzed in isolation. Rather, the relevant inquiry is whether *all* of the misrepresentations, in the context of the registration statement, deceived the reasonable investor about the "nature of the securit[y]." *Demaria*, 318 F.3d at 180–81 (quoting *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir.1990). The alleged misstatements—which together conceal and effectuate a massive scheme to inflate stock prices and then share the profits among the Issuer, its officers, and the Underwriter—plainly are neither trivial nor obviously unimportant.[147] *See Metzner v. D.H. Blair & Co.*, 689 F.Supp. 262, 264 (S.D.N.Y.1988) ("[M]arket manipulation is a fact reasonable investors might have considered important in the making of their decisions.") (quotation marks, citations and alterations omitted); *see also Chasins*, 438 F.2d at 1171 ("[A] material fact is one '. . . which in reasonable and objective contemplation might affect the value of the corporation's stock or securities . . . .' ") (quoting *Kohler v. Kohler Co.*, 319 F.2d 634, 642 (7th Cir.1963)).

### 2. All Defendants Had a Duty to Disclose [148]

In addition to being material, "a statement must also be misleading." *Basic,*

485 U.S. at 239 n. 17, 108 S.Ct. 978. *See also* 17 C.F.R. § 240.10b–5(b). Both untrue statements and omissions are evaluated "in the light of the circumstances under which they were made." 17 C.F.R. § 240.10b–5(b).

█ An "untrue statement," *i.e.,* a misstatement that comprises a half-truth or a whole lie (as opposed to an omission), is *always* misleading because a speaker, having begun to speak, is obliged to do so completely and truthfully. *See Caiola*, 295 F.3d at 329–31. Thus, to the extent that Defendants are accused of misstatements, *see* 11/1/02 Tr. at 72–86,[149] they unquestionably had a duty to disclose.

█ "Silence [*i.e.,* an omission], absent a duty to disclose, is not misleading under Rule 10b–5." *Basic*, 485 U.S. at 239 n. 17, 108 S.Ct. 978.

[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact. Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts. . . . [W]e have not only emphasized the importance of ascertaining a duty to disclose when omissions are at issue but have also drawn a distinction between the

---

**147.** Indeed, the mere fact that many Issuer and Individual Defendants allegedly profited by taking advantage of their knowledge of the truth (*e.g.,* by selling the stock or by making stock-based acquisitions) is strong evidence of materiality that renders the Complaints immune from dismissal under Rule 12(b)(6). *See Basic*, 485 U.S. at 240 n. 18, 108 S.Ct. 978 ("We recognize that trading (and profit making) by insiders can serve as an indication of materiality . . . .") (citations and emphasis omitted).

**148.** All Defendants who signed or were otherwise responsible for the alleged misrepresen-

tations in the registration statements have the same duty to disclose.

**149.** Plaintiffs' counsel identified the first, second, and sixth misrepresentations as omissions, the third and eighth misrepresentations as misstatements, and the fourth and seventh as both misstatements and omissions. *See id.* (Statement of Robert B. Wallner). Plaintiffs' counsel did not identify the fifth misrepresentation, but it is clearly an omission. *See id.* at 77 ("The fifth one says the registration statement *failed to disclose* that the investment banks were violating NASD Conduct Rule 2330(f) . . . .") (emphasis added).

concepts of a duty to disclose and materiality.

*Time Warner,* 9 F.3d at 267 (citations omitted). *See also First Virginia Bankshares v. Benson,* 559 F.2d 1307, 1314 (5th Cir.1977) ("A misstatement or omission encompasses patently false statements. Silence, or omission to state a fact, is proscribed only in certain situations: first, where the defendant has a duty to speak, secondly, where the defendant has revealed some relevant, material information even though he had no duty (*i.e.,* a defendant may not deal in half-truths).").

Thus, "[t]he initial inquiry in each case is what duty of disclosure the law should impose upon the person being sued." *Chris–Craft Indus. Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 363 (2d Cir.1973). A duty to speak honestly may arise in a number of ways.[150] "Under the securities laws, the duty to disclose is statutory, or

has been derived from statutory obligations." *See H.L. Federman & Co. v. Greenberg,* 405 F.Supp. 1332, 1336 (S.D.N.Y.1975).

Here, Plaintiffs charge Defendants with making material misstatements and omissions to conceal and effectuate the scheme to defraud. The sufficiency of those claims turns on whether Defendants had a duty to disclose the underlying scheme. Defendants deny that they had any such duty, relying on a dense thicket of regulations.[151]

■■■ Despite Defendants' invitation, it is not necessary to analyze the application of these rules and regulations at this stage. Where a defendant has engaged in conduct that amounts to "market manipulation" under Rule 10b–5(a) or (c), that misconduct creates an independent duty to disclose.[152] Failure to do so thus gives rise to a violation of Rule 10b–5(b). This is so because

---

**150.** For example, "one circumstance creating a duty to disclose arises when disclosure is necessary to make prior statements not misleading." *Time Warner,* 9 F.3d at 268 (citing *Glazer v. Formica Corp.,* 964 F.2d 149, 157 (2d Cir.1992)). There is also a duty to update statements that may "have become misleading as the result of intervening events" or the passage of time. *Time Warner,* 9 F.3d 259 at 267 (citing *In re Gulf Oil/Cities Serv. Tender Offer Litig.,* 725 F.Supp. 712, 745–49 (S.D.N.Y.1989)). If an insider seeks to trade on the basis of information known only to her, there is a duty to disclose. *See Chiarella v. United States,* 445 U.S. 222, 227–29, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). And certain relationships, *e.g.,* fiduciary relationships, may create a duty to disclose as well. *See id.* at 238, 100 S.Ct. 1108; *Chris–Craft,* 480 F.2d at 363.

**151.** For example, Defendants rely on the following laws and regulations to demonstrate that they had no duty to disclose the alleged Undisclosed Compensation: (i) Schedule A of the Securities Act, 15 U.S.C. § 77aa, Schedule A, (ii) Item 508(e) of Regulation S–K, 17 C.F.R. § 229.508(e), (iii) the "Corporate Financing Rule," NASD Conduct Rule 2710,

(iv) NASD Conduct Rule 2330, and (v) the "mark-up" rule, NASD Conduct Rule 2440.

**152.** Defendants' counsel admitted as much at oral argument. *See* 11/1/02 Tr. at 61 (Statement of Robert B. McCaw) ("[W]hat an underwriter does in the allocation process and in the underwriting process, there are extremely detailed and comprehensive regulations setting forth what must be disclosed, and there was no violation of those disclosure requirements. And *if there's no manipulation,* there is otherwise no requirement for such disclosure.") (emphasis added).

Defendants also concede this point—that an illegal market manipulation always gives rise to a duty to disclose—in their briefs. Although Defendants dedicated an entire section to rebut Plaintiffs' argument that Defendants were obliged to disclose that they had "rigged" the market, *see* 2 Pl. Mem. 25–26, 34, Defendants fail to address the core argument that a properly pled market manipulation claim gives rise to a duty to disclose. Rather, Defendants repeat their arguments, elsewhere, that the market manipulation claim was not properly pled and otherwise insufficient. *See* 3 Und. Reply 9–10.

participants in the securities markets are entitled to presume that all of the actors are behaving legally; silence that conceals illegal activity is therefore intrinsically misleading and (presuming the illegality is also material) is always violative of Rule 10b–5(b).

This result follows logically from the very purpose of the Exchange Act.

> In making this determination [of whether there is a duty to disclose] we should bear in mind that a major congressional policy behind the securities laws in general, and the antifraud provisions in particular, is the protection of investors who rely on the completeness and accuracy of information made available to them. Those with greater access to information, or having a special relationship to investors making use of the information, often may have an affirmative duty of disclosure. When making a representation, they are required to ascertain what is material as of the time of the transaction and to disclose fully those material facts about which the [investor] is presumably uninformed and which would, in reasonable anticipation, affect his judgment. A failure to perform these duties with "due diligence" in issuing registration materials provides a basis for suit under § 11 of the 1933 Act.... A knowing or reckless failure to discharge these obligations constitutes sufficiently culpable conduct to justify a judgment under Rule 10b–5 or § 14(e) for damages or other appropriate relief against the wrongdoer.

*Chris–Craft*, 480 F.2d at 363 (citations and internal quotation marks omitted) (second alteration in original). The "fundamental purpose" of the securities laws is "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor*," *Capital Gains Research Bureau*, 375 U.S. at 186, 84 S.Ct. 275, and in order to "effectuate its remedial purpose," the securities laws must be applied "not technically and restrictively, but flexibly." *Id.* at 195, 84 S.Ct. 275. Where insiders conspire to frustrate the efficient function of securities markets by exploiting their position of privilege, they have perpetrated a double fraud: they have manipulated the market, and they have covered it up with lies and omissions. This conduct gives rise to liability under every section of Rule 10b–5.

Moreover, the duty to disclose falls on all parties aware of the manipulation, or who take advantage of it. Here, for example, it is unimportant that only Allocating Underwriters are directly liable for the market manipulation. It is enough that all Defendants—Underwriters, Issuers, and Individuals alike—are alleged to have known of or recklessly disregarded the manipulation, and to have used that knowledge to their advantage. *See supra* Part X.A.2. "Failure to disclose that market prices are being artificially depressed operates as a deceit on the market place and is an omission of a material fact." *United States v. Regan*, 937 F.2d 823, 829 (2d Cir.1991) (quoting *United States v. Charnay*, 537 F.2d 341, 351 (9th Cir.1976)). This is equally true, of course, for the failure to disclose that market prices are being artificially inflated.

Plaintiffs have sufficiently alleged a claim of prohibited market manipulation. *See infra* Part XI. "This being so, [Defendants] possessed the affirmative duty ... to disclose this fact" to Plaintiffs.[153] *Affiliated Ute Citizens v. United States*, 406

---

153. Indeed, even if the conduct alleged in the market manipulation claims was merely a permitted stabilization practice, as Defendants urge, *see infra* Part XI.B, that conduct must still be disclosed under Regulation M. *See* 17 C.F.R. § 242.104(h) (detailing duty to disclose stabilization practices).

U.S. 128, 153, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). And because, in addition to that duty, the content of the alleged misrepresentation was material, *see supra* Part X.B.1, Plaintiffs have stated a Rule 10b–5(b) claim for material misstatements upon which relief may be granted. *See, e.g., Alter v. DBLKM, Inc.,* 840 F.Supp. 799, 807–08 (D.Colo.1993) (holding that allegations of manipulation of bond market that induced plaintiffs to make trades "suffice to create a duty and state a claim") (citing *Texas Gulf Sulphur,* 401 F.2d at 857–60).

■ But Defendants had a duty to disclose even under the regulatory scheme on which they rely. SEC Regulation S–K explains that with respect to "Underwriter's Compensation," a registration statement must disclose, among other things, *"all other items* considered by the National Association of Securities Dealers to be underwriting compensation...." 17 C.F.R. § 229.508(e).[154]

The NASD is explicit when it comes to what it considers to be underwriting compensation:

> For purposes of determining the amount of underwriting compensation, *all items of value* received *from any source* by the underwriter and related persons which are deemed to be in connection

with or related to the distribution of the public offering ... shall be included. NASD Rule 2710(c)(2) (emphasis added). The analysis ends there. According to long-held canons of construction, regulations must be read according to their plain meaning. *See Barnhart,* 534 U.S. at 450, 122 S.Ct. 941; *see also Gibbs v. PFS Invs., Inc.,* 209 F.Supp.2d 620, 626 (E.D.Va.2002) (giving terms in NASD rules their plain meaning). All means *all;* any means *any.* There is no suggestion elsewhere in the NASD Rules that these words are somehow terms of art that should be given any meaning but the usual ones.[155] Similarly, there can be no question that the alleged Undisclosed Compensation was an "item of value," *see* NASD Rule 2710(c)(3) (defining that term broadly), which was given "in connection with or related to the distribution," *see id.* 2710(c)(4) (defining that term broadly). Investors are alleged to have been required to pay compensation—in the form of money or commissions—to Underwriters in order to receive an allocation in the distribution of the public offering. Only an "Alice in Wonderland"-like reading of the regulations would permit the result Defendants urge.[156]

■ Thus, under any analysis, Defendants had a duty to disclose.[157] That duty, coupled with the materiality of the con-

---

**154.** Schedule A of the Securities Act, relied on by Defendants, is therefore of no moment. Schedule A does define Underwriter compensation to include "all commissions ... paid, directly or indirectly, *by the issuer* to the underwriters in respect of the sale of the security to be offered." 15 U.S.C. § 77aa, Schedule A, ¶ 17 (emphasis added). However, Regulation S–K specifically provides that a registration statement must *also* make disclosures pursuant to NASD Rules, according to that which is "considered *by the [NASD]* to be underwriting compensation." 17 C.F.R. § 229.508(e) (emphasis added).

**155.** Indeed, NASD Rule 2710(c)(2)(C) later repeats that *"[a]ll items of underwriting compensation* shall be disclosed in the section on

underwriting or distribution arrangements in the prospectus or similar document."

**156.** "When *I* use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean—neither more nor less." "The question is," said Alice, "whether you can make words mean so many different things." "The question is," said Humpty Dumpty, "which is to be master—that's all."

Lewis Carroll, *Through the Looking Glass* (emphasis in original) (quoted in *United States v. Pacheco,* 225 F.3d 148, 149 (2d Cir.2000)).

**157.** Allocating Underwriters were under a duty to disclose under yet another analysis: Where an insider trades in securities, it is

cealed information, gives rise to a claim under Rule 10b–5(b) upon which relief can be granted.

\* \* \* \* \* \*

For the reasons stated above, Defendants' motions to dismiss the Rule 10b–5 claims are denied *except* in those instances where Plaintiffs have not sufficiently alleged scienter.

## XI. RULE 10B–5 CLAIMS FOR MARKET MANIPULATION AGAINST THE ALLOCATING UNDERWRITERS

Plaintiffs' second set of Rule 10b–5 claims allege that "[t]he Allocating Underwriter Defendants employed devices, schemes and artifices to defraud and/or engaged in acts, practices and a course of business which operated as a fraud and deceit upon the Plaintiffs," Cacheflow Compl. ¶ 87, which mimics the provisions of Rule 10b–5(a) and (c).[158]

Defendants challenge the market manipulation claim on the grounds that Plaintiffs have failed the pleading requirements of

Rule 9(b) and the PSLRA, and have failed to state a claim under Rule 12(b)(6).

### A. The Market Manipulation Claims Satisfy Paragraph (b)(2) of the PSLRA—Scienter

 In order to comply with the pleading requirements of the PSLRA, it is only necessary to discuss paragraph (b)(2), which requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).[159] Because the briefing displays confusion about this requirement, an important clarification is warranted. Plaintiffs do not need to plead the defendant's actual knowledge of the market manipulation scheme with particularity. Courts in this circuit have long recognized that "at this stage of the litigation, we cannot realistically expect plaintiffs to be able to plead defendants' actual knowledge." *Ross,* 607 F.2d at 558.[160] Paragraph (b)(2) does require, however, that plaintiffs plead facts that give rise to a "strong inference"

---

well-settled that she is under a duty to disclose all material information. *See Chiarella,* 445 U.S. at 230, 100 S.Ct. 1108. An "insider" includes "[the corporation's] agent, . . . a fiduciary, [or] . . . a person in whom the sellers [of the securities] had placed their trust and confidence." *Dirks v. SEC,* 463 U.S. 646, 654, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983) (alterations in original) (quoting *Chiarella,* 445 U.S. at 232, 100 S.Ct. 1108). Because Allocating Underwriters certainly fall into the latter category, and because they are alleged to have sold the securities, they were under a duty to disclose.

**158.** Rule 10b–5 makes it unlawful:
 (a) To employ any device, scheme, or artifice to defraud, [or]

 . . . . .

 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

**159.** Because Plaintiffs' claims of market manipulation do not require proof that Defendants made any material misstatements or omissions, *see* 17 C.F.R. § 240.10b–5(a),(c), paragraph (b)(1) is not triggered.

**160.** *Ross v. A.H. Robins Co.* is the case in which the Second Circuit first articulated the "strong inference" requirement. As the doctrine developed, no court challenged *Ross'* s holding that plaintiffs do not have to plead defendant's actual knowledge with particularity. *See supra* note 49 and accompanying text (discussing *Ross* and its progeny). The PSLRA did not change this standard because Congress only " 'heightened the requirement for pleading scienter to the level used by the Second Circuit.' " *Ganino,* 228 F.3d at 170 (quoting *Press,* 166 F.3d at 537–38). *See also Novak,* 216 F.3d at 310 ("[W]e conclude that the enactment of paragraph (b)(2) did not change the basic pleading standard for scienter in this circuit.").

that the defendant acted with the required state of mind, and it is *those* facts that must be stated with particularity. *See* 15 U.S.C. § 78u–4(b)(2).

 With respect to the market manipulation claim against the Allocating Underwriters, Plaintiffs have satisfied paragraph (b)(2) for a simple reason: They have alleged that the Allocating Underwriters "engaged in [the] deliberately illegal behavior" of requiring customers to enter into Tie-in Agreements in order to obtain IPO stock. *Novak*, 216 F.3d at 311.[161] As the Plaintiffs correctly argue, "[t]he Underwriter Defendants do not even attempt to suggest that the misconduct alleged here was anything but intentional." 1 Pl. Mem. at 48. Nor could they—Tie-in Agreements do not happen accidently, negligently, or even recklessly. Tie-in Agreements only happen if the Allocating Underwriters intentionally require them.

Thus, under the PSLRA, *Novak* and case law long-established in this circuit, Plaintiffs' allegations that the Allocating Underwriters required their customers to enter into Tie-in Agreements—an allegation that must be accepted as true on a motion to dismiss—gives "rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

## B. The Market Manipulation Claims Adequately State Claims Upon Which Relief May Be Granted

 The elements of a Rule 10b–5 market manipulation claim are well-settled in this circuit.

---

[S]ection 10(b) and Rule 10b–5 impose primary liability upon those persons or entities who employ manipulative and deceptive practices while engaged in a scheme to defraud. To state a claim for market manipulation, Plaintiffs must allege that (1) they were injured; (2) in connection with the purchase or sale of securities; (3) by relying on a market for securities; (4) controlled or artificially affected by defendant's deceptive or manipulative conduct; and (5) the defendants engaged in the manipulative conduct with scienter.

*Blech II*, 961 F.Supp. at 582 (citing *Ernst & Ernst*, 425 U.S. at 199, 96 S.Ct. 1375). *Accord In re Sterling Foster & Co., Inc. Sec. Litig.*, 222 F.Supp.2d 289, 303–04 (E.D.N.Y.2002). Because the PSLRA sets no special pleading requirements for market manipulation claims, the "deceptive or manipulative conduct" in a market manipulation claim need only be pled under Rule 9(b). *See supra* Part VII.B.2. Moreover, the "deceptive or manipulative conduct" in a market manipulation claim, while still requiring particularity, may be pled with less specificity than that required in claims alleging material misstatements or omissions.

Unlike most fraud—most notably misrepresentation claims, where Rule 9(b) has been most heavily commented upon—where at least some aspects of the time, place, and other details of a defendant's activity are within the knowledge of the plaintiff as a matter of course—market manipulation claims

---

**161.** "Plaintiffs could also meet the pre-PSLRA pleading standard by alleging facts that constituted strong circumstantial evidence of conscious misbehavior or recklessness on the part of defendants. *Intentional misconduct is easily identified since it encompasses deliberate illegal behavior,* such as securities trading by insiders privy to undisclosed and material information, *see Simon DeBartolo,* 186 F.3d at 168–69, or knowing sale of a company's stock at an unwarranted discount, *see Schoenbaum v. Firstbrook,* 405 F.2d 215, 219 (2d Cir.1968) (en banc)." *Novak,* 216 F.3d at 308 (emphasis added).

present circumstances in which the mechanism of the scheme is likely to be unknown to the plaintiffs. . . . [W]here the principal allegations of wrongdoing involve market manipulation rather than false statements, *the Complaint sets forth a sufficient level of detail by alleging the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants.* Although [the Complaint here] does so in broad strokes, at this stage no more can be required to give Defendants fair notice of Plaintiffs' claims and thereby to satisfy Rule 9(b). *In re Blech Sec. Litig.*, 928 F.Supp. 1279, 1290–91 (S.D.N.Y.1996) *("Blech I")* (emphasis added).[162] *See also Baxter v. A.R. Baron*, No. 94 Civ. 3913, 1996 WL 586338, at *8 (S.D.N.Y. Oct.11, 1996) ("The degree of particularity required for pleading a market manipulation scheme is not as demanding as it is when Rule 9(b) is applied in other instances of fraud because the

facts relating to a manipulation scheme are often known only by the defendants.").[163]

The question, then, is whether Plaintiffs have adequately pled that the Allocating Underwriters engaged in "deceptive or manipulative conduct." Although Underwriters are certainly correct in pointing out that "to state a claim for market manipulation, a plaintiff must do more than merely allege the existence of a manipulative scheme," *Scone*, 1998 WL 205338, at *5, I have already held in the material misstatement context that Plaintiffs have alleged transaction and loss causation, which also include the elements of damages and reliance. *See supra* Part X.A.3. Because the material misstatements were made for the primary purpose of concealing and affecting the manipulative scheme alleged herein, that analysis applies with equal force in the market manipulation context.

---

**162.** Although no Court of Appeals has adopted (or refused to adopt) the "nature, purpose, and effect" formulation for pleading market manipulation, many district courts—particularly in this district—have embraced it. *See, e.g., In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F.Supp.2d 549, 580–81 (S.D.Tex.2002); *Nanopierce*, 2002 WL 31819207, at *5; *Sterling Foster*, 222 F.Supp.2d at 270; *Internet Law Library, Inc. v. Southridge Capital Mgmt., L.L.C.*, 223 F.Supp.2d 474, 486 (S.D.N.Y.2002); *Log On Am., Inc. v. Promethean Asset Mgmt.*, 223 F.Supp.2d 435, 445 (S.D.N.Y.2001); *SEC v. Environmental, Inc.*, 82 F.Supp.2d 237, 240 (S.D.N.Y.2000); *Vandenberg v. Adler*, No. 98 Civ. 3544, 2000 WL 342718, at *5 (S.D.N.Y. Mar. 31, 2000); *SEC v. Blech*, No. 99 Civ. 4770, 2000 WL 288263, at *3 (S.D.N.Y. Mar.20, · 2000); *Global Intellicom, Inc. v. Thomson Kernaghan & Co.*, No. 99 Civ. 342, 1999 WL 544708, at *8 (S.D.N.Y. July 27, 1999); *Dietrich v. Bauer*, 76 F.Supp.2d 312, 329 (S.D.N.Y.1999); *T.H.C., Inc. v. Fortune Petroleum Corp.*, Nos. 96 Civ. 2690–91, 1999 WL 182593, at *3 (S.D.N.Y. Mar.31, 1999); *SEC v. Schiffer*, No. 97 Civ. 5853, 1998 WL 226101, at *3 (S.D.N.Y. May 5, 1998); *City of*

*Painesville, Ohio v. First Montauk Fin. Corp.*, 178 F.R.D. 180, 188 (N.D.Ohio 1998).

**163.** There is no support for the proposition advanced by Underwriter Defendants that Plaintiffs must plead particular manipulative trades, "including the number of shares purchased, the time period in which the purchases occurred, the prices paid and the effect of the customers' transactions on the market price for the securities," 4 Und. Mem. at 2. Indeed, even the case cited by Underwriters only requires that *"without other pleaded fraudulent acts,* plaintiff should plead defendant's daily trading percentages, or at least the trading percentages throughout the duration of the alleged manipulation." *In re College Bound Consol. Litig.*, Nos. 93 Civ. 2348 and 94 Civ. 3033, 1995 WL 450486, at *6 (S.D.N.Y. July 31, 1995) *("College Bound II")* (emphasis added). Here, Plaintiffs have pled "other fraudulent acts," including the material misstatements on the registration statements and prospectuses, the Undisclosed Compensation, and the analyst conflicts. Thus, they are not required to plead particular trades or percentages. *See also infra* Part XI.B.2.

## 1. Plaintiffs Adequately Plead "Deceptive or Manipulative Conduct"

Nonetheless, not all conduct that harms investors can be called "manipulative." The word "manipulative" is "virtually a term of art when used in connection with securities markets. It connotes intentional or wilful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst,* 425 U.S. at 199, 96 S.Ct. 1375.

> [Manipulation] refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.... Section 10(b)'s general prohibition of practices deemed by the SEC to be "manipulative"—in this technical sense of artificially affecting market activity in order to mislead investors—is fully consistent with the fundamental purpose of the 1934 Act....

*Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 476–77, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). That fundamental purpose is " '[t]o insure to the multitude of investors the maintenance of fair and honest markets,' " *Crane Co. v. Westinghouse Air Brake Co.,* 419 F.2d 787, 794 (2d Cir.1969) (quoting H.R.Rep. No. 73–1383, at 11 (1934)). This goal is achieved by "prevent[ing] practices that impair the function of stock markets in enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily accurate) estimates of the underlying economic value of the securities traded." *Sullivan & Long, Inc. v. Scattered Corp.,* 47 F.3d 857, 861 (7th Cir.1995) (Posner, C.J.).

"Market manipulation" is that conduct which runs afoul of the "fundamental objectives of the securities laws." *Id.* at 865. *See also Blech II,* 961 F.Supp. at 580. Indeed, the Supreme Court has explained:

> The[ ] proscriptions [of the securities laws], by statute and rule, are broad and ... are obviously meant to be inclusive. The Court has said that the 1934 Act and its companion legislative enactments embrace a "fundamental purpose ... to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). In the case just cited the Court noted that Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed "not technically and restrictively, but flexibly to effectuate its remedial purposes." *Id.* at 195, 84 S.Ct. 275.

*Affiliated Ute,* 406 U.S. at 151, 92 S.Ct. 1456 (footnote omitted). *See also Zandford,* 122 S.Ct. at 1903; *Superintendent of Ins. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). In the end, "[t]he gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Gurary v. Winehouse,* 190 F.3d 37, 45 (2d Cir.1999).

Underwriters insist that their conduct does not constitute market manipulation under any of these descriptions; they argue that Plaintiffs' Tie-in Allegations attempt to criminalize [164] legitimate book building [165] activity by characterizing the

---

**164.** Rule 10b–5 is interpreted identically in the civil and criminal contexts. *See United States v. Clark,* 359 F.Supp. 128, 130 (S.D.N.Y.1973).

**165.** Book building "entails the lead underwriter gathering and assessing potential investors' demand for the offering." 4 Und. Mem. at 4 (citing MA ¶¶ 18–24).

gathering of "indications of interest" as market manipulation. Indications of interest are necessary, Underwriters insist, in order to engage effectively in legitimate price stabilization practices,[166] including prohibiting investors from "flipping"[167] their IPO allocations. *See* 4 Und. Mem. at 5–6. Thus underwriters may permissibly contact potential IPO investors and inquire into their intentions in the aftermarket, including whether they plan to buy, hold, or sell the newly-issued security. Underwriters argue, essentially, that their conduct—which was merely a necessary predicate to permitted stabilization practices— was consistent with the purpose of the securities laws.[168]

This argument radically mischaracterizes the Complaints.[169] As pled, the Complaints make no mention of stabilization practices, charging Allocating Underwriters with requiring investors to make aftermarket purchases in order to receive IPO allocations. *See, e.g.*, MA ¶ 34. These Complaints cannot be dismissed unless Plaintiffs have affirmatively pleaded themselves out of court by alleging legitimate stabilization practices in clear and unambiguous language. *See supra* Part V.A. There are no such allegations. *See* Cacheflow Compl. ¶ 38 ("Defendants ... required[d] their customers seeking to purchase IPO shares to engage in transactions causing the market price of Cacheflow common stock to rise, in transactions that *cannot be characterized as stabilizing transactions* ....") (emphasis added).

While "price stabilization in contravention of SEC regulations is unlawful ... the

---

**166.** Scholars have recognized that "stabilization is a form of manipulation," that is specifically carved out as lawful. 9 Loss & Seligman, *Securities Regulation* 3989.

**167.** " 'Flipping' is a practice that many consider disruptive to syndicated underwriting. Flipping occurs when persons who purchase shares in initial public offerings ('subscribers') turn around and sell their shares quickly. It is often very appealing for a subscriber to flip because the combination of public offering publicity and the practice of purposely underpricing offerings serves to drive-up the stock price in initial trading. However, if many subscribers flip, their collective action can cause a glut of shares to enter trading, depressing the stock price. The depressed stock price, in turn, can disrupt the efficient distribution of the stock." *Friedman I*, 2000 WL 1804719, at *2.

**168.** But, in a parallel case brought by many of these Plaintiffs under the antitrust laws, Underwriter Defendants have all but admitted that their conduct, as alleged, may be illegal under the securities law:

[W]ith respect to tie-ins, the SEC is right now, as we speak, in the process of trying to determine what the line is between a permissible indication of interest and *an impermissible agreement with respect to the future market*. And, again, there are lots of places they are to cut that line including, for example, a client saying, ["]I intend to, and I will, eventually reach a position which will be ten times or five time or four times the allocation that I get.["] Which side of the line does that fall? That turns perhaps on the words: whether it is ["]solicited["] under the NASD rule that bars solicitations or whether it is ["]offered["] by the client.

Transcript of Oral Argument before Hon. William H. Pauley III on Defendants' Motion to Dismiss, *In re Initial Public Offering Antitrust Litig.*, No. 01 Civ.2014 (S.D.N.Y. Jan. 17, 2003), at 19 (Statement of Robert B. McCaw, counsel to Salomon Smith Barney, Inc.) (emphasis added). Here, of course, Plaintiffs allege investors were "required" to make aftermarket purchases, *see* MA ¶ 34, thereby alleging conduct that falls on the "impermissible" side of the line.

**169.** Indeed, Underwriters have created a "straw man" by rewriting Plaintiffs' allegations and then attacking only their version of the allegations. *See generally* Madsen Pirie, *The Book of the Fallacy: A Training Manual for Intellectual Subversives* 160–61 (1985). Although Underwriters do this in several places in their briefing, *see supra* Part VII.A.2, this is a particularly egregious example.

[Exchange Act] allows price stabilization practices that the SEC does not prohibit." *Friedman II*, 313 F.3d at 803. If the Underwriters were permitted to require investors to enter into Tie-in Agreements, then Plaintiffs cannot state a claim upon which relief can be granted and the Complaints must be dismissed. *See* Fed. R.Civ.P. 12(b)(6). Thus, the critical questions for purposes of this motion are (1) whether tie-ins are a form of stabilization, as opposed to market manipulation, and (2) whether SEC regulations or the Exchange Act prohibit Tie-in Agreements as alleged. Because SEC regulations plainly prohibit the conduct as alleged there is no need to address the first question.

"Stabilization is that process whereby the market price of a security is pegged or fixed for the limited purpose of preventing or retarding a decline in contemplation of or during a public offering of securities." Exchange Act Release No. 34–4163, *available at* 1948 WL 28675 (Sept. 16, 1948). Rule 104 of SEC Regulation M provides that "[s]tabilizing is prohibited except for the purpose of preventing or retarding a decline in the market price of a security." 17 C.F.R. § 242.104(b).[170] Stabilization practices therefore stand in marked contrast to the manipulative conduct described above, which is aimed primarily at inflating or otherwise artificially moving the price of securities. Thus whether the Complaints allege stabilization or manipulation turns largely on the "nature, purpose, and effect" of the conduct alleged." *Blech I*, 928 F.Supp. at 1291.

■ Throughout the Complaints and in the Master Allegations, Plaintiffs allege a sweeping scheme whose nature, purpose, and effect was to artificially inflate the price of newly-issued securities.[171] Not only do Plaintiffs allege that the scheme charged "had the effect of inflating the price of the Issuer's common stock above the price that would have otherwise prevailed in a fair and open market," Cacheflow Compl. ¶ 59, they allege that Defendants "carried out a plan, scheme and course of conduct *which was intended to* . . . artificially inflate and maintain the market price and trading volume of the Issuer's common stock; and [ ] induce Plaintiffs . . . to purchase or otherwise acquire the Issuer's common stock at artificially inflated prices." *Id.* ¶ 86 (emphasis added) (allegation as to Allocating Underwriter Defendants); *id.* ¶ 96 (identical allegation as to all Underwriter Defendants); *id.* ¶ 114 (identical allegation as to all Issuer and Individual Defendants). *See also id.* ¶ 110(b)-(c). In sum, Plaintiffs allege that Defendants "knowingly or recklessly

---

**170.** A violation of Regulation M suffices to establish the "deceptive or manipulative conduct" necessary to support a market manipulation claim. *See* 5B Arnold S. Jacobs, *Disclosure and Remedies Under the Securities Laws* § 6:33 (2002) ("To prove a Section 10 claim, the complainant must show a breach of Regulation M and the elements of a Section 10 cause of action.").

**171.** It is therefore particularly odd that Underwriter Defendants repeatedly cite Chief Judge Posner's opinion in *Sullivan & Long*. *See* 4 Und. Mem. at 14–15; 4 Und. Reply at 9. In that case, defendant was accused of market manipulation by selling short more shares of a corporation than actually existed. The court affirmed the dismissal of plaintiff's market manipulation claim because defendant's conduct was "not market manipulation, but arbitrage," since it "eliminate[d] artificial price differences." 47 F.3d at 862. Far from holding that market manipulation requires "disguised transactions" or "fictitious trades," 4 Und. Reply at 9, Judge Posner explained that "the essential point of [the] opinion" was that "since the conduct in which [defendant] engaged appears to have served rather than disserved the fundamental objectives of the securities laws, we are not inclined to strain to find a violation of a specific provision." 47 F.3d at 865.

participated in conduct that artificially inflated the price of the issuer's shares." MA ¶ 3.[172]

Because Plaintiffs have sufficiently alleged a scheme, the "nature, purpose, and effect" of which was to artificially raise stock prices above their true value, as opposed to "preventing or retarding a decline in the market price of a security," 17 C.F.R. § 242.104(b), they have adequately pled a market manipulation scheme upon which relief may be granted.[173]

### 2. *College Bound II* Is Not the Law

Notwithstanding the clear statements of the Supreme Court, the Second Circuit and a number of courts in this district, counsel for Underwriters, when asked to identify the "irreducible minimum of the elements that must be pled . . . in a market manipulation claim," 11/1/02 Tr. at 88, identified an entirely different list:

> There needs to be domination and control, and there needs to be disguised or fictitious transactions. There needs to be economic reasonableness. There is a sole intent requirement.

*Id.* (Statement of David W. Ichel, counsel to J.P. Morgan Chase & Co., Hambrecht & Quist, LLC, Chase Securities, Inc., J.P. Morgan Securities, Inc., and Robert Fleming, Inc.). The Underwriters insist that the pleading requirements for Rule 10b–5 market manipulation claims were laid out by the Court of Appeals in *United States v. Mulheren,* 938 F.2d 364 (2d Cir.1991), as interpreted by Chief Judge Mukasey in *College Bound II:*

> the elements of an open-market manipulation claim outlined in *Mulheren* [are]: 1) "profit or personal gain to the alleged manipulator"; 2) deceptive intent; 3) market domination; and 4) economic reasonableness of the alleged transaction.

1995 WL 450486, at *6 (quoting *Mulheren,*

---

**172.** Underwriters' argument that their conduct amounted to stabilization is further undercut by another section of Regulation M, which provides that a distributor of an initial offering may not "attempt to induce any person to bid for or purchase, a covered security during the applicable restricted period." 17 C.F.R. § 242.101(a). *See also* SEC Legal Bulletin ("Tie-in agreements are a particularly egregious form of solicited transaction prohibited by Regulation M."). *See also supra* Part IV.A.1 (describing the Complaints' allegations of market manipulation); Part III.B (describing history of Tie-in Agreements).

Defendants' only response to these allegations is that "while plaintiffs allege in the passive voice that 'one customer [ ] was required or *induced*' to purchase aftermarket shares in order to obtain IPO shares . . . none of these allegations states that *an Underwriter Defendant required* an aftermarket purchase. . . ." 4 Und. Reply at 11 (emphasis and brackets in original) (quoting MA ¶ 34). But drawing every inference in Plaintiffs' favor, it is patently obvious that the unnamed subject of these sentences is the Allocating Underwriters. Written in the active voice, these allegations would read: "Allocating Underwriters required or induced one customer to purchase aftermarket shares in order to obtain IPO shares."

**173.** Plaintiffs have also adequately identified the role of the Underwriters in the market manipulation, even though there are no separate allegations identifying the role each particular Underwriter played, because Plaintiffs have alleged that the Underwriters worked as a "syndicate" and were inextricably linked in the offering of the relevant securities. *See, e.g.,* Cacheflow Compl. ¶¶ 14–16, 33–34, 77–92. *See also Internet Law Library,* 223 F.Supp.2d at 487 ("since plaintiffs have alleged [a] concrete connection between [defendants], the fact that defendants' roles are not distinguished from each other to a greater degree is forgivable at this early stage"); *Blech I,* 928 F.Supp. at 1291 ("to the extent that [ ] Defendants' roles are not distinguished from each other, the inextricable linkage among them in the management of Blech & Co. excuses such a blurring of roles at this juncture").

938 F.2d at 370).[174] Throughout their (fourth) brief and at oral argument, Underwriters relied almost exclusively on *Mulheren* and *College Bound II*. Therefore, several observations about *Mulheren* and *College Bound II* are in order.[175]

*First, College Bound II* and *Mulheren* are expressly limited to cases of so-called "open-market manipulation." *College Bound II*, 1995 WL 450486, at *6.[176] In fact, there is no such thing. A review of federal securities law and academic literature yields *no* authority—other than *College Bound II* and *Nanopierce* (itself displaying skepticism, *see* 2002 WL 31819207, at *6–7 & n. 11)—that recognizes a distinction between open-market manipulation and any other market manipulation. What the cases just cited call "open-market manipulation" are merely those cases involving conduct that stands near the line between illegal and legal activity because their resolution turns less on conduct and more on the intent of the defendants. *See Markowski v. SEC*, 274 F.3d 525, 528 (D.C.Cir.2001), *cert. denied*, —— U.S. ——, 123 S.Ct. 96, 154 L.Ed.2d 26 (2002).[177]

*Second*, even if there were such a thing as open-market manipulation, the "elements" outlined in *College Bound II* have no basis in law. *Mulheren*—itself a criminal case, decided as a direct appeal from a

jury verdict rather than on a motion to dismiss—never required that a defendant act with the "sole intent" to defraud, but instead "assume[d], without deciding ... that an investor may lawfully be convicted under Rule 10b–5 where the purpose of his transaction is solely to affect the price of a security." *Mulheren*, 938 F.2d at 368. The court therefore left open the question of whether a defendant who acts with, for example, the "primary" intent of affecting a stock price could be criminally liable for securities fraud. *See id. Mulheren* also refers to "profit or personal gain" as merely "[o]ne of the hallmarks of manipulation." *Id.* at 370. As for market domination, the court only "agree[d], as a general proposition, that market domination is *a* factor that supports a manipulation charge." *Id.* at 371 (emphasis added). And all of these "factors"—personal gain, market domination, economic reasonableness—were simply intended as examples of conduct from which "manipulative intent can be inferred." *Id.* at 371. *Mulheren* is *not* an opinion purporting to announce the elements for some new cause of action, but one of many Second Circuit opinions about scienter in market manipulation cases. Read properly, *Mulheren* adds little to the well-settled tests of scienter in this circuit:

---

**174.** In addition, according to Judge Mukasey, a defendant must have acted "with the 'sole intent' of raising the price of the stock." *College Bound II*, 1995 WL 450486 at *5 (quoting *Mulheren*, 938 F.2d at 368).

**175.** I make these observations even though Plaintiffs have adequately pled the elements set forth in *College Bound II. See, e.g.,* Cacheflow Compl. ¶ 77 (alleging sole intent); *id.* ¶ 83(c) (alleging profit or personal gain in the form of Undisclosed Compensation); *id.* ¶ 88 (alleging deceptive intent); *id.* ¶¶ 14, 34; MA ¶ 33 (alleging market domination because Underwriters controlled the allocation process); Cacheflow Compl. ¶ 47 (alleging economic reasonableness).

**176.** Open-market manipulation is purportedly that subset of all market manipulations "where the alleged manipulator has made otherwise legitimate trades, yet with the subjective intent to affect the stock price thereby." *Nanopierce*, 2002 WL 31819207, at *6.

**177.** Moreover, even the *College Bound II* court would not construe the Complaints here as alleging "open-market manipulation" because they allege—in addition to trades designed to inflate the price of the relevant securities—material misstatements and omissions to conceal and effectuate the fraudulent purpose of the trades. *See College Bound II*, 1995 WL 450486, at *7.

"motive and opportunity" and "strong circumstantial evidence." *Novak*, 216 F.3d at 309, 311. *See generally supra* Part VI.B.2.

Tellingly, *Mulheren* was decided over eleven years ago and *College Bound II* over seven years ago, yet those cases have been cited precisely once—in this or any other court—as establishing the elements of an open-market manipulation claim. *See Nanopierce*, 2002 WL 31819207, at *6 n. 10. And that case, far from holding that "courts enforce special [strict] pleading requirements when evaluating the adequacy of allegations in the market manipulation context," 4 Und. Mem. at 2, joined the many courts, cited earlier, holding that a market manipulation claim need only identify the "nature, purpose, and effect" of the allegedly fraudulent scheme. With all due respect, *College Bound II*, to the extent it purports to interpret and apply *Mulheren*, is simply not the controlling law of this circuit.

For all of the reasons set forth above, Plaintiffs have adequately pled a market manipulation claim against Allocating Underwriters on which relief may be granted. Defendants' motion to dismiss these claims are therefore denied.

## XII. SECTION 20 CLAIMS

Plaintiffs' final set of claims assert that all of the Individual Defendants are liable under Section 20 of the Exchange Act. Section 20(a) states, in pertinent part:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such con-

trolled person is liable, *unless* the controlling person acted in good faith and did not directly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (emphasis added). Every Individual Defendant accused of secondary liability under Section 20 is also accused of primary liability under Rule 10b–5. The Section 20 claims accuse the Individual Defendants of controlling the Issuers at the time the Issuers allegedly violated Rule 10b–5. *See, e.g.*, Cacheflow Compl. ¶ 122 ("The Individual Defendants acted as controlling persons of the Issuer within the meaning of Section 20(a) of the Exchange Act as alleged herein and culpably participated in the wrongdoing."). Thus, Plaintiffs seek to hold Individual Defendants liable both for their own alleged misconduct, and for the alleged misconduct of the companies they controlled.[178]

As with control person liability under Section 15 of the Securities Act, *see supra* Part IX, the two threshold questions are: (1) Does Rule 8 or Rule 9(b) apply to the pleading of a Section 20 claim, *i.e.*, is Section 20 a fraud claim?; and (2) does the PSLRA apply to the pleading of a Section 20 claim, *i.e.*, does Section 20 require proof (and thus, under paragraph (b)(2), pleading) of scienter? In order to answer these questions, it is necessary to explore the elements of a Section 20(a) claim.

The Supreme Court has never delineated the elements of a Section 20(a) claim. While the various courts of appeals agree that "control" and an underlying violation of the securities laws by the controlled entity are required elements, there is deep

---

**178.** Primary liability by the controlling person is not a necessary predicate to a Section 20(a) claim. Section 20 is typically used to sue defendants who do *not* have primary liability.

In that sense, Section 20 serves as a statutory form of *respondeat superior*. *See Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 711–16 (2d Cir.1980).

disagreement over whether Section 20(a) also has a scienter element. Six courts of appeals have clearly held that there is *no* scienter requirement; two have clearly held that there is.[179]

The Second Circuit has yet to definitively answer this question. However, the Second Circuit has held that in order to *prove* a Section 20 claim, "a plaintiff must show (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998) (quoting *First Jersey,* 101 F.3d at 1472). Defendants argue that Plaintiffs have failed to adequately plead the elements of control and culpable participation (and, of course, that there was no underlying violation of the Exchange Act). *See* Iss. Mem. at 60–65.

 "Control" in Section 20 has the same meaning as in Section 15, and has been adequately alleged. *See supra* Part IX. *See also* 17 C.F.R. § 240.12b–2 (defining control as "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."). The Rule 10b–5 claims against Issuers, who are identified in the Section 20 claims as the primary violators, have been adequately pled. *See supra* Part X and Part B of Appendix 5 to this Opinion. Thus the critical question is what is meant by "culpable participation"—a term that does not appear anywhere in Section 20(a).

Because some courts have assumed that "culpable participation" requires *proof* of a certain state of mind,[180] they have held that plaintiffs must *plead* scienter under paragraph (b)(2) of the PSLRA. *See, e.g., In re CINAR Corp. Sec. Litig.,* 186 F.Supp.2d 279, 310 (E.D.N.Y.2002); *Independent Energy,* 154 F.Supp.2d at 770. This assumption has been made despite the fact that the Second Circuit has never defined "culpable participation" or equated that term with scienter.[181]

Given the reliance of courts on this assumption, it is interesting to trace the development of Section 20(a) jurisprudence

---

**179.** The Fifth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits have all rejected a scienter requirement, holding that good faith may be asserted as an affirmative defense. *See G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 958 (5th Cir.1981); *Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d 873, 881 (7th Cir.1992); *Metge v. Baehler,* 762 F.2d 621, 631 (8th Cir.1985); *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1575 (9th Cir. 1990) (en banc); *First Interstate Bank of Denver, N.A. v. Pring,* 969 F.2d 891, 896–97 (10th Cir.1992), *rev'd on other grounds sub nom. Central Bank v. First Interstate Bank,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994); *Brown v. Enstar Group, Inc.,* 84 F.3d 393, 396 (11th Cir.1996). Only the Third and Fourth have reached the opposite conclusion. *See Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 890–91 (3d Cir.1975) (requiring, but not defining, "culpable participation"); *Carpenter v.*

*Harris, Upham & Co.,* 594 F.2d 388, 394 (4th Cir.1979) (requiring only proof of "something more than negligence"). *See generally* Sandra P. Wysocki, Note, *Controlling Personal Liability of Directors Under Section 20(A) of the Securities Exchange Act of 1934,* 31 Suffolk U.L.Rev. 695 (1998).

**180.** There is, however, an apparent split in authority as to what is the required state of mind. *See Deutsche Telekom,* 2002 WL 244597, at *7 (collecting cases)

**181.** This has been a source of frustration for many district courts. *See, e.g., Mishkin v. Ageloff,* No. 97 Civ. 2690, 1998 WL 651065, at *22 (S.D.N.Y. Sept. 23, 1998) ("Although one would think, and hope, that the standard to be applied to a motion to dismiss a section 20(a) claim is well-established, the opposite is all too unfortunately the case.").

in the Second Circuit. As early as 1973, the court wrote:

> The intent of Congress in adding [Section 20], passed at the same time as the amendment to Section 15 of the 1933 Act, was obviously to impose liability only on those directors who fall within its definition of control *and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons.*

*Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299 (2d Cir.1973) (en banc) (emphasis added). *See also Gordon v. Burr,* 506 F.2d 1080, 1086 (2d Cir.1974).

In 1980, however, the Second Circuit suggested that there was *no scienter* (as opposed to culpable participation) element to Section 20(a) when it held that allegations of control, coupled with an underlying violation, are sufficient to state a claim. *See Marbury Mgmt.,* 629 F.2d at 716. According to the *Marbury Management* court, good faith could only be asserted as an affirmative defense. *Id.*

Nonetheless, after 1980, district courts were divided on whether Section 20(a) contained an element of scienter depending on whether they "followed" *Lanza* and *Gordon,* or *Marbury Management.*[182] Compare, e.g., *Robbins v. Moore Med. Corp.,* 788 F.Supp. 179, 188 (S.D.N.Y.1992) (holding that plaintiff must plead control and scienter), *with In re CitiSource, Inc. Sec. Litig.,* 694 F.Supp. 1069, 1076 (S.D.N.Y. 1988) (holding that plaintiff must merely plead control). *See generally In re Health Mgmt., Inc. Sec. Litig.,* 970 F.Supp. 192, 205–06 (E.D.N.Y.1997) (discussing split in the district courts).

In 1996, the Court of Appeals attempted to reconcile its prior precedent by holding that,

> In order to establish a prima facie case of controlling-person liability, a plaintiff must *show* a primary violation by the controlled person and control of the primary violator by the targeted defendant, and *show* that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person.

*First Jersey,* 101 F.3d at 1472 (emphasis added) (citations and quotation marks omitted). According to the *First Jersey* court, once the prima facie case has been established, the burden shifts to defendants to demonstrate good faith. *Id* at

---

**182.** This false dichotomy arose because those courts that "followed" *Lanza* and *Gordon* assumed that "culpable participation" meant scienter. Why "culpable participation" was equated with scienter is a mystery that no court in this circuit has ever explained. "Culpable" means: "Guilty; blameworthy" *Black's Law Dictionary* 385 (7th ed.1999). Certainly conduct can be blameworthy though it was done unintentionally or unknowingly: both statutory rape, *see People v. Dozier,* 72 A.D.2d 478, 424 N.Y.S.2d 1010 (N.Y.A.D.2d Dep't 1980), and possession of an unregistered firearm, *see* 26 U.S.C. § 586(d), are examples of strict liability *crimes. See generally Staples v. United States,* 511 U.S. 600, 607 n. 3, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994). Although courts will typically eschew a strict liability interpretation of a criminal statute, *see Morisette v. United States,* 342 U.S. 246, 250–63, 72 S.Ct. 240, 96 L.Ed. 288 (1952), Section 20(a) has no criminal analog and merely creates "joint and several liability." Moreover, the scienter-free definition of "culpable" is particularly appropriate when it modifies "participation," which means "to take part in something (as an enterprise or *activity* ) usu[ally] in common with others," *Websters Third Int'l Dictionary* at 1646 (1963) (emphasis added) (defining "participate"). The term "culpable participation" is therefore more closely analogous to the (criminal) concept of *actus reus, i.e.,* culpable conduct, than it is to *mens rea, i.e.,* culpable state of mind. *See United States v. Apfelbaum,* 445 U.S. 115, 131, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980) (Brennan, J., concurring).

1473. Again, the term "culpable participation" was never defined.

Although many district courts understood *First Jersey* to conclusively require plaintiffs to plead scienter, *see, e.g., Mishkin*, 1998 WL 651065, at *22–24, the Court of Appeals has revisited Section 20(a) three times since 1996, *see Boguslavsky*, 159 F.3d at 720; *Ganino*, 228 F.3d at 170; *Suez Equity*, 250 F.3d at 101, but never addressed the meaning of "culpable participation." Interestingly, whenever the Second Circuit has *applied* its own test, it has essentially rendered the "culpable participation" requirement meaningless.

In *First Jersey,* the court explained:

As discussed ... above, the district court properly found that First Jersey violated the 1934 Act; and for the reasons discussed ... above, there can be no question that Brennan was a controlling person with respect to First Jersey. Hence, *in order to escape controlling person liability, Brennan had the burden of showing that he did not induce the Firm's violations and that he maintained and enforced a reasonable and proper system of supervision and internal control over the pertinent personnel.*

101 F.3d at 1473 (emphasis added). Most recently in *Suez Equity,* on appeal from a motion to dismiss, the court reasoned:

The complaint alleges that DeRoziere was an officer of the Bank and that he had primary responsibility for the dealings of that Bank and the other corporate defendants with SAM Group. While somewhat broad, *this allegation is sufficient to plead controlling-person liability for the Bank derived from DeRoziere, the purported primary violater.*

250 F.3d at 101 (emphasis added). In both *First Jersey* and *Suez Equity,* allegations of control coupled with an underlying violation sufficed to plead a Section 20(a) claim. Neither case—both post-PSLRA—even hinted that scienter must be pled in a Section 20(a) claim in accordance with paragraph (b)(2), and *Suez Equity* explicitly recognized that plaintiff's allegations, while adequate to state a claim under Section 20(a), were "somewhat broad," *i.e.,* not particular. Thus, although the meaning of "culpable participation" is unclear, there is strong reason to believe that it *is not* the same as scienter.[183]

The holding that Section 20(a) has no scienter element is also commanded by the congressional intent underlying Section 20(a), namely the desire to hold "a person who controls a person subject to the act or a rule or regulation thereunder ... liable to the same extent as the person controlled *unless* the controlling person acted in good faith and did not induce the act in question." S.Rep. No. 73–792, at 22. (emphasis added); H.R. Conf. Rep. No. 73–1383, at 26 (1934) (same). As Justice Douglas explained, dissenting from a denial of certiorari,

Section 20(a) provides that *anyone* who "controls" a person liable under the 1934 Act is equally liable, *subject only to the defense of "good faith."* The section is remedial and is to be construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a "controlling person" liable.... The purpose of the Act is to expand, not restrict, the public's remedies.

**183.** It is worth noting, however, that even if "culpable participation" did entail scienter, Plaintiffs have pleaded it here with respect to those Individual Defendants liable under Rule 10b–5. *See Chalverus v. Pegasystems, Inc.,* 59 F.Supp.2d 226, 236–37 (D.Mass.1999) ("[A] court should deny a motion to dismiss a section 20(a) claim when the defendants themselves made the allegedly false and misleading statements.").

*Sennott v. Rodman & Renshaw*, 414 U.S. 926, 929, 94 S.Ct. 224, 38 L.Ed.2d 160 (1973) (emphasis added). Finding a scienter requirement where none exists in the plain text would therefore undercut the remedial purpose of the statute.

 As the Supreme Court explained in *Ernst & Ernst,*

> In each instance that Congress created express civil liability in favor of purchasers or sellers of securities it clearly specified whether recovery was to be premised on knowing or intentional conduct, negligence, or entirely innocent mistake.

425 U.S. at 207, 96 S.Ct. 1375 (citations omitted). For example, while Section 11 provides for absolute liability on the part of issuers, those who assist the issuers (*i.e.*, experts) may raise the affirmative defense that their conduct was not negligent.

> Within the limits specified by § 11(e), the issuer of the securities is held absolutely liable for any damages resulting from such misstatement or omission [in the registration statement]. But experts such as accountants who have prepared portions of the registration statement are accorded a "due diligence" defense. In effect, this is a negligence standard. *An expert may avoid civil liability with respect to the portions of the registration statement for which he was responsible by showing*

> that "after reasonable investigation" he had "reasonable ground[s] to believe" that the statements for which he was responsible were true and there was no omission of a material fact.

*Id.* at 208, 96 S.Ct. 1375 (emphasis added) (alterations in original, citations omitted). Similarly, " § 20, which imposes liability upon controlling persons for violations of the Act by those they control, *exculpates a defendant who acted in good faith and did not induce the act constituting the violation.*" *Id.* at 209 n. 28, 96 S.Ct. 1375 (emphasis added; quotation marks, alterations, and citations omitted). Under both sections, the burden is on *defendants* (other than issuers under Section 11) to "exculpate" themselves by proving either good faith or due diligence.[184] Plaintiffs, therefore, need not affirmatively plead negligence.

 In sum, scienter is not an essential element of a Section 20(a) claim such that a "plaintiff may recover money damages *only* on proof that the defendant acted with a particular state of mind." 15 U.S.C. § 78u-4(b)(2).[185] Rather, a plaintiff need only prove scienter if a defendant presents the affirmative defense that it acted in good faith. Section 20(a) must therefore be pleaded only in accordance with Rule 8(a). Neither the PSLRA (because scienter is not an essential element), nor Rule 9(b) (because fraud is not an essential element),[186] apply to a Section

---

**184.** Indeed, the notion that Section 20(a) only requires proof that a defendant acted negligently, permitting a defendant to prove that her conduct was *not* negligent, may be precisely what the Court of Appeals had in mind by promulgating a "culpable participation" standard. In an entirely different context, the Second Circuit has recently explained that a "culpable state of mind" only requires negligence, but does not require affirmative proof of "bad faith." *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir.2002).

**185.** That paragraph (b)(2) of the PSLRA was not intended to apply to Section 20(a) claims is further bolstered by the legislative history of the PSLRA, which specifies that its heightened pleading standards only apply to "securities fraud" claims. *See* S.Rep. No. 104–98, at 7. Section 20 does not require proof of fraud.

**186.** Of course, where Section 20(a) is premised on an underlying violation of Rule 10b–5, as here, the Rule 10b–5 claim must always be pleaded under the PSLRA and Rule 9(b).

20(a) claim.[187]

Therefore, because Plaintiffs have adequately alleged control, *see supra* Part IX, the Individual Defendants' motion to dismiss the Section 20(a) claims is denied except as to those Individual Defendants alleged to have controlled Issuer Defendants previously dismissed under Rule 10b–5, *see supra* Part X.A.2.d.ii.[188]

## CONCLUDING MATERIAL

## XIII. LEAVE TO REPLEAD

When a cause of action is dismissed because of pleading deficiencies, the usual remedy is to permit plaintiff to replead its case. *See* Fed.R.Civ.P. 15(a) ("leave [to replead] shall be freely given when justice so requires."); *see also Foman v. Davis*, 371 U.S. 178, 183, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). This policy is especially appropriate in the context of claims dismissed under Rule 9(b) because the law favors resolving disputes on their merits. *See Acito*, 47 F.3d at 54–55; *Luce*, 802 F.2d at 56–57.

■ Nonetheless, not every securities fraud claim that is dismissed lends itself to repleading. There are two instances in particular where granting leave to replead may be inappropriate. *First*, where a claim is dismissed as a matter of law because it fails to state a claim, repleading would be "futile." *Lucente v. International Bus. Mach. Corp.*, 310 F.3d 243, 258 (2d Cir.2002) ("An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6)") (citing *Dougherty v. North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir.2002)). *See also Health–Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir.1990). *Second*, where leave to amend or replead has been repeatedly granted, it may be appropriate to deny leave. Although the Rules eschew "technical forms of pleading," Fed.R.Civ.P. 8(e)(i), where pleading deficiencies have been identified a number of times and not cured, there comes a point where enough is enough. *See, e.g., Dooner v. Keefe, Bruyette & Woods, Inc.*, No. 00 Civ. 572, 2003 WL 135706, at *4 (S.D.N.Y. Jan.17, 2003) ("this is the plaintiff's third complaint ... [t]hree bites at the apple is enough"); *see also In re Am. Express Co. Shareholders Litig.*, 39 F.3d 395 (2d Cir. 1994); *Fisher v. Offerman & Co., Inc.*, No. 95 Civ. 2566, 1996 WL 563141, at *9 (S.D.N.Y. Oct.2, 1996); *In re Hyperion Sec. Litig.*, No. 93 Civ. 7179, 1995 WL 422480, at *8 (S.D.N.Y. July 14, 1995), *aff'd sub nom., Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir.1996).

■ A number of Plaintiffs' claims here have been dismissed because they fail to state a claim as a matter of law. *See supra* Parts VIII.B.3 (dismissing Section 11 claims where Plaintiffs sold above the offering price); IX (dismissing certain Section 15 claims); X.A.2.d.ii (dismissing Rule 10b–5 claims against Issuers who only made acquisitions after a certain date); X.A.2.c.ii (dismissing Rule 10b–5 claims

---

That underlying fraud, however, does not require that the Section 20(a) claim be pleaded under Rule 9(b) for the same reasons stated above in Part VIII.A.2 (rejecting the "sound in fraud" doctrine).

**187.** Although this conclusion contradicts my earlier decisions in *Independent Energy*, 154 F.Supp.2d at 770, and *Gabriel Capital*, 122 F.Supp.2d at 426–27, "[w]isdom too often

never comes, and so one ought not to reject it merely because it comes late." *Henslee v. Union Planters Nat. Bank & Trust Co.*, 335 U.S. 595, 600, 69 S.Ct. 290, 93 L.Ed. 259 (1949) (Frankfurter, J., dissenting).

**188.** The Individual Defendants against whom the Section 20(a) claims are dismissed are listed at Appendix 6 to this Opinion.

against Individual Defendants who sold a small percentage of their stock, or who did not sign registration statement). It would be futile for Plaintiffs to replead these claims. Accordingly, leave is denied.

■ Moreover, many of the claims dismissed by today's Order should not be repled, even though they have been dismissed under Rule 9(b), because Plaintiffs have had numerous opportunities to amend their pleadings. Over a year ago, in accordance with this Court's rules, Defendants first notified Plaintiffs of perceived deficiencies in the Complaints. See 1/22/02 Letter from Gandolfo V. DiBlasi, Underwriters' Liaison Counsel, to Plaintiffs; 1/29/02 Letter from Nina (Nicki) Locker & Laurie B. Smilan, writing on behalf of Issuer and Individual Defendants, to Plaintiffs. When those letters were exchanged, Plaintiffs had not yet filed their Consolidated Amended Class Action Complaints; together, those letters identified most, if not all, of the arguments ultimately raised by Defendants in the instant motions. In April 2002, Plaintiffs filed their Amended Complaints, presumably taking into consideration the objections leveled by Defendants three months earlier.

Nonetheless, in an attempt to limit the scope of these motions to dismiss to issues that could not be cured by simple repleading, I again directed Defendants to identify perceived pleading deficiencies in the Amended Complaints. As I explained at the time:

> You've seen many motions granted with leave to amend.... Well, that's not something I wanted to see here. I was very hopeful that the earlier [January]

letter exchange, that long number of meetings you had, would close obvious issues and would leave only truly contested legal issues, so to speak, where they just don't agree with your theory, but not something you can fix.

5/23/02 Tr. at 33–34. Thus, Defendants were asked to provide Plaintiffs with a "table of contents" of their contemplated motions to dismiss. Id. at 34. Defendants did just that approximately one week later. See 5/31/02 Letter from Gandolfo V. DiBlasi to Plaintiffs; 6/4/02 Letter from Jack C. Auspitz, Issuer and Individual Defendants' Liaison Counsel, to Plaintiffs. These two letters identified a number of shortcomings. As a result, Plaintiffs were again permitted to amend their Complaints in December 2002, two months after the instant motions were fully submitted and argued. See In re Initial Public Offering Sec. Litig., No. 21 MC 92, 2002 WL 31894620 (S.D.N.Y. Dec.27, 2002). Plaintiffs were fully aware of the grounds raised in the motions to dismiss when they filed their most recent amendments.[189]

Although pleading is not a "game of skill in which one misstep by counsel may be decisive to the outcome," Conley, 355 U.S. at 48, 78 S.Ct. 99, where there have been several missteps, even after one's adversary has played her hand, the game is up. In a number of instances, Plaintiffs have failed to plead essential material despite repeated opportunities to do so; there is no good reason to provide yet another opportunity. See supra Part X.A.2.d.ii. (dismissing Rule 10b–5 claims against Issuers for whom Plaintiffs made no allegation of scienter); Part X.A.2.c.ii. (dismissing Rule 10b–5 claims against Individual

---

**189.** Moreover, the December amendments were plainly responsive to Defendants' concerns. For example, Plaintiffs sought leave to join certain additional named plaintiffs to overcome standing problems identified by Defendants. See Initial Public Offering Sec. Li-

tig., 2002 WL 31894620, at *3 ("Plaintiffs informed the Court and defendants at conferences on June 20, 2002, and July 9, 2002, that they intended to join new plaintiffs to cure certain alleged pleading deficiencies.") (citations omitted).

Defendants for whom Plaintiffs made *no* allegations of scienter); Part XII (dismissing certain Section 20 claims).[190]

 Plaintiffs may replead, however, claims that have been dismissed for lack of the required particularity. Specifically, Plaintiffs may *only* replead the following claims:

1. Rule 10b–5 claims against the twelve Individuals listed in Part D of Appendix 4 to this Opinion; and

2. Rule 10b–5 claims against the twenty-one Issuers listed in Part D of Appendix 5 to this Opinion.

If Plaintiffs are able to successfully replead the Rule 10b–5 claims, they may be able to revive certain of the Section 20 claims. Leave to replead all other claims is denied.

## XIV. CONCLUSION

Because Plaintiffs have alleged that Defendants failed to adhere to a "philosophy of full disclosure" and engaged in a scheme to manipulate the securities markets, the motions to dismiss are, for the most part, denied. The Underwriter Defendants' motions to dismiss are granted in part and denied in part and the Issuers and Individual Defendants' motions to dismiss are granted in part and denied in part. As a result, discovery may now proceed. *See* 15 U.S.C. § 78u–4(3)(B). A conference is scheduled for March 5 at 11 a.m.

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Acito v. IMCERA Group, Inc.,* 47 F.3d 47 (2d Cir.1995)............................325, 365, 397

*Ackerman v. Northwestern Mut. Life Ins. Co.,* 172 F.3d 467 (7th Cir.1999) ..............326

*Adair v. Kaye Kotts Assocs.,* No. 97 Civ. 3375, 1998 WL 142353 (S.D.N.Y. Mar. 27, 1998).............................................................................. 347, 351

*Affiliated Ute Citizens v. United States,* 406 U.S. 128 (1972).......................382, 387

*Aldridge v. A.T. Cross Corp.,* 284 F.3d 72 (1st Cir.2002)..............................332

*Alter v. DBKLM,* Inc., 840 F.Supp. 799 (D.Colo.1993) ................................383

*American Home Assurance Co. v. Republic Ins. Co.,* 984 F.2d 76 (2d Cir.1993) ..........326

*APAC Teleservices, Inc., Sec. Litig.,* No. 97 Civ. 9145, 1999 WL 1052004 (S.D.N.Y. Nov.19, 1999) ........................................................................363

*Aquino v. Trupin,* 833 F.Supp. 336 (S.D.N.Y.1993) ..................................374

*Artuz v. Bennett,* 531 U.S. 4 (2000)................................................340

**190.** The failure to plead scienter was one of the deficiencies identified by Issuers in their June 4, 2002 letter to Plaintiffs. *See, e.g.,* 6/4/02 Letter from Jack C. Auspitz to Plaintiffs at 3 ("None of the Section 10(b) claims includes any allegation of the Issuer [or Individual] Defendants' knowledge (or even reckless disregard) beyond mere attendance at road show presentations....."). Certain Rule 10b–5 claims have been dismissed because Plaintiffs' only allegations of scienter were based on the road show presentations, an allegation which fails to give rise to a strong inference of knowledge or recklessness. *See supra* Parts X.A.2.c-d.

*Atchinson v. District of Columbia,* 73 F.3d 418 (D.C.Cir.1996) . . . . . . . . . . . . . . . . . . . . . . .323

*AUSA Life Ins. Co. v. Ernst & Young,* 206 F.3d 202 (2d Cir.2000) . . . . . . . . . . . . . . . . . . . .374

*Badaracco v. Commissioner of Internal Revenue,* 464 U.S. 386 (1984) . . . . . . . . . . . . . . . . .340

*Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677 (7th Cir.1992). . . . . . . . . . . . . . . .325

*Barnes v. Osofsky,* 373 F.2d 269 (2d Cir.1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .344

*Barnhart v. Sigmon Coal Co.,* 534 U.S. 438 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . 348, 383

*Barrett v. Van Pelt,* 268 U.S. 85 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .358

375, 377,
379, 380,
*Basic Inc. v. Levinson,* 485 U.S. 224 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Bastian v. Petren Res. Corp.,* 892 F.2d 680 (7th Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . . .374

*Baxter v. A.R. Baron,* No. 94 Civ. 3913, 1996 WL 586338 (S.D.N.Y. Oct.11, 1996). . . . .386

*Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46 (2d Cir.1987) . . . . . . . . . . . . . . . . . .329

*Beecher v. Able,* 435 F.Supp. 397 (S.D.N.Y.1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .351

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,* 757 F.2d 523 (2d Cir.1985). . . . . . . . . . . . . . . .324

*Berwecky v. Bear, Stearns & Co.,* 197 F.R.D. 65 (S.D.N.Y.2000) . . . . . . . . . . . . . . . . . . . .376

*Billet v. Storage Tech. Corp.,* 72 F.R.D. 583 (S.D.N.Y.1976) . . . . . . . . . . . . . . . . . . . . . . .339

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57 (2d Cir.1985) . . . . . . . . . .372

*Boguslavsky v. Kaplan,* 159 F.3d 715 (2d Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 393, 395

*Bontkowski v. Smith,* 305 F.3d 757 (7th Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .323

*Brady v. Anderson,* No. 97 Civ. 2154, 1998 U.S. Dist. LEXIS 20774 (C.D.Cal. May
 27, 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .355

*Brown v. Enstar Group, Inc.,* 84 F.3d 393 (11th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . .393

370, 372,
*Caiola v. Citibank, N.A.,* 295 F.3d 312 (2d Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . . 373, 380

*Cammer v. Bloom,* 711 F.Supp. 1264 (D.N.J.1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .377

*Caremark, Inc. v. Coram Healthcare Corp.,* 113 F.3d 645 (7th Cir.1997) . . . . . . . . . . . . . . .374

*Carpenter v. Harris, Upham & Co.,* 594 F.2d 388 (4th Cir.1979). . . . . . . . . . . . . . . . . . . . .393

*Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171 (2d Cir.2001 . . . . . . . . . . . . . . . . . . . .374

*Cayman Exploration Corp. v. United Gas Pipe Line Co.,* 873 F.2d 1357 (10th
 Cir.1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .327

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164
 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .299

*Chalverus v. Pegasystems, Inc.,* 59 F.Supp.2d 226 (D.Mass.1999) . . . . . . . . . . . . . . . . . . .395

*Chamberlain Mach. Works v. United States,* 270 U.S. 347 (1926) . . . . . . . . . . . . . . . . . . . . . . . .325

*Chambers v. Time Warner, Inc.,* 282 F.3d 147 (2d Cir.2002) . . . . . . . . . . . . . . . . . . . . . . 331, 347

*Chance v. Armstrong,* 143 F.3d 698 (2d Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .331

*Chasins v. Smith, Barney & Co.,* 438 F.2d 1167 (2d Cir.1970) . . . . . . . . . . . . . . . . . . . . 348, 380

*Chiarella v. United States,* 445 U.S. 222 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 381, 384

*Chickasaw Nation v. United States,* 534 U.S. 84 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . .349

*Chill v. General Elec. Co.,* 101 F.3d 263 (2d Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .365

*Chris–Craft Indus., Inc. v. Piper Aircraft Corp.,* 480 F.2d 341 (2d Cir.1973) . . . . . . . . 381, 382

*Circuit City Stores, Inc. v. Adams,* 532 U.S. 105 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .338

*Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489 (2d Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . .375

*City of Painesville, Ohio v. First Montauk Fin. Corp.,* 178 F.R.D. 180 (N.D.Ohio 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .386

*City of Philadelphia v. Fleming Cos.,* 264 F.3d 1245 (10th Cir.2001) . . . . . . . . . . . . . . 333, 335

*Conley v. Gibson,* 355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 322, 323, 331, 341, passim

*Conn v. GATX Terminals Corp.,* 18 F.3d 417 (7th Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . .324

*Connecticut Nat. Bank v. Germain,* 503 U.S. 249 (1992) . . . . . . . . . . . . . . . . . . . . . . . . 348, 349

*Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42 (2d Cir.1991) . . . . . . . . . . . . . . . . . . . .347

*Cramer v. General Tel. & Elecs. Corp.,* 582 F.2d 259 (3d Cir.1978) . . . . . . . . . . . . . . . . . . . .329

*Crane Co. v. Westinghouse Air Brake Co.,* 419 F.2d 787 (2d Cir.1969) . . . . . . . . . . . . . . . . . .387

*Credit & Fin. Corp. v. Warner & Swasey Co.,* 638 F.2d 563 (2d Cir.1981) . . . . . . . . . . . . . . .327

*Cromer Fin. Ltd. v. Berger,* 137 F.Supp.2d 452 (S.D.N.Y.2001) . . . . . . . . . . . . . . . . . . . . . . .352

*Danis v. USN Communications, Inc.,* 189 F.R.D. 391 (N.D.Ill.1999) . . . . . . . . . . . . . . . . . . . .376

*Danis v. USN Communications, Inc.,* 73 F.Supp.2d 923 (N.D.Ill.1999) . . . . . . . . . . . . . . . . . .339

*Davis v. A.G. Edwards & Sons, Inc.,* 823 F.2d 105 (5th Cir.1987) . . . . . . . . . . . . . . . . . . . . . .324

*Degulis v. LXR Biotechnology, Inc.,* 928 F.Supp. 1301 (S.D.N.Y.1996) . . . . . . . . . . . . . . . . . .343

*Degulis v. LXR Biotechnology, Inc.,* No. 95 Civ. 4204, 1997 WL 20832 (S.D.N.Y. Jan.21, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .343

*Demarco v. Edens,* 390 F.2d 836 (2d Cir.1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .352

*DeMaria v. Andersen,* No. 01–7505, 2003 WL 174543 (2d Cir. Jan.28, 2003) . . . . . . . . 344, 380

*Denny v. Barber,* 576 F.2d 465 (2d Cir.1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .326

*Dietrich v. Bauer,* 76 F.Supp.2d 312 (S.D.N.Y.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .386

*DiLeo v. Ernst & Young,* 901 F.2d 624 (7th Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .327

*Dirks v. SEC,* 463 U.S. 646 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .384

*DiVittorio v. Equidyne Extractive Indus.,* 822 F.2d 1242 (2d Cir.1987) . . . . . . . . . . . . . . . . .325

*Dooner v. Keefe, Bruyette & Woods, Inc.,* No. 00 Civ. 572, 2003 WL 135706 (S.D.N.Y. Jan.17, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .397

*Dorchester Investors v. Peak Trends Trust,* No. 99 Civ. 4696, 2003 WL 223466 (S.D.N.Y. Feb.3, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .352

*Dougherty v. North Hempstead Bd. of Zoning Appeals,* 282 F.3d 83 (2d Cir.2002) . . . . .397

*Duncan v. Pencer,* No. 94 Civ. 0321, 1996 WL 19043 (S.D.N.Y. Jan. 18, 1996) . . . . . . . . . . .370

*Eckstein v. Balcor Film Investors,* 8 F.3d 1121 (7th Cir.1993) . . . . . . . . . . . . . . . . . . . . . . . .376

*Ellison v. American Image Motor Co.,* 36 F.Supp.2d 628 (S.D.N.Y.1999) . . . . . . . . . . . 338, 377

*Ernst & Ernst v. Hochfelder,* 425 U.S. 185 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 295, 298, 299, 385, 387, passim

*Federal Deposit Ins. Corp. v. La Antillana, S.A.,* No. 88 Civ. 2670, 1990 WL 58914 (S.D.N.Y. May 4, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .327

*Feeney v. Mego Mortgage Corp.,* 45 F.Supp.2d 1356 (N.D.Ga.1999) . . . . . . . . . . . . . . . . . . . .355

*Fellman v. Electro Optical Sys. Corp.,* No. 98 Civ. 6403, 2000 WL 489713 (S.D.N.Y. Apr.25, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .377

*Felton v. Walston & Co.,* 508 F.2d 577 (2d Cir.1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .326

*Ferber v. Travelers Corp.,* 785 F.Supp. 1101 (D.Conn.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . .363

*Ferguson v. Neighborhood Hous. Servs.,* 780 F.2d 549 (6th Cir.1986) . . . . . . . . . . . . . . . . . .324

*First Interstate Bank of Denver, N.A. v. Pring,* 969 F.2d 891 (10th Cir.1992) . . . . . . . . . . .393

*First Virginia Bankshares v. Benson,* 559 F.2d 1307 (5th Cir.1977) . . . . . . . . . . . . . . . . . . . .381

*Fisher v. Offerman & Co., Inc.,* No. 95 Civ. 2566, 1996 WL 563141 (S.D.N.Y. Oct.2, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .397

*Flickinger v. Harold C. Brown & Co.,* 947 F.2d 595 (2d Cir.1991) . . . . . . . . . . . . . . . . . . . . . .324

*Foman v. Davis,* 371 U.S. 178 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .397

*Freeman v. Laventhol & Horwath,* 915 F.2d 193 (6th Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . .376

*Friedlander v. Nims,* 755 F.2d 810 (11th Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .327

*Friedman v. Salomon/Smith Barney, Inc.,* No. 98 Civ. 5990, 2000 WL 1804719 (S.D.N.Y. Dec.8, 2000) (*"Friedman I"*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .360

*Friedman v. Salomon/Smith Barney, Inc.,* 313 F.3d 796 (2d Cir.2002) (*"Friedman II"*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 360, 389

*G.A. Thompson & Co. v. Partridge,* 636 F.2d 945 (5th Cir.1981) . . . . . . . . . . . . . . . . . . . . . . .393

*Gabriel Capital, L.P. v. Natwest Fin. Inc.*, 122 F.Supp.2d 407 (S.D.N.Y.2000) . . . . . . . 352, 397

*Gabriel Capital, L.P. v. Natwest Fin. Inc.*, 177 F.Supp.2d 169 (S.D.N.Y.2001) . . . . . . . . . . . 310

*Ganino v. Citizens Util. Co.*, 228 F.3d 154 (2d Cir.2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 364, 368, 379, 384, 395

*General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074 (7th Cir.1997) . . . . . 328

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 347

*Gibbs v. PFS Invs., Inc.*, 209 F.Supp.2d 620 (E.D.Va.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 383

*Glazer v. Formica Corp.*, 964 F.2d 149 (2d Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 381

*Global Intellicom, Inc. v. Thomson Kernaghan & Co.*, No. 99 Civ. 342, 1999 WL 544708 (S.D.N.Y. July 27, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 386

*Goldman v. Belden*, 580 F.Supp. 1373 (W.D.N.Y.1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 365

*Goldman v. Belden*, 754 F.2d 1059 (2d Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 365, 379

*Good v. Zenith Elecs. Corp.*, 751 F.Supp. 1320 (N.D.Ill.1990) . . . . . . . . . . . . . . . . . . . . . . . . 377

*Gordon v. Burr*, 506 F.2d 1080 (2d Cir.1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 394

*Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 333

*Gruber v. Price Waterhouse*, 776 F.Supp. 1044 (E.D.Pa.1991) . . . . . . . . . . . . . . . . . . . . . . . . 376

*Gryl v. Shire Pharm. Group PLC*, 298 F.3d 136 (2d Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . 347

*Guidry v. U.S. Tobacco Co.*, 188 F.3d 619 (5th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . 327, 328

*Gurary v. Winehouse*, 190 F.3d 37 (2d Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 387

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 299

*H.L. Federman & Co. v. Greenberg*, 405 F.Supp. 1332 (S.D.N.Y.1975) . . . . . . . . . . . . . . . . . 381

*Hade v. Capozzi*, No. 91 Civ. 5897, 1996 WL 426394 (S.D.N.Y. July 30, 1996) . . . . . . . . . . . 375

*Halperin v. eBanker USA.COM, Inc.*, 295 F.3d 352 (2d Cir.2002) . . . . . . . . . . . . . . . . . . . . . 379

*Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774 (7th Cir.1994) . . . . . . . . . . . . . . . . . . 324

*Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873 (7th Cir.1992) . . . . . . . . . . . . . . . . . . 393

*Health–Chem Corp. v. Baker*, 915 F.2d 805 (2d Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 397

*Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir.2001) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . 332

*Henslee v. Union Planters Nat. Bank & Trust Co.*, 335 U.S. 595 (1949) . . . . . . . . . . . . . . . . 397

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 336, 343, 344, 347

*Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076 (9th Cir.1999) . . . . . . . . . . . . . . . . . . . . . 344

*Higgs v. Carver*, 286 F.3d 437 (7th Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

*High View Fund, L.P. v. Hall,* 27 F.Supp.2d 420 (S.D.N.Y.1998) . . . . . . . . . . . . . . . . . . . . . . .371

*Hishon v. King & Spalding,* 467 U.S. 69 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .323

*Hollinger v. Titan Capital Corp.,* 914 F.2d 1564 (9th Cir.1990) (en banc) . . . . . . . . . . . . . . .393

*Hotel Constructors, Inc. v. Seagrave Corp.,* 574 F.Supp. 384 (S.D.N.Y.1983) . . . . . . . . . . . . .356

*Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . .349

*In re Accelr8 Tech. Corp. Sec. Litig.,* 147 F.Supp.2d 1049 (D.Colo.2001) . . . . . . . . . . .374

*In re Adams Golf, Inc. Sec. Litig.,* 176 F.Supp.2d 216 (D.Del.2001) . . . . . . . . . . . . . . . . . .343

*In re Advanta Corp. Sec. Litig.,* 180 F.3d 525 (3d Cir.1999). . . . . . . . . . . . . . . . . . . . . . . . . 330, 333, 335

*In re Aetna, Inc. Sec. Litig.,* 34 F.Supp.2d 935 (E.D.Pa.1999) . . . . . . . . . . . . . . . . . . . . . . .355

*In re Allaire Corp. Sec. Litig.,* 224 F.Supp.2d 319 (D.Mass.2002) . . . . . . . . . . . . . . . . . 330, 355

*In re Am. Express Co. Shareholders Litig.,* 39 F.3d 395 (2d Cir.1994) . . . . . . . . . . . . . . . . . .397

*In re Ames Dep't Stores Inc. Stock Litig.,* 991 F.2d 953 (2d Cir.1993) . . . . . . . . . . . . . . . . . .375

*In re AnnTaylor Stores Sec. Litig.,* 807 F.Supp. 990 (S.D.N.Y.1992) . . . . . . . . . . . . . . . . 338, 343, 344

*In re Apple Computer Sec. Litig.,* 886 F.2d 1109 (9th Cir.1989) . . . . . . . . . . . . . . . . . . . . . .365

*In re Blech Sec. Litig.,* 928 F.Supp. 1279 (S.D.N.Y.1996) ("*Blech I*") . . . . . . . . . . . . . . . . . . 386, 389, 390

*In re Blech Sec. Litig.,* 961 F.Supp. 569 (S.D.N.Y.1997) ("*Blech II*") . . . . . . . . . . . . . . . . . . . 374, 385, 387

*In re Broderbund/Learning Co. Sec. Litig.,* 294 F.3d 1201 (9th Cir.2002) . . . . . . . . . . . . . . . .347

*In re Chambers Dev. Sec. Litig.,* 848 F.Supp. 602 (W.D.Pa.1994) . . . . . . . . . . . . . . . . . . . . .340

*In re Chaus Sec. Litig.,* No. 88 Civ. 8641, 1990 WL 188921 (S.D.N.Y. Nov.20, 1990). . . . .338

*In re CINAR Corp. Sec. Litig.,* 186 F.Supp.2d 279 (E.D.N.Y.2002) . . . . . . . . . . . . . . . . . . . .393

*In re Citisource, Inc. Sec. Litig.,* 694 F.Supp. 1069 (S.D.N.Y.1988) . . . . . . . . . . . . . . . . . . . .394

*In re College Bound Consol. Litig.,* No. 93 Civ. 2348, 1994 WL 172408 (S.D.N.Y. May 4, 1994) ("*College Bound I*") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .338

*In re College Bound Consol. Litig.,* Nos. 93 Civ. 2348 and 94 Civ. 3033, 1995 WL 450486 (S.D.N.Y. July 31, 1995) ("*College Bound II*") . . . . . . . . . . . . . . . . . . . . . . 386, 390, 391, passim

*In re Complete Mgmt. Inc. Sec. Litig.,* 153 F.Supp.2d 314 (S.D.N.Y.2001) . . . . . . . . . . . . . . .369

*In re Control Data Corp. Sec. Litig.,* 933 F.2d 616 (8th Cir.1991) . . . . . . . . . . . . . . . . . . . . . .377

*In re Credit Suisse First Boston Corp. Sec. Litig.,* No. 97 Civ. 4760, 1998 WL 734365 (S.D.N.Y. Oct.20, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .379

*In re Deutsche Telekom AG Sec. Litig.,* No. 00 Civ. 9475, 2002 WL 244597 (S.D.N.Y. Feb.20, 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 363, 393

*In re Enron Corp. Sec., Derivative & ERISA Litig.,* MDL No. 1446, 235 F.Supp.2d 549 (S.D.Tex.2002) .................................................................386

*In re Equimed, Inc. Sec. Litig.,* No. 98–CV–5374, 2000 WL 562909 (E.D.Pa. May 9, 2000).............................................................................357

*In re First Merchs. Acceptance Corp. Sec. Litig.,* No. 97–C2715, 1998 WL 781118 (N.D.Ill. Nov.4, 1998)......................................................339

*In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541 (9th Cir.1994) (en banc) .................328

*In re Green Tree Fin. Corp. Stock Litig.,* 61 F.Supp.2d 860 (D.Minn.1999), rev'd on other grounds, 270 F.3d 645 (8th Cir.2001) .....................................356

*In re Guilford Mills, Inc., Sec. Litig.,* No. 98 Civ. 7739, 1999 WL 33248953 (S.D.N.Y. July 21, 1999) ...............................................................368

*In re Gulf Oil/Cities Serv. Tender Offer Litig.,* 725 F.Supp. 712 (S.D.N.Y.1989) ..........381

*In re Health Mgmt., Inc. Sec. Litig.,* 970 F.Supp. 192 (E.D.N.Y.1997)....................394

*In re Health Mgmt. Sys., Inc. Sec. Litig.,* No. 97 Civ. 1865, 1998 WL 283286 (S.D.N.Y. June 1, 1998)............................................... 355, 359

*In re Hyperion Sec. Litig.,* No. 93 Civ. 7179, 1995 WL 422480 (S.D.N.Y. July 14, 1995)..............................................................................397

*In re Independent Energy Holdings PLC Sec. Litig.,* 154 F.Supp.2d 741 (S.D.N.Y.2001).......................................................352, 393, 397

*In re Initial Public Offering Sec. Litig.,* No. 21 MC 92, 2002 WL 31780181 (S.D.N.Y. Dec.12, 2002)..........................................................................374

*In re Initial Public Offering Sec. Litig.,* No. 21 MC 92, 2002 WL 31894620 (S.D.N.Y. Dec. 27, 2002 ..........................................................................398

*In re In–Store Adver. Sec. Litig.,* 878 F.Supp. 645 (S.D.N.Y.1995) ........................338

*In re Laser Arms Corp. Sec. Litig.,* 794 F.Supp. 475 (S.D.N.Y.1989) .....................377

*In re McKesson HBOC, Inc. Sec. Litig.,* 126 F.Supp.2d 1248 (N.D.Cal.2000) .............348

*In re MobileMedia Sec. Litig.,* 28 F.Supp.2d 901 (D.N.J.1998) .........................342

*In re NationsMart Corp. Sec. Litig.,* 130 F.3d 309 (8th Cir.1997) .......................338

*In re Navarre Corp. Sec. Litig.,* 299 F.3d 735 (8th Cir.2002) ..................... 333, 334

*In re Nice Sys., Ltd. Sec. Litig.,* 135 F.Supp.2d 551 (D.N.J.2001) ......................356

*In re Oxford Health Plans, Inc. Sec. Litig.,* 187 F.R.D. 133 (S.D.N.Y.1999) ..............367

*In re Party City Sec. Litig.,* 147 F.Supp.2d 282 (D.N.J.2001) ..........................356

*In re PetsMart, Inc. Sec. Litig.,* 61 F.Supp.2d 982 (D.Ariz.1999)........................356

*In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63 (2d Cir.2001) .........................367

*In re Silicon Graphics, Inc. Sec. Litig.,* 970 F.Supp. 746 (N.D.Cal.1997) .................355

*In re Stac Elec. Sec. Litig.*, 89 F.3d 1399 (9th Cir.1996) ..............................340

*In re Sterling Foster & Co., Inc. Sec. Litig.*, 222 F.Supp.2d 289 (E.D.N.Y.2002) ..........385

*In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d Cir.1993) ...................... 372, 381

*In re Turkcell Iletisim Hismetler, A.S. Sec. Litig.*, 202 F.Supp.2d 8 (S.D.N.Y.2001).....343

*In re Twinlab Corp. Sec. Litig.*, 103 F.Supp.2d 193 (E.D.N.Y.2000) ................ 343, 370

*In re Ultimate Corp. Sec. Litig.*, No. 86 Civ. 5944, 1989 WL 86961 (S.D.N.Y. June 30, 1989) (mem.) ...............................................................343

*In re Westinghouse Sec. Litig.*, 90 F.3d 696 (3d Cir.1996) ....................... 340, 341

*INS v. National Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183 (1991) .................337

*Internet Law Library, Inc. v. Southridge Capital Mgmt., L.L.C.*, 223 F.Supp.2d 474 (S.D.N.Y.2002) ....................................................... 386, 390

*IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049 (2d Cir.1993) .................335

*Jackson v. Stinnett*, 102 F.3d 132 (5th Cir.1996) ....................................335

*Johns Hopkins Univ. v. Hutton*, 422 F.2d 1124 (4th Cir.1970) .........................379

*Joseph v. Wiles*, 223 F.3d 1155 (10th Cir.2000) .....................................344

*Kelly v. Schmidberger*, 806 F.2d 44 (2d Cir.1986).....................................324

*Knapp v. Ernst & Whinney*, 90 F.3d 1431 (9th Cir.1996) ..............................377

*Kohler v. Kohler Co.*, 319 F.2d 634 (7th Cir.1963) ...................................380

*Kramer v. Scientific Control Corp.*, 365 F.Supp. 780 (E.D.Pa.1973) ....................348

*Langadinos v. American Airlines, Inc.*, 199 F.3d 68 (1st Cir.2000) ................. 324, 333

*Lanza v. Drexel & Co.*, 479 F.2d 1277 (2d Cir.1973) (en banc) ........................394

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993) ..................................................322, 324, 328

*Lee v. Ernst & Young, LLP*, 294 F.3d 969 (8th Cir.2002) ..............................344

*Levenson v. B. & M. Furniture Co.*, 120 F.2d 1009 (2d Cir.1941) (per curiam)...........333

*Levitin v. PaineWebber, Inc.*, 159 F.3d 698 (2d Cir.1998) .............................379

*Lipton v. Documation, Inc.*, 734 F.2d 740 (11th Cir.1984) ............................377

*Lipton v. Pathogenesis Corp.*, 284 F.3d 1027 (9th Cir.2002) ...................... 333, 335

*Lirette v. Shiva Corp.*, 999 F.Supp. 164 (D.Mass.1998) ...............................355

*List v. Fashion Park, Inc.*, 340 F.2d 457 (2d Cir.1965) ...............................379

*Log On Am., Inc. v. Promethean Asset Mgmt.*, 223 F.Supp.2d 435 (S.D.N.Y.2001).....386

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363 (5th Cir.2001) . . . . . . . . 339, 341

*Luce v. Edelstein*, 802 F.2d 49 (2d Cir.1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 329, 397

*Lucente v. International Bus. Mach. Corp.*, 310 F.3d 241 (2d Cir.2002) . . . . . . . . . . . . . . . . .397

*Lyeth v. Chrysler Corp.*, 929 F.2d 891 (2d Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .326

*Lynx Ventures LP v. Canadian Imperial Bank of Commerce*, No. CV 99–07160,
2000 WL 33223384 (C.D.Cal. Apr.18, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .373

*Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp.*, 801 F.2d 13 (2d Cir.1986). . . . .372

*Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705 (2d Cir.1980) . . . . . . . . . . . . . . . . . . . . . . . 392, 394

*Market Co. v. Hoffman*, 101 U.S. 112 (1879) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 338, 349

*Markowski v. SEC*, 274 F.3d 525 (D.C.Cir.2001), *cert. denied*, 123 S.Ct. 96 (2003). . . . .391

*Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir.2002) . . . . . . . . . . . . . . . . . . . . . . .349

*McDaniel v. Compania Minera Mar de Cortes, Sociedad Anonimo, Inc.*, 528
F.Supp. 152 (D.Ariz.1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .352

*McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226 (1st Cir.1980 . . . . . . . . . . . . . . . . . . . .328

*McHenry v. Renne*, 84 F.3d 1172 (9th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .324

*McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576 (2d Cir.1990) . . . . . . . . . . . . . . .380

*McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044 (2d Cir.1995) . . . . . . . . . . 344, 351

*MDCM Holdings, Inc. v. Credit Suisse First Boston Corp.*, 216 F.Supp.2d 251
(S.D.N.Y.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .294, 300, 332

*Melder v. Morris*, 27 F.3d 1097 (5th Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .339

*Metge v. Baehler*, 762 F.2d 621 (8th Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .393

*Metzner v. D.H. Blair & Co.*, 689 F.Supp. 262 (S.D.N.Y.1988) . . . . . . . . . . . . . . . . . . . . . . . .380

*Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674 (6th Cir.1988) . . . . . . . . . . . . . . . . . . . .327

*Miller v. Steinberg*, 268 F.Supp. 255 (S.D.N.Y.1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .361

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir.1993) . . . . . . . . . . . . . . . . . . . . . . . . . .328

*Milman v. Box Hill Sys. Corp.*, 192 F.R.D. 105 (S.D.N.Y.2000) . . . . . . . . . . . . . . . . . . . . . . .344

*Mishkin v. Ageloff*, No. 97 Civ. 2690, 1998 WL 651065 (S.D.N.Y. Sept.23, 1998) . . . . . 393, 395

*Missouri Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306 (8th Cir.1990) . . . . . . . . . . . . . . . . . . .324

*Montclair v. Ramsdell*, 107 U.S. 147 (1883) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .349

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . .338

*Morisette v. United States*, 324 U.S. 246 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .394

**408**

*Muniz v. United States,* 236 F.3d 122 (2d Cir.2001) ................................349

*Nanopierce Techs. Inc. v. Southridge Capital Mgmt. LLC,* No. 02 Civ. 0767,.. 372, 386, 391, 2002 WL 31819207 (S.D.N.Y. Oct.10, 2002) ................................. 392

*National Ass'n of Life Underwriters, Inc. v. Commissioner of Internal Revenue,* 30 F.3d 1526 (D.C.Cir.1994) ..........................................................324

*Nelson v. Paramount Communications, Inc.,* 872 F.Supp. 1242 (S.D.N.Y.1994) ..........338

*Newman v. Silver,* 713 F.2d 14 (2d Cir.1983) ......................................324

*Novak v. Kasaks,* 216 F.3d 300 (2d Cir.2000) ...................................... 325, 330, 334, passim

*O'Brien v. National Prop. Analysts Partners,* 936 F.2d 674 (2d Cir.1991) ...............325

*Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2 (2d Cir.1996) .......................372

*Ouaknine v. MacFarlane,* 897 F.2d 75 (2d Cir.1990) ............................. 326, 328

*Page v. Derrickson,* No. 96–842–CIV–T–17C, 1997 WL 148558 (M.D.Fla. Mar.25, 1997) ...........................................................................373

*Peil v. Speiser,* 806 F.2d 1154 (3d Cir.1986) ......................................375

*Phelps v. Kapnolas,* 308 F.3d 180 (2d Cir.2002) ............................... 331, 342

*Phelps v. Wichita Eagle–Beacon,* 886 F.2d 1262 (10th Cir.1989) .......................328

*Pierce v. Marano,* No. 01 Civ. 3410, 2002 WL 1858772 (S.D.N.Y. Aug.13, 2002)...........331

*PPM Am., Inc. v. Marriott Corp.,* 853 F.Supp. 860 (D.Md.1994) ........................348

*Press v. Chemical Inv. Servs. Corp.,* 166 F.3d 529 (2d Cir.1999) .................. 375, 384

*Rankow v. First Chicago Corp.,* 870 F.2d 356 (7th Cir.1989) ...........................374

*Reingold v. Deloitte Haskins & Sells,* 599 F.Supp. 1241 (S.D.N.Y.1984) .................376

*Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99 (2d Cir.2002) ...........396

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,* 185 F.Supp.2d 389 (S.D.N.Y.2002).....377

*Robbins v. Moore Med. Corp.,* 788 F.Supp. 179 (S.D.N.Y.1992) ........................394

*Robinson v. Shell Oil Co.,* 519 U.S. 337 (1997) ....................................348

*Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880 (3d Cir.1975) ...........................393

*Ross v. A.H. Robins Co., Inc.,* 607 F.2d 545 (2d Cir.1979) ....................... 328, 384

*Ross v. Bank South, N.A.,* 885 F.2d 723 (11th Cir.1989) (en banc) .....................377

*Ross v. Bolton,* 904 F.2d 819, 823 (2d Cir.1970) ...................................325

*Ross v. Warner,* 480 F.Supp. 268 (S.D.N.Y.1979) ...:...............................338

*Rothman v. Gregor,* 220 F.3d 81 (2d Cir.2000) .....................................374

*Ruskin v. TIG Holdings, Inc.,* No. 98 Civ. 1068, 2000 WL 1154278 (S.D.N.Y. Aug. 14, 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 365

*Sandstad v. CB Richard Ellis, Inc.,* 309 F.3d 893 (5th Cir.2002). . . . . . . . . . . . . . . . . . . .310

*Santa Fe Indus., Inc. v. Green,* 430 U.S. 462 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .387

*Sarlie v. E.L. Bruce Co.,* 265 F.Supp. 371 (S.D.N.Y.1967). . . . . . . . . . . . . . . . . . . . . . . . . .348

*Saunders v. Coughlin,* No. 92 Civ. 4289, 1994 WL 98108 (S.D.N.Y. Mar. 15, 1994). . . . .331

*Schaller Tel. Co. v. Golden Sky Sys., Inc.,* 298 F.3d 736 (8th Cir.2002) . . . . . . . . . . . . . . .327

*Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374 (2d Cir.1974), *overruled on other grounds by Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083 . . . . . 329, 372, 373, (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 375

*Schmedding v. Tnemec Co.,* 187 F.3d 862 (8th Cir.1999). . . . . . . . . . . . . . . . . . . . . . . . . . .324

*Schnell v. Conseco, Inc.,* 43 F.Supp.2d 438 (S.D.N.Y.1999) . . . . . . . . . . . . . . . . . . . . . . . . .372

*Schoenbaum v. Firstbrook,* 405 F.2d 215 (2d Cir.1968) (en banc) . . . . . . . . . . . . . . . . . . .385

*Schoenfeld v. Giant Stores Corp.,* 62 F.R.D. 348 (S.D.N.Y.1974) . . . . . . . . . . . . . . . . . . . . .339

*Schoenhaut v. American Sensors, Inc.,* 986 F.Supp. 785 (S.D.N.Y.1997) . . . . . . . . . . . . . . .338

*Schott Motorcycle Supply, Inc. v. American Honda Motor Co.,* 976 F.2d 58 (1st Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .324

*Scone Invs. L.P. v. American Third Mkt. Corp.,* No. 97 Civ. 3802, 1998 WL 205338 (S.D.N.Y. Apr.28, 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 376, 386

*Sears v. Likens,* 912 F.2d 889 (7th Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .339

*SEC v. Blech,* No. 99 Civ. 4770, 2000 WL 288263 (S.D.N.Y. Mar.20, 2000) . . . . . . . . . . . . .386

*SEC v. Capital Gains Research Bureau,* 375 U.S. 180 (1963) . . . . . . . . . . . . . . . . . . . . . . . 299, 325, 382

*SEC v. Environmental, Inc.,* 82 F.Supp.2d 237 (S.D.N.Y.2000). . . . . . . . . . . . . . . . . . . . . . .386

*SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450 (2d Cir.1996) . . . . . . . . . . . . . . . . . . . . . . 352, 393, 394, 395

*SEC v. Schiffer,* No. 97 Civ. 5853, 1998 WL 226101 (S.D.N.Y. May 5, 1998) . . . . . . . . . . . . .385

*SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir.1968) (en banc) . . . . . . . . . . . . . 379, 383

*SEC v. Zandford,* 122 S.Ct. 1899 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 299, 387

*Segal v. Gordon,* 467 F.2d 602 (2d Cir.1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 327, 328

*Sennott v. Rodman & Renshaw,* 424 U.S. 926 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .395

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786 (3d Cir.1984). . . . .327

*Shapiro v. UJB Fin. Corp.,* 964 F.2d 272 (3d Cir.1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . .339

*Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124 (2d Cir.1994) . . . . . . . . . . . . . . . . . . 335, 363, 364, 369

*Shores v. Sklar,* 647 F.2d 462 (5th Cir.1981) (en banc) .............................377

*Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.,* 186 F.3d 157 (2d Cir.1999) ...................................................... 356, 385

*Simpson v. Specialty Retail Concepts,* 823 F.Supp. 353 (M.D.N.C.1993) ................377

*Soo Line R.R. Co. v. St. Louis Southwestern Ry. Co.,* 125 F.3d 481 (7th Cir.1997).....324

*Staples v. United States,* 511 U.S. 600 (1994) .......................................394

*Stearns v. Page,* 48 U.S. (7 How.) 819 (1849).......................................325

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.,* No. 00 Civ. 8058, 2001 WL 1111508 (S.D.N.Y. Sept.20, 2001) ......................................................363

*Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997 (2d Cir.1988) ...........................329

*Stevelman v. Alias Research, Inc.,* 174 F.3d 79 (2d Cir.1999) ........................365

*Stone Motor Co. v. General Motors Corp.,* 293 F.3d 456 (8th Cir.2002) ..................324

*Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87 (2d Cir.2001) 372, 373, 374, 375, passim

*Sullivan & Long, Inc. v. Scattered Corp.,* 47 F.3d 857 (7th Cir.1995) ............... 387, 389

*Superintendent of Ins. v. Bankers Life & Cas. Co.,* 404 U.S. 6 (1971) ...................387

*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002)................................ 322, 323, 333, 340, 342, passim

*T.H.C., Inc. v. Fortune Petroleum Corp.,* Nos. 96 Civ. 2690–91, 1999 WL 182593 (S.D.N.Y. Mar.31, 1999) ......................................................386

*T.J. Raney & Sons v. Fort Cobb, Okla. Irrigation Fuel Auth.,* 717 F.2d 1330 (10th Cir.1983) ..................................................................377

*Tho Dinh Tran v. Alphonse Hotel Corp.,* 281 F.3d 23 (2d Cir.2002) ................ 324, 346

*TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438 (1976)................................379

*United States v. Apfelbaum,* 445 U.S. 115 (1980) ....................................394

*United States v. Charney,* 537 F.2d 341 (9th Cir.1976) ...............................382

*United States v. Clark,* 359 F.Supp. 128 (S.D.N.Y.1973) ..............................387

*United States v. Fisher,* 6 U.S. (2 Cranch) 358 (1805) ................................337

*United States v. Gonzales,* 520 U.S. 1 (1997)........................................348

*United States v. Menasche,* 348 U.S. 528 (1955) .....................................349

*United States v. Mulheren,* 938 F.2d 364 (2d Cir.1991)........................... 391, 392

*United States v. Nordic Vill., Inc.,* 503 U.S. 30 (1992)............................ 337, 349

*United States v. Pacheco,* 225 F.3d 148 (2d Cir.2000) ...............................383

*United States v. Regan,* 937 F.2d 823 (2d Cir.1991).................................382

*United States v. Ron Pair Enters., Inc.,* 489 U.S. 235 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .349

*United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am. Inc.,* 508 U.S. 439 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337, 349

*Vandenberg v. Adler,* No. 98 Civ. 3544, 2000 WL 342718 (S.D.N.Y. Mar. 31, 2000) . . . . .386

*Vess v. Ciba–Geigy Corp. USA,* —— F.3d ——, No. 01–55834, 2003 WL 203124 (9th Cir. Jan.31, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .340

*Walker v. Thompson,* 288 F.3d 1005 (7th Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .323

*Washington Nat'l Ins. Co. of New York v. Morgan Stanley & Co.,* No. 90 Civ. 3342, 1999 WL 461796 (S.D.N.Y. July 2, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .376

*Weiner v. Quaker Oats Co.,* 129 F.3d 310 (3d Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .355

*Weixel v. Board of Educ. of New York,* 287 F.3d 138 (2d Cir.2002) . . . . . . . . . . . . . . . . . . . . .331

*Wexner v. First Manhattan Co.,* 902 F.2d 169 (2d Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . . .329

*Williams v. WMX Techs., Inc.,* 112 F.3d 175 (5th Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . .326

*Zeid v. Kimberley,* 973 F.Supp. 910 (N.D.Cal.1997), *reversed on other grounds,* 201 F.3d 446 (9th Cir.1999) (table) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .356

*Ziemba v. Cascade Int'l Inc.,* 256 F.3d 1194 (11th Cir.2001) . . . . . . . . . . . . . . . . . . . . . . .327

*Zucker v. Quasha,* 891 F.Supp. 1010 (D.N.J.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .343

**STATE CASES**

*People v. Dozier,* 424 N.Y.S.2d 1010 (2d Dep't 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .394

**STATUTES**

15 U.S.C.
§ 77k . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim
§ 77l . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .299
§ 77o . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 299, 314, 351
§ 77z–1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .337
§ 77aa, Schedule A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 381, 383
§§ 78a–78mm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .299
§ 78i . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 299, 361
§ 78j . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 299, 314, 334
§ 78m . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 299, 334
§ 78n . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 299, 334
§ 78p . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .299
§ 78r . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .299
§ 78t . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 299, 314
§ 78t–1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .299
§ 78u–4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim
§§ 79 et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .299
§§ 80a–1 et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .299
§§ 80b–1 et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .299
26 U.S.C. § 586(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .394
28 U.S.C. § 2072(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .322
Pub.L. No. 107–204 § 804(a), 116 Stat. 745 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .294
48 Stat. 74 (1933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .349

## FEDERAL RULES

Fed.R.Civ.P.

8 .................................................................. passim
9 .................................................................. passim
10 ............................................................... 331, 347
11 ....................................................................326
12 .................................................................. passim
15 ............................................................... 356, 397
54 ....................................................................323
84 ............................................................... 323, 328
App. Form 9 ................................................. 323, 324,
 327, 342
App. Form 13 ............................................... 327, 373

Fed.R.Evid.
201(b)(2)............................................................357
803(17) ............................................................357

## FEDERAL REGULATIONS

17 C.F.R.
§ 229.508(e) .................................................. 312, 354,
 381, 383
§ 240.10b–5 .................................................. passim
§ 240.12b–2 ....................................................352
§ 240.14a–9 ................................................ 299, 334
§ 240.14e–3 ................................................ 299, 334
§ 242.101 .................................................. 311, 354,
 390
§ 242.104 .................................................. 360, 382,
 389, 390

## SEC/NASD AGENCY AUTHORITIES

Certain Manipulative Practices in Public Offerings, Exchange Act Release No.
11328, 40 Fed.Reg. 16090, 16091–92 (Apr. 2, 1975) ................................304

Exchange Act Release No. 26182 (Oct. 14, 1988), *available at* 1988 WL 999999 ...........304

Exchange Act Release No. 10636, 39 Fed.Reg. 7806 (Feb. 11, 1974) .....................304

Exchange Act Release No. 9673 (July 26, 1972) .....................................303

Exchange Act Release No. 34–4163, *available at* 1948 WL 28675 (Sept. 16, 1948) passim

Securities Act Release Nos. 5274, 5276, 5277, 5279 (July 26, 1972) .....................303

Securities Act Release No. 4358/Exchange Act Release No. 6536 (Apr. 24, 1961),
*available at* 1961 WL 61584 .............................................301

*Report of Special Study of Securities Markets of the Securities and Exchange* .. 300, 301, 302,
*Commission,* H.R. Doc. No. 88–95 (1st Sess.1963) ("SEC Special Study") ....... passim

*Report of the Securities and Exchange Commission Concerning the Hot* ...... 300, 301, 302,
*Issues Markets* (Aug.1984) ("Hot Issues Report") ......................... 303, passim

Public Investigation in the Matter of Hot Issues Securities Markets, Ad. File No. 4–
148 (1972) ("SEC File No. 4–148") ....................................... 300, 303

U.S. Securities and Exchange Commission Staff Legal Bulletin No. 10, Aug. 25,
2000 *available at* http://www.sec.gov/interps/legal/slbmr10.htm ("SEC Legal
Bulletin") .........................................................300, 307, 390

NASD Rule 2330 .................................................. 313, 380, 381

NASD Rule 2440 ................................................. 313, 381

NASD Rule 2710(c) .............................................. 312, 381, 383

**LEGISLATIVE HISTORY**

141 Cong. Rec. 37801 (1995) ......................................331

78 Cong. Rec. 8716 (1934) ........................................350

S.Rep. No. 104–98 (1995) ......................................... 330, 335, 372, 374, 396

S.Rep. No. 73–792 (1934) ....................................... 299, 395

S.Rep. No. 73–47 (1933) ..........................................349

H.R. Conf. Rep. No. 104–369 (1995) ..............................358

H.R. Conf. Rep. No. 73–1383 (1934) ............................ 387, 395

H.R.Rep. No. 73–85 (1933) ..................................... 295, 349

*Federal Securities Act: Hearings before the House Interstate and Foreign Commerce Committee,* 73d Cong. 145–46 (1933) ....................................349

*Securities Act: Hearings before the Senate Banking and Currency Committee,* 73d Cong. 87–88, 149–54, 230 (1933) ...............................................350

*Legislative History of the Securities Act of 1933 and Securities Exchange Act of 1934* (J.S. Ellenberger & Ellen P. Mahar eds.1973) ...............................298

**OTHER AUTHORITIES**

**1. Dictionaries and Treatises**

*The American Heritage Dictionary of the English Language* (4th ed.2000) ...............346

*Black's Law Dictionary* (7th ed.1999) ........................................ 330, 394

*Websters Third Int'l Dictionary* (1963) ...........................................394

Arnold S. Jacobs, *Disclosure and Remedies Under the Securities Laws* (2002) ...........389

Michael J. Kaufman, *Securities Litigation: Damages* (2002) ...........................348

W. Page Keeton et al., *Prosser and Keeton on Torts* (5th ed.1984) .......................379

David L. Scott, *Wall Street Words* 326 (Rev. ed.1997) .................................310

Louis Loss & Joel Seligman, *Securities Regulation* (3d ed.1992) .................. 361, 388

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* (3d ed.1998) .. 325, 326, 328, 329

Restatement (Second) of Torts (1977) ...........................................379

**414**

## 2. Scholarly Articles

Allen, Samuel N., *A Lawyer's Guide to the Operation of Underwriting Syndicates,* 26 New Eng. L.Rev. 349 (1991) ...............................................361

Clurman, David, *Controlling a Hot Issue Market,* 56 Cornell L.Rev. 74 (1970) ...........303

Coffee, John C., *Brave New World? The Impact(s) of the Internet on Modern Securities Regulation,* 52 Bus. Law. 1195 (1997) ...................................376

Conrad, Jr., Winthrop B. and Bruce K. Dallas, *The Registration Process—Overview and Selected Considerations, in How to Prepare an Initial Public Offering 2001* 157 (Practicing Law Institute Corporate Law and Practice Course Handbook Series No. B0–01BW, 2001) ................................................312

DeSimone, Joseph, Note, *Should Fraud on the Market Theory Extend to the Context of Newly Issued Securities?,* 61 Fordham L.Rev. S151 (1993) ................377

DeValerio, Glen & Kathleen M. Donovan–Maher, *Information and Belief Pleading Under the Private Securities Litigation Reform Act of 1995,* SF86 ALI–ABA 365 (Course of Study May 10, 2001).............................................355

Douglas, William O., & George E. Bates, *The Federal Securities Act of 1933,* 43 Yale L.J. 171 (1933) .......................................................350

Hanna, John, *The Securities Exchange Act of 1934,* 23 Cal. L.Rev. 1 (1934)..............350

Ibbotson, Roger G., et al., *The Market's Problems with the Pricing of Initial Public Offerings,* 6 J. Applied Corp. Fin. (1994) .....................................300

Landis, James M., *The Legislative History of the Securities Act of 1933,* 28 Geo. Wash. L.Rev. 29 (1959) ....................................................351

Murray, Brian and Donald J. Wallace, *You Shouldn't Have To Plead More Than You Have To Prove,* 53 Baylor L.Rev. 783 (2001) .................................341

Newkirk, Robert G., Comment, *Sufficient Efficiency: Fraud on the Market in the Initial Public Offering Context,* 58 U. Chi. L.Rev. 1393 (1991) ......................377

Note, *The Fraud–on–the–Market Theory,* 95 Harv. L.Rev. 1143 (1982)..................377

Pastuszenski, Brian E., et al., *Post–PSLRA Judicial Treatment of Insider Trading Allegations as a Basis for Pleading Scienter in Securities Fraud Cases,* SG091 ALI–ABA 831 (Course of Study May 2–3, 2002) .................................367

Prentice, Robert, *Whither Securities Regulation? Some Behavioral Observations Regarding Proposals For Its Future,* 51 Duke L.J. 1397 (2002) ................. 300, 376

Ritter, Jay R., *The 'Hot Issue' Market of 1980,* 57 J. Bus. 215 (1984)....................300

Shulman, Harry, *Civil Liability and the Securities Act,* 43 Yale L.J. 227 (1933) ..........350

Steve, Thel, *The Original Conception of Section 10(b) of the Securities Exchange Act,* 42 Stan. L.Rev. 385 (1990) .....................................................298

Turnquist, Krista L., Note, *Pleading Under Section 11 of the Securities Act of 1933,* 98 Mich. L.Rev. 2395 (2000) ..................................................341

Wysocki, Sandra P., Note, *Controlling Personal Liability of Directors Under Section 20(A) of the Securities Exchange Act of 1934*, 31 Suffolk U.L.Rev. 695 (1998) .......................................................................393

3. **Newspaper Articles**

*D.H. Blair Ex–Broker Pleads Guilty to Charges of Stock Fraud in IPOs*, Wall. St. J., June 6, 2001, at B10 ..........................................................358

Greg Ip, et al., *Internet Bubble Broke Records, Rules and Bank Accounts*, Wall St. J., July 14, 2000, at A1 ......................................................358

Howard Kurtz, *Risky Business*, Wash. Post, Aug. 27, 2000, at W08 .....................358

Suzanne McGee, *Venture Capitalists 'R' Us: CacheFlow: The Life Cycle of a Venture–Capital Deal*, Wall St. J., Feb. 22, 2000 at C1, *available at* 2000 WL–WSJ 3018799 ............................................................................309

Patrick McGeehan, *Hedge Fund Managers Said to Talk to Grand Jury*, N.Y. Times, May 11, 2001, at C1 ...............................................................316

Susan Pulliam & Randall Smith, *Linux Deal is Focus of IPO–Commission Probe*, Wall St. J., Dec. 12, 2000, at C1 ..............................................358

Susan Pulliam, et al. *SEC Intensifies Inquiry into Commissions for Hot IPOs— Goldman, Bear Stearns and Morgan Stanley Get Requests for Data*, Wall St. J., Dec. 13, 2000, at C1 .............................................................. 358, 359

Susan Pulliam & Randall Smith, *Trade Offs: Seeking IPO Shares, Investors Offer to Buy More in After–Market*, Wall St. J., Dec. 6, 2000, at A1 .........................359

Susan Pulliam & Randall Smith, *Trying to Avoid the Flippers*, Wall St. J., Dec. 6, 2000 ....................................................................... 294, 307

Susan Pulliam & Randall Smith, *U.S. Probes Inflated Commissions for Hot IPOs*, Wall St. J., Dec. 7, 2000 ........................................................308

Neil Roland, *Credit Suisse Pays US$100M Over IPOs: Avoids Fraud Charges*, Nat'l Post, Jan. 23, 2002, at FP16 ....................................................359

Randall Smith & Susan Pulliam, *U.S. Probes Inflated Commissions for Hot IPOs*, Wall St. J., Dec. 7, 2000, at C1 ..................................................359

Bruce Weber, *Burning Bridges and Bridging Disasters: Lampooning@disorganization.com*, N.Y. Times, May 14, 2002 ...............................................306

4. **Miscellaneous**

Lewis Carroll, *Through the Looking Glass* ...........................................383

John Cassidy, *Dot.con: The Greatest Story Ever Sold* (2002) ..........................306

Lori Gottlieb & Jesse Jacobs, *Inside the Cult of Kibu: And Other Tales of the Millennial Gold Rush* (2002) .......................................................306

Casey Kait & Stephen Weiss, *Digital Hustlers: Living Large and Falling Hard in Silicon Alley* (2001) ..............................................................306

David Kuo, *dot.bomb: My Days and Nights at an Internet Goliath* .....................306

*Arthur Levitt, Remarks before the 2000 Annual Meeting of the Securities Industry Association* (Nov. 9, 2000) ............................................................ 303

Michael Lewis, *The New New Thing: A Silicon Valley Story* (2001) .................... 306

Stephan Paternot, *A Very Public Offering: A Rebel's Story of Business Excess, Success and Reckoning* (2001) ........................................................ 306

Madsen Pirie, *The Book of the Fallacy: A Training Manual for Intellectual Subversives* (1985) .................................................................. 388

Jay Ritter, *Big Runups of 1975–2000* (Aug.2001) *available at* http://bear.cba.ufl.edu/ritter/runup750.pdf ......................................... 306

Jay Ritter, *IPO Data, at* http://bear.cba.ufl.edu/ritter/ipodata.htm ...................... 300

Jay Ritter, *Money Left on the Table in IPOs,* Working Paper (Jan. 14, 2003), *available at* http://bear.cba.ufl.edu/ritter/work_papers/monew.pdf ................... 369

Jay Ritter & Tim Loughran, *Why Has IPO Underpricing Changed Over Time?,* Working Paper (Jan. 16, 2003), available at http://bear.cba.ufl.edu/ritter/work_papers/whynew.pdf ............................................................... 293

*Behind the Startup: IceVan.com* (Sharon Zezima & Kal Deutsch 2002), available at http://www.icevan.com/ ............................................................ 306

*Dotcom: Hot Tubs, Pork Chops and Valium* (Brett Singer & Simeon Schnapper 2002) ................................................................................ 306

*E–Dreams* (Wonsuk Chin & Sam Pai 2002) ........................................ 306

*Proverbs* 21:23 (New International Version) ........................................ 324

*Start-up.com* (Artisan Entertainment 2001) ........................................ 306

*What Happened* (The Means of Production, Inc.2002) ............................... 306

### *Appendix 1: Captions*
### *CASES CONSOLIDATED AS IN RE INITIAL PUBLIC OFFERING SECURITIES LITIGATION, 21 MC 92*

In re 724 Solutions, Inc. IPO Sec. Litig., 01 Civ. 5333
In re Accelerated Networks, Inc. IPO Sec. Litig., 01 Civ. 5644
In re Aclara Biosciences, Inc. IPO Sec. Litig., 01 Civ. 10050
In re Aether Systems, Inc. IPO Sec. Litig., 01 Civ. 5570
In re Agency.com, Ltd. IPO Sec. Litig., 01 Civ. 5902
In re Agile Software Corp. IPO Sec. Litig., 01 Civ. 9413
In re Agilent Technologies, Inc. IPO Sec. Litig., 01 Civ. 10639
In re AirGate PCS Inc. IPO Sec. Litig., 01 Civ. 9801
In re Airnet Communications Corp. IPO Sec. Litig., 01 Civ. 10161
In re Airspan Networks, Inc. IPO Sec. Litig., 01 Civ. 6747
In re Akamai Technologies, Inc. IPO Sec. Litig., 01 Civ. 6000
In re Alamosa PCS Holdings IPO Sec. Litig., 01 Civ. 11235
In re Alloy Online, Inc. IPO Sec. Litig., 01 Civ. 9742
In re Antigenics, Inc. IPO Sec. Litig., 01 Civ. 9741
In re Apropos Technology, Inc. IPO Sec. Litig., 01 Civ. 9982
In re Ariba, Inc. IPO Sec. Litig., 01 Civ. 2359
In re Ashford.com, Inc. IPO Sec. Litig., 01 Civ. 6275

In re AsiaInfo Holdings, Inc. IPO Sec. Litig., 01 Civ. 10901
In re Ask Jeeves, Inc. IPO Sec. Litig., 01 Civ. 9422
In re Aspect Medical Systems, Inc. IPO Sec. Litig., 01 Civ. 7090
In re Audible, Inc. IPO Sec. Litig., 01 Civ. 5258
In re Autobytel.com, Inc. IPO Sec. Litig., 01 Civ. 6825
In re AutoWeb.com, Inc. IPO Sec. Litig., 01 Civ. 3360
In re Avanex Corp. IPO Sec. Litig., 01 Civ. 6890
In re AvantGo, Inc. IPO Sec. Litig., 01 Civ. 9618
In re Avenue A, Inc. IPO Sec. Litig., 01 Civ. 5446
In re Avici Systems, Inc. IPO Sec. Litig., 01 Civ. 3363
In re B2B Internet HOLDRS IPO Sec. Litig. 01 Civ. 2858
In re Backweb Technologies Ltd. IPO Sec. Litig., 01 Civ. 10000
In re Be Free, Inc. IPO Sec. Litig., 01 Civ. 10827
In re Blue Martini Software, Inc. IPO Sec. Litig., 01 Civ. 6241
In re Bookham Technology PLC IPO Sec. Litig., 01 Civ. 9883
In re Bottomline Technologies, Inc. IPO Sec. Litig., 01 Civ. 6824
In re Braun Consulting, Inc. IPO Sec. Litig., 01 Civ. 10629
In re Breakaway Solutions, Inc. IPO Sec. Litig., 01 Civ. 6397
In re Brocade Communications Systems, Inc. IPO Sec. Litig., 01 Civ. 6613
In re BSquare Corp. IPO Sec. Litig., 01 Civ. 6216
In re Buy.com, Inc. IPO Sec. Litig., 01 Civ. 6323
In re Cacheflow, Inc. IPO Sec. Litig., 01 Civ. 5143
In re Caldera Systems, Inc. IPO Sec. Litig., 01 Civ. 6271
In re Calico Commerce, Inc. IPO Sec. Litig., 01 Civ. 2601
In re Caliper Technologies Corp. IPO Sec. Litig., 01 Civ. 5072
In re Capstone Turbine Corp. IPO Sec. Litig., 01 Civ. 11220
In re Carrier1 International SA IPO Sec. Litig., 01 Civ. 10940
In re Centra Software, Inc. IPO Sec. Litig., 01 Civ. 10988
In re Chartered Semiconductor Manufacturing, Ltd. IPO Sec. Litig., 01 Civ. 10839
In re Chinadotcom Corp. IPO Sec. Litig., 01 Civ. 5937
In re Choice One Communications, Inc. IPO Sec. Litig., 01 Civ. 10576
In re Chordiant Software, Inc. IPO Sec. Litig., 01 Civ. 6222
In re Clarent Corp. IPO Sec. Litig., 01 Civ. 6322
In re Click Commerce, Inc. IPO Sec. Litig., 01 Civ. 11234
In re Cobalt Networks IPO Sec. Litig., 01 Civ. 10971
In re Commerce One, Inc. IPO Sec. Litig., 01 Civ. 5575
In re CommTouch Software, Inc. IPO Sec. Litig., 01 Civ. 7044
In re Concur Technologies, Inc. IPO Sec. Litig., 01 Civ. 6828
In re Copper Mountain Networks, Inc. IPO Sec. Litig., 01 Civ. 10943
In re Corio, Inc. IPO Sec. Litig., 01 Civ. 10686
In re Corvis Corp. IPO Sec. Litig., 01 Civ. 3857
In re CoSine Communications, Inc. IPO Sec. Litig., 01 Civ.10105
In re Covad Communications Group, Inc. IPO Sec. Litig., 01 Civ. 5834
In re Critical Path, Inc. IPO Sec. Litig., 01 Civ. 6542
In re CyberSource Corp. IPO Sec. Litig., 01 Civ. 7000
In re Daleen Technologies, Inc. IPO Sec. Litig., 01 Civ. 10944
In re Data Return Corp. IPO Sec. Litig., 01 Civ. 10107
In re deCode Genetics, Inc. IPO Sec. Litig., 01 Civ. 11219
In re Delano Technology Corp. IPO Sec. Litig., 01 Civ. 7180
In re Deltathree.com, Inc. IPO Sec. Litig., 01 Civ. 5425
In re Dice, Inc. (Earthweb) IPO Sec. Litig., 01 Civ. 9747
In re Digimarc Corp. IPO Sec. Litig., 01 Civ. 3792
In re Digital Impact, Inc. IPO Sec. Litig., 01 Civ. 4942
In re Digital Insight Corp. IPO Sec. Litig., 01 Civ. 11231
In re Digital Island, Inc. IPO Sec. Litig., 01 Civ. 6887
In re Digital River, Inc. IPO Sec. Litig., 01 Civ. 7355
In re DigitalThink, Inc. IPO Sec. Litig., 01 Civ. 9619
In re Digitas, Inc. IPO Sec. Litig., 01 Civ. 5948
Vicki M. Muller, et al. v. Diversa Corp., et al., 02 Civ. 9699

In re DoubleClick, Inc. IPO Sec. Litig., 01 Civ. 3980
In re DrKoop.com, Inc. IPO Sec. Litig., 01 Civ. 6242
In re Drugstore.com, Inc. IPO Sec. Litig., 01 Civ. 5838
In re E–LOAN, Inc. IPO Sec. Litig., 01 Civ. 7467
In re E.piphany, Inc. IPO Sec. Litig., 01 Civ. 6158
In re eBenx, Inc. IPO Sec. Litig., 01 Civ. 9411
In re EGain Communications Corp. IPO Sec. Litig., 01 Civ. 9414
In re El Sitio, Inc. IPO Sec. Litig., 01 Civ. 5089
In re Eloquent, Inc. IPO Sec. Litig., 01 Civ. 6775
In re Engage Technologies, Inc. IPO Sec. Litig., 01 Civ. 8404
In re Equinix, Inc. IPO Sec. Litig., 01 Civ. 7002
In re eToys, Inc. IPO Sec. Litig., 01 Civ. 5911
In re Evolve Software, Inc. IPO Sec. Litig., 01 Civ. 9800
In re Exchange Applications, Inc. IPO Sec. Litig., 01 Civ. 9516
In re Exfo Electro Optical Engineering, Inc. IPO Sec. Litig., 01 Civ. 10684
In re Expedia, Inc. IPO Sec. Litig., 01 Civ. 4973
In re Extensity, Inc. IPO Sec. Litig., 01 Civ. 11246
In re Extreme Networks, Inc. IPO Sec. Litig., 01 Civ. 6143
In re F5 Networks, Inc. IPO Sec. Litig., 01 Civ. 7055
In re Fairmarket, Inc. IPO Sec. Litig., 01 Civ. 6948
In re Fatbrain.com, Inc. IPO Sec. Litig., 01 Civ. 10164
In re Finisar Corp. IPO Sec. Litig., 01 Civ. 10813
In re FirePond, Inc. IPO Sec. Litig., 01 Civ. 7048
In re FlashNet Communications, Inc. IPO Sec. Litig., 01 Civ. 10738
In re Focal Communications Corp. IPO Sec. Litig., 01 Civ. 10111
In re Foundry Networks, Inc. IPO Sec. Litig., 01 Civ. 10640
In re FreeMarkets, Inc. IPO Sec. Litig., 01 Civ. 7039
In re Gadzoox Networks, Inc. IPO Sec. Litig., 01 Civ. 5039
In re Gigamedia Ltd. IPO Sec. Litig., 01 Civ. 10884
In re Global Crossing, Ltd. IPO Sec. Litig., 01 Civ. 7023
In re GlobeSpan, Inc. IPO Sec. Litig., 01 Civ. 10741
In re GoTo.com, Inc. IPO Sec. Litig., 01 Civ. 6339
In re GRIC Communications, Inc. IPO Sec. Litig., 01 Civ. 6771
In re GT Group Telecom, Inc. IPO Sec. Litig., 01 Civ. 9748
In re Handspring, Inc. IPO Sec. Litig., 01 Civ. 7033
In re High Speed Access Corp. IPO Sec. Litig., 01 Civ. 9743
In re Hoover's, Inc. IPO Sec. Litig., 01 Civ. 10122
In re iBasis, Inc. IPO Sec. Litig., 01 Civ. 6272
In re iBeam Broadcasting Corp. IPO Sec. Litig., 01 Civ. 6842
In re iManage, Inc. IPO Sec. Litig., 01 Civ. 6277
In re Immersion Corp. IPO Sec. Litig., 01 Civ. 9975
In re IMPSAT Fiber Networks, Inc. IPO Sec. Litig., 01 Civ. 9710
In re Informatica Corp. IPO Sec. Litig., 01 Civ. 9922
In re InforMax, Inc. IPO Sec. Litig., 01 Civ. 10834
In re Inforte Corp. IPO Sec. Litig., 01 Civ. 10836
In re Inrange Technologies Corp. IPO Sec. Litig., 01 Civ. 10800
In re InsWeb Corp. IPO Sec. Litig., 01 Civ. 10969
In re Integrated Information Systems, Inc. IPO Sec. Litig., 01 Civ. 6120
In re Integrated Telecom Express, Inc. IPO Sec. Litig., 01 Civ. 10108
In re InterNAP Network Services Corp. IPO Sec. Litig., 01 Civ. 6084
In re Internet Capital Group, Inc. IPO Sec. Litig., 01 Civ. 3975
In re Internet Infrastructure HOLDRS IPO Sec. Litig., 01 Civ. 7654
In re Internet Initiative Japan IPO Sec. Litig., 01 Civ. 10974
In re Intersil Holding Corp. IPO Sec. Litig., 01 Civ. 5144
In re InterTrust Technologies Corp. IPO Sec. Litig., 01 Civ. 4187
In re Interwave International Ltd. IPO Sec. Litig., 01 Civ. 10598
In re Interwoven, Inc. IPO Sec. Litig., 01 Civ. 9917
In re Intraware, Inc. IPO Sec. Litig., 01 Civ. 9349
In re iPrint Technologies, Inc. (F/k/a Iprint.com) IPO Sec. Litig., 01 Civ. 5365

In re iTXC Corp. IPO Sec. Litig., 01 Civ. 6892
In re iVillage, Inc. IPO Sec. Litig., 01 Civ. 4974
In re iXL Enterprises, Inc. IPO Sec. Litig., 01 Civ. 9417
In re Jazztel P.L.C. IPO Sec. Litig., 01 Civ. 10983
In re JNI Corp. IPO Sec. Litig., 01 Civ. 10740
In re Juniper Networks, Inc. IPO Sec. Litig., 01 Civ. 10899
In re Kana Software, Inc. IPO Sec. Litig., 01 Civ. 6822
In re Keynote Systems, Inc. IPO Sec. Litig., 01 Civ. 7666
In re Korea Thrunet Co., Ltd. IPO Sec. Litig., 01 Civ. 9442
In re Lante Corporation, Inc. IPO Sec. Litig., 01 Civ. 7046
In re Latitude Communications, Inc. IPO Sec. Litig., 01 Civ. 10121
In re Lexent, Inc. IPO Sec. Litig., 01 Civ. 9440
In re Liberate Technologies, Inc. IPO Sec. Litig., 01 Civ. 4147
In re Lionbridge Technologies, Inc. IPO Sec. Litig., 01 Civ. 6770
In re Liquid Audio, Inc. IPO Sec. Litig., 01 Civ. 6661
In re Looksmart, Ltd. IPO Sec. Litig., 01 Civ. 7030
In re Loudeye Technologies, Inc. IPO Sec. Litig., 01 Civ. 6872
In re Manufacturers Services Ltd. IPO Sec. Litig., 01 Civ. 11000
In re Marimba, Inc. IPO Sec. Litig., 01 Civ. 3483
In re MarketWatch.com, Inc. IPO Sec. Litig., 01 Civ. 3225
In re Martha Stewart Living Omnimedia IPO Sec. Litig., 01 Civ. 10900
In re Marvell Technologies IPO Sec. Litig., 01 Civ. 7053
In re MatrixOne, Inc. IPO Sec. Litig., 01 Civ. 6757
In re Maxygen, Inc. IPO Sec. Litig., 01 Civ. 10990
In re McAfee.com Corp. IPO Sec. Litig., 01 Civ. 7034
In re McData Corp. IPO Sec. Litig., 01 Civ. 6627
In re MCK Communications, Inc. IPO Sec. Litig., 01 Civ. 11230
In re Mediaplex, Inc. IPO Sec. Litig., 01 Civ. 6301
In re MedicaLogic, Inc. IPO Sec. Litig., 01 Civ. 7726
In re MetaSolv Software, Inc. IPO Sec. Litig., 01 Civ. 9651
In re Metawave Communications Corp. IPO Sec. Litig., 01 Civ. 9799
In re Microtune, Inc. IPO Sec. Litig., 01 Civ. 6823
In re Modem Media, Inc. IPO Sec. Litig., 01 Civ. 7201
In re MP3.com, Inc. IPO Sec. Litig., 01 Civ. 4183
In re Multex.com, Inc. IPO Sec. Litig., 01 Civ. 3910
In re NaviSite, Inc. IPO Sec. Litig., 01 Civ. 5374
In re Neoforma.com, Inc. IPO Sec. Litig., 01 Civ. 6689
In re Net Perceptions, Inc. IPO Sec. Litig., 01 Civ. 9675
In re Net2000 Communications, Inc. IPO Sec. Litig., 01 Civ. 5227
In re Net2Phone, Inc. IPO Sec. Litig., 01 Civ. 7028
In re Netcentives, Inc. IPO Sec. Litig., 01 Civ. 5332
In re NetRatings, Inc. IPO Sec. Litig., 01 Civ. 9798
In re Netro Corp. IPO Sec. Litig., 01 Civ. 7035
In re NETsilicon, Inc. IPO Sec. Litig., 01 Civ. 7281
In re NetSolve, Inc. IPO Sec. Litig., 01 Civ. 11239
In re Network Engines, Inc. IPO Sec. Litig., 01 Civ. 10894
In re Netzero, Inc. IPO Sec. Litig., 01 Civ. 3358
In re New Focus, Inc. IPO Sec. Litig., 01 Civ. 5822
In re Next Level Communications, Inc. IPO Sec. Litig., 01 Civ. 6004
In re NextCard, Inc. IPO Sec. Litig., 01 Civ. 10823
In re Nextel Partners, Inc. IPO Sec. Litig., 01 Civ. 10945
In re Network Plus Corp. IPO Sec. Litig., 01 Civ. 6089
In re Niku Corp. IPO Sec. Litig., 01 Civ. 7280
In re NorthPoint Communications Group, Inc. IPO Sec. Litig., 01 Civ. 9561
In re Nuance Communications Inc. IPO Sec. Litig., 01 Civ. 7344
In re Numerical Technologies, Inc. IPO Sec. Litig., 01 Civ. 9513
In re OmniSky, Corp. IPO Sec. Litig., 01 Civ. 6660
In re OmniVision Technologies, Inc. IPO Sec. Litig., 01 Civ. 10775
In re On Semiconductor Corp. IPO Sec. Litig., 01 Civ. 6114

In re ONI Systems Corp. IPO Sec. Litig., 01 Civ. 7842
In re Onvia.com, Inc. IPO Sec. Litig., 01 Civ. 5354
In re Onyx Software Corp. IPO Sec. Litig., 01 Civ. 9560
In re OpenTV Corp. IPO Sec. Litig., 01 Civ. 7032
In re Openwave Systems, Inc. IPO Sec. Litig., 01 Civ. 9744
In re Oplink Communications, Inc. IPO Sec. Litig., 01 Civ. 9904
In re Optio Software, Inc. IPO Sec. Litig., 01 Civ. 10051
In re OraPharma, Inc. IPO Sec. Litig., 01 Civ. 9918
In re Oratec Interventions, Inc. IPO Sec. Litig., 01 Civ. 10799
In re Orchid Biosciences, Inc. IPO Sec. Litig., 01 Civ. 10575
In re Organic, Inc. IPO Sec. Litig., 01 Civ. 4778
In re OTG Software, Inc. IPO Sec. Litig., 01 Civ. 6873
In re Pac–West Telecomm, Inc. IPO Sec. Litig., 01 Civ. 11217
In re Pacific Internet Ltd. IPO Sec. Litig., 01 Civ. 11202
In re Packateer, Inc. IPO Sec. Litig., 01 Civ. 10185
In re Palm, Inc. IPO Sec. Litig., 01 Civ. 5613
In re Paradyne Networks, Inc. IPO Sec. Litig., 01 Civ. 10797
In re pcOrder, Inc. IPO Sec. Litig., 01 Civ. 10828
In re Perot Systems Corp. IPO Sec. Litig., 01 Civ. 6820
In re PlanetRx.com, Inc. IPO Sec. Litig., 01 Civ. 2621
In re Portal Software, Inc. IPO Sec. Litig., 01 Civ. 6160
In re Predictive Systems, Inc. IPO Sec. Litig., 01 Civ. 10059
In re Preview Systems, Inc. IPO Sec. Litig., 01 Civ. 7279
In re Priceline.com, Inc. IPO Sec. Litig., 01 Civ. 2261
In re Primus Knowledge Solutions, Inc. IPO Sec. Litig., 01 Civ. 11201
In re Prodigy Communications, Inc. IPO Sec. Litig., 01 Civ. 9504
In re Proton Energy Systems, Inc. IPO Sec. Litig., 01 Civ. 6082
In re PSI Technologies Holdings, Inc. IPO Sec. Litig., 01 Civ. 8401
In re PurchasePro.com, Inc. IPO Sec. Litig., 01 Civ. 10867
In re Quest Software, Inc. IPO Sec. Litig., 01 Civ. 10745
In re Quicklogic Corp. IPO Sec. Litig., 01 Civ. 9503
In re Radio One, Inc. IPO Sec. Litig., 01 Civ. 10160
In re Radio Unica Communications Corp. IPO Sec. Litig., 01 Civ. 9978
In re Radware Ltd. IPO Sec. Litig., 01 Civ. 10898
In re Ravisent Technologies, Inc. IPO Sec. Litig., 01 Civ. 10683
In re Razorfish, Inc. IPO Sec. Litig., 01 Civ. 5427
In re Red Hat, Inc. IPO Sec. Litig., 01 Civ. 2712
In re Redback Networks, Inc. IPO Sec. Litig., 01 Civ. 6090
In re Regent Communications, Inc. IPO Sec. Litig., 01 Civ. 10942
In re Register.com, Inc. IPO Sec. Litig., 01 Civ. 10120
In re Repeater Technologies, Inc. IPO Sec. Litig., 01 Civ. 10140
In re Resonate, Inc. IPO Sec. Litig., 01 Civ. 11245
In re Retek, Inc. IPO Sec. Litig., 01 Civ. 5225
In re Rhythms NetConnections, Inc. IPO Sec. Litig., 01 Civ. 6128
In re RoweCom, Inc. IPO Sec. Litig., 01 Civ. 6950
In re Saba Software, Inc. IPO Sec. Litig., 01 Civ. 10754
In re Satyam Infoway, Ltd. IPO Sec. Litig., 01 Civ. 9746
In re SciQuest.com, Inc. IPO Sec. Litig., 01 Civ. 7415
In re Selectica, Inc. IPO Sec. Litig., 01 Civ. 4941
In re Sequenom, Inc. IPO Sec. Litig., 01 Civ. 10831
In re Silicon Image, Inc. IPO Sec. Litig., 01 Civ. 10903
In re Silicon Laboratories, Inc. IPO Sec. Litig., 01 Civ. 11218
In re SilverStream Software, Inc. IPO Sec. Litig., 01 Civ. 5600
In re Sirenza Microdevices, Inc. IPO Sec. Litig., 01 Civ. 10596
In re SmartDisk Corp. IPO Sec. Litig., 01 Civ. 6870
In re SMTC Corp. IPO Sec. Litig., 01 Civ. 10838
In re SonicWALL, Inc. IPO Sec. Litig., 01 Civ. 10941
In re Sonus Networks, Inc. IPO Sec. Litig., 01 Civ. 9921
In re Spanish Broadcasting System, Inc. IPO Sec. Litig., 01 Civ. 10753

In re Stamps.com Inc. IPO Sec. Litig., 01 Civ. 4186
In re StarMedia Network, Inc. IPO Sec. Litig., 01 Civ. 6846
In re Storage Networks, Inc. IPO Sec. Litig., 01 Civ. 7181
In re Stratos Lightwave, Inc. IPO Sec. Litig., 01 Civ. 6821
In re Support.com, Inc. IPO Sec. Litig., 01 Civ. 10756
In re Switchboard, Inc. IPO Sec. Litig., 01 Civ. 10595
In re Sycamore Networks, Inc. IPO Sec. Litig., 01 Civ. 6001
In re Talarian Corp. IPO Sec. Litig., 01 Civ. 7474
In re Telaxis Communications Corp. IPO Sec. Litig., 01 Civ. 5267
In re Telecommunication Systems, Inc. IPO Sec. Litig., 01 Civ. 9500
In re TeleCorp PCS, Inc. IPO Sec. Litig., 01 Civ. 11249
In re TenFold Corp. IPO Sec. Litig., 01 Civ. 9797
In re Terra Networks, SA IPO Sec. Litig., 01 Civ. 6288
In re theGlobe.com, Inc. IPO Sec. Litig., 01 Civ. 7247
In re TheStreet.com, Inc. IPO Sec. Litig., 01 Civ. 10970
In re Tibco Software, Inc. IPO Sec. Litig., 01 Civ. 6110
In re Ticketmaster Online–Citysearch, Inc. IPO Sec. Litig., 01 Civ. 10822
In re Tickets.com, Inc. IPO Sec. Litig., 01 Civ. 6008
In re Tippingpoint Technologies, Inc. (F/k/a Netpliance) IPO Sec. Litig., 01 Civ. 10976
In re TiVo, Inc. IPO Sec. Litig., 01 Civ. 5269
In re Transmeta Corp. IPO Sec. Litig., 01 Civ. 6492
In re Triton Network Systems, Inc. IPO Sec. Litig., 01 Civ. 10115
In re Turnstone Systems, Inc. IPO Sec. Litig., 01 Civ. 9981
In re Tut Systems, Inc. IPO Sec. Litig., 01 Civ. 9563
In re UAXS Global Holdings, Inc. IPO Sec. Litig., 01 Civ. 9719
In re United Pan–Europe Communications, N.V. IPO Sec. Litig., 01 Civ. 10744
In re USInternetworking, Inc. IPO Sec. Litig., 01 Civ. 9348
In re UTStarcom, Inc. IPO Sec. Litig., 01 Civ. 9604
In re VA Linux Systems, Inc. IPO Sec. Litig., 01 Civ. 0242
In re Valicert, Inc. IPO Sec. Litig., 01 Civ. 10889
In re Valley Media, Inc. IPO Sec. Litig., 01 Civ. 9745
In re Value America, Inc. IPO Sec. Litig., 01 Civ. 5739
In re Variagenics, Inc. IPO Sec. Litig., 01 Civ. 10999
In re Ventro Corp. IPO Sec. Litig., 01 Civ. 3450
In re Verado Holdings (f/k/a Firstworld) IPO Sec. Litig., 01 Civ. 9558
In re VerticalNet, Inc. IPO Sec. Litig., 01 Civ. 5241
In re Via Net.Works, Inc. IPO Sec. Litig., 01 Civ. 9720
In re Viador, Inc. IPO Sec. Litig., 01 Civ. 10040
In re Viant Corp. IPO Sec. Litig., 01 Civ. 6403
In re Vicinity Corp. IPO Sec. Litig., 01 Civ. 6906
In re Vignette Corp. IPO Sec. Litig., 01 Civ. 9514
In re Virage, Inc. IPO Sec. Litig., 01 Civ. 7866
In re Virata Corp. IPO Sec. Litig., 01 Civ. 10833
In re Vitria Technology, Inc. IPO Sec. Litig., 01 Civ. 10092
In re Vixel Corp. IPO Sec. Litig., 01 Civ. 10053
In re WebMD (f/k/a Healtheon) IPO Sec. Litig., 01 Civ. 6768
In re WebMethods, Inc. IPO Sec. Litig., 01 Civ. 10830
In re Webvan Group, Inc. IPO Sec. Litig., 01 Civ. 6365
In re Wink Communications, Inc. IPO Sec. Litig., 01 Civ. 10638
In re Wireless Facilities, Inc. IPO Sec. Litig., 01 Civ. 4779
In re Women.com Networks, Inc. IPO Sec. Litig., 01 Civ. 10866
In re World Wrestling Federation Entertainment, Inc. IPO Sec. Litig., 01 Civ. 10972
In re XCare.net, Inc. IPO Sec. Litig., 01 Civ. 10075
In re Xpedior, Inc. IPO Sec. Litig., 01 Civ. 10984
In re Z–Tel Technologies, Inc. IPO Sec. Litig., 01 Civ. 5074
In re Ziff-davis, Inc. (CNET Networks) IPO Sec. Litig., 01 Civ. 7669

*Appendix 2: Section 11*

**Cases in Which the Section 11 Claims Are Dismissed:**

1. In re Agile Software Corp. IPO Sec. Litig.[191]
2. In re Caliper Technologies Corp. IPO Sec. Litig.
3. In re Click Commerce Inc. IPO Sec. Litig.
4. In re DigitalThink, Inc. IPO Sec. Litig.
5. In re eBenX, Inc. IPO Sec. Litig.
6. In re eGain Communications Corp. IPO Sec. Litig.
7. In re Exfo Electro Optical Engineering, Inc. IPO Sec. Litig.
8. In re GT Group Telecom, Inc. IPO Sec. Litig.
9. In re MetaSolv Software, Inc. IPO Sec. Litig.
10. In re Resonate, Inc. IPO Sec. Litig.

*Appendix 3: Section 15*

**Individual Defendants Against Whom the Section 15 Claims Are Dismissed:**

1. Agile Software Corp.: Bryan T. Stoller [192]
2. Agile Software Corp.: Thomas P. Shanahan [193]
3. GT Group Telecom, Inc.: Daniel R. Milliard
4. GT Group Telecom, Inc.: Stephen H. Shoemaker

*Appendix 4: Rule 10b–5 Claims Against Individual Defendants*

## INDIVIDUAL DEFENDANTS WHOSE MOTIONS TO DISMISS 10B–5 CLAIMS ARE DENIED:

**A. Individual Defendants for Whom Scienter Has Been Adequately Alleged:**

1. Ask Jeeves, Inc.: Robert W. Wrubel
2. Braun Consulting, Inc.: John C. Burke
3. Braun Consulting, Inc.: Thomas J. Duvall
4. Breakaway Solutions, Inc.: Keith Comerford
5. Calico Commerce, Inc.: William B. Paseman
6. Clarent Corp: Syaru Shirley Lin
7. Covad Communications Group, Inc.: Robert Knowling, Jr.
8. Covad Communications Group, Inc.: Timothy Leahy
9. Critical Path Inc.: David C. Hayden
10. Critical Path, Inc.: David A. Thatcher
11. Deltathree.com, Inc.: Mark T. Hirschorn
12. Diversa Corp.: Karen Eastham
13. Expedia, Inc.: Gregory B. Maffei
14. Extreme Networks, Inc.: Gordon L. Stitt
15. Extreme Networks, Inc.: Vito E. Palermo
16. Extreme Networks, Inc.: Peter Wolken
17. Extreme Networks, Inc.: Charles Carinalli
18. Extreme Networks, Inc.: Promod Haque
19. Foundry Networks, Inc.: Bobby R. Johnson
20. Foundry Networks, Inc.: Timothy D. Heffner
21. Gadzoox Networks, Inc.: Dr. Alistair Black
22. Gadzoox Networks, Inc.: Christian E. Munson
23. Global Crossing Ltd: Gary Winnick
24. Global Crossing Ltd: Lodwrick Cook

---

**191.** In *Agile Software,* the Section 11 claims are dismissed with respect to the IPO (First Claim) but not with respect to the Secondary Public Offering (Third Claim).

**192.** In *Agile Software,* the Section 15 claims are dismissed with respect to the IPO (Second Claim) but not with respect to the Secondary Public Offering (Fourth Claim).

**193.** In *Agile Software,* the Section 15 claims are dismissed with respect to the IPO (Second Claim) but not with respect to the Secondary Public Offering (Fourth Claim).

25. Global Crossing Ltd: David L. Lee
26. Global Crossing Ltd: Abbott L. Brown
27. Global Crossing Ltd: Barry Porter
28. Global Crossing Ltd: Hillel Weinberger
29. Global Crossing Ltd: Jack M. Scanlon
30. Global Crossing Ltd: Dan J. Cohrs
31. GlobeSpan, Inc.: Armando Geday
32. GlobeSpan, Inc.: Robert McMullen
33. GlobeSpan, Inc.: James Coulter
34. GlobeSpan, Inc.: Thomas Epley
35. IMPSAT Fiber Networks, Inc.: Enrique M. Pescaroma
36. Informatica Corp.: Guarav S. Dhillon
37. Informatica Corp: Diaz H. Nesamoney
38. iVillage, Inc.: Candice Carpenter
39. JNI Corp.: Gloria Purdy
40. MCK Communications, Inc.: Steven J. Benson
41. MCK Communications, Inc.: Paul K. Zurlo
42. Microtune, Inc.: Douglas J. Bartek
43. Microtune, Inc.: Everett Rogers
44. Net2Phone, Inc.: Clifford M. Sobel
45. NetRatings, Inc.: David A. Norman
46. Northpoint Communications Group, Inc.: Henry P. Huff
47. Openwave Systems, Inc.: Alain Rossman
48. Optio Software, Inc.: F. Barron Hughes
49. Optio Software, Inc.: Wayne Cape
50. Preview Systems, Inc.: Vincent Pluvinage
51. Retek, Inc.: John Buchanan
52. Retek, Inc.: Gregory A. Effertz
53. Rhythms Netconnections, Inc.: Scott C. Chandler
54. Rhythms Netconnections, Inc.: Catherine M. Hapka
55. Rhythms Netconnections, Inc.: John L. Walecka
56. Support.com, Inc.: Brian M. Beattie
57. Transmeta Corp.: T. Peter Thomas
58. Transmeta Corp.: Murray A. Goldman
59. Transmeta Corp.: Paul M. McNulty
60. USInternetworking, Inc.: Christopher McCleary
61. USInternetworking, Inc.: Stephen E. McManus
62. USInternetworking, Inc.: Andrew A. Stern
63. Value America, Inc.: Dean M. Johnson
64. Wink Communications, Inc.: Mary Agnes Wilderotter

**INDIVIDUAL DEFENDANTS WHOSE MOTIONS TO DISMISS 10B–5 CLAIMS ARE GRANTED:**

**B. Individual Defendants Not Alleged to Have Signed the Registration Statement**

1. Cobalt Networks: Gordon A. Campbell
2. Cobalt Networks: Stephen W. Dewitt
3. Cobalt Networks: Kenton D. Chow
4. Commerce One, Inc.: Thomas J. Gonzalez II
5. Covad Communications Group, Inc.: Charles McMinn
6. Foundry Networks, Inc.: H. Earl Ferguson
7. Global Crossing, Ltd: James C. Gorton
8. Global Crossing, Ltd.: Rolla P. Huff
9. iVillage, Inc.: Alison Abraham
10. JNI Corp.: Charles McKnett
11. JNI Corp.: Thomas K. Gregory
12. Openwave Systems Inc.: Malcolm Bird
13. PSI Technologies Holdings, Inc.: Helen Tiu
14. Retek, Inc.: Gordon Masson

15. Transmeta Corp.: Douglas Laird
16. Transmeta Corp: James N. Chapman
17. Webvan Group, Inc.: Robert Swan
18. Webvan Group, Inc.: Mark Holtzman

**C. Individual Defendants Not Alleged to Have Sold (and/or Owned) Shares:**

1. Agile Software Corp: Bryan T. Stolle
2. Agile Software Corp: Thomas P. Shanaham
3. B2B Internet HOLDRS: Ahmass L. Fakahany
4. B2B Internet HOLDRS: John L. Steffans
5. B2B Internet HOLDRS: E. Stanley O'Neal
6. B2B Internet HOLDRS: George A. Shieren
7. Breakaway Solutions, Inc.: Christopher H. Greendale
8. Calico Commerce, Inc.: Arthur F. Knapp
9. Calico Commerce, Inc.: Alan P. Naumann
10. Calico Commerce, Inc.: Bernard J. LaCroute
11. Calico Commerce, Inc.: William D. Unger
12. Carrier1 International SA: Mark A. Pelson
13. Carrier1 International SA: Glenn M. Creamer
14. Carrier1 International SA: Stig Johansson
15. Carrier1 International SA: Joachim W. Bauer
16. Carrier1 International SA: Victor A. Pelson
17. Carrier1 International SA: Thomas J. Wynne
18. Covad Communications Group, Inc: Frank Marshall
19. Critical Path, Inc.: Douglas T. Hickey
20. Deltathree.com, Inc.: Amos Sela
21. Deltathree.com, Inc.: Elie Wurtman
22. Deltathree.com, Inc.: Jacob Davidson
23. Deltathree.com, Inc.: Itzhak Fisher,
24. Deltathree.com, Inc.: Nir Tarlovsky
25. Deltathree.com, Inc.: Donald R. Shassian
26. Deltathree.com, Inc.: Jacob Z. Schuster
27. Deltathree.com, Inc.: Avery S. Fischer
28. Diversa Corp.: James H. Cavanaugh
29. eToys, Inc.: Edward C. Lenk
30. eToys, Inc: Steven J Schoch
31. Global Crossing, Ltd.: Joseph P. Clayton
32. Global Crossing, Ltd.: Jay R. Bloom
33. Global Crossing, Ltd.: Dean C. Kehler
34. Global Crossing, Ltd.: Jay R. Levine
35. Global Crossing, Ltd.: William D. Phoenix
36. Global Crossing, Ltd.: Bruce Raben
37. Global Crossing, Ltd.: Michale R. Steed
38. GT Group Telecom, Inc.: Daniel R. Milliard
39. GT Group Telecom, Inc.: Stephen H. Shoemaker
40. iBeam Broadcasting Corp.: Peter Desnoes
41. iBeam Broadcasting Corp.: Chris Dier
42. Immerson Corp.: Victor Viegas
43. IMPSAT Fiber Networks, Inc.: Guillermo Joffe
44. IMPSAT Fiber Networks, Inc.: Ricardo A. Verdauger
45. InforMax, Inc.: Alex Titomirov
46. Internet Initiative Japan: Koichi Suzuki
47. Internet Initiative Japan: Yasuhiro Nashi
48. Internet Infrastructure HOLDRS: Ahmass L. Fakahany
49. Internet Infrastructure HOLDRS: John L. Steffens
50. iPrint Technology, Inc. (f/k/a iPrint.com) Richard P. Farros
51. iPrint Technology, Inc. (f/k/a iPrint.com): James McCormick
52. iVillage, Inc.: Douglas McCormick

53. iVillage, Inc.: Sanjay Muraldihar
54. iVillage, Inc.: Craig T. Monaghan
55. iXL Enterprises, Inc.: U. Bertram Ellis, Jr.
56. iXL Enterprises, Inc.: M. Wayne Boylston
57. Jazztel P.L.C.: Antonio Carro
58. Jazztel P.L.C.: Miguel Salis
59. Jazztel P.L.C.: Antonio Canton
60. JNI Corp: Terry M. Flanagan
61. Korea Thrunet Co., Ltd.: Yong–The Lee
62. Korea Thrunet Co., Ltd.: Jong–Kil Kim
63. Korea Thrunet Co., Ltd.: Boo–Woong Yoo
64. Maxygen, Inc.: Russell J. Howard
65. Maxygen, Inc.: Simba Gill
66. Net2000 Communications, Inc.: Peter B. Callowhill
67. Net2000 Communications, Inc.: Clayton A. Thomas, Jr.
68. Net2000 Communications, Inc.: Clyde Heintzelman
69. Net2000 Communications, Inc.: Donald F. Clarke
70. Net2000 Communications, Inc.: Eric Geis
71. Net2000 Communications, Inc.: Reid Miles
72. Netcentives, Inc.: West Shell III
73. Netcentives, Inc.: John F. Longinotti
74. Network Plus Corp.: George Alex
75. OmniSky, Corp.: Patrick S. McVeigh
76. OmniSky, Corp.: Lawrence Winkler
77. OmniSky, Corp.: Michael Malesardi
78. Onyx Software Corp.: Sarwart H. Ramdan
79. Onyx Software Corp.: Brent R. Frei
80. Pacific Internet Ltd.: Chiam Heng Huat
81. Pacific Internet Ltd.: Nicholas Lee Meng Tuck
82. Pacific Internet Ltd.: Chan Wing Leong
83. PlanetRx.com, Inc.: William Razzouk
84. PlanetRx.com, Inc.: David Beirne
85. PlanetRx.com, Inc.: Christos Cotsakos
86. PlanetRx.com, Inc.: Michael Moritz
87. PlanetRx.com, Inc.: Steve Valenzuela
88. Preview Systems, Inc.: G. Bradford Solso
89. PSI Technologies Holdings, Inc.: Thelma Oribello
90. PSI Technologies Holdings, Inc.: Arthur Young
91. PSI Technologies Holdings, Inc.: Jose A. Concepcion III
92. Razorfish, Inc.: Jeffrey Dachis
93. Razorfish, Inc.: Per I.G. Bystedt
94. Razorfish, Inc.: Jonas Svensson
95. Razorfish, Inc.: Craig Kanarick
96. Razorfish, Inc.: Kjell Nordstrom
97. Rhythms Netconnectins, Inc.: Kevin R. Compton
98. Rhythms Netconnectins, Inc.: Keith B. Geeslin
99. Rhythms Netconnectins, Inc.: Ken L. Harrison
100. Rhythms Netconnectins, Inc.: Susan Mayer
101. Rhythms Netconnectins, Inc.: William R. Stensrud
102. Rhythms Netconnectins, Inc.: Edward J. Zander
103. Saba Software, Inc.: Terry Carlitz
104. Spanish Broadcasting System, Inc.: Raul Alarcon, Sr.
105. Spanish Broadcasting System, Inc.: Raul Alarcon, Jr.
106. Spanish Broadcasting System, Inc.: Joseph A. Garcia
107. Stratos Lightwave, Inc.: William J. McGinley
108. Transmeta Corp.: Larry R. Carter
109. Transmeta Corp.: R. Hugh Barnes
110. Transmeta Corp.: Mark K. Allen
111. Transmeta Corp.: Merle A. McClendon

112. Valicert, Inc.: Timothy Conley
113. Valicert, Inc.: Joseph Amram
114. Valley Media, Inc.: Barnet J. Cohen
115. Valley Media, Inc.: Robert R. Cain,
116. Valley Media, Inc.: J. Randolph Cerf
117. Value America, Inc: Rex Scatena
118. Value America, Inc: Thomas Morgan
119. Verado Holdings, Inc. (f/k/a Firstworld): Paul C. Adams
120. Verado Holdings, Inc. (f/k/a Firstworld): Sheldon S. Ohringer
121. Verado Holdings, Inc. (f/k/a Firstworld): Jeffrey L. Dykes
122. Virage, Inc.: Alfred J. Castino
123. Virage, Inc.: Paul G. Lego
124. Webvan Group, Inc.: Louis H. Borders
125. Webvan Group, Inc.: George T. Shaheen
126. Webvan Group, Inc.: Kevin R. Czinger
127. Women.com Networks, Inc.: Marlene McDaniel
128. World Wrestling Federation Entertainment, Inc.: Vincent K. McMahon
129. World Wrestling Federation Entertainment, Inc.: Linda E. McMahon
130. World Wrestling Federation Entertainment, Inc.: August J. Liguori
131. XPedior, Inc.: Steven M. Isaacson
132. XPedior, Inc.: James W. Crownover
133. Xpedior, Inc.: David N. Campbell

**D. Individual Defendants Whose Stock Sales Are Not Alleged with Sufficient Particularity**

1. Carrier1 International SA: Jonathan E. Dick
2. Expedia, Inc.: Richard N. Barton
3. Expedia, Inc.: Gregory S. Stanger
4. Globespan, Inc.: John Marren
5. MedicaLogic, Inc.: Frank J. Spina
6. Network Plus Corp.: Robert T. Hale, Jr.
7. Network Plus Corp.: James J. Crowley
8. Transmeta Corp: David R. Ditzel
9. Value America Inc.: Craig A. Winn
10. Value America Inc.: Glenda M. Dorchak
11. Value America Inc.: Sandra T. Watson
12. Women.com Networks, Inc.: Michael Perry

**E. Individual Defendants Alleged to Have Sold Less Than Ten Percent of Their Total Holdings**

1. Braun Consulting, Inc.: Steven J. Braun
2. Breakaway Solutions, Inc.: Gordon Brooks
3. Diversa Corp.: Jay M. Short
4. Gadzoox Networks, Inc.: Bill Sickler
5. GlobeSpan, Inc.: Keith Geeslin
6. iVillage, Inc.: Nancy Evans
7. JNI, Corp.: Eric P. Wenaas
8. MedicaLogic, Inc.: Mark K. Leavitt
9. NetRatings, Inc.: David J. Toth
10. Net2000 Communications, Inc.: Mitchell Reese
11. Network Plus Corp.: Robert T. Hale
12. Northpoint Communications Group, Inc.: Michael W. Malaga
13. Saba Software, Inc: Bobby Yazdani
14. Support.com, Inc.: Radha Basu
15. Transmeta Corp.: William P. Tai
16. Wink Communications, Inc.: Brian P. Dougherty
*Appendix 5: Rule 10b–5 Claims Against Issuers*

**A. Issuers Not Named as Defendants**

1. AirGate, PCS
2. Aspect Medical Systems, Inc.
3. B2B Internet HOLDRS
4. CommTouch Software, Inc.
5. DrKoop.com, Inc.
6. Internet Infrastructure HOLDRS
7. LookSmart, Ltd.
8. Numerical Technologies, Inc.

*ISSUER DEFENDANTS WHOSE MOTIONS TO DISMISS 10B–5 CLAIMS ARE DENIED:*

**B. Issuer Defendants for Whom Scienter Has Been Adequately Alleged:**

1. 724 Solutions, Inc.
2. Aether Systems, Inc.
3. Agile Software Corp.
4. Akamai Technologies, Inc.
5. Ask Jeeves, Inc.
6. Ashford.com, Inc.
7. Autobytel.com, Inc.
8. Avanex Corp.
9. Backweb Technologies, Ltd.
10. Be Free, Inc.
11. Bookham Technology PLC
12. Bottomline Technologies, Inc.
13. Braun Consulting, Inc.
14. Breakaway Solutions, Inc.
15. Bsquare Corp.
16. Buy.com
17. Cacheflow, Inc.
18. Caldera Systems, Inc.
19. Calico Commerce, Inc.
20. Capstone Turbine Corp.
21. Centra Software, Inc.
22. Chartered Semiconductor Manufacturing, Ltd.
23. Chinadotcom Corp.
24. Choice One Communications, Inc.
25. Chordiant Software, Inc.
26. Clarent Corp.
27. Cobalt Networks, Inc.
28. Commerce One, Inc.
29. Concur Technologies, Inc.
30. Copper Mountain Networks, Inc.
31. Covad Communications Group, Inc.
32. Critical Path, Inc.
33. CyberSource Corporation
34. Daleen Technologies, Inc.
35. Delano Technology Corp.
36. Deltathree.com
37. Dice, Inc. (Earthweb)
38. Digital Impact, Inc.
39. Digital Insight Corp.
40. Digital Island, Inc.
41. Digital River, Inc.
42. DigitalThink, Inc.

43. DoubleClick, Inc.
44. Drugstore.com, Inc.
45. El Sitio, Inc.
46. E.piphany, Inc.
47. eBenX, Inc.
48. eGain Communications Corp.
49. E-LOAN, Inc.
50. Eloquent, Inc.
51. Engage Technologies, Inc.
52. eToys, Inc.
53. Evolve Software, Inc.
54. Exchange Applications, Inc.
55. Exfo Electro Optical Engineering, Inc.
56. Expedia, Inc.
57. Extreme Networks, Inc.
58. Fatbrain.com, Inc.
59. F5 Networks, Inc.
60. Finisar Corp.
61. FirePond, Inc.
62. FreeMarkets, Inc.
63. Gadzoox Networks, Inc.
64. Global Crossing Ltd.
65. GlobeSpan, Inc.
66. GoTo.com
67. GT Group Telecom, Inc.
68. Handspring, Inc.
69. Hoover's Inc.
70. iBasis, Inc.
71. iManage, Inc.
72. Immersion Corp.
73. Informatica Corp.
74. InterNAP Network Services Corp.
75. Internet Capital Group, Inc.
76. Intersil Holding Corp.
77. InterTrust Technologies Corp.
78. Interwave International Ltd.
79. Interwoven, Inc.
80. Intraware, Inc.
81. iPrint Technologies, Inc.
82. iTXC Corp.
83. iVillage, Inc.
84. iXL Enterprises, Inc.
85. JNI Corp.
86. Juniper Network, Inc.
87. Kana Software, Inc.
88. Keynote Systems, Inc.
89. Liberate Technologies, Inc.
90. Lionbridge Technologies, Inc.
91. Liquid Audio, Inc.
92. Loudeye Technologies, Inc.
93. Manufacturers Services Ltd.
94. MarketWatch.com, Inc.
95. Marvell Technologies
96. Maxygen, Inc.
97. MCK Communications, Inc.
98. Mediaplex, Inc.
99. MedicaLogic, Inc.
100. Metawave Communications Corp.
101. Microtune, Inc.

102. Modem Media, Inc.
103. MP3.com, Inc.
104. Multex.com, Inc.
105. NaviSite, Inc.
106. Neoforma, Inc.
107. Net Perceptions, Inc.
108. Net2000 Communications, Inc.
109. Net2Phone, Inc.
110. Netcentives
111. Netro Corp.[194]
112. NETsilicon, Inc.
113. Network Engines, Inc.
114. Network Plus Corp.
115. Netzero, Inc.
116. New Focus, Inc.
117. NextCard, Inc.
118. Next Level Communications, Inc.
119. Niku Corporation
120. Nuance Communications, Inc.
121. OmniSky Corp.
122. ONI Systems Corp.
123. Onvia.com, Inc.
124. Onyx Software Corp.
125. Openwave Systems, Inc.
126. OTG Software, Inc.
127. Pacific Internet Ltd.
128. Packeteer, Inc.
129. Palm, Inc.
130. Paradyne Networks, Inc.
131. pcOrder, Inc.
132. PlanetRx.com, Inc.
133. Portal Software, Inc.
134. Predictive Systems, Inc.
135. Priceline.com, Inc.
136. Primus Knowledge Solutions, Inc.
137. Prodigy Communications, Inc.
138. PurchasePro.com, Inc.
139. Quest Software, Inc.
140. Quicklogic Corp.
141. Radio One, Inc.
142. Radware Ltd.
143. Razorfish, Inc.
144. Red Hat, Inc.
145. Redback Networks, Inc.
146. Regent Communications, Inc.
147. Register.com, Inc.
148. Retek, Inc.
149. Rhythms NetConnections, Inc.
150. RoweCom, Inc.
151. Satyam Infoway, Ltd.
152. ScieQuest.com, Inc.
153. Selectica, Inc.
154. Silicon Image, Inc.
155. Silicon Laboratories, Inc.

**194.** In the Netro case, Plaintiffs allege an acquisition that is insufficient because it occurred after December 31, 2001, but because they also allege an add-on offering, scienter is properly pleaded.

156. SilverStream Software, Inc.
157. SmartDisk Corp.
158. SMTC Corp.
159. SonicWALL, Inc.
160. Spanish Broadcasting System, Inc.
161. Stamps.com
162. StarMedia Networks, Inc.
163. StorageNetworks, Inc.
164. Sycamore Networks, Inc.
165. TeleCorp PCS, Inc.
166. Terra Networks, SA
167. theGlobe.com, Inc.
168. Tibco Software, Inc.
169. Turnstone Systems, Inc.
170. Tut Systems, Inc.
171. UAXS Global Holdings, Inc.
172. United Pan–Europe Communications, N.V.
173. USInternetworking, Inc.
174. VA Linux Systems
175. Ventro Corp.
176. VerticalNet, Inc.
177. Viant Corp.
178. Vignette Corp.
179. Virata Corp.
180. Vitria Technology, Inc.
181. WebMD (f/k/a Healtheon)
182. WebMethods, Inc.
183. Webvan Group, Inc.
184. Women.com Networks, Inc.
185. Z–Tel Technologies, Inc.

*ISSUER DEFENDANTS WHOSE MOTIONS TO DISMISS 10B–5 CLAIMS ARE GRANTED:*

**C. Issuers Against Whom There Are No Allegations of Motive**

1. Aclara Biosciences, Inc.
2. Agency.com, Ltd.
3. Agilent Technologies Inc.
4. Airnet Communications Corp.
5. Airspan Networks, Inc.
6. Alamosa PCS Holdings
7. Alloy Online, Inc.
8. Apropos Technology, Inc.
9. Audible, Inc.
10. AvantGo, Inc.
11. Avenue A, Inc.
12. Avici Systems, Inc.
13. Blue Martini Software, Inc.
14. Brocade Communications Systems, Inc.
15. Caliper Technologies Corp.
16. Carrier1 International SA
17. Click Commerce Inc.
18. Corio, Inc.
19. Corvis Corp.
20. CoSine Communications, Inc.
21. Data Return Corp.
22. deCode Genetics, Inc.
23. Digimarc Corp.
24. Digitas, Inc.

25. Diversa Corp.
26. Equinix, Inc.
27. Extensity, Inc.
28. Fairmarket, Inc.
29. Focal Communication Corp.
30. Foundry Networks, Inc.
31. GRIC Communications, Inc.
32. High Speed Access Corp.
33. IMPSAT Fiber Networks, Inc.
34. InforMax, Inc.
35. Inforte Corp.
36. InsWeb Corp.
37. Integrated Information Systems, Inc.
38. Internet Initiative Japan
39. Jazztel P.L.C.
40. Korea Thrunet Co., Ltd.
41. Lante Corporation, Inc.
42. Latitude Communications, Inc.
43. Marimba, Inc.
44. Martha Stewart Living Omnimedia, Inc.
45. MatrixOne, Inc.
46. McData Corp.
47. NetRatings, Inc.
48. NetSolve, Inc.
49. Nextel Partners, Inc.
50. NorthPoint Communications Group, Inc.
51. OmniVision Technologies, Inc.
52. On Semiconductor Corp.
53. Oplink Communications, Inc.
54. Optio Software, Inc.
55. OraPharma, Inc.
56. Oratec Interventions, Inc.
57. Orchid Biosciences, Inc.
58. Organic, Inc.
59. Pac–West Telecomm, Inc.
60. Perot Systems Corp.
61. Preview Systems, Inc.
62. Proton Energy Systems, Inc.
63. PSI Technologies Holdings, Inc.
64. Radio Unica Communications Corp.
65. Repeater Technologies, Inc.
66. Resonate, Inc.
67. Saba Software, Inc.
68. Sequenom, Inc.
69. Sirenza Microdevices, Inc.
70. Sonus Networks, Inc.
71. Stratos Lightwave, Inc.
72. Support.com, Inc.
73. Switchboard, Inc.
74. Talarian Corp.
75. TenFold Corp.
76. TheStreet.com, Inc.
77. Ticketmaster Online–Citysearch, Inc.
78. Tippingpoint Technologies, Inc.
79. TiVo, Inc.
80. Transmeta Corp.
81. Triton Network Systems, Inc.
82. UTStarcom, Inc.
83. Valicert, Inc.

84. Valley Media, Inc.
85. Value America, Inc.
86. Variagencics, Inc.
87. Verado Holdings Inc.
88. Viador, Inc.
89. Virage, Inc.
90. Vixel Corp.
91. Wink Communications, Inc.
92. World Wrestling Federation Entertainment, Inc.
93. Xcare.net, Inc.

**D. Issuers Whose Acquisitions Are Not Alleged with Sufficient Particularity**

1. Antigenics, Inc.
2. Ariba, Inc.
3. AsiaInfo Holdings, Inc.
4. AutoWeb.com, Inc.
5. FlashNet Communications, Inc.
6. Gigamedia Ltd.
7. iBeam Broadcasting Corp.
8. Inrange Technologies Corp.
9. Integrated Telecom Express, Inc.
10. Lexent, Inc.
11. McAfee.com Corp.
12. MetaSolv Software, Inc.
13. OpenTV Corp.
14. Ravisent Technologies, Inc.
15. Telecommunication Systems, Inc.
16. Tickets.com, Inc.
17. Via Net.Works, Inc.
18. Vicinity Corp.
19. Wireless Facilities, Inc.
20. XPedior, Inc.
21. Ziff–Davis, Inc. (CNET Networks)

**E. Issuer Defendants Alleged to Have Made Acquisitions After December 31, 2001**

1. Accelerated Networks, Inc.
2. Telaxis Communications Corp.

*Appendix 6: Section 20*

**Individual Defendants Against Whom the Section 20 Claims Are Dismissed:**

1. Carrier1 International SA: Glenn M. Creamer
2. Carrier1 International SA: Stig Johansson
3. Carrier1 International SA: Joachim W. Bauer
4. Carrier1 International SA: Victor A. Pelson
5. Carrier1 International SA: Mark A. Pelson
6. Carrier1 International SA: Thomas J. Wynne
7. Carrier1 International SA: Jonathan E. Dick
8. Diversa Corp.: Karen Eastham
9. Diversa Corp.: James H. Cavanaugh
10. Diversa Corp.: Jay M. Short
11. Foundry Networks, Inc.: H. Earl Ferguson
12. Foundry Networks, Inc.: Bobby R. Johnson
13. Foundry Networks, Inc.: Timothy D. Heffner
14. iBeam Broadcasting Corp.: Peter Desnoes
15. iBeam Broadcasting Corp.: Chris Dier
16. IMPSAT Fiber Networks, Inc.: Enrique M. Pescaroma

17. IMPSAT Fiber Networks, Inc.: Ricardo A. Verdaguer
18. IMPSAT Fiber Networks, Inc.: Guillermo Joffe
19. InforMax, Inc.: Alex Titomirov
20. Internet Initiative Japan: Koichi Suzuku
21. Internet Initiative Japan: Yasuhiro Nashi
22. Jazztel P.L.C.: Antonio Carro
23. Jazztel P.L.C.: Miguel Salis
24. Jazztel P.L.C.: Antonio Canton
25. Korea Thrunet Co., Ltd: Yong–The Lee
26. Korea Thrunet Co., Ltd: Jong–Kil Kim
27. Korea Thrunet Co., Ltd: Boo–Woong Yoo
28. NetRatings, Inc.: David A. Norman
29. NetRatings, Inc.: David J. Toth
30. Northpoint Communications Group, Inc.: Henry P. Huff
31. Northpoint Communications Group, Inc.: Michael W. Malaga
32. Optio Software, Inc.: F. Barron Hughes
33. Optio Software, Inc.: Wayne Cape
34. Preview Systems, Inc.: Vincent Pluvinage
35. Preview Systems, Inc.: G. Bradford Solso
36. PSI Technologies Holdings, Inc.: Arthur Young
37. PSI Technologies Holdings, Inc.: Jose A. Concepcion, III
38. PSI Technologies Holdings, Inc.: Helen Tiu
39. PSI Technologies Holdings, Inc.: Thelma Oribello
40. Saba Software, Inc.: Bobby Yazdani
41. Saba Software, Inc.: Terry Carlitz
42. Stratos Lightwave, Inc.: William J. McGinley
43. Support.com, Inc.: Brian M. Beattie
44. Support.com, Inc.: Radha R. Basu
45. Transmeta Corp.: T. Peter Thomas
46. Transmeta Corp.: Murray A. Goldman
47. Transmeta Corp.: William P. Tai
48. Transmeta Corp.: Douglas Laird
49. Transmeta Corp.: James N. Chapman
50. Transmeta Corp.: David R. Ditzel
51. Transmeta Corp.: R. Hugh Barnes
52. Transmeta Corp.: Paul M. McNulty
53. Transmeta Corp.: Mark K. Allen
54. Transmeta Corp.: Merle A. McClendon
55. Transmeta Corp.: Larry R. Carter
56. Valicert, Inc.: Joseph Amram
57. Valicert, Inc.: Timothy Conley
58. Valley Media, Inc.: Barnet J. Cohen
59. Valley Media, Inc.: Robert R. Cain
60. Valley Media, Inc.: J. Randoph Cerf
61. Value America, Inc.: Dean M. Johnson
62. Value America, Inc.: Craig A. Winn
63. Value America, Inc.: Rex Scatena
64. Value America, Inc.: Glenda M. Dorchak
65. Value America, Inc.: Sandra T. Watson
66. Value America, Inc.: Thomas Morgan
67. Verado Holdings, Inc. (f/k/a Firstworld): Sheldon S. Ohringer
68. Verado Holdings, Inc. (f/k/a Firstworld): Jeffrey L. Dykes
69. Verado Holdings, Inc. (f/k/a Firstworld): Paul C. Adams
70. Virage, Inc.: Alfred J. Castino
71. Virage, Inc.: Paul G. Lego
72. Wink Communications, Inc.: Mary Agnes Wilderotter
73. Wink Communications, Inc.: Brian P. Dougherty
74. World Wrestling Federation Entertainment, Inc.: Vincent K. McMahon
75. World Wrestling Federation Entertainment, Inc.: Linda E. McMahon

76. World Wrestling Federation Entertainment, Inc.: August J. Liguori
77. XPedior, Inc.: Steven M. Isaacson
78. XPedior, Inc.: James W. Crownover
79. Xpedior, Inc.: David N. Campbell